No. 22-2954

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____

MICHELLE FITZGERALD,

*Plaintiff-Appellant,*

v.

RONCALLI HIGH SCHOOL, INC., AND ROMAN
CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, INC.,

*Defendants-Appellees.*

_____

On Appeal from a Final Judgment of the
United States District Court for the Southern District of Indiana
Case No. 1:19-cv-04291-RLY-TAB Hon. Richard L. Young

_____

## OPENING BRIEF OF APPELLANT MICHELLE FITZGERALD

_____

MARK W. SNIDERMAN
Findling, Park, Conyers, Woody &
    Sniderman, P.C.
151 N. Delaware Street,
Suite 1520
Indianapolis, IN 46204
(317) 231-1100

RICHARD B. KATSKEE
BRADLEY GIRARD
GABRIELA HYBEL
Americans United for Separation of
    Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-3234

*Counsel for Appellant*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-2954

Short Caption: Fitzgerald v. Roncalli High School

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Michelle Fitzgerald

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Americans United for Separation of Church and State; Findling, Park, Conyers, Woody & Sniderman, P.C.; and

David T. Page

(3)    If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

n/a

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Bradley Girard     Date: 1/25/2023

Attorney's Printed Name: Bradley Girard

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑   No ☐

Address: 1310 L Street NW, Suite 200

Washington, D.C. 20005

Phone Number: (202) 466-3234     Fax Number: (202) 466-3353

E-Mail Address: girard@au.org

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-2954

Short Caption: Fitzgerald v. Roncalli High School

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Michelle Fitzgerald

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Americans United for Separation of Church and State; Findling, Park, Conyers, Woody & Sniderman, P.C.; and

David T. Page

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Richard B. Katskee    Date: 1/25/2023

Attorney's Printed Name: Richard B. Katskee

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 1310 L Street NW, Suite 200

Washington, D.C. 20005

Phone Number: (202) 466-3234    Fax Number: (202) 466-3353

E-Mail Address: katskee@au.org

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2954

Short Caption: Fitzgerald v. Roncalli High School

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Michelle Fitzgerald

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Americans United for Separation of Church and State; Findling, Park, Conyers, Woody & Sniderman, P.C.; and

    David T. Page

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: /s/ Gabriela Hybel    Date: 1/25/2023

Attorney's Printed Name:  Gabriela Hybel

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address:  1310 L Street NW, Suite 200

       Washington, D.C. 20005

Phone Number:  (202) 466-3234    Fax Number:  (202) 466-3353

E-Mail Address: hybel@au.org

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2954

Short Caption: Fitzgerald v. Roncalli High School

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Michelle Fitzgerald

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Americans United for Separation of Church and State; Findling, Park, Conyers, Woody & Sniderman, P.C.; and

David T. Page

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

n/a

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Mark W. Sniderman     Date: 1/25/2023

Attorney's Printed Name: Mark W. Sniderman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** [ ]     **No** [✓]

Address: Findling Park Conyers Woody & Sniderman, P.C., 151 North Delaware Street, Suite 1520

Indianapolis, IN 46220

Phone Number: (317) 361-4700     Fax Number: (317) 231-1106

E-Mail Address: msniderman@findlingpark.com

rev. 12/19 AK

## STATEMENT REGARDING ORAL ARGUMENT

The First Amendment's ministerial exception is an individualized, fact-intensive inquiry that looks primarily to an employee's day-to-day responsibilities. The district court applied the exception in a way that interpreted this Court's decision in *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022), as creating a new constitutional standard. Appellees Roncalli and the Archdiocese also presented additional, novel arguments under the First Amendment; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

Appellant Michelle Fitzgerald requests oral argument so that the parties will have the opportunity to assist the Court in the constitutional, statutory, and factual analysis required to resolve the appeal.

# TABLE OF CONTENTS

**Page(s)**

Circuit Rule 26.1 Disclosure Statements................................................. i

Statement Regarding Oral Argument ...................................................... v

Table of Authorities ............................................................................ viii

Introduction ........................................................................................... 1

Jurisdictional Statement......................................................................... 3

Issues Presented ..................................................................................... 3

Statement of the Case ............................................................................ 5

    A.   Factual Background.................................................................... 5

        1.   Fitzgerald gets hired without any religious qualifications..................... 5

        2.   Fitzgerald's secular work with students was the bulk of her job. ........... 6

        3.   Fitzgerald's administrative duties were overwhelmingly secular. .......... 9

        4.   Fitzgerald did not play a significant role in any of Roncalli's religious activities. .................................................... 13

        5.   Year after year, Roncalli lauded Fitzgerald's performance. .................. 15

        6.   Roncalli required Fitzgerald to sign a ministerial contract that did not reflect her past, present, or future responsibilities. Then it fired her. ....................................................... 16

    B.   Procedural Background ........................................................... 18

Summary of Argument ........................................................................ 20

Standards of Review ............................................................................ 22

Argument ............................................................................................. 22

I.   The ministerial exception does not apply............................................ 22

    A.   Fitzgerald introduced abundant evidence that she was not a minister. .................................................................................. 23

    B.   The district court misunderstood *Starkey*. .................................. 33

    C.   Deferring to contract terms and ignoring conflicting evidence do not serve the ministerial exception's purpose....................................... 38

II.   Roncalli's additional arguments are both premature and wrong. ...................... 41

    A.   Roncalli's statutory arguments fail............................................. 41

    B.   Roncalli's other First Amendment arguments fail. ......................... 45

Conclusion ........................................................................................... 49

**TABLE OF CONTENTS—continued**

**Page(s)**

Certificate of Compliance ..................................................................................

Required Short Appendix ..................................................................................

    Certificate of Compliance with Rule 30....................................................

    Judgment ...............................................................................................

    Opinion and Order of the District Court ................................................

Statutory Addendum ..................................................................................

Certificate of Service......................................................................................

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Alexander v. Gardner-Denver Co.*,
    415 U.S. 36 (1974) ................................................................. 34

*Alicea-Hernandez v. Cath. Bishop of Chi.*,
    320 F.3d 698 (7th Cir. 2003) ........................................... 35, 39

*Bostock v. Clayton Cty.*,
    140 S.Ct. 1731 (2020) ..................................... 42, 43, 45, 46

*Bouldin v. Alexander*,
    82 U.S. 131 (1872) ................................................................. 46

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000) ............................................................. 48

*Boyd v. Harding Acad. of Memphis, Inc.*,
    88 F.3d 410 (6th Cir. 1996) ............................................. 43

*Bryce v. Episcopal Church in the Diocese of Colo.*,
    289 F.3d 648 (10th Cir. 2002) ......................................... 46

*Christian Legal Soc'y v. Walker*,
    453 F.3d 853 (7th Cir. 2006) ........................................... 48

*Clackamas Gastroenterology Assocs., P.C. v. Wells*,
    538 U.S. 440 (2003) ............................................................. 34

*Cline v. Cath. Diocese of Toledo*,
    206 F.3d 651 (6th Cir. 2000) ....................................... 43, 44

*DeMarco v. Holy Cross High Sch.*,
    4 F.3d 166 (2d Cir. 1993) ................................................... 44

*Demkovich v. St. Andrew the Apostle Par.*,
    3 F.4th 968 (7th Cir. 2021) (en banc) ...............22, 26, 35, 38, 40, 41, 49

*Demkovich v. St. Andrew the Apostle Par.*,
    343 F.Supp.3d 772 (N.D. Ill. 2018) ............................... 47

*DeWeese-Boyd v. Gordon Coll.*,
    163 N.E.3d 1000 (Mass. 2021)
    *cert. denied*, 142 S.Ct. 952 (2022) ............................... 35

*EEOC v. Pac. Press Pub. Ass'n*,
    676 F.2d 1272 (9th Cir. 1982) ......................................... 44

*Fed. Mut. Ins. Co. v. Coyle Mech. Supply Inc.*,
    983 F.3d 307 (7th Cir. 2020) ........................................... 41

## TABLE OF AUTHORITIES—continued

Page(s)

*Flowers v. Renfro*,
46 F.4th 631 (7th Cir. 2022) ................................................................. 22

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*,
882 F.3d 655 (7th Cir. 2018) ............................................ 5, 24, 33, 35

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ................................................................................ 48

*Hopkins v. Price Waterhouse*,
920 F.2d 967 (D.C. Cir. 1990) ............................................................. 48

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012). ..........................1, 23, 24, 25, 26, 28, 35, 36, 38, 39, 42, 47, 48

*Jackson v. Payday Fin., LLC*,
764 F.3d 765 (7th Cir. 2014) ............................................................... 34

*Johnson v. Advoc. Health & Hosps. Corp.*,
892 F.3d 887 (7th Cir. 2018) ................................................................. 5

*Joy v. Hay Grp., Inc.*,
403 F.3d 875 (7th Cir. 2005) ............................................................... 34

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*,
344 U.S. 94 (1952) ................................................................................ 45

*Kennedy v. St. Joseph's Ministries, Inc.*,
657 F.3d 189 (4th Cir. 2011) ............................................................... 43

*Listecki v. Off. Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) ............................................................... 44

*Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chi.*,
649 F.3d 539 (7th Cir. 2011) ............................................................... 22

*McCarthy v. Fuller*,
714 F.3d 971 (7th Cir. 2013) ............................................................... 46

*McClure v. Salvation Army*,
460 F.2d 553 (5th Cir. 1972) ......................................................... 35, 44

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) .............................................................................. 42

*Md. & Va. Eldership of Churches of God v. Church of God*,
396 U.S. 367 (1970) (per curiam) ...................................................... 46

*Nation Ford Baptist Church, Inc. v. Davis*,
876 S.E.2d 742 (N.C. 2022) ................................................................. 46

## TABLE OF AUTHORITIES—continued

Page(s)

*Nationwide Mut. Ins. Co. v. Darden,*
    503 U.S. 318 (1992) .................................................................. 34

*N.Y. State Club Ass'n v. City of New York,*
    487 U.S. 1 (1988) .................................................................... 48

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S.Ct. 2049 (2020) .................................................1, 2, 3, 22, 23, 24, 25, 26, 28,
    ..............................................................................31, 32, 33, 35, 36, 47, 49

*Payne v. Pauley,*
    337 F.3d 767 (7th Cir. 2003) .................................................... 5

*Presbyterian Church v. Hull Church,*
    393 U.S. 440 (1969) ................................................................ 46

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ................................................................ 48

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
    772 F.2d 1164 (4th Cir. 1985) ........................................ 39, 41, 42, 46

*Rumsfeld v. FAIR, Inc.,*
    547 U.S. 47 (2006) .................................................................. 48

*Rweyemamu v. Cote,*
    520 F.3d 198 (2d Cir. 2008) ..................................................... 44

*Schmidt v. Ottawa Med. Ctr., P.C.,*
    322 F.3d 461 (7th Cir. 2003) .................................................... 34

*Serbian E. Orthodox Diocese v. Milivojevich,*
    426 U.S. 696 (1976) ................................................................ 46

*Smith v. Lamz,*
    321 F.3d 680 (7th Cir. 2003) .................................................... 34

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.,*
    41 F.4th 931 (7th Cir. 2022)..........................................18, 22, 23, 26, 31, 33, 36, 47

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.,*
    496 F.Supp.3d 1195 (S.D. Ind. 2020) ....................................... 43

*Sterlinski v. Cath. Bishop of Chi.,*
    934 F.3d 568 (7th Cir. 2019) ........................................ 24, 35, 36, 37

*Tomic v. Cath. Diocese of Peoria,*
    442 F.3d 1036 (7th Cir. 2006) ........................................... 36, 37

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Tony & Susan Alamo Found. v. Sec'y of Lab.*,
  471 U.S. 290 (1985) .................................................................. 37

*United Mine Workers v. Gibbs*,
  383 U.S. 715 (1966) ................................................................. 3

*Watson v. Jones*,
  80 U.S. 679 (1871) ................................................................... 46

*Young v. N. Ill. Conf. of United Methodist Church*,
  21 F.3d 184 (7th Cir. 1994) .................................................... 35

**Constitutional Provisions, Statutes, and Rules**

U.S. Const. amend. I................................................................... 29

28 U.S.C. § 1291............................................................................. 3

28 U.S.C. § 1331............................................................................. 3

28 U.S.C. § 1343............................................................................. 3

28 U.S.C. § 1367............................................................................. 3

42 U.S.C. § 2000e ............................................................... 3, 41, 43

42 U.S.C. § 2000e–1 .................................................................... 42

42 U.S.C. § 2000bb................................................................ 41, 42, 44

42 U.S.C. § 2000bb–1................................................................. 44, 45

42 U.S.C. § 2000bb–2................................................................. 44, 45

Fed. R. Civ. P. 56 ........................................................................ 22

**Other Authorities**

Alliance Defending Freedom, *Protecting Your Ministry* (2018),
  https://perma.cc/2KSY-KNCC.............................................. 40

Conner & Winters, *Mitigating Risk with the Ministerial Exception*
  (Mar. 2019), https://perma.cc/5WKN-KBC2......................... 40

McGuireWoods, *U.S. Supreme Court Broadens Ministerial Exemption
  to Employment Discrimination Claims*
  (July 10, 2020), https://perma.cc/Q3EB-HV6S..................... 40

## INTRODUCTION

Shelly Fitzgerald excelled at her job as Co-Director of Guidance at Roncalli High School. Students and families trusted her to help them navigate the college-application process, select class schedules, and prepare for standardized tests. But after fourteen years of near-perfect performance reviews, Fitzgerald was fired because the Archdiocese learned that she had married a woman.

Roncalli undoubtedly discriminated against Fitzgerald. But the School asked the court to shield it from Title VII liability because—according to Roncalli—Fitzgerald was a "minister." The First Amendment guarantees religious institutions' right to determine their own religious doctrine and message. To carry out that guarantee, the ministerial exception gives those institutions the right to select, free from government intrusion, the important teachers and preachers of the faith.

The ministerial exception is tailored to that purpose: It applies only to employees who play an important role in the organization's key religious activities. Lay employees, even those who perform some religious duties, maintain their civil rights. In this way, "the First Amendment has struck the balance for us" between society's interest in preventing employment discrimination and religious groups' interest in choosing their own religious message. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 196 (2012).

At Roncalli's urging, the district court upset this balance. Time and again, the Supreme Court and this Court have made clear that the ministerial exception requires a fact-based, individualized, functional test. "What matters, at bottom, is what an employee *does*." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct.

2049, 2064 (2020) (emphasis added). Yet the district court disregarded Fitzgerald's abundant record evidence that she never performed religious duties, that Roncalli never told her to incorporate religion into her work, and that neither Roncalli nor the students or their families ever expected her to provide religious guidance.

Instead, the court concluded that Fitzgerald was a minister based on a few lines in a couple of formal employment documents. To the district court, what an employee does and what the employee is expected to do are "not material," Op. 11; all that matters is whether the employer has inserted a few rote statements in documents that employees may never have read or even seen. But under binding precedent, boilerplate employment documents do not and cannot decide the ministerial-exception question.

Roncalli also put forth scattershot constitutional and statutory arguments—each as novel as it is wrong. Its position boils down to an assertion that religious employers are simply above the law. Any of these arguments, if accepted, would allow religious employers to discriminate with impunity: Millions of lay employees—janitors, nurses, math teachers, volleyball coaches, and so many more—would lose all protections of the fundamental civil-rights laws that are supposed to shield them from discrimination on the basis of sex, race, disability, age, and veteran status. And for what?

The First Amendment rightly gives religious employers special solicitude to choose important religious figures to teach and preach the faith. It does not give them the power to choose what laws apply to them and when.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction because the case presents federal questions. *See* 28 U.S.C. §§ 1331, 1343. Specifically, Fitzgerald alleged sex discrimination under Title VII, 42 U.S.C. § 2000e *et seq.* The district court had supplemental jurisdiction over Fitzgerald's state-law claims because the state and federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *see* 28 U.S.C. § 1367(a).

Fitzgerald appeals the district court's grant of summary judgment to Defendants, which resolved all claims of all parties. The district court issued its final judgment on September 30, 2022. Fitzgerald timely filed her notice of appeal 28 days later, on October 28, 2022. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

**I.** The ministerial exception protects religious employers from liability for discrimination claims brought by employees who have been entrusted with important duties in preaching or teaching the faith. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020). The exception is an affirmative defense that requires fact-intensive inquiry to determine "what an employee does." *Id.* at 2064. There is no "rigid formula"; and "[s]imply giving an employee the title of 'minister' is not enough to justify the exception." *Id.* at 2063, 2069. Here, the district court found that "genuine disputes" remained about whether Fitzgerald—a guidance counselor responsible primarily for helping students get into college—had "any religious duties" at all, let alone important ones. Op. 11. Yet the court held that because her contract

labeled her a minister, the exception applied to bar recovery for violations of her rights under Title VII.

The first issue is whether the district court erred by holding that formal employment documents made Fitzgerald a minister as a matter of law, even though her evidence thoroughly contradicted those documents.

**II.** Roncalli also raised a slew of other First Amendment and statutory defenses in a motion for judgment on the pleadings, and again in its motion for summary judgment. At Roncalli's request, however, the district court limited discovery to the ministerial exception and did not afford Fitzgerald any opportunity to develop and present evidence on her substantive claims. So the district court denied these other defenses, reasoning that they were either inapplicable or premature because they depended on facts not in the record.

The second issue is whether the district court correctly rejected Roncalli's other defenses based on the allegations in the complaint.

## STATEMENT OF THE CASE

Because this case was decided on summary judgment, the Court must give the nonmoving party—Fitzgerald—"the benefit of conflicts in the evidence and draw[] reasonable inferences in her favor," *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 656 (7th Cir. 2018). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). And it must avoid "the temptation to decide which party's version of the facts is more likely true." *Id.*

### A. Factual Background

Shelly Fitzgerald began working as a guidance counselor at Roncalli High School in 2004 and was quickly promoted to Co-Director of the Guidance Department. 155A ¶¶ 3, 7. She continued to thrive in that role for more than a decade until she was fired for being married to a woman. 147A-54A; 176A.[1]

#### 1. Fitzgerald gets hired without any religious qualifications.

When applying to Roncalli, Fitzgerald made no mention in her cover letter of her faith, nor did she describe any experience teaching religion. 124A. Instead, her application showed her secular education: She obtained degrees from public schools— a B.S. in physical education and corporate fitness at the University of Southern Indiana and a then-pending M.S. in School Counseling at Indiana University–Purdue University, Indianapolis. 125A. She never attended a religious college, pursued a

---

[1] Citations with a page number ending in "A" are to Fitzgerald's Rule 30(b) separately bound appendix. Citations beginning with "Op." are to the district court's opinion, which is attached to this brief as part of the Rule 30(a) appendix.

5

theological degree, or held any religious posts—either before or after she began at Roncalli. 125A-126A; 155A-56A ¶¶ 5-6. Such qualifications weren't necessary for guidance counselors at Roncalli. Unlike religion teachers and other employees who provided "instruction in the essential teachings of the Catholic faith," guidance counselors were not expected to be certified catechists or to have any other religious training. 155A ¶ 5; 228A.

### 2. Fitzgerald's secular work with students was the bulk of her job.

Fitzgerald's primary job duties were indistinguishable from those of a guidance counselor at a public school. 181A ¶ 30; 187A ¶ 16; 192A ¶ 22.[2] She was responsible for scheduling students' classes, coordinating standardized tests, and providing academic, college, and career counseling. 156A ¶ 13; 179A ¶ 12. At the start of the academic year, Fitzgerald met with seniors to discuss "college applications and admissions, standardized testing, college-decision-making, and career goals." 157A ¶ 17. Because these meetings were short, Fitzgerald "had to keep the conversation focused on college and post-graduation planning." 157A ¶ 17.

Later in the fall semester, Fitzgerald would "prepar[e] for the scheduling appointments for freshmen, sophomores, and juniors" by giving presentations about the scheduling process and answering students' e-mails. 157A ¶ 20. Fitzgerald and the other guidance counselors met with freshmen, sophomores, and juniors throughout much of the spring semester. 158A ¶¶ 25-27. These meetings lasted only ten to twenty minutes and "were focused solely on academics and scheduling." 158A

---

[2] Indeed, one guidance counselor who worked with Fitzgerald and then went on to work at a public school explained that her new school's "guidance department functioned very similarly to Roncalli's." 192A ¶ 22.

¶¶ 25-27. Specifically, Fitzgerald discussed course selection, extracurriculars, college visits, and career plans with students. 158A ¶¶ 25-27. Finally, near the end of the year, Fitzgerald met with incoming freshmen to discuss their "ninth grade schedule[s], current classes, and extracurricular involvements." 160A ¶ 44; 202A ¶ 6.

The annual meetings were the only times that Fitzgerald met with most of her assigned students. 157A ¶ 16. When she met with students beyond their annual meetings, it was to discuss "study skills, test-taking skills, homework, and effort." 157A ¶ 15. For example, when one student felt stressed by her heavy courseload and many extracurriculars, she went to Fitzgerald to discuss "what [they] could do to make [the student's] schedule more manageable." 208A ¶ 13. Another student explained that he "never went to Ms. Fitzgerald with questions about religion or spirituality" and "never discussed religion during [their] counseling sessions." 203A ¶ 11. Instead, when students wished to discuss spiritual matters with an adult, they were encouraged to go to "religious sisters, a priest, the dean, the principal, or the religion teachers." 203A ¶ 12. The few times that students brought up serious personal issues during meetings with Fitzgerald, she approached the issues the way a guidance counselor at a public school would—by sending the student to the school's social worker. 160A ¶¶ 39, 42. Fitzgerald did not pray or discuss religion with students. 157A ¶ 18; 159A ¶¶ 29-33; 160A ¶¶ 40-42; *see also* 203A ¶¶ 10-13; 206A ¶¶ 11-14; 207A-08A ¶¶ 5, 7-12; 211A ¶¶ 7-8, 11-12; 216A ¶¶ 8-11.

"No one at Roncalli ever told" Fitzgerald that she should "includ[e] religion in [her] counseling work," "pray with students or suggest to students that they pray," or "give students prayer cards, rosaries, religious keychains, or other religious

memorabilia." 159A ¶¶ 30-33. Nor did she. 159A ¶¶ 30, 31, 33. She focused on the work that was assigned to her—providing academic counseling. And during her tenure, she "never received—from Roncalli or anyone else—direction or training on how to counsel on spiritual issues." 160A ¶ 36.

For its part, Roncalli made clear to the school community that religious counseling "wasn't the purpose of the Guidance Department." 196A ¶ 31. The school's website listed the services offered by the Guidance Department as academic, focused on academic counseling, planning for postsecondary opportunities, career counseling, college counseling, standardized testing, and scholarship planning. 229A-30A. And that is how students used the Guidance Department. They understood its "role to be providing academic guidance, not religious guidance," 208A ¶ 9, and getting "the college acceptance rate as high as possible," 203A ¶ 10. *See also* 159A ¶ 34; 203A ¶¶ 11-12; 206A ¶¶ 11-13; 208A ¶¶ 9-11; 212A-13A ¶¶ 19-21; 216A ¶¶ 12-15.

Though the Guidance Department's website lists "Personal Counseling" as a service offered, that function was assigned to the "Catholic Charities social worker"— a separate role from guidance counselor. 229A. Although the social worker reported to Fitzgerald, her "direct supervisor worked for Catholic Charities." 190A ¶ 7. That supervisor—not Fitzgerald—conducted the social worker's performance evaluations. 190A ¶ 7.

When students approached teachers with religious questions, the teachers sent them to the Religion Department, the Campus Minister, or the school Priest—not to the counselors in the Guidance Department. 196A ¶¶ 30-31; 200A-01A ¶¶ 17-20, 22.

In fact, one of the religion teachers proposed a brand-new role for the Guidance Department—"spiritual guidance counselor." 161A ¶ 49; *see* 229A-30A.

### 3. Fitzgerald's administrative duties were overwhelmingly secular.

As Co-Director of Guidance, Fitzgerald also had several logistical duties. She was responsible for coordinating and administering the PSAT and AP Exams, which took up a substantial portion of her time and consisted of purely administrative tasks: ordering tests, coordinating the testing day, training proctors and teachers, and returning test results. 167A-68A ¶¶ 98-100. Fitzgerald was also tasked with "preparing the master schedule of classes for the next year," which required "figuring out how many sections of each class were needed based on student interest and then fitting them into the weekly class schedule alongside teachers' planning periods and other scheduling needs." 158A ¶ 21. Nothing about class scheduling was religious. Indeed, the number of religion classes was predetermined before Fitzgerald ever began working on the schedule. 158A ¶ 22.

During the school year, Fitzgerald met weekly with Roncalli's Administrative Council. 161A ¶ 50. Her role on the Council was "to talk about logistical issues related to the work of the Guidance Department and related to academics more generally." 161A ¶ 51. For example, she contributed to discussions on "(a) the potential use of virtual learning days in place of snow days; (b) nominations and awards for academic scholarships, both internal and external; (c) logistics for the high school placement test (such as the number of children who would be participating and who would be available to proctor); (d) standardized testing; (e) the grading scale; and (f) logistics for graduation practice." 161A ¶ 51.

The Council also discussed events and challenges at the school. For example, following the Parkland school shooting, students at Roncalli proposed a walkout. 164A ¶ 67. Worried about the risk of liability, Fitzgerald proposed alternatives, including the possibility of allowing students to "gather together among themselves to talk, pray, or do whatever else they needed to do to cope without leaving campus." 164A ¶ 67; *see also* 99A:21-102:8. Fitzgerald played no other part in planning the response to the Parkland shooting, nor did she attend the event that students ultimately arranged. 164A ¶ 67.

Although to the district court Roncalli described the Administrative Council as the "lifeblood of decision-making at the school," responsible for 95% of Roncalli's daily ministry, 44A, 54A, 56A, "Fitzgerald submit[ed] considerable evidence suggesting this is not true," Op. 4; *see* 162 ¶¶ 55-57; 163A ¶ 66; 164A ¶ 68; 195A ¶¶ 22-24; 200A ¶¶ 14-15. It was the Advancement Team, not the Administrative Council, that was responsible for "deciding how Roncalli could set itself apart from public schools in the area." 164A ¶ 72. And discussions about Roncalli's religious mission were left to the Vice President of Mission and Ministry, the Campus Minister, the Campus Ministry Team, the Chaplain, and the Religion Department. 162A ¶ 59; *see also* 173A ¶ 144. And while some of the individuals in charge of Roncalli's religious mission were on the Administrative Council and occasionally discussed religious ministry with one another, Fitzgerald "was not expected to contribute" to those conversations. 162A ¶ 58; 163A ¶¶ 61-62. Nor did she. 163A ¶ 63. For example, although the Council members read and discussed *Living as Missionary Disciples*, she did not remember contributing anything to the "very brief," conversations about the book. 164A-65A

¶ 73. When discussions touched on religious matters, Fitzgerald's participation was limited to issues within her scope of expertise, such as whether counselors' professional duty of confidentiality prohibited them from notifying parents about a student's gender identity. 106A:8-107A:17; *see* 232A.

In addition to the Administrative Council, Fitzgerald also attended the school's monthly Department Chair meetings, facilitated weekly Guidance Department meetings, and served on the school's Student Assistance Program, called SAP. 165A ¶ 76; 166A ¶¶ 84, 88. None of these responsibilities required Fitzgerald to perform religious duties. For example, the Department Chair meetings, "did not include discussion of anything related to religion, including the religion curriculum," 165A ¶ 79, but were instead "focused on matters relevant to the Department Chairs for the core academic subject areas," 165A ¶ 77. As a representative of the Guidance Department, Fitzgerald's role at the meetings was to "answer questions from the other Department Chairs about standardized testing or classroom presentations on testing and scheduling." 165A ¶ 78. Likewise, guidance counselors used their department meetings to address topics relevant to their work, including scheduling appointments, standardized tests, graduation requirements, and college applications. 188A ¶¶ 28-29; 192A ¶¶ 20-21; 223A-27A (sample meeting agendas). The counselors did not address religious topics. 166A ¶ 85; 188A ¶ 29; 192A ¶ 21; 223A-27A. Nor did Fitzgerald lead the counselors in prayer. 117A:12-13; *see also* 166A ¶ 86; 188A ¶ 30.

And although Roncalli asserted to the district court that SAP addressed students' religious concerns and personal struggles, 39A-40A, staff at Roncalli disagreed, 191A ¶ 9; *see also* 180A ¶¶ 19-21. "Instead, students with religious or spiritual issues would

generally reach out to the Chaplain, the Campus Minister, the Vice President of Mission and Ministry, or a religion teacher." 167A ¶ 93. SAP primarily addressed students' issues with alcohol, drugs, and academics. 166A ¶¶ 89-90; 191A ¶ 8. One student who participated in the SAP program described it as "exclusively a program for drug testing students." 203A ¶¶ 15-16; *see also* 208A ¶ 15; 219A ¶ 16.

Fitzgerald also took steps to ensure that she and other guidance counselors could get raises. 169A ¶¶ 111-12, 115. They asked to be included in the "Catholic Educator Advancement Program"—CEAP—Roncalli's method for evaluating performance and mapping career advancement, and, importantly, the only method for getting pay raises. 169A ¶ 112. Fitzgerald helped adjust CEAP to fit the roles and duties of guidance counselors. 169A ¶ 115. Principal Weisenbach told her that she could not remove the "Spirit of Roncalli Formation" metric—not for any religious reasons—but because it would be unfair to the teachers. 169A ¶ 113. When Fitzgerald saw that Weisenbach was uncertain and was not treating CEAP for the counselors as a priority, Fitzgerald volunteered to go through the process herself to confirm that it would work for the other counselors. 169A ¶ 115.

At no point while completing CEAP did any of the evaluations involve religious criteria. 169A ¶¶ 116-20. While, as part of her self-assessment, Fitzgerald stated that she would have "no problems sharing [her] beliefs and [her] love of God," 116A:3-4, she testified that though she may have been *willing* to share her faith, that simply wasn't part of her job, 116A:14-17. The district court noted that "the exact meaning and truthfulness of [Fitzgerald's] self-evaluation is genuinely at issue." Op. 7.

Meanwhile, Roncalli's leadership proposed the possibility of moving guidance counselors to hourly pay, which would require them to track their hours and go unpaid during the summer. In response, Fitzgerald's Co-Director of Guidance, Starkey, sent a letter explaining why guidance counselors should qualify for the same salary contract as teachers had. 110A:4-12. Although the letter included some language suggesting that guidance counselors performed the same tasks as teachers, including ministerial duties, 113A:13-14, Fitzgerald testified that she disagreed with the letter's description of her work and that Starkey added her signature without her permission, 108A:3-09A:7; 115A:14-22; 170A ¶ 124.

### 4. Fitzgerald did not play a significant role in any of Roncalli's religious activities.

Because Roncalli is a religious school, it hosted various religious events throughout the year. Fitzgerald attended some, but far from all, of these religious events.

For example, Roncalli hosted "an annual faculty meeting at the beginning of each school year, known as a Day of Reflection." 194A ¶ 8; 174A ¶ 153. The day started with a nuts-and-bolts session at which "Principal Weisenbach would talk about news, policies, and updates for the new school year," and was followed by religious sessions. 175A ¶ 154, Op. 5-6. Fitzgerald attended only the nuts-and-bolts part of the day; Weisenbach excused the guidance counselors from everything else so that they could focus on senior appointments. 175A ¶ 155; Op. 6.

Fitzgerald's attendance at other religious events throughout the year was sparse. And when she went, she did not perform any leadership or religious duties, nor was she expected to. For example, she attended some of the school's liturgies—which were

13

open to the students, staff, and the broader Roncalli community—but only when her workload permitted. 173A ¶ 137. Her participation "was the same as it would be for any ordinary attendee at a Catholic Mass." 173A ¶ 138. She "never distributed communion or ashes, gave the readings, sang in the choir, or delivered prayer," but instead "sat in the back separate from the students." 173A ¶ 138.

Roncalli also hosted regular retreats for seniors throughout each school year. Fitzgerald attended only one senior retreat during her fourteen-year tenure, at which she "was an observer instead of an adult leader." 174A ¶ 146. At one point during the retreat, she presented a "Graph of Life" talk and discussed the ups and downs of her own life. 174A ¶ 148. Students who attended did not see the adult volunteers as religious leaders. 209A ¶ 18; 216A-17A ¶¶ 19-20. Nor did the school encourage them to; it was student leaders, not adults, who led group discussions. 174A ¶ 147.

Fitzgerald also sometimes discussed her faith in a personal capacity with Weisenbach, with whom she had developed a close friendship during their many years working together. Although staff were not expected to set personal goals, Fitzgerald sometimes included these when preparing for her performance reviews and discussed them with Weisenbach. 168A ¶¶ 108. Fitzgerald recalled only one year in which her voluntary, personal goal related to her faith. 168A-69A ¶ 109; *see also* 144A-52A. Similarly, Weisenbach and she exchanged book recommendations, some of which addressed "religious and theological topics." 46A; 176A ¶ 165. They discussed these books as friends, based on their years-long relationship. 176A ¶¶ 164-65; *see also* 120A:21-21A:17.

**5.  Year after year, Roncalli lauded Fitzgerald's performance.**

"At no point" during Fitzgerald's tenure did Weisenbach tell Fitzgerald that she or any of the other guidance counselors "needed to pray with students, talk about God or religion in [their] counseling appointments, or otherwise perform [their] counseling work from a religious perspective." 161A ¶ 49.

On the contrary, Fitzgerald repeatedly received overwhelmingly positive feedback from her supervisors, colleagues, and students. *See, e.g.*, 144A-52A; 168A ¶¶ 106-07; 183A ¶ 45; 189A ¶ 36; 196A ¶ 33; 201A ¶ 23; 211A ¶ 6; 213A ¶ 29; 215A ¶ 7. In 2017, for example, Principal Weisenbach wrote that he did "not believe [he] ha[d] ever received more positive comments about an employee when seeking feedback than [he] did when getting feedback from folks about their working with [Fitzgerald]!!" 144A. He lauded Fitzgerald on several fronts, including her "unmatched combination of organization and efficiency," her efforts to move the school's scheduling on-line, and her problem-solving skills. 145A, 150A.

"Not one positive comment or performance evaluation references religious or ministry work with students or as part of her official duties. Nor did any comments reflect the need to incorporate religious teachings into her work." Op. 7; *see also* 144A-53A. Roncalli never criticized Fitzgerald for not praying with students, for not incorporating the faith into her counseling work, or for not spending time on students' religious issues. 159A-61A ¶¶ 29-32, 36, 41, 49. Likewise, none of Fitzgerald's evaluations under CEAP addressed any religious criteria or personal counseling. 169A ¶ 116-18. The CEAP completion letter she received when she was promoted to

15

Distinguished School Counselor did not mention her performing any religion-related tasks or even hint that she should incorporate religion into her work. 154A.

### 6. Roncalli required Fitzgerald to sign a ministerial contract that did not reflect her past, present, or future responsibilities. Then it fired her.

Despite Fitzgerald's secular duties, she and the rest of the Guidance Department were required in late May 2018 to sign a ministry contract. 127A-28A; *see* 171A ¶ 127; 182A ¶ 37; 187A ¶¶ 17-18. The contract referenced a ministerial description, which stated that she was expected to "facilitate[] faith formation" at Roncalli. 127A; 129A. But Fitzgerald was not given the opportunity to share input, negotiate the terms, or even read the ministry description before signing the contract. *See* 171A ¶ 128; 182A-83A ¶¶ 37-38, 42; 188A ¶ 23. And no one explained the contract to her. 171A ¶ 129.[3]

The ministry description did not align with what the school had previously expected of guidance counselors. 170A ¶ 123; 171A-72A ¶¶ 130-32; 182A-83A ¶¶ 37-42; 187A ¶¶ 19-21; 229A-30A. Fitzgerald was never instructed to incorporate religious guidance into her work with students—not before she was required to sign the ministry contract, and importantly, not after either. *See, e.g.*, 144A-52A; 168A ¶ 107; 170A ¶ 122; 171A-72A ¶¶ 130-32; 189A ¶ 36. For example, when conducting student meetings, Fitzgerald followed the checklist provided by Roncalli, which

---

[3] Likewise, a year or two earlier, during the middle of the school year, Roncalli dropped ministerial contract addendums in every teacher's mailbox without warning and without explanation. 194A ¶ 14. The teachers received the contracts on Monday and were required to sign and return them by Friday as a condition of keeping their jobs. 194A-95A ¶¶ 14, 16. Roncalli offered no explanation or opportunity for negotiation. 194A-95A ¶¶ 14, 16. And when one teacher approached the Dean of Students to raise concerns—namely that she did not consider herself a minister and that some of her religious views differed from those of the Catholic Church—he simply told her that she "had nothing to worry about." 195A ¶ 15.

16

included topics like college planning and class scheduling, and did not mention any personal or spiritual matters or functions. 159A-60A ¶¶ 29-36, 41, 45. The School did not instruct guidance counselors to do their jobs differently or incorporate religion into their work after they were made to sign the ministry contract. 170A ¶ 122; 172A ¶¶ 132-33.

Mere months later, and after fourteen years of receiving stellar performance evaluations and consistently positive feedback on her work, Fitzgerald was unceremoniously fired from Roncalli. In August 2018, Weisenbach and Roncalli President Joe Hollowell informed her that the Archdiocese had learned of her marriage to her wife. 176A ¶ 167. They gave her four options. She could: (a) dissolve her marriage; (b) resign; (c) be fired immediately; or (d) if she stayed quiet, finish out her contract and continue working with students for the rest of the year—and *then* be fired. 176A ¶ 167. Fitzgerald discussed the meeting with a few close colleagues but did not make any public statements about it. 176A ¶ 169. Then, contrary to what Weisenbach and Hollowell had told her, Roncalli issued a press release explaining that Fitzgerald had been placed on administrative leave. 176A ¶ 170. It banned her from the school campus, locked her out of her work e-mail account, and placed an advertisement for a replacement. 7A ¶¶ 57, 59, 60. Roncalli later told Fitzgerald that her contract would not be renewed. 176A ¶ 171. It also barred her father, a longtime volunteer at Roncalli, from continuing his volunteer work, 12A-13A ¶¶ 100-05, which caused deep emotional harm to both Fitzgerald and her father, 13A ¶¶ 104, 106.

## B. Procedural Background

Fitzgerald sued Roncalli and the Archdiocese, arguing that the School violated Title VII, Title IX, and Indiana state law when it fired her for being a woman married to another woman and when it retaliated against her for opposing that discrimination. 1A-18A.

Roncalli filed a motion for judgment on the pleadings, 19A-20A, which the district court granted in part and denied in part, 21A-26A. The district court held that Fitzgerald had alleged sufficient facts to support her Title VII claims of sex discrimination, retaliation, and hostile work environment. 25A. It further held that Title VII's religious exemption did not bar her Title VII claims, but that Title VII preempted her Title IX retaliation claims. 25A-26A. Finally, the court held that it would be premature to decide whether the First Amendment barred her claims, because that analysis requires facts that were not yet in the record. 25A.

Separately, Fitzgerald sought to intervene in *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, a case brought by Fitzgerald's Co-Director of Guidance, Lynn Starkey, challenging similar discrimination by the School. Mot. of Michelle Fitzgerald to Intervene as Pl.-Appellee, No. 20-3265 (7th Cir. July 22, 2021), ECF 20. Roncalli successfully opposed Fitzgerald's motion to intervene, arguing that "Fitzgerald's case" and the one "involving Lynn Starkey . . . originate from two separate incidents." Resp. to Proposed Intervenor's Mot. to Intervene, ECF 23.[4]

---

[4] Starkey's and Fitzgerald's cases continued separately in the district court. The court granted Roncalli summary judgment in *Starkey* but did not decide this case until thirteen months later. In the interim, Starkey appealed to this Court, resulting in a decision for Roncalli. *See Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022).

At Roncalli's urging, the district court bifurcated discovery and ordered the parties to proceed only on the applicability of the ministerial exception. ECF 117. After that narrowly circumscribed discovery, Roncalli moved for summary judgment, arguing that Fitzgerald was a minister, and renewing the other arguments that it had made—and the court had rejected as premature—in the Motion for Judgment on the Pleadings. ECF 118.

Granting Roncalli summary judgment on the ministerial exception, the district court explained that factual "disputes abound" and spent eleven of thirteen pages describing those disputes in detail. Op. 7. For example, the court determined that there remains "an issue of fact about whether the department meetings and her supervisory duties required religious action by Fitzgerald[,] . . . whether Fitzgerald helped develop religious standards for evaluating guidance counselors or whether those standards were developed by others and merely applied to guidance counselors to secure better pay . . . [, and] [w]hether Fitzgerald's supervisory role was religious." Op. 5. The court also determined that there were "genuine disputes as to" whether the Co-Director of Guidance "had any religious duties in [her] supervisory *or* guidance counsellor role." Op. 11 (emphasis added). And, the court recognized, "it may be the reason there were suggestions to employ spiritual guidance counsellors is because the current guidance counsellors could not and were not expected to provide spiritual counseling." Op. 11.

Despite these "genuine disputes" as to whether Fitzgerald was entrusted with or in any way performed ministerial duties, the court concluded that Fitzgerald was a minister. Op. 11-13. That is because the court read *Starkey* as requiring courts to

defer to employment agreements and faculty handbooks, regardless of evidence showing that these written documents were not accurate reflections of what employees did or were entrusted to do. Op. 13. According to the district court, Fitzgerald's "considerable evidence," Op. 4, must be ignored because her "employment agreement and Roncalli's description of Fitzgerald's expected duties are, alone, sufficient to resolve this case," Op. 12.

## SUMMARY OF ARGUMENT

**I.** The district court correctly found that genuine disputes exist about whether Fitzgerald, as Co-Director of Guidance, was entrusted with any ministerial duties. But the district court incorrectly concluded that these factual disputes were rendered immaterial merely because Roncalli introduced documents labeling Fitzgerald a minister.

As a matter of law, formal employment documents are not conclusive. Instead, application of the ministerial exception turns on a fact-intensive functional analysis, with a focus primarily on the employee's daily job duties. Here, Fitzgerald's daily duties were effectively indistinguishable from those of a guidance counselor at a public high school, where religious ministry and spiritual counseling of students are forbidden by the First Amendment: Fitzgerald provided academic counseling to students, prepared the class schedule, coordinated standardized tests, and helped students apply to college.

To the extent that Roncalli's ministerial documents might suggest that Fitzgerald was expected to perform important religious duties but failed to do so, that suggestion is disputed by the evidence. Roncalli never told Fitzgerald to pray with students or

discuss religion with them, never trained her in the faith, never evaluated her on religious metrics, and never reprimanded her for performing exclusively secular duties. That dispute alone bars summary judgment in Roncalli's favor.

For the district court to have done otherwise is irreconcilable with the Supreme Court's unambiguous holdings: It afforded undo deference to a religious employer, treated written job descriptions as dispositive without regard to what the employee actually did and was expected to do, and disrupted the balance between society's interest in stopping invidious discrimination and religious institutions' First-Amendment interest in selecting those who decide church doctrine and preach and teach the faith. On the record here, the ministerial exception's functional test forecloses summary judgment.

**II.** As for Roncalli's other First Amendment and statutory arguments, those fail too.

First, no circuit has ever held that Title VII's religious exemption—Section 702—frees religious employers from their duty to treat all employees equally, regardless of race, sex, or national origin. Section 702 applies exclusively to religious institutions' right to hire coreligionists. And this Court has held that the Religious Freedom Restoration Act applies only where the government is a party to the lawsuit—not to cases like this one that are between private parties. Roncalli's novel arguments find no support in the Supreme Court's or this Court's precedents or the statutory text.

Roncalli's church-autonomy and free-association arguments go even further astray: They would make the ministerial exception obsolete—and in the process, strip millions of workers of their civil rights, while serving no First Amendment purpose.

The district court correctly denied Roncalli's request for an unprecedented, unlimited exemption from the laws that ensure fair employment practices and equal treatment at work.

## STANDARDS OF REVIEW

The district court's grant of summary judgment under the ministerial exception is reviewed *de novo*. *Starkey*, 41 F.4th at 938. When reviewing a summary judgment, this Court, like the trial court, has "one task only—to determine whether there were any [genuine] disputes of material fact." *Flowers v. Renfro*, 46 F.4th 631, 636 (7th Cir. 2022); Fed. R. Civ. P. 56(a).

The district court's denial of Roncalli's additional First Amendment and statutory arguments are also reviewed *de novo*. *See Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chi.*, 649 F.3d 539, 547 (7th Cir. 2011). Because the court limited discovery to the ministerial-exception defense, all allegations in the complaint must be taken as true and all reasonable inferences must be drawn in Fitzgerald's favor. *See id.*

## ARGUMENT

## I.   The ministerial exception does not apply.

The ministerial exception protects a religious institution's ability to select which employees will "serve[] as a messenger or teacher of its faith." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2064 (2020). When the exception applies, it strips workers of their right to win relief on an employment claim, leaving them vulnerable to "invidious discrimination." *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 989 (7th Cir. 2021) (en banc) (Hamilton, J., dissenting). Because of its potent effect, the exception applies only to "personnel who are essential to the

performance" of religious functions. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 199 (2012) (Alito, J., concurring). The exception must always be "tailored to this purpose." *Id.*

The district court erred in applying the ministerial exception to Fitzgerald on summary judgment because, as the district court itself determined, there remain genuine issues whether Fitzgerald actually performed or was expected to perform religious duties at Roncalli. *See* Op. 11. The court's decision was based on a misreading of *Starkey* that would give employers a free pass to discriminate while not serving any First Amendment interests.

### A. Fitzgerald introduced abundant evidence that she was not a minister.

There is no "rigid formula" for determining whether an employee is a minister. *Hosanna-Tabor*, 565 U.S. at 190. Instead, the fact-intensive analysis requires the reviewing court to "take all relevant circumstances into account" and determine whether an employee "performed vital religious duties." *Morrissey-Berru*, 140 S.Ct. at 2066-67. The Supreme Court identified four primary considerations: the employee's job title, the employee's religious or secular training, how the employee was held out to others, and the employee's job responsibilities. *Hosanna-Tabor*, 565 U.S. at 190-92. Of those, the most important is the employee's day-to-day duties. *Morrissey-Berru*, 140 S.Ct. at 2064. "What matters, at bottom, is what an employee does," *id.* at 2064, and is entrusted to do, *Starkey*, 41 F.4th at 941. For example, teachers at religious schools may be ministers if they regularly lead students in prayer, *Hosanna-Tabor*, 565 U.S. at 192, teach religion in the classroom, *Morrissey-*

*Berru*, 140 S.Ct. at 2057, or impart religious tenets to their students, *Grussgott*, 882 F.3d at 656. Fitzgerald did none of that.

To be sure, religious institutions decide for themselves which duties count as religious, *Sterlinski v. Cath. Bishop of Chi.*, 934 F.3d 568, 570 (7th Cir. 2019), but evidence—not the employer's say-so—shows whether an employee actually performed or was tasked with performing religious duties, *see Grussgott*, 882 F.3d at 660. And here, "disputes abound" as to what Fitzgerald did and was expected to do. Op. 7. When those disputes are viewed in Fitzgerald's favor, as they must be, the district court's ruling that she was a minister as a matter of law cannot stand.

1. *First*, nothing about Fitzgerald's title suggests that she served in a religious role. Unlike "called" teachers, *see Hosanna-Tabor*, 565 U.S. at 177, Fitzgerald's job title was "Co-Director of Guidance." 156A ¶ 7. "One might have this same title at a public school and perform a completely secular job." *Grussgott*, 882 F.3d at 659. In fact, one of Fitzgerald's fellow guidance counselors moved to a public school and explained that its "guidance department functioned very similarly to Roncalli's." 192A ¶ 22.

*Second*, Fitzgerald's training was entirely secular. She attended public universities and obtained degrees in secular fields: physical education and school counseling. 125A. A secular education like Fitzgerald's—not any religious certification—is what Roncalli expected of its guidance counselors. Meanwhile, Roncalli made clear that students would receive religious instruction from certified catechists. 228A. "Presumably the purpose of" having certified catechists responsible for teaching the faith "is to make sure that the person holding the position

24

understands the faith and can explain it accurately and effectively." *Morrissey-Berru*, 140 S.Ct. at 2064. Roncalli did not expect or require *any* religious training—much less certification as a catechist—for members of its Guidance Department. 160A ¶ 36.

*Third*, Roncalli held Fitzgerald out to teachers, students, and families as a secular employee responsible for students' academic success, not their spiritual enlightenment or religious instruction. Unlike in *Hosanna-Tabor*, where the school held the teacher-plaintiff out to the community as a religious leader, assigned her a role "distinct from that of most" staff, and labeled her a "minister," 565 U.S. at 191, Roncalli described the Guidance Department in academic terms, 229A-30A. Its website informed students and families that the department existed to help the students with academic and career counseling, postsecondary planning, standardized testing, and scholarship opportunities. 229A-30A. Staff who served alongside Fitzgerald stressed that they were never instructed to send students to the Guidance Department with spiritual questions. 196A ¶¶ 30-31; 200A-01A ¶¶ 17-20, 22. And students understood that the guidance counselors were there to provide "academic guidance, not religious guidance." 208A ¶ 9. They saw Fitzgerald as primarily responsible for getting "the college acceptance rate as high as possible." 203A ¶ 10. How Roncalli held Fitzgerald out to the community underscores that it expected her to "play[] no religious or ministerial role." Op. 2.[5]

---

[5] Nor does the 2018 ministerial contract support that Roncalli held Fitzgerald out as a minister. Roncalli did not introduce any evidence below that the contract terms were made public or communicated to Roncalli parents or students in any way. But even if it had, Fitzgerald introduced evidence that she was held out as a secular employee performing secular functions, and any conflict must be resolved in her favor. *See* Op. 3; 229A-30A.

*Finally*, Fitzgerald presented abundant evidence that she was assigned and performed secular duties. This consideration—what the employee does—is as a matter of law the most important, because the ministerial exception applies only to employees "who are essential to the performance of" "key religious activities." *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). By classifying those employees as ministers, with a different "legal status," the ministerial exception "recognizes that ministerial employment differs from nonreligious employment, or even from nonministerial employment within a religious organization." *Demkovich*, 3 F.4th at 978. Unlike lay employees, "ministers imbue a religious organization with spirituality." *Id.* at 979. For example, the employee in *Demkovich* was a minister because "[h]is participation in the liturgy was the reason for his work." *Id.* at 978. The teacher in *Hosanna-Tabor* was a minister because she "taught her students religion four days a week, and led them in prayer three times a day. Once a week she took her students to a school-wide chapel service, and—about twice a year—she took her turn leading it, choosing the liturgy, selecting the hymns, and delivering a short message based on verses from the Bible." 565 U.S. at 192. And the teachers in *Morrissey-Berru* "were the members of the school staff who were entrusted most directly with the responsibility of educating their students in the faith." 140 S.Ct. at 2066.

As Judge Easterbrook observed, "[i]t is a stretch to call a high school guidance counsellor a minister. Even if the school expects counsellors to pray with students and discuss matters of faith with them, the job is predominantly secular." *Starkey*, 41 F.4th at 945 (Easterbrook, J., concurring). Here, Roncalli did not expect Fitzgerald to

pray with students, discuss matters of faith with them, or perform *any* religious duties. 159A-60A ¶¶ 29-36; 182A-83A ¶¶ 39-40. Roncalli never told Fitzgerald to incorporate prayer or spiritual guidance in her work with students or other faculty, and it never offered her a prayerbook or any instruction on how to pray with students or guide them in the faith. 160A ¶¶ 36, 41; 168A ¶ 107; *see also* 144A-53A. By contrast, classroom teachers *were* provided with prayerbooks and instructed to pray with their students weekly. 200 ¶ 13. Classroom teachers, not guidance counselors, were "often the first to learn that a student was struggling." 160A ¶ 38. When that happened, it was the social worker—not the guidance counselors—who addressed students' personal issues. 190A ¶ 4.

Before the district court, Roncalli sought to support the ministry contract by introducing statements from Angela Maly—a guidance counselor who started working at Roncalli the month that Fitzgerald was placed on leave. 39A-41A. And while according to Maly's declaration, she prayed with students, taught the Catholic faith, and discussed students' questions about Catholicism, 222A, one of the students Maly counseled disputes all of that, declaring that Maly never prayed with him, never gave him any religious memorabilia, never addressed any of his personal issues, and never discussed religion with him at all, 219A ¶¶ 8-15. And guidance counselors who actually worked at Roncalli at the same time as, and alongside Fitzgerald testified that they never talked with students about faith or religion, but instead focused on standardized testing, career planning, and class scheduling. 179A-80A ¶¶ 11, 25; 182A-83A ¶¶ 36-40; 187A-88A ¶¶ 18-23.

In sum, unlike the teachers in *Hosanna-Tabor* and *Morrissey-Berru*, Fitzgerald played no role, much less an "important one," in spreading Roncalli's religious doctrine to students. Instead, she primarily advised students on academics, scheduled their courses, and prepared them for exams and college applications—duties that Roncalli and Fitzgerald agree were secular. 156A-58A ¶¶ 14, 20-27; 202A ¶¶ 5-7; 205A ¶¶ 4-6; 207A ¶¶ 4-5; 215A ¶¶ 5-7.

Fitzgerald's secondary responsibilities—coordinating PSAT and AP exams, discussing day-to-day school operations with the School's Administrative Council, supervising the other guidance counselors in the department, and drug-testing students—were likewise nonreligious. 83A:13-15; 161A ¶ 51; 166A-67A ¶¶ 84, 89, 99-100; 203A ¶¶ 14-16; 208A ¶ 15; 219A ¶ 16. In fact, "the guidance counselors' duties were seemingly so nonreligious that a religion teacher proposed creating a new position for a 'spiritual guidance counselor.'" Op. 3. But the Guidance Department was not the place for students to receive spiritual instruction. Roncalli instead instructed students to seek spiritual guidance from the Campus Minister, Chaplain, and religion teachers. 82A:11-22; *see also* 203A ¶ 12; 208A ¶¶ 10-11; 216A ¶¶ 12, 15; 219A ¶ 10.

2. Before the district court, Roncalli relied on evidence that was either disputed or irrelevant to support its argument that Fitzgerald was entrusted with religious duties. Op. 11.

For example, Roncalli contended that the Administrative Council was "responsible for 95% of Roncalli's daily ministry, education, and operations." Op. 3. But "taking the record in the light most favorable to Fitzgerald," as the courts must

at summary judgment, "would indicate that the Administrative Council only ran day-to-day operations, while other departments engaged in spiritual teaching." Op. 11; *see* 162A ¶¶ 55-57; 195A ¶¶ 22-24; 200A ¶¶ 14-15. It was the Advancement Team that was responsible for "deciding how Roncalli could set itself apart from public schools in the area," and the Campus Ministry Team that planned liturgies, retreats, and other religious activities at the school. 164A ¶ 72; 173A ¶ 144. Fitzgerald was not a member of either.

To the extent that the Administrative Council did sometimes address ministry issues, those "were 'handled' by 'the campus pastor, religion department, and priest,'" not by Fitzgerald. Op. 4. Fitzgerald's role on the Council was to discuss e-learning days, academic-scholarship nominations, the PSAT and AP exams, and the administration of the high-school-placement test. 161A ¶ 51. During her entire eleven years on the Council, the Council had only "very brief" discussions about one religious book during a few meetings. 164A-65A ¶ 73. Even then, the book "was [not] treated as any form of religious education or training," the "Administrative Council did not take any action based on the book or implement it in any way at the school," and Fitzgerald does not remember contributing anything during the conversations. 164A-65A ¶¶ 73-75. So there is at the very least, "a genuine issue of fact about what the [Administrative] Council does and whether it has religious responsibilities at Roncalli." Op. 3.

Fitzgerald also presented plenty of evidence to dispute Roncalli's argument that her responsibilities supervising staff and attending departmental meetings included religious tasks. Op. 5. Several of the guidance counselors that Fitzgerald supervised

testified that they never performed religious duties and therefore did not look to Fitzgerald for religious supervision. 179A ¶¶ 11-14; 180A ¶¶ 24-25; 181A ¶¶ 28, 34; 183A ¶¶ 44-48; 185A ¶ 4; 186A ¶¶ 5-6; 188A ¶¶ 24-29, 31; 189A ¶¶ 32-33. And Fitzgerald showed that in department meetings, "the guidance counselors never discussed 'anything related to religion, including the religion curriculum,' which was left to other positions like the Vice President of Mission and Ministry." Op. 5. Although Roncalli insists that guidance counselors were expected to attend the ministerial sessions that concluded the Days of Reflection each year, Fitzgerald showed that she was exempt from them. Op. 5-6.

Fitzgerald attended one—and only one—senior retreat during her fourteen-year tenure at Roncalli. And "it is unclear . . . whether Fitzgerald attended in her personal capacity, speaking about her personal beliefs, or if she attended pursuant to her formal duties." Op. 6-7. Other than one talk about the ups-and-downs of her own life, Fitzgerald observed the retreat; she did not lead students or instruct them in the faith. 174A ¶ 147. Students testified that they did not see Fitzgerald—or any adult volunteer at any of those retreats—as a religious leader. *See* 209A ¶ 18; 216A-17A ¶¶ 19-20.

Roncalli also relied on a ministerial contract that it required her to sign some fourteen years into her tenure as a guidance counselor. Op. 12. Ministerial language in a contract may be relevant when it accurately reflects what an employee did and was expected to do. But neither the Supreme Court nor this Court has ever held that a ministerial contract on its own suffices to render an employee a minister. Instead, it is one piece of evidence among many that may be used to support a finding about

what the employee was entrusted to do. *Morrissey-Berru*, 140 S.Ct. at 2066. And it is most persuasive when backed by evidence that the employee's work was "evaluated to ensure that they were fulfilling that responsibility," *id.*, which is not the case here.

To be sure, Fitzgerald's co-director sought unsuccessfully in *Starkey* to refute the ministerial language in her contract. 41 F.4th at 941. But while her evidence showed that she did not perform specific religious duties, it did not counter the school's evidence that it *expected* her to perform those duties. *See id.* Starkey did not address whether she was evaluated on religious metrics, whether the school held her out as being responsible for religious duties, or whether she was ever instructed by supervisors to perform the tasks of a minister. *See id.* Because the ministerial contract served as the primary record evidence on those questions in *Starkey*, the Court was left to conclude that she was expected to perform vital religious duties but failed to do so. *Id.* So the ministerial exception applied—after all, an underperforming minister is still a minister. *Id.*

The record here tells an entirely different story. Fitzgerald presented abundant evidence that the ministerial contract did not reflect her role as a guidance counselor—not what she did, and not what she was expected to do. Op. 11. Unlike Starkey, Fitzgerald did not join the Roncalli Guidance Department with any background serving as a religious leader at the school. *Starkey*, 41 F.4th at 935. While Starkey was a certified catechist and had previously performed religious duties as Roncalli's New Testament teacher, and later as its fine arts chair, *id.*, Fitzgerald worked only in Roncalli's Guidance Department and joined after obtaining a degree in secular fields from public universities, 155A ¶ 4. And while Starkey delivered

morning prayers over the school's public-address system and "instructed staff how to prepare students of different faiths for the Catholic liturgy," *id.* at 936, Fitzgerald never did, 173A ¶ 142.

To the extent that the ministerial contract might be said to show something about what Fitzgerald was *expected* to do, she introduced substantial evidence disputing that too. Op. 11. For example, feedback that an employee receives from supervisors about her job performance is highly relevant for determining what duties were assigned to the employee and whether the employee was evaluated on religious criteria or for religious functions. *Morrissey-Berru*, 140 S.Ct. at 2057. Here, Roncalli consistently praised Fitzgerald's work, giving her "overwhelmingly positive" performance reviews. Op. 7. Not one "reference[d] religious or ministry work with students or as part of her official duties. Nor did any comments reflect the need to incorporate religious teachings into her work." Op. 7. Roncalli never criticized her for not praying with students, for not incorporating the faith into her counseling work, or for not spending time on students' religious issues. 159A-61A ¶¶ 29-32, 36, 41, 49. Nor did Roncalli ever communicate to Fitzgerald that she was expected to incorporate religious duties into her job—not in her performance evaluations, and not at any other time either. Fitzgerald showed with specificity the duties that she was expected to perform on a daily basis. They did not include the religious tasks identified in Roncalli's ministerial contract or in its briefs to the court.

As the district court acknowledged, therefore, "as far as Fitzgerald attempts to create genuine disputes" as to each of the ministerial-exception's considerations, "she

is correct that a reasonable jury could make each of those findings on this record."
Op. 11. These genuine disputes preclude summary judgment and require reversal.

### B. The district court misunderstood *Starkey*.

Despite concluding that there remain genuine disputes as to what Fitzgerald did and was expected to do, the district court granted Roncalli's motion for summary judgment because it decided that those disputes are not "material." Op. 11. Overlooking that this Court and the Supreme Court have reiterated time and again that what an employee does is precisely what *is* material, *see, e.g.*, *Morrissey-Berru*, 140 S.Ct. at 2064; *Grussgott*, 882 F.3d at 657, the district court rested its conclusion on a mistaken reading of *Starkey*.

As the district court understood it, *Starkey* stands for the proposition that as long as the employer can put forth formal employment documents suggesting that an employee might be a minister, the issue is decided. Op. 12 ("Fitzgerald's employment agreement and Roncalli's description of Fitzgerald's expected duties are, alone, sufficient to resolve this case because those documents make clear that Roncalli entrusted Fitzgerald to teach the Catholic faith and carry out Roncalli's religious mission.").

But whether someone is entrusted with ministerial duties must be decided based on all the evidence introduced by the parties. *Starkey*, 41 F.4th at 940-42. To be sure, formal employment documents may be relevant in determining whether an employee is a minister. But a contract is merely one piece of evidence among many. And as with any other piece of evidence at summary judgment, a contract on its own may be

conclusive only when the employee fails to put forth competing evidence. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).[6]

Holding otherwise and granting contracts absolute deference in the face of contradictory evidence would not only ignore the Supreme Court's functional test, but it would go well beyond the bounds of traditional contract law. Contract terms do not receive absolute deference when extrinsic evidence demonstrates "that the contract may not mean what it says." *Joy v. Hay Grp., Inc.*, 403 F.3d 875, 878 (7th Cir. 2005); *see also Jackson v. Payday Fin., LLC*, 764 F.3d 765, 777-78 (7th Cir. 2014) (evidence outside the four corners of the contract, such as procedural and substantive unconscionability, may render a contract or a clause unenforceable). That is especially true in the employment context. Take "employee" classification as an example. Like the ministerial exception, determining whether a claimant qualifies as an "employee" is a "functional" test, *Schmidt v. Ottawa Med. Ctr., P.C.*, 322 F.3d 461, 464 (7th Cir. 2003), that "depends on 'all of the incidents of the relationship . . . with no one factor being decisive,'" *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 450-51 (2003) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992)). So, for example, "the mere existence of a document styled 'employment

---

[6] As for the "morals clause" that Roncalli puts in every contract, it is irrelevant to the ministerial exception. Categorizing each employee as a minister by saying that membership in a protected class is "immoral" would effectively allow employers to contract out of Title VII. But "there can be no prospective waiver of an employee's rights under Title VII." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974). In any event, Weisenbach explained that the morals clause was not about job duties—the primary ministerial consideration. 193A-94A ¶ 6. Instead, it was about *public* advocacy "involving an issue that violates Catholic Church teachings while holding [oneself] out as a representative of Roncalli." 193A-94A ¶ 6.

agreement'" does not "lead inexorably to the conclusion that either party is an employee." *Id.* at 450.

The same is true here: "The realities of the position" are what make it ministerial. *Alicea-Hernandez v. Cath. Bishop of Chi.*, 320 F.3d 698, 704 n.5 (7th Cir. 2003). The mere labeling of an employee as a minister in a job contract does not and cannot make the employee "the chief instrument for a religious organization to fulfill its purpose." *Demkovich*, 3 F.4th at 978 (quoting *McClure v. Salvation Army*, 460 F.2d 553, 559 (5th Cir. 1972)); *see DeWeese-Boyd v. Gordon Coll.*, 163 N.E.3d 1000, 1013 (Mass. 2021) (rejecting a religious college's argument that a professor was a minister just because formal documents said so), *cert. denied,* 142 S.Ct. 952 (2022). The ministerial exception requires, and always has required, a functional analysis. *Young v. N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 186 (7th Cir. 1994); *Alicea-Hernandez*, 320 F.3d at 703; *Grussgott*, 882 F.3d at 661; *Sterlinski*, 934 F.3d at 570.

Underscoring that functional analysis, the Supreme Court has twice emphasized that courts must "take all relevant circumstances into account"—including all the evidence from both the employee and the employer—"to determine whether each particular position implicated the fundamental purpose of the exception." *Morrissey-Berru*, 140 S.Ct. at 2067; *see also Hosanna-Tabor*, 565 U.S. at 190. In both *Hosanna-Tabor* and *Morrissey-Berru*, the Supreme Court declined to adopt a ministerial-exception test that would "defer to religious organizations' good-faith claims that a certain employee's position is ministerial." *Morrissey-Berru*, 140 S.Ct. at 2069-70 (Thomas, J., concurring); *Hosanna-Tabor*, 565 U.S. at 196 (Thomas, J., concurring). And it rejected "rigid formula[s]" that rely on a single piece of evidence—like a job

contract or description. *Morrissey-Berru*, 140 S.Ct. at 2067; *see also Hosanna-Tabor*, 565 U.S. at 190-91.

Yet under the district court's reading, *Starkey* ignored the straightforward holdings of *Hosanna-Tabor* and *Morrissey-Berru* and instead adopted Justice Thomas's concurring opinions, which would have reviewing courts defer to a religious institution's "good-faith claims" that an employee is a minister, *Morrissey-Berru*, 140 S.Ct. at 2070-71 (Thomas, J., concurring); *Hosanna-Tabor*, 565 U.S. at 196 (Thomas, J., concurring)—a standard that the majorities in both cases manifestly did not adopt. In granting summary judgment solely because Roncalli introduced a ministerial contract, despite genuine disputes about whether Fitzgerald had or performed ministerial duties, the district court misread *Starkey* to adopt Justice Thomas's preferred approach of extreme deference.

In fact, the district court's reading of *Starkey* goes even further than Justice Thomas's twice-rejected approach: Justice Thomas would rely on the good faith of a religious employer's categorization, but the district court's analysis leaves no room for employees even to dispute an employer's attempt to categorize all employees as ministers—no matter how inaccurate, inapposite, or insincere.

"It is easy to see a potential problem with a completely hands-off approach" that defers entirely to the label listed in an employment contract. *Sterlinski*, 934 F.3d at 570-71. Imagine that a religious school required *every* employee to sign a ministerial contract—from janitors, to custodians, to school-bus drivers. *Id.* at 570-71; *see also Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006), *abrogated on other grounds by Hosanna-Tabor*, 565 U.S. 171. "That is not fanciful—it is what one

religious group *did* assert in *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985), in claiming immunity from federal minimum-wage legislation. The Justices rejected that claim in *Alamo Foundation,*" and this Circuit "assume[d] that they would be equally unreceptive in litigation under Title VII." *Sterlinski*, 943 F.3d at 570-71. To avoid that sort of "judicial abnegation," *id.* at 571, courts must treat religious employers' "pretextual justifications," *id.*, as exactly what they are— "subterfuge," *Tomic*, 442 F.3d at 1039.

Here, even under Justice Thomas's approach, when the evidence is viewed in Fitzgerald's favor, a reasonable factfinder could conclude that Roncalli's assignment of ministerial labels was pretextual, coming, as it did, fourteen years into Fitzgerald's employment as a guidance counselor, without any change in her actual job functions. In light of the guidance counselors' secular duties, if Roncalli had actually wanted them to take on religious roles, it would surely have trained them in how to perform those duties—or at the very least communicated the expectation to them. Instead, Fitzgerald was given a chance to read the ministry description only *after* she had signed the guidance-counselor-ministry contract. 171A ¶ 128. Roncalli did not inform her that the ministry description changed anything about her job. It did not explain the description to her. And it did not give her any training in how to implement the contract. 171A ¶ 129; 182A ¶ 38; 188A ¶ 23.[7]

Likewise, if Roncalli really had expected Fitzgerald to "communicate[] the Catholic faith to students and families," "teach[] and celebrate[] Catholic traditions,"

---

[7] It wasn't just counselors: Roncalli made *all* its teachers—including those who taught purely secular subjects—sign ministerial contracts without explanation, training, or change in job duties. *See* 194-95A ¶¶ 14-21.

or "convey[] the Church's message," 129A, then surely it would have evaluated her on her performance of those duties. At the very least, Roncalli would, at some point in her tenure, have communicated to Fitzgerald that her utter lack of religious involvement was a shortcoming. It did not. 144A-53A. And if Roncalli had, in fact, envisioned the Guidance Department as a source of spiritual instruction for students, then it would have held Fitzgerald out as a religious resource. Instead, Roncalli told students and families to rely on the Guidance Department for academic and career support and to go elsewhere with religious questions. 229A-30A. Just as in any secular prep school, the Guidance Department was responsible for getting "the college acceptance rate as high as possible." 203A ¶ 10. Nothing about that responsibility changed after Fitzgerald signed the ministerial contract. 172A ¶ 132; 182A ¶ 39; 187A ¶ 20.

Taken all together, a reasonable factfinder could conclude that the ministerial description dropped into handbooks and formal employment documents was nothing more than legal cover for Roncalli.

## C. Deferring to contract terms and ignoring conflicting evidence do not serve the ministerial exception's purpose.

The ministerial exception is designed to balance the "interest of society in the enforcement of employment discrimination statutes and the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Demkovich*, 3 F.4th at 976 (quoting *Hosanna-Tabor*, 565 U.S. at 196). It allows religious groups to select their ministers free from governmental intrusion, while maintaining civil-rights protections for lay employees. To preserve that

38

balance, applications of the exception must always be "tailored to this purpose." *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring).

By granting religious institutions unfettered discretion in deciding who will actually serve as their ministers—while requiring them to follow the law as to their lay employees—the ministerial exception "may create minimal infidelity to the objectives of Title VII" to ensure "maximum protection of the First Amendment right to free exercise of religious beliefs." *Alicea-Hernandez*, 320 F.3d at 703 (quoting *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985)). Applying the exception based exclusively on formal documents when, as here, there is clear evidence that the employee was not expected to preach or teach a religious institution's articles of faith upends the constitutional balance: It produces maximum *in*fidelity to Title VII, while doing nothing to safeguard First Amendment interests.

If this Court were to sign off on the district court's misreading of *Starkey* and radical departure from ministerial-exception jurisprudence, religious employers would be encouraged to categorize all employees as ministers by requiring them to sign boilerplate ministerial contracts, regardless of the employees' actual job functions. An employer could drop ministerial contracts in every employee's mailbox on any given day (as Roncalli did to its entire teaching staff, *see* 194A-95A ¶¶ 14-21) and in one fell swoop strip them of their fundamental civil rights. And it would not matter whether the employer actually entrusted the employees with those duties, communicated any expectations to them, or evaluated them on performance of ministerial functions. If the district court's analysis were correct, then just like

Fitzgerald, a school crossing guard, a nonprofit's IT director, and a hospital janitor could all fall subject to the ministerial exception as long as some document labeled them as such. That would strip millions of workers of their legal rights and make them vulnerable to invidious discrimination—without regard to whether the purpose of the ministerial exception is or isn't being served.

This concern is not hypothetical: "[M]any employers with religious affiliations, such as hospitals and schools, are actively trying to expand the reach of the ministerial exception to cover a much broader range of their employees, such as teachers, nurses, and other health-care workers." *Demkovich*, 3 F.4th at 995 (Hamilton, J., dissenting). Law firms and advocacy groups are already expansively advising religiously affiliated employers on how to "squeeze into the cleft" of the ministerial exception to avoid Title VII's requirements.[8] One law firm, for example, suggests that religious employers "distribut[e] religious duties to as many staff members as is reasonably appropriate," so that the employer "can increase the *perception* that employees who have those duties are ministers."[9] Alliance Defending Freedom recommends that, "for legal purposes," religious employers should "detail how the receptionist is required to answer basic questions about the church's faith, provide religious resources, or pray with callers."[10]

---

[8] *See, e.g.*, McGuireWoods, *U.S. Supreme Court Broadens Ministerial Exemption to Employment Discrimination Claims* (July 10, 2020), https://perma.cc/Q3EB-HV6S.

[9] Conner & Winters, *Mitigating Risk with the Ministerial Exception* (Mar. 2019), https://perma.cc/5WKN-KBC2 (emphasis added).

[10] Alliance Defending Freedom, *Protecting Your Ministry* 13 (2018), https://perma.cc/2KSY-KNCC.

If endorsed by the courts, this gamesmanship could leave millions of workers without basic legal protections at work. That is not what the First Amendment requires—or even allows: The exception protects religious institutions against governmental intrusion into their internal decisions about who will serve as the "chief instrument" to fulfill their religious purpose. *Demkovich*, 3 F.4th at 978. It does not allow employers to opt out of antidiscrimination laws by merely declaring anyone and everyone a minister.

## II. Roncalli's additional arguments are both premature and wrong.

Roncalli also argued a slew of novel statutory and constitutional defenses in the district court, going well beyond what this Court or any other circuit has ever accepted. Each fails.[11]

### A. Roncalli's statutory arguments fail.

"Religious employers have long been subject to employment discrimination suits by their nonministerial employees. The processes of civil litigation can be intrusive, of course; no employer welcomes them. But civil litigation of such claims against religious employers has not been deemed a sufficient basis to require dismissal." *Demkovich*, 3 F.4th at 992 (Hamilton, J., dissenting); *see also Rayburn*, 772 F.2d at 1166-67, 1171. Ignoring that long history, Roncalli asked the district court to apply two statutory texts—the Religious Freedom Restoration Act and Title VII's

---

[11] Even if any of Roncalli's non-ministerial-exception defenses were colorable, they would be premature. Because the district court limited discovery to whether Fitzgerald was a minister for purposes of the ministerial exception, any additional argument can rely only on the pleadings, and all facts and inferences must be viewed in Fitzgerald's favor. *See Fed. Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 312-13 (7th Cir. 2020).

exemption allowing religious entities to hire coreligionists—to exempt religious institutions from essentially every possible Title VII claim, no matter the job duties of the employee who suffers workplace discrimination. These novel readings of Title VII and RFRA find no support in either statute's text or the jurisprudence under them.

1. Title VII protects employees against discrimination by requiring "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of . . . impermissible classification[s]" like race or sex. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973). In doing so, Title VII enforces an interest "of the highest order." *Rayburn*, 772 F.2d at 1169; *see also Hosanna-Tabor*, 565 U.S. at 196 ("The interest of society in the enforcement of employment discrimination statutes is undoubtedly important.").

That interest is undermined when an employer fires an employee because she is a woman married to another woman. In those cases, the Supreme Court has expressly held, the employee's gender is a "but for" cause of her termination. *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1744 (2020). And it is precisely what happened here. Fitzgerald's gender thus played "an unmistakable and impermissible role in the discharge decision." *Id.* at 1741-42.

Section 702 of Title VII grants religious employers a narrow exemption "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e–1(a). By excusing discrimination only by religious entities and only with respect to the employment of "individuals of a particular religion," Section 702 permits religious

organizations to hire only coreligionists. *Id.* A Catholic nonprofit may choose to hire only Catholic outreach workers; a Sikh food bank may choose to hire only Sikh cooks.

"Title VII still applies, however, to a religious institution charged with sex discrimination," even when that discrimination is religiously motivated. *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996). As the district court concluded, the "exemption prohibits claims of religious discrimination against religious employers when the employer favored a coreligionist, but it does not allow religious employers to discriminate on the basis of other protected characteristics, such as sexual orientation." ECF 98, at 5; *see also Boyd*, 88 F.3d at 413.

Roncalli argues that as long as an employment action is in some way based on religious beliefs, the employer is excused from complying with Title VII, even for actions that explicitly target characteristics protected by Title VII. 63A-64A. But "a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Bostock*, 140 S.Ct. at 1739.

Beyond being foreclosed by *Bostock*, Roncalli's approach would make the exemption swallow the rule: It "would allow a religious employer to convert any claim of discrimination on the basis of one of the protected classes under Title VII to a case of religious discrimination, so long as there was a religious reason behind the employment decision." *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F.Supp.3d 1195, 1203 (S.D. Ind. 2020), *appeal dismissed*. No wonder every circuit to consider the question has rejected the reading of Title VII that Roncalli asserts. *See, e.g., Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011); *Cline*

43

*v. Cath. Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 173 (2d Cir. 1993); *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1276 (9th Cir. 1982); *McClure*, 460 F.2d at 558. This Court should not create a circuit split by eviscerating Title VII's application to ordinary lay employees just because they happen to work for religious employers.

2. In an even bolder attempt at statutory interpretation, Roncalli argues that its discrimination is protected by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq. See* 61A-62A. But this Court has already held that RFRA applies only when the government is a party to the litigation. *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015). Because the government is not a party to this lawsuit, Roncalli cannot assert a RFRA defense.

Roncalli's argument is foreclosed by *Listecki* for good reason: "[T]he text of RFRA is plain." *Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2 (2d Cir. 2008). RFRA on its face requires that "Government may substantially burden a person's exercise of religion only if" it can demonstrate that the burden is "the least restrictive means of furthering a compelling governmental interest." 42 U.S.C. § 2000bb–1(b). Because RFRA has nothing to say about disputes between private parties, it can serve as basis for a claim or defense only when the government is a party to the suit.

The rest of RFRA's text affirms this commonsense conclusion: The Act puts the onus on the government to "meet[] the burdens of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2(3). The government cannot meet the burdens of production and persuasion if it is not a party to the litigation, nor can it delegate that burden to a private party. *Listecki*, 780 F.3d at 736.

44

Finally, the relief that RFRA provides "is clearly and unequivocally limited to that from the 'government.'" *Id.* at 737. "A person whose religious exercise has been burdened in violation of [RFRA] may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief agt a *government*." 42 U.S.C. § 2000bb-1(c) (emphasis added). RFRA defines "government" as "a branch, department, agency, instrumentality, [or] official (or other person acting under color of law) of the United States . . . ." 42 U.S.C. § 2000bb-2(1). Private parties are notably absent from that list. And a party cannot obtain relief from the government, nor can a court order it, when the government is not before the court as part of the suit.

The Supreme Court's language in *Bostock* suggesting that RFRA "might supersede Title VII's commands in appropriate cases," 140 S.Ct. at 1754, does not change the plain meaning of the statutory text. So RFRA might supersede Title VII in "appropriate cases" when the government sues to enforce Title VII, but not when one private party sues another.

**B. Roncalli's other First Amendment arguments fail.**

In a last-ditch effort, Roncalli asserted two novel First Amendment defenses— church autonomy and freedom of association. Neither apply. Nor can they: Both lack a limiting principle and both would make the ministerial exception obsolete. The district court was correct to reject them.

1. The church-autonomy doctrine protects religious institutions' freedom to make *religious* decisions—neither courts nor political branches may decide "matters of church government" or "those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952). Religious institutions must be

free to decide for themselves who qualifies as a nun, *McCarthy v. Fuller*, 714 F.3d 971, 979 (7th Cir. 2013), "whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations," *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976), and how to engage in internal discussions of their own religious doctrine, *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 651-53 (10th Cir. 2002).

But "churches are not—and should not be—above the law." *Rayburn*, 772 F.2d at 1171. The First Amendment requires religious neutrality, not favoritism. So "when disputes arise which can be resolved solely through the application of 'neutral principles of law' that are equally applicable to non-religious institutions and organizations, a court's involvement in such a dispute does not 'jeopardize[] values protected by the First Amendment.'" *Nation Ford Baptist Church, Inc. v. Davis*, 876 S.E.2d 742, 747 (N.C. 2022) (quoting *Presbyterian Church v. Hull Church*, 393 U.S. 440, 449 (1969)); *see also Md. & Va. Eldership of Churches of God v. Church of God*, 396 U.S. 367, 368 (1970) (per curiam); *Bouldin v. Alexander*, 82 U.S. 131, 137 (1872); *Watson v. Jones*, 80 U.S. 679, 731 (1871). Whether Roncalli discriminated against a nonministerial employee based on her sexual orientation (and hence, her sex, *see Bostock*, 140 S.Ct. at 1744) is a neutral question that does not call on the courts to decide any issues of religious doctrine or church governance. So "[l]ike any other person or organization," Roncalli "may be subject to Title VII scrutiny." *Rayburn*, 772 F.2d at 1171.

What is more, Roncalli's church-autonomy argument would make the ministerial exception a dead letter. The exception applies only to those who are "essential to the

performance" of religious functions. *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). Roncalli asks this Court to create a broad, absolute defense to employment-discrimination claims brought by any employee—lay or ministerial— whenever the employer offers a religious explanation for its actions.

If the church-autonomy doctrine applied whenever a religious employer asserted a religious justification for its actions in a motion for judgment on the pleadings, then there would be no need for courts ever to undertake the fact-intensive ministerial-exception inquiry in most race-, sex-, or disability-discrimination cases. *But see Morrissey-Berru*, 140 S.Ct. at 2067; *Starkey*, 41 F.4th at 940-42. Religious employers facing claims of employment discrimination regularly assert religious justifications for their actions. In *Hosanna-Tabor*, for example, the defendant school alleged that it terminated a minister's contract not because of the minister's medical condition (which would be discrimination on the basis of disability), but also for "a religious reason"—namely, that the employee took her employer to court rather than resolving the dispute solely within the church. 565 U.S. at 180; *see also Demkovich v. St. Andrew the Apostle Par.*, 343 F.Supp.3d 772, 786-87 (N.D. Ill. 2018). When employers have religious motivations, just as when they don't, courts regularly apply the ministerial exception rather than the church-autonomy doctrine for ministerial employees—which they would never need to do if the church-autonomy doctrine meant what Roncalli insists that it should. The Supreme Court and this Circuit have had the opportunity to adopt Roncalli's reasoning but have wisely and judiciously declined to do so. *Starkey*, 41 F.4th at 942-43; *Morrissey-Berru*, 140 S.Ct. at 2060-61.

2. Nor does Title VII infringe an employer's free-association rights. *See Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984). The First Amendment protects the rights of expressive associations—like membership organizations and student groups—to choose their members in accordance with their own views. *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861-64 (7th Cir. 2006). It applies only when an expressive association can show "that it will not be able to advocate its desired viewpoints nearly as effectively" if it cannot choose its members. *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 13 (1988).[12]

But neither the Supreme Court nor any Circuit has concluded that associational rights apply to an employment relationship, much less that they allow employers to opt out of any and all antidiscrimination laws. Where parties enter into economic contracts—including employment contracts—those "acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992); *see also Hishon*, 467 U.S. at 78. The district court was correct to reject Roncalli's freedom-of-association claim because associational rights are inapplicable in the employment context.

Roncalli's argument would go even further than shielding every religious organization from all antidiscrimination laws. "The right to freedom of association is a right enjoyed by religious and secular groups alike." *Hosanna-Tabor*, 565 U.S. at

---

[12] "[A] speaker cannot 'erect a shield' against" antidiscrimination laws (especially pre-discovery), "'simply by asserting' that mere association 'would impair its message.'" *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 69 (2006) (quoting *Dale*, 530 U.S. at 653). In all events, "[e]ven assuming" that an entity like Roncalli "has cognizable associational rights," those rights "must yield to the compelling national interest in eradicating discrimination." *Hopkins v. Price Waterhouse*, 920 F.2d 967, 980 (D.C. Cir. 1990).

189. So if framing discrimination in associational terms allowed religious employers to opt out of antidiscrimination laws, then there's nothing stopping secular employers from doing the same. Millions of employers—from advocacy groups to nonprofit organizations, private colleges to for-profit companies—would be free to discriminate.

## CONCLUSION

Roncalli's requests are nothing short of remarkable: It insists that this Court rewrite the Supreme Court's mandated functional analysis under the ministerial exception, ignore the text and long-standing interpretations of statutes, and reconceive of multiple constitutional doctrines. At bottom, Roncalli's position is that religious employers should not have to follow the law, simply because they are religious employers. But every one of Roncalli's arguments runs headlong into the settled principle that "religious organizations do not 'enjoy a general immunity from secular laws.'" *Demkovich*, 3 F.4th at 982 (quoting *Morrissey-Berru*, 140 S.Ct. at 2060). This Court should not defenestrate that rule.

The Court should vacate the summary judgment and remand for further proceedings.

Respectfully submitted,

   /s/ *Bradley Girard*

MARK W. SNIDERMAN
Findling, Park, Conyers, Woody &
   Sniderman, P.C.
151 N. Delaware Street,
Suite 1520
Indianapolis, IN 46204
(317) 231-1100

RICHARD B. KATSKEE
BRADLEY GIRARD
   *Counsel of Record*
GABRIELA HYBEL
Americans United for Separation of
   Church and State
1310 L Street NW, Suite 200
Washington, D.C. 20005
(202) 466-3234
*girard@au.org*

*Counsel for Appellant*

January 26, 2023

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1) and Circuit Rule 32, I certify that this brief:

(i) complies with the type-volume limitation of Circuit Rule 32 because it contains 13,322 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Circuit Rule 32(b) because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 12 points or larger.

*/s/ Bradley Girard*

# REQUIRED SHORT APPENDIX

## CERTIFICATE OF COMPLIANCE WITH RULE 30

In accordance with Circuit Rule 30(d), I certify that this appendix contains all the materials required by Circuit Rule 30(a) and that the separately filed appendix contains all the materials required by Circuit Rule 30(b).

/s/ *Bradley Girard*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04291-RLY-TAB |
| | ) | |
| RONCALLI HIGH SCHOOL, INC. and, | ) | |
| ROMAN CATHOLIC ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**Final Judgment**

In today's Entry, the court granted summary judgment for the Defendants based on

the ministerial exception.  In doing so, the court resolved all of the claims at issue in the

case.  Accordingly, the court now enters final judgment in favor of Defendants and

against the Plaintiff.


**IT IS SO ORDERED** this 30th day of September 2022.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Roger A.G. Sharpe, Clerk

BY: _Nina M. Dosle_

Deputy Clerk, U.S. District Court


Distributed Electronically to Registered Counsel of Record.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04291-RLY-TAB |
| | ) | |
| RONCALLI HIGH SCHOOL, INC. and, | ) | |
| ROMAN CATHOLIC ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendant, Roncalli High School, Inc., fired Plaintiff, Michelle (Shelly) Fitzgerald, who had been employed by Roncalli for fifteen years, after learning that she lawfully married another woman.  In her role as a guidance counselor at Roncalli, Fitzgerald gave advice to students on matters involving class schedules, college applications, and standardized testing.  She sues Roncalli and the church that oversaw it, the Roman Catholic Archdiocese of Indianapolis, Inc., alleging they violated 42 U.S.C. § 2000e by firing her (Counts I, II, and III), that Roncalli retaliated against her for engaging in protected conduct (Count IV),[1] and that the Archdiocese interfered with her contractual and business relationship with the school (Count V and VI).  Roncalli and the Archdiocese defend on the ground that the ministerial exception bars all of Fitzgerald's

---

[1] In a previous Entry, the court concluded that Title VII, which forms the basis for Counts I–III, preempts Fitzgerald's Count IV retaliation claim.  (*See* Filing No. 98).  Therefore, the court granted judgment to Roncalli on the pleadings for Count IV.  (*Id.*).

claims.  For the reasons set forth below, the court agrees with Defendants.   Accordingly,

the court **GRANTS** Defendants' Motion for Summary Judgment (Filing No. 118).

## I.      Background

Shelly Fitzgerald began working as a guidance counselor for Roncalli in 2004.

(Filing No. 125, Supplemental Appendix ("SA") at 2 ¶ 3).  Three years later, Roncalli

promoted her to Co-Director of the Guidance Department.  (*Id.* at 3 ¶ 7).  She primarily

assisted students with academics, class scheduling, college planning, and career

counseling.  (*Id.* at 3–4 ¶¶ 14–15).  The parties dispute whether Fitzgerald and other

guidance counselors had or performed religious duties.  (*Compare* Filing No. 120,

Appendix ("App.") at 1–9 (declaration of guidance counselor hired after Fitzgerald was

let go) *with* SA at 26–32 (declaration of guidance counselor with whom Fitzgerald

worked)).

Roncalli introduces a declaration from guidance counselor Angela Maly, who

describes her role as "assist[ing] students with their social, mental, academic, emotional,

and spiritual needs."  (App. at 2 ¶ 4).  Accordingly she instructed students "how to rely on

God," prayed regularly with students, and encouraged students to "offer [their]

struggle[s] up to Christ through prayer."  (*Id.* at 2–3 ¶¶ 7, 9, 13).  But she was only hired

after Fitzgerald had been placed on leave.  (*Id.* at 1 ¶ 2).

Fitzgerald, to the contrary, submits evidence from contemporary guidance

counselors who stress guidance counselors played no religious or ministerial role during

Fitzgerald's tenure.  Counselors never talked with students about religion or faith, and

instead focused on SAT/ACT testing, career guidance, and scheduling.  (SA at 27, 28 ¶¶

11, 25).  Fitzgerald also claims she never prayed or discussed religious doctrine as part of

work, and that students did not come to her with religious or spiritual issues at all.  (*Id.* at

7 ¶¶ 37–40; *id.* at 47 ¶¶ 25–26).  When a student needed in-depth answers to religious

questions, teachers referred them "to a religion teacher, the campus minister, or the

school's priest" instead of guidance counselors.  (*Id.* at 47 ¶ 30).  Allegedly, Roncalli

encouraged students to go to "religious sisters, a priest, the dean, the principal, or the

religion teachers" but not guidance counselors when religious questions arose.  (*Id.* at 56

¶ 12).  Indeed, the guidance counselors' duties were seemingly so non-religious that a

religion teacher proposed creating a new position for a "spiritual guidance counselor."

(*Id.* at 8 ¶ 49).  That position would talk about God, religion, and spirituality with

students during counseling appointments because the current guidance counselors were

not.  (*Id.*)

    As part of her job, Fitzgerald sat on the "Administrative Council."  (App. at 18

¶¶ 4, 7).  The council included the Principal, Campus Minister, Chaplain, two Assistant

Principals, Dean of Students, Athletic Director, and Co-Directors of Guidance.  (*Id.*).

There is, however, a genuine issue of fact about what the Council does and whether it has

religious responsibilities at Roncalli.

    Roncalli contends this was "[t]he main leadership body in the school" and was

"the lifeblood of decision-making at the school" such that it was "responsible for 95% of

Roncalli's daily ministry, education, and operations."  (App. at 18–19 ¶¶ 4–7).  They

explain that the council planned "all-school liturg[ies]," evaluated who should serve "as

Eucharistic ministers," and brainstormed "[h]ow to get [students] more involved in" Mass. (App. at 208, 220–21, 224–25, 447, 487–88).

Yet, Fitzgerald submits considerable evidence suggesting this is not true.  On that evidence, the "Administrative Council and the Department Chairs were not responsible for 95% of Roncalli's daily ministry."  (SA at 46 ¶ 23 (declaration of Charisse Phillips); *see also id.* at 9 ¶ 57 (declaration of Michelle Fitzgerald)).  Nor was the Administrative Council the main leadership and decision-making body of the school; that would be the President's Council (i.e. the President, Principal, Dean, and Assistant Principles among others).  (*Compare id.* at 9 ¶ 55 (identifying members) *with* App. 19 ¶ 6 (describing body as the "President's Council" and explaining it "focuses on mission, financial planning . . . and strategic planning for the school")).  The Administrative Council only "dealt with the everyday questions related to running a school."  (SA at 46 ¶ 22).  Ministry issues were "handled" by "the campus pastor, religion department, and priest."  (*Id.* at 46 ¶ 23; *accord id.* at 9 ¶ 59).  To emphasize, the "Administrative Council did not decide who could serve as Eucharistic ministers" at all, that was decided "by the Campus Ministry team" who might bring an update about their decision to the principal during an Administrative Council meeting.  (*Id.* at 10 ¶ 62).  To the extent that a ministry issue was discussed at an Administrative Council meeting, the Campus Minister raised the issue solely to inform the principle; "[o]ther members of the Council were not expected to contribute anything when these sorts of side conversations would come up."  (*Id.* at 10 ¶ 61–64).

As Co-Director, Fitzgerald attended department chair meetings and supervised other guidance counsellors.  (SA at 12 ¶ 76).  Common topics of discussion at chair and

supervisory meetings were updates on "core academic subject areas," "standardized

testing," and "classroom presentations on testing and scheduling." (*Id.* at ¶ 78).

However, there is an issue of fact about whether the department meetings and her

supervisory duties required religious action by Fitzgerald. The parties also dispute

whether Fitzgerald helped develop religious standards for evaluating guidance counselors

or whether those standards were developed by others and merely applied to guidance

counselors to secure better pay. (*See* App. at 37; *see also id.* at 273).

Whether Fitzgerald's supervisory role was religious is also in dispute. For its part,

Roncalli contends that these supervisory duties required Fitzgerald to address student

crises "in light of [the school's] Catholic faith." (App. at 19 ¶ 8). Fitzgerald and other

guidance counselors indicate the opposite. The Department Chair meetings "did not

involve making decisions about or shaping the school's religious mission." (SA at 12

¶ 82). Instead, they revolved around "core academic subject areas," "standardized

testing," and "classroom presentations on testing and scheduling." (*Id.* at 12 ¶ 78). In

other words, according to Fitzgerald, the guidance counsellors never discussed "anything

related to religion, including the religion curriculum," which was left to other positions

like the Vice President of Mission and Ministry. (SA at 9, 12 ¶ 59, 79).

Further, like all faculty, Fitzgerald attended the "Days of Reflection," a school

gathering at the beginning of the year. (App. at 21 ¶ 19). That gathering included both

"nuts-and-bolts" and ministerial sessions. (*Id.* at 355–56; SA at 45 ¶ 9; *id.* at 22 ¶¶ 154–

156). The nuts-and-bolts sessions covered new rule changes and other information

relevant to the day-to-day running of a school, (SA at 45 ¶ 9), while the ministerial

sessions involved activities like commissioning participants to "faithfully and joyfully serve as ministers of the faith," (App. at 36).  Some staff at the school, like cafeteria and janitorial staff, were exempt from the ministerial sessions.  (*Id.* at 359).

The parties dispute whether guidance counsellors were also exempt from the ministerial sessions.  Roncalli argues that Fitzgerald attended these gatherings, where she and the rest of the faculty "promise[d] to willingly share my faith with others" and were "commission[ed] . . . as ministers of the faith."  (*Id.* at 22 ¶¶ 21–22; *id.* at 36).  Yet, Fitzgerald states she—like cafeteria staff and janitors—only attended nuts-and-bolts sessions which solely covered "procedural . . . and major rules changes" and other information relevant to running the school.  (SA at 45 ¶ 9; App. at 355–56 (explaining how Principal Weisenbach excused guidance counselors from the religious components of Days of Reflection to "meet with . . . seniors" about academics); *id.* at 359 (noting cafeteria and janitorial staff were exempted from religious parts of Days of Reflection but not the nuts-and-bolts session)).  She states she was not required or expected to attend the religious aspects such as Mass.  (SA at 22 ¶¶ 155–56).  Her testimony also claims Roncalli exempted her from religious activities on the Days of Reflection specifically due to her role as a guidance counselor.  (SA at 22–23 ¶¶ 156, 163 (noting Fitzgerald was "never 'Commissioned' as a 'Minister of the Faith'" like other teachers)).

Fitzgerald attended only one of many senior retreats during her 15-year tenure at Roncalli.  (SA at 21 ¶ 145).  These retreats focused on "help[ing] students understand how Christ is present in their daily life," (App. at 6 ¶ 35), and featured talks about spirituality and prayer, (App at 600).  For her part, Fitzgerald gave a speech about how

her "relationship with God shifted throughout [her] life." (App. at 311). It is unclear, however, whether Fitzgerald attended in her personal capacity, speaking about her personal beliefs, or if she attended pursuant to her formal duties.

During her tenure at Roncalli, Fitzgerald received overwhelmingly positive performance reviews. (App. at 609–17). Indeed, Principal Weisenbach did not believe he had "ever received more positive comments about an employee when seeking feedback than [he] did when getting feedback from folks about their work[] with Fitzgerald." (*Id.* at 609). Not one positive comment or performance evaluation references religious or ministry work with students or as part of her official duties. (*Id.* at 609–17). Nor did any comments reflect the need to incorporate religious teachings into her work. (*Id.*). Fitzgerald, in a self-evaluation, referred to "hav[ing] no problems sharing my beliefs and my love of God," (*id.* at 47), but the exact meaning and truthfulness of this self-evaluation is genuinely at issue.

Other disputes abound. Roncalli claims the Student Assistance Program helped students spiritually, (App. at 3–4, 23 ¶¶ 14–18, 29), while Fitzgerald marshals evidence demonstrating that the program only addressed drug use, (SA at 41 ¶ 9 ("SAP did not address students' religious issues or struggles."); *accord* App. at 184). In the same vein, the parties dispute whether Fitzgerald's speech given to a seniors at a religious retreat was a private reflection on her personal spiritual journey not required by Roncalli, (SA at 21 ¶¶ 145, 146, 148), or a part of her official duties.

In May 2018, Fitzgerald signed a "School Guidance Counselor Ministry Contract." (App. at 507–08; *Id.* at 261). That contract incorporated a faculty handbook which stated

7

that guidance counselors were expected to "assist[] the students in strengthening and developing their social, emotional, intellectual and Christian development." (*Id.* at 435, 437). The ministry description—incorporated into the contract—also required Fitzgerald to communicate the Catholic faith to students, pray with students, and teach and celebrate Catholic traditions. (*Id.* at 29). The contract also charged her with "foster[ing] the spiritual . . . growth of the children entrusted in his/her care." (*Id.* at 509). In other words, the school described her as "a minister of the faith." (*Id.*). The contract also contained a "default" clause that provided Fitzgerald would forfeit her position if she engaged in "personal conduct . . . at variance with . . . the moral or religious teachings of the Roman Catholic Church." (*Id.* at 508).

Three months after Fitzgerald signed the ministry contract, Roncalli's leaders learned Fitzgerald was married[2] to another woman. Defendants stipulate for the purposes of this summary judgment motion that because Fitzgerald had married another woman, Roncalli placed her on "paid administrative leave" for the remainder of her contract, which Roncalli decided not to renew. (Filing No. 29, Defs.' Answer ¶¶ 56, 66). In Defendants' view, Fitzgerald, because she is a woman, could not "form with [her wife] an intimate communion of life and love," which Catholic doctrine limits to "a man and a

---

[2] Roncalli repeatedly refers to Fitzgerald's relationship as a civil union. The evidence and Roncalli's own admission, however, demonstrates that Fitzgerald's relationship is a marriage, not a civil union. (App. at 157; SA at 23 ¶ 166; Filing No. 29, Defs.' Answer ¶ 52 (noting "Defendants admit" that "Roncalli President . . . and Principal . . . knew of [Fitzgerald's] marriage to a female spouse")). As this court previously explained, this distinction is important. "[M]arriage is more than a routine classification for purposes of certain statutory benefits;" it uniquely provides "hundreds of rights and responsibilities under Indiana and federal law," *Baskin v. Bogan*, 12 F. Supp. 3d 1144, 1161 (S.D. Ind. 2014), and provides "equal dignity" to same-sex couples, *Obergefell v. Hodges*, 576 U.S. 644, 681 (2015).

woman." (Catechism of the Catholic Church § 1660). Therefore, as Fitzgerald engaged

in conduct at odds with "the moral or religious teachings of" Roncalli and the

Archdiocese, Fitzgerald was in default under the contract and Roncalli let her go. (App.

at 508).

## II.     Legal Standard

Summary judgment is only appropriate if "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Skiba v.*

*Ill. Cent. R.R.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal quotation marks omitted).

This process requires reviewing the record in the "light most favorable to the nonmoving

party and draw[ing] all reasonable inferences in that party's favor." *Zerante v. DeLuca*,

555 F.3d 582, 584 (7th Cir. 2009).

## III.    Discussion

The ministerial exception is "an affirmative defense to . . . otherwise cognizable

claim[s]." *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S.

171, 195 n.4 (2012). The exception binds courts "to stay out of employment disputes

involving those holding certain important positions with churches and other religious

institutions." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060

(2020). Where it applies, it bars both federal and state law claims. *Starkey v. Roman*

*Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th at 945 (7th Cir. 2022). Naturally, while

the exception unambiguously applies to "the head of a religious congregation," *Hosanna-*

*Tabor*, 565 U.S. at 190, it also applies more broadly to all religious employees that "perform[] vital religious duties," *Morrissey-Berru*, 140 S. Ct. at 2066.

Determining whether an employee qualifies as a minister is a fact-intensive inquiry that requires "tak[ing] all relevant circumstances into account" to determine whether an employee is a "teacher[] of religion." *Morrissey-Berru*, 140 S. Ct. at 2066–67. "What matters" to that analysis "is what an employee does." *Id.* at 2064. Under Seventh Circuit precedent that "involves what an employee is entrusted to do, not simply what acts an employee" did. *Starkey*, 41 F.4th at 941. One way of determining what duties the organization entrusts to the employee is to examine the employment agreement and employee's expected duties. *See id.* (relying on employment agreement and faculty handbook).

Fitzgerald argues that Roncalli never entrusted her with religious teaching duties by raising numerous genuine factual disputes over what exactly she did at the school.[3] She contends the record demonstrates that Roncalli entrusted her in description alone. She never engaged in religious teaching, nor did Roncalli expect her to.

---

[3] The parties spend considerable time discussing whether Fitzgerald believed she was a minister. Roncalli points to some e-mails allegedly co-signed by Fitzgerald that argued she was a minister and should receive extra pay. (*See* App. at 498). Fitzgerald contends that her signature was added without her knowledge and consent. (*See id.* at 247). Roncalli also submits that Fitzgerald represented she engaged in religious teaching during her annual evaluation to get a raise. (*See id.* at 40–48; *see also id.* at 37 (describing Fitzgerald's goal of "find[ing] more ways to celebrate Christ")). Fitzgerald argues Roncalli's description of her evaluation is inaccurate and that her representations were puffery to try and get a raise. (*See id.* at 282–284; *see also* SA at 15–16 (describing goal of celebrating Christ as a personal not professional goal)). Regardless, Fitzgerald's subjective understanding of her role is not dispositive. *See Morrissey-Beru*, 140 S. Ct. at 2066 (explaining "the school['s] definition and explanation of the[] role[] is important"). Instead, "it is the school's expectation . . . that matters." *Grussgott*, 882 F.3d at 661.

For example, taking the record in the light most favorable to Fitzgerald would indicate that the Administrative Council only ran day-to-day operations, while other departments engaged in spiritual teaching.  (SA at 9–10 ¶¶ 57, 62; *id* at 46 ¶ 23).  Moreover, the Co-Director of Guidance may not have had any religious duties in their supervisory or guidance counsellor role.  (SA at 27, 28, 29 ¶¶ 11, 25, 30).  Indeed, guidance counsellors may have been treated like cafeteria and janitorial staff with regard to being exempted from religious discussions.  (SA at 22 ¶ 155, 163; App. at 355–56).  And it may be the reason there were suggestions to employ spiritual guidance counsellors is because the current guidance counsellors could not and were not expected to provide spiritual counseling.  Thus, as far as Fitzgerald attempts to create genuine disputes as to these issues, she is correct that a reasonable jury could make each of those findings on this record.

Yet these disputes are not material under *Starkey*.  41 F.4th at 941.  *Starkey* teaches it is not "simply what acts an employee chooses to perform," but "what an employee is entrusted to do."  *Id.*  In making that determination, the Seventh Circuit principally relied on (1) the employment ministry contracts, (2) the faculty code of conduct, and (3) being called a minister of the faith.  *Id.* at 940.  Reliance on those documents is not unusual in determining what duties a religious organization entrusts to an employee.  *See Sterlinksi v. Cath. Bishop of Chi.*, 934 F.3d 568, 569 (7th Cir. 2019) (utilizing church document to determine whether organ player duties were religious); *see also Grussgott*, 882 F.3d at 660–61 (using schools' description of its curriculum to determine minister status); *Skryzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238,

11

1243 (10th Cir. 2010) (finding ministerial status based on "job description" and description of religious duties among other church documents).

All three grounds for the decision in *Starkey* are present here.  Fitzgerald's employment agreement and Roncalli's description of Fitzgerald's expected duties are, alone, sufficient to resolve this case because those documents make clear that Roncalli entrusted Fitzgerald to teach the Catholic faith and carry out Roncalli's religious mission. Fitzgerald's employment agreement was a "teaching ministry contract" and Fitzgerald agreed to "[f]aithfully perform all duties of a [t]eacher in the school."  (App. at 513).  The faculty code of conduct indicated these expected duties included "assist[ing] the students in strengthening . . . their . . . Christian development," and "foster[ing] the spiritual . . . growth of the children entrusted in his/her care."  (*Id.* at 86, 509).  Counsellors were also charged with being "role models" by "leading students toward Christian maturity and with teaching the Word of God."   (*Id.* at 13).  Indeed, the school describes guidance counselors as "minister[s] of the faith" with the responsibilities of communicating the Catholic faith to students, praying with students, and teaching and celebrating Catholic traditions.  (*Id.* at 29).

All this indicates Roncalli entrusted guidance counselors like Fitzgerald to convey the Church's message in addition to their secular duties.  And under Seventh Circuit precedent, Fitzgerald's non-performance of these entrusted duties makes her "an underperforming minister" who may be removed pursuant to the ministerial exception. *Id.* at 941; *see also Sterlinksi*, 934 F.3d at 571 ("[A] church may decide that any organist who plays like a robot *ought* to be fired.") (emphasis in original).

12

To be sure, "[i]t is a stretch to call a high school guidance counsellor a minister," as "the job is predominantly secular." *Starkey*, 41 F.4th at 945 (Easterbrook, J., concurring). But because Roncalli, through the employment agreement and faculty handbooks, expressly entrusted Fitzgerald with shaping the school's religious policy, Fitzgerald's position as Co-Director of Guidance qualifies for the ministerial exception under *Starkey*. Since the application of the ministerial exception bars all of Fitzgerald's claims, summary judgment is appropriate for Roncalli and the Archdiocese. *Id.* at 942–45.

## IV.    Conclusion

For the reasons discussed above, the court **GRANTS** the Defendants' Motion for Summary Judgment (Filing No. 118).


**IT IS SO ORDERED** this 30th day of September 2022.



RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana



Distributed Electronically to Registered Council of Record.

# STATUTORY ADDENDUM

## Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

*42 U.S.C. § 2000e. Definitions*

For the purposes of this subchapter—

\*        \*        \*

**(j)** The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

\*        \*        \*

*42 U.S.C. § 2000e–1. Exemption*

### (a) Inapplicability of subchapter to certain aliens and employees of religious entities

This subchapter shall not apply to \* \* \* a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

\*        \*        \*

## Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

*42 U.S.C. § 2000bb–1. Free Exercise of Religion Protected*

### (a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

### (b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

**(1)** is in furtherance of a compelling governmental interest; and

**(2)** is the least restrictive means of furthering that compelling governmental interest.

**(c) Judicial relief**

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. . . .

*42 U.S.C. § 2000bb-2. Definitions*

As used in this chapter—

**(1)** the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

\*     \*     \*

**(3)** the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion . . . .

\*     \*     \*

**CERTIFICATE OF SERVICE**

I certify that on January 26, 2023 this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.


*/s/ Bradley Girard*