No. 22-2954

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

MICHELLE FITZGERALD,

*Plaintiff-Appellant,*

v.

RONCALLI HIGH SCHOOL, INC., AND ROMAN
CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, INC.,

*Defendants-Appellees.*

On Appeal from a Final Judgment of the
United States District Court for the Southern District of Indiana
Case No. 1:19-cv-04291-RLY-TAB Hon. Richard L. Young

## CIRCUIT RULE 30(b) APPENDIX OF APPELLANT MICHELLE FITZGERALD

MARK W. SNIDERMAN
Findling, Park, Conyers, Woody &
    Sniderman, P.C.
151 N. Delaware Street,
Suite 1520
Indianapolis, IN 46204
(317) 231-1100

RICHARD B. KATSKEE
BRADLEY GIRARD
GABRIELA HYBEL
Americans United for Separation of
    Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-3234

*Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

In accordance with Circuit Rule 30(d), I certify that this appendix contains all the materials required by Circuit Rule 30(b) and that the appendix attached to the brief contains all of the materials required by Circuit Rule 30(a).


*/s/ Bradley Girard*

# TABLE OF CONTENTS

Complaint,
Oct. 21, 2019, ECF 1................................................................ 1a

Motion for Judgment on the Pleadings,
April 1, 2020, ECF 41 ............................................................ 19a

Entry on Defendant's Motion for Judgment on the Pleadings,
March 31, 2021, ECF 98.......................................................... 21a

Brief in Support of Defendants' Motion for Summary
Judgment or, in the Alternative, Motion for Judgment
on the Pleadings,
November 22, 2021, ECF 119 ................................................ 27a

Excerpts of Deposition of Shelly Fitzgerald, ECF 120

Deposition Transcript Excerpts ........................................ 69a

Deposition Exhibit 1,
Shelly Fitzgerald Guidance Counselor Application ........................ 124a

Deposition Exhibit 19,
Shelly Fitzgerald Ministry Contract ................................ 127a

Deposition Exhibit 20,
Ministry Description .................................................. 129a

Deposition Exhibit 25,
Shelly Fitzgerald CEAP Assessment.............................. 133a

Deposition Exhibit 33,
Shelly Fitzgerald Performance Appraisal,
May 2017................................................................ 144a

Deposition Exhibit 34,
Shelly Fitzgerald Performance Appraisal,
January 2014 .......................................................... 147a

Deposition Exhibit 35,
Shelly Fitzgerald Performance Appraisal,
May 2010................................................................ 150a

Deposition Exhibit 36,
Shelly Fitzgerald Performance Appraisal,
December 2008 ........................................................ 152a

Shelly Fitzgerald & Lynn Starkey Performance Appraisal
January 2010
ECF 125-22 ............................................................ 153a

Shelly Fitzgerald CEAP Completion Letter
    October 2016
    ECF 125-23 ................................................................................................ 154a

Declaration of Shelly Fitzgerald,
    ECF 125-1 .................................................................................................. 155a

Declaration of Autumn Currens,
    Former Roncalli Guidance Counselor,
    ECF 125-2 .................................................................................................. 178a

Declaration of Kelly Meyer,
    Former Roncalli College Counselor,
    ECF 125-3 .................................................................................................. 185a

Declaration of Kelley Fisher,
    Former Roncalli Social Worker,
    ECF 125-4 .................................................................................................. 190a

Declaration of Charisse Phillips,
    Former Roncalli Teacher,
    ECF 125-5 .................................................................................................. 193a

Declaration of Emily Dunham,
    Former Roncalli Teacher,
    ECF 125-6 .................................................................................................. 198a

Declaration of Blakely Phillips-Powell,
    Former Roncalli Student,
    ECF 125-7 .................................................................................................. 202a

Declaration of Benjamin Pesto,
    Former Roncalli Student,
    ECF 125-8 .................................................................................................. 205a

Declaration of Sarah Shover,
    Former Roncalli Student,
    ECF 125-9 .................................................................................................. 207a

Declaration of Ellen Schrader,
    Former Roncalli Student,
    ECF 125-10 ................................................................................................ 210a

Declaration of Brigid Parker,
    Former Roncalli Student,
    ECF 125-11 ................................................................................................ 215a

Declaration of Dominic Conover,
      Former Roncalli Student,
      ECF 125-12 ................................................................................ 218a

Declaration of Angela Maly,
      Roncalli Guidance Counselor,
      ECF 120-1 .................................................................................. 221a

Meeting Agendas of Roncalli's Guidance Department,
      ECF 125-13 ................................................................................ 223a

Roncalli Rebel Handbook,
      ECF 120-60 ................................................................................ 228a

Roncalli Website—Guidance Services Offered (May 11, 2017), *obtained
      from* https://web.achive.org/web/20170511003709/
      http://www.roncalli.org:80/guidance/guidance-services-offered,
      ECF 125-19 ................................................................................ 229a

American School Counselor Association,
      Ethical Standards for School Counselors,
      ECF 25 ........................................................................................ 231a

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MICHELLE FITZGERALD,                )
                                    )
            Plaintiff,              )
                                    )
    v.                              )   Case No. 1:19-cv-4291
                                    )
RONCALLI HIGH SCHOOL, INC., and     )
the ROMAN CATHOLIC ARCHDIOCESE OF   )
INDIANAPOLIS, INC.,                 )
                                    )
            Defendants.             )   Jury Demanded

## COMPLAINT FOR DAMAGES

### Introduction

1.     This is an action for damages brought by Plaintiff, Michelle ("Shelly") Fitzgerald,

against Defendants, Roncalli High School, Inc., and the Roman Catholic Archdiocese of

Indianapolis, Inc., for their wrongful and unlawful discrimination against her. A beloved and

trusted guidance counselor at a private school, Fitzgerald was placed on administrative leave,

banned from campus, and fired from her job because she married a woman. By doing so,

Defendants explicitly and impermissibly have discriminated because of sex: that of Fitzgerald's

and/or her spouse's. Further, though the Defendants claim they took adverse actions against

Fitzgerald because her actions allegedly contradicted the teaching of the Catholic Church, they

took and take no similar actions against male and/or heterosexual employees whose actions also

contradict the teaching of the Catholic Church.

### Jurisdiction, Venue and Causes of Action

2.     This Court has original subject matter jurisdiction of the federal questions

presented herein pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental

jurisdiction of the state law claims presented pursuant to 28 U.S.C. § 1367(a), because the state

and federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), for the events or omissions giving rise to these claims arose here.

4.      Plaintiff sets forth claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq. ("Title VII"), Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), and state law.

5.      Plaintiff satisfied her requirement to exhaust administrative remedies by filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), on or about January 9, 2018, against the Roman Catholic Archdiocese of Indianapolis, Inc. (Charge No. 470-2019-01150).

6.      On or about July 23, 2019, the EEOC issued a Notice of Right to Sue related to the Charge of Discrimination against the Roman Catholic Archdiocese of Indianapolis, Inc. (Charge No. 470-2019-01150).

7.      Fitzgerald satisfied her requirement to exhaust administrative remedies by filing a Charge of Discrimination with the EEOC on or about January 10, 2019, against Roncalli High School, Inc. (Charge No. 470-2019-01193).

8.      On or about July 23, 2019, the EEOC issued a Notice of Right to Sue related to the Charge of Discrimination against Roncalli High School, Inc. (Charge No. 470-2019-01193).

9.      Plaintiff filing a Charge of Discrimination with the EEOC on or about March 4, 2019, against Roncalli High School, Inc. (Charge No. 470-2019-01713).

10.     On or about July 23, 2019, the EEOC issued a Notice of Right to Sue related to the Charge of Discrimination against Roncalli High School, Inc. (Charge No. 470-2019-01713).

11.     Fitzgerald filed a Charge of Discrimination with the EEOC on or about March 4, 2019, against the Roman Catholic Archdiocese of Indianapolis, Inc. (Charge No. 470-2019-01717).

12.     On or about July 3, 2019, the EEOC issued a Notice of Right to Sue related to the Charge of Discrimination against the Roman Catholic Archdiocese of Indianapolis, Inc. (Charge No. 470-2019-01717).

## Parties

13.     Plaintiff Michelle Fitzgerald was an adult resident of Hancock County, Indiana at all relevant times.

14.     Defendant Roncalli High School, Inc. (hereinafter referred to as "Roncalli"), is a non-profit domestic corporation with its principal place of business located in Indianapolis, and operates a private Catholic school of the same name.

15.     Defendant Roman Catholic Archdiocese of Indianapolis, Inc. ("Archdiocese"), is a non-profit domestic corporation with its principal place of business located in Indianapolis

16.     Roncalli and its school are operated under the guidance and supervision of the Archdiocese.

17.     The Archdiocese derives its power to supervise and guide Roncalli's actions, as both a Catholic school and a Catholic Institution, from the Catholic Church through the power invested in the Archdiocese by the Pope and the Vatican.

18.     As such, both Roncalli's affiliation with the Catholic Church, and its designation as a Catholic Institution, are controlled by the Catholic Church through the Archdiocese.

19.     The Archdiocese has the power to remove Roncalli's affiliation with the Catholic Church, and its designation as a Catholic Institution, if the Archdiocese believes that Roncalli is failing to follow the teachings of the Catholic Church.

20.     Through the Catholic Church, the Archdiocese also has the power to prevent Roncalli from acting as a Catholic Institution, observing Catholic rituals, performing the sacraments, and saying Mass.

21.     As a result, the Archdiocese is able to both control and influence Roncalli's personnel decisions, by threatening to remove Roncalli's designation as a Catholic institution, if the Archdiocese believes that Roncalli is employing individuals who may be failing to follow the teachings of the Catholic Church.

**Factual Allegations**

22.     Fitzgerald is a female former employee (pursuant to 42 U.S.C. § 2000e(f)) of the Archdiocese and Roncalli.

23.     Both Defendants receive federal financial assistance.

24.     Both Defendants participate in the Indiana school voucher program, wherein State public funding "follows" students enrolled at private schools.

25.     Roncalli students receive benefits and services from federal and state sources based on student eligibility.

26.     Roncalli is a high school of which the Archbishop of the Archdiocese is the sole corporate member.

27.     Fitzgerald was employed by Defendants from July of 2004 until 2019.

28.     For almost all of the foregoing term of employment, Fitzgerald served Defendants as a Guidance Counselor and/or Co-Director of Guidance at Roncalli.

29.     Fitzgerald was employed pursuant to a contract, which was renewed annually until 2019.

30.     As Guidance Counselor and Co-Director of Guidance, Fitzgerald was responsible for assisting and advising students regarding academic, professional and vocational options available to students.

31.     Fitzgerald's positions as Guidance Counselor and Co-Director of Guidance required her to be a professional educator licensed by the State of Indiana.

32.     Fitzgerald's positions as Guidance Counselor and Co-Director of Guidance did not include any religious duties.

33.     Fitzgerald's positions as Guidance Counselor and Co-Director of Guidance did not include any teaching duties.

34.     Fitzgerald's positions as Guidance Counselor and Co-Director of Guidance did not include any ministerial duties.

35.     Fitzgerald's positions as Guidance Counselor and Co-Director of Guidance did not include any religious component.

36.     Fitzgerald has never been a minister.

37.     Fitzgerald has never held herself out as a minister.

38.     Fitzgerald has never had held a title with the Catholic Church.

39.     Fitzgerald has never been a member of the clergy of the Catholic Church.

40.     Fitzgerald has never been ordained by the Catholic Church.

41.     Fitzgerald has never held a title with the Catholic Church.

42.     Fitzgerald was not required to have any religious instruction or training to hold her positions with Defendants.

43.     Fitzgerald did not receive any religious training or instruction from either Defendant.

44.     Fitzgerald had no job-related duties or responsibilities with respect to the celebration of Mass at Roncalli.

45.     In 2012, the United States Supreme Court handed down its opinion in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012), holding, inter alia, that a "ministerial exception" is available to religious institutions, which such institutions can use as a defense to certain employment-related legal claims brought by employees properly classified as "ministerial employees."

46.     Prior to the Supreme Court handing down *Hosanna-Tabor*, Fitzgerald had never been classified as a ministerial employee.

47.     The ministerial exception precludes governmental regulation of certain features of the employment relationship between a religious institution and its ministers.

48.     On information and belief, in or around May 2016, the Archdiocese's Human Resources department told Roncalli's Principal, Chuck Weisenbach, via e-mail, that the Archdiocese's lawyers believed "school counselors and social workers do not meet the definition for the ministerial exemption."

49.     Approximately two or three years ago, the Archdiocese directed Roncalli to implement uniform "morals clauses" in its employee contracts.

50.     Since the 2017-18 school year, Roncalli, at the direction of the Archdiocese, required Fitzgerald to sign a "Ministry" contract, but did not provide her with ministerial or religious training, in contrast to priests and religion teachers, who did receive religious training.

51.     Fitzgerald has a female spouse, to whom she has been legally married since 2014.

52.     On August 10, 2018, Roncalli President Joseph Hollowell and Principal Weisenbach met with Fitzgerald and informed her they knew of her marriage to a female spouse.

53.     Hollowell and Weisenbach presented Fitzgerald with the options of resigning, dissolving what they termed her "civil union" (referring to her marriage), "keeping quiet" until her contract was up (at which time it would not be renewed), or being fired.

54.     Hollowell and Weisenbach represented to Plaintiff that they gave her the foregoing options because they believed her marriage violated the contract between her and Roncalli, insofar as it was contrary to teaching of the Catholic Church.

55.     Fitzgerald refused to resign, dissolve her marriage, or keep quiet about it.

56.     On August 10, 2018, Defendants placed Fitzgerald on paid administrative leave.

57.     On August 12, 2018, Defendants banned Fitzgerald from the school campus until further notice.

58.     On August 12, 2018, Defendants issued a press release stating that Fitzgerald had been placed on paid administrative leave because she was "living in a civil marriage that is not valid in the eyes of the Church."

59.     On August 12, 2018, Defendants cut off Fitzgerald's access to her work e-mail account.

60.     On or about September 10, 2018, Defendants placed a classified advertisement for a temporary replacement for Fitzgerald.

61.     On or about October 6, 2018, Defendants placed a classified advertisement for a permanent replacement for Fitzgerald.

62.     On or about October 6, 2018, Fitzgerald cleaned out her office, accompanied by Weisenbach.

63.     At some point before the end of 2018, Defendants hired a guidance counselor to replace Fitzgerald.

64.     Fitzgerald met Defendants' legitimate performance expectations throughout her period of employment with them.

65.     On or around January 31, 2019, Fitzgerald received from Roncalli an "Intent to Return" form, upon which she designated her intent to return to her employment during the next contract year of 2019-20, and which she promptly returned.

66.     On May 2, 2019, Roncalli informed Fitzgerald that her employment contract, which expired on July 31, 2019, was not going to be renewed.

67.     Roncalli's decision not to renew Fitzgerald's employment contract was consistent with Defendant's statement of intent in the meeting with Fitzgerald on August 10, 2018.

68.     As such, Roncalli's decision not to renew Fitzgerald's contract was the culmination of Defendant's discriminatory acts taken against her.

69.     Since August 10, 2018, Fitzgerald and her family have taken an active role in opposing the discriminatory and unlawful actions taken by the Defendants against her.

70.     Fitzgerald's family has opposed the actions of the Defendants with frequent posts on social media, by participating in rallies and protests, by appearing on television and by speaking to the print media.

71.     Fitzgerald's activism has included her participation in numerous interviews with all forms of media across the world, including print, television, radio and podcasts.

72.     Fitzgerald was also named the Keynote Speaker of the Women's March and the Grand Marshall of the Pride Parade; was appointed to the Board of the Indiana Youth Group; appeared on the Ellen DeGeneres show; and spoke out against Defendants' wrongful discrimination against her and others in these and other capacities and venues.

73.     After Fitzgerald was placed on administrative leave, several students at Roncalli formed a non-profit advocacy group known as "Shelly's Voice" which was formed to oppose the

discriminatory actions of the Defendants and to promote acceptance and unity within the Catholic Church.

74.     Fitzgerald serves on the Board of Shelly's Voice and is an active mentor for the students in their efforts opposing discrimination and expanding their social activism.

75.     Fitzgerald's activism in opposition to the Defendants' discriminatory actions continues to this day, including a trip to Washington D.C. to meet with Representative André Carson, conduct an interview with the Washington Post, participate in the rallies in Washington D.C., and observe the oral arguments held on October 8, 2019 before the United States Supreme Court in *Bostock v. Clayton County,* Docket No. 17-1618, cert. granted 2019 WL 1756677 (U.S. Apr. 22, 2019), and *Altitude Express, Inc. v. Zarda*, No. 17-1623, cert. granted 2019 WL 1756678 (U.S. Apr. 22, 2019).

76.     As a result of her actions opposing the Defendants' discriminatory actions, Fitzgerald was named "Human of the Year" by the *Indianapolis Star*.

## Legal Claims

### Count I
### Violation of Title VII

77.     Each paragraph of this *Complaint* is incorporated as if fully restated herein.

78.     As described herein, Defendants discriminated against Fitzgerald by treating her differently from and less preferably than similarly situated employees who are married to women, and/or who are heterosexual, by wrongfully discharging her, with respect to her terms, conditions or privileges of employment, in substantial part due to her sex, sexual orientation, and/or marriage to a woman.

79.     Fitzgerald is a member of a protected class due to her sexual orientation, of which Defendants knew prior to the adverse actions they took against her.

80.     Fitzgerald is in a legally valid same sex marriage.

81.     Roncalli and the Archdiocese employ heterosexuals who are in legally valid, opposite sex marriages that allegedly violate the teaching of the Catholic Church.

82.     Roncalli and the Archdiocese employ heterosexuals who violate teachings of the Catholic Church.

83.     Fitzgerald met or exceeded Defendants' legitimate performance expectations during her employment by them.

84.     Fitzgerald suffered one or more adverse employment actions affecting the terms and conditions of her employment, including but not limited to: being placed on administrative leave; being banned from the Roncalli campus; being blocked from using her work email; being accompanied and supervised while she cleaned out her office; having her co-workers, supporters and students subjected to threats and intimidation; and the non-renewal of her employment contract.

85.     Defendants treated Fitzgerald differently, and to her detriment, as compared to similarly situated heterosexual employees.

86.     Defendants treated Fitzgerald differently, and to her detriment, as compared to similarly situated male employees.

87.     Defendants discriminated Fitzgerald on the basis of sex and violated Title VII by:

        (1) treating her less favorably because of her sex;

        (2) taking her sex into account by treating her differently from similarly-situated men who married a woman;

        (3) taking into account the sex of her spouse;

        (4) discriminating against her based on gender and sex stereotypes, including heterosexually-defined gender norms;

(5) taking her sex into account by treating her differently from men who are in marriages that allegedly violate the teaching of the Catholic Church; and/or

(6) taking her sexual orientation into account by treating her differently from heterosexuals who are in legally valid, opposite sex marriages that allegedly violate the teaching of the Catholic Church; and/or

(7) taking her sex and/or sexual orientation into account by treating her differently from men and/or heterosexuals whose behavior allegedly violates the teaching of the Catholic Church.

88.     There is a causal connection between Fitzgerald's sex and marital status and Defendants' adverse employment actions towards her.

89.     There is a causal connection between Fitzgerald's sexual orientation and marital status and Defendants' adverse employment actions towards her.

90.     Fitzgerald has suffered damages as a result of Defendants' discriminatory actions, including but not limited to lost back pay, lost front pay, loss of future earning capacity, lost employer provided benefits, and emotional distress damages.

91.     Defendants' wrongful discrimination against Plaintiff violated Title VII, 42 U.S.C. § 2000e-2.

92.     As a proximate result of the actions and omissions discussed in this count, Fitzgerald suffered damages, experienced mental anguish and emotional distress and may continue to suffer from these injuries in the future.

**Count II**
**Violation of Title VII – 42 U.S.C. § 2000e-3**
**Retaliation**

93.     Each paragraph of this *Complaint* is incorporated as if fully restated herein.

94.     As described herein, Defendants wrongfully discriminated and retaliated against Fitzgerald for her activism in opposing the unlawful practices described in Count I and throughout this Complaint.

95.     Fitzgerald opposed Defendants' wrongful discrimination and unlawful practices by complaining to the Archbishop of the Archdiocese, Principal Weisenbach, President Hollowell, and through her social activism, based upon her reasonable, good-faith belief that the Defendants had violated Title VII.

96.     In response to Fitzgerald's efforts to oppose the perceived discrimination, the Defendants took retaliatory action against Pat Fitzgerald, the natural and biological father of Fitzgerald.

97.     As Fitzgerald's natural and biological father, and a long-time volunteer closely affiliated with Roncalli, Pat Fitzgerald falls within the "zone of interests" sought to be protected by Title VII.

98.     The Senior Retreat is offered to Roncalli students in their final year of high school as an opportunity to explore and reflect upon their personal and spiritual growth.

99.     The Senior Retreat is a deeply personal and emotional experience that is supervised by adult volunteers who guide the students on a journey of reflection and understanding.

100.    Pat Fitzgerald had worked as a volunteer and guest speaker on the Roncalli Senior Retreat every year for over twenty-six (26) years.

101.    Pat Fitzgerald considered the Roncalli Senior Retreat as one of the most rewarding and emotionally fulfilling experiences of his life.

102.    By all accounts, Pat Fitzgerald was an excellent speaker, a valued volunteer, and a significant contributor to the overall experience of the students on the Senior Retreat.

103.    In mid-January of 2019, Pat Fitzgerald was advised by a representative of the Defendants that he could no longer work as a volunteer at the Roncalli High School Senior Retreat.

104.    Pat Fitzgerald was emotionally crushed when he was told he would no longer be allowed to participate in the Senior Retreats.

105.    When Pat Fitzgerald inquired as to why such action was being taken against him, he was advised that the decision was being made by the Defendants because he had appeared on the news in a rally to support his daughter wherein he had held up a sign that read "Please treat my daughter Shelly kindly."

106.    When Fitzgerald learned of the action taken against her father by the Defendants due to his support of her efforts to oppose perceived discrimination by the Defendants, she became wracked with guilt and anxiety and suffered extreme emotional pain and distress.

107.    Defendants' actions against Pat Fitzgerald were intended to punish Fitzgerald for her social activism and her efforts to oppose the Defendants' unlawful acts.

108.    Defendants' actions against Pat Fitzgerald were also intended to deter Fitzgerald's social activism and her efforts to oppose the Defendants' unlawful acts.

109.    Defendants' actions against Pat Fitzgerald were intended to cause both Pat Fitzgerald and his daughter so much emotional anguish and pain that Fitzgerald would forego any litigation against the Defendants.

110.    In addition to the actions taken against Fitzgerald's father, Defendants' wrongful discrimination and retaliation against Plaintiff included, inter alia, one or more adverse employment actions impacting the terms and conditions of her employment, a hostile work environment, being placed on administrative leave, being banned from campus, and the non-renewal of her employment contract, each of which violated Title VII, 42 U.S.C. § 2000e-3.

111.    As a proximate result of the actions and omissions discussed in this count, Fitzgerald suffered damages, experienced mental anguish and emotional distress and may continue to suffer from these injuries in the future.

**Count III**
**Violation of Title VII – 42 U.S.C. § 2000e**
**Hostile Work Environment**

112.    Each paragraph of this *Complaint* is incorporated as if fully restated herein.

113.    Fitzgerald is a member of a protected class due to her sexual orientation.

114.    From August 2018 through her last day of employment, Fitzgerald was subjected to a discriminatorily abusive work environment, or hostile work environment, based on her sexual orientation and her sex.

115.    The work environment at Roncalli was objectively and subjectively hostile towards homosexual students, faculty, and staff, and sufficiently severe or pervasive to alter the terms of conditions of employment.

116.    Defendants knew or should have known about the hostile work environment experienced by Fitzgerald and failed to take any reasonable steps to take corrective action or prevent the hostile work environment from recurring.

117.    As a proximate result of the actions and omissions discussed in this count, Fitzgerald suffered damages, experienced mental anguish and emotional distress and may continue to suffer from these injuries in the future.

**Count IV**
**Violation of Title IX – Retaliation**

118.    Each paragraph of this *Complaint* is incorporated as if fully restated herein.

119.    At all relevant times, Defendants received federal financial assistance.

120.    Fitzgerald engaged in protected activity under Title IX by opposing Defendants' unlawful discrimination.

121.    Fitzgerald opposed Defendants' wrongful discrimination and unlawful practices by complaining to the Archbishop of the Archdiocese, Principal Weisenbach, President Hollowell, and the media, based upon her reasonable, good-faith belief that the Defendants had violated Title VII and/or Title IX.

122.    Fitzgerald suffered one or more adverse employment actions, impacting the terms and conditions of her employment, including but not limited to a hostile work environment, constructive discharge, and the non-renewal of her employment contract.

123.    Defendants retaliated against Fitzgerald for engaging in protected activities through her complaints of sex, sexual orientation, and/or marital status discrimination and publicity associated with those complaints.

124.    Fitzgerald has suffered damages as a result of Defendants' retaliatory actions, including but not limited to lost back pay, lost front pay, loss of future earning capacity, lost employer provided benefits, and emotional distress damages.

**Count V**
**Indiana State Law - Tortious Interference with a Contractual Relationship**
**against the Archdiocese only**

125.    Each paragraph of this *Complaint* is incorporated as if fully restated herein.

126.    Fitzgerald and Roncalli had a valid and existing contract for Fitzgerald's employment as a guidance counselor and Co-Director of Guidance at Roncalli.

127.     Based on her successful employment, positive performance evaluations, and excellent professional reputation, Fitzgerald had every reason to expect to continue to work at Roncalli for the foreseeable future.

128.     The Archdiocese knew about the contract between Fitzgerald and Roncalli.

129.     The Archdiocese intentionally interfered with Fitzgerald's contract with Roncalli by forcing Roncalli to place Fitzgerald on administrative leave, ban her for campus, constructively discharge her, not renew Fitzgerald's contract for the 2019-20 school year, directing Roncalli to consider her a ministerial employee, and/or by directing Roncalli to implement a "morals clause" in Fitzgerald's contract.

130.     The Archdiocese's interference with Fitzgerald's contract with Roncalli was not justified.

131.     Fitzgerald has suffered damages as a result of Defendant's actions described herein, including but not limited to lost back pay, lost front pay, loss of future earning capacity, lost employer provided benefits, and emotional distress damages.

### Count VI
### Indiana State Law - Tortious Interference with a Business Relationship against the Archdiocese only

132.     Each paragraph of this *Complaint* is incorporated as if fully restated herein.

133.     Fitzgerald and Roncalli had a valid and existing employment relationship.

134.     The Archdiocese knew about Fitzgerald's employment relationship with Roncalli.

135.     The Archdiocese intentionally interfered with Fitzgerald's employment relationship with Roncalli by forcing Roncalli to place Fitzgerald on administrative leave, ban her for campus, constructively discharge her, and not renew Fitzgerald's contract for the 2019-20 school year, directing Roncalli to consider her a ministerial employee, and/or by directing Roncalli to implement a "morals clause" in Fitzgerald's contract.

136.    The Archdiocese's interference with Fitzgerald's business relationship with Roncalli was not justified.

137.    Fitzgerald has suffered damages as a result of Defendant's actions described herein, including but not limited to lost back pay, lost front pay, loss of future earning capacity, lost employer provided benefits, and emotional distress damages.

**WHEREFORE**, Michelle Fitzgerald, by counsel, respectfully prays the Court enter judgment in her favor, against Defendants, as follows:

A.    An award of back pay with interest for the salary and other employment benefits and opportunities that she has lost as a result of the Defendants' unlawful adverse employment actions, including termination of Plaintiff's employment;

B.    Compensatory and punitive damages in an amount to be determined by a jury to compensate Plaintiff for the emotional distress and mental anguish she has suffered due to Defendants' conduct, and to deter Defendants and other employers from engaging in similar conduct in the future;

C.    An award of damages to compensate Plaintiff for the losses that she reasonably has and will sustain as the result of the denial of continued employment by Defendants;

D.    Pre-judgment and post-judgment interest where appropriate;

E.    An award of reasonable attorney fees and costs incurred in this action; and

F.    Such other relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

138.    Plaintiff, by counsel, hereby requests a trial by jury with respect to any issues so triable.

Respectfully submitted,


_s/ David T. Page_
David T. Page
1634 W. Smith Valley Road, Suite B
Greenwood, IN  46142
317-885-0041 Tel
888-308-6503 Fx

_s/ Mark W. Sniderman_
Mark W. Sniderman
FINDLING PARK CONYERS WOODY
 & SNIDERMAN, P.C.
151 N. Delaware St., Ste. 1520
Indianapolis, IN  46220
(317) 231-1100 Tel
(317) 231-1106 Fx
msniderman@findlingpark.com

_Attorneys for Plaintiff, Michelle Fitzgerald_

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

MICHELLE FITZGERALD,      )
                          )
      Plaintiff,        )
                          )
      v.                 )     Case No. 1:19-cv-04291-RLY-TAB
                          )
RONCALLI HIGH SCHOOL, INC.,  )
and the ROMAN CATHOLIC     )
ARCHDIOCESE OF           )
INDIANAPOLIS, INC.,        )
                          )
      Defendants.     )

## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants Roncalli High School, Inc., and the Roman Catholic Archdiocese of Indianapolis, Inc., by and through their attorneys, hereby move this Court pursuant to Federal Rule of Civil Procedure 12(c) to enter judgment on the pleadings as to all Plaintiff's claims (Counts I-VI, Dkt. 1).

As more fully set forth in the accompanying supporting brief being filed contemporaneously: (1) the alleged conduct is not proscribed by Title VII and IX; and (2) the claims are barred by First Amendment doctrines relating to (a) religious autonomy, (b) non-entanglement in religious questions, and (c) freedom of association.

In accordance with Local Rule 7-1(b)(1), this motion is accompanied by a supporting brief more fully setting forth the grounds of this motion. This motion is supported by the argument in that brief, the pleadings, attached exhibits properly considered under Rule 12(c), and any arguments that may be presented at any hearing in this matter. This motion is made in good faith and not for any improper or dilatory purpose.

Respectfully submitted,

By: /s/ Luke W. Goodrich
Luke W. Goodrich (DC # 977736)
Daniel H. Blomberg (DC # 1032624)
Christopher C. Pagliarella (DC # 273493)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave NW
Suite 700
Washington, DC 20036
(202) 955-0095
(202) 955-0090 fax

John S. (Jay) Mercer, #11260-49
Paul J. Carroll, #26296-49
MERCER BELANGER
One Indiana Square, Suite 1500
Indianapolis, IN 46204
(317) 636-3551
(317) 636-6680 fax

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04291-RLY-TAB |
| | ) | |
| RONCALLI HIGH SCHOOL, INC. and | ) | |
| ROMAN CATHOLIC ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

Michelle Fitzgerald, Plaintiff, sued Roncalli High School and the Roman Catholic Archdiocese of Indianapolis, Defendants, after Defendants declined to renew her employment contract upon learning of her marriage to another woman.  Fitzgerald brought claims of discrimination, retaliation, and hostile work environment under Title VII, retaliation under Title IX, and Indiana state law claims of tortious interference with a contractual relationship and tortious interference with a business relationship.  She asserts the state law claims against the Archdiocese only.

This case presents virtually identical issues to those presented in another case in this court, *Starkey v. Roncalli High School, Inc. and the Roman Catholic Archdiocese of Indianapolis, Inc.*, No. 1:19-cv-03153-RLY-TAB, namely the extent to which civil rights laws apply to religious institutions.  The court recently granted in part and denied in part Defendants' motion for judgment on the pleadings in *Starkey*.  *See id.* (Filing No. 93).  Because this motion presents the same arguments and issues as those addressed in this

court's entry in *Starkey*, the court incorporates the reasoning and conclusions from that

motion.  Defendants' motion is, therefore, **GRANTED in part** and **DENIED in part.**

## I.    Background

The following facts are taken from Fitzgerald's Complaint, which the court accepts

as true at this stage of the litigation.  *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388,

400 (7th Cir. 2018).  Roncalli is a Catholic school in Indianapolis, Indiana, and it is

operated under the guidance and supervision of the Roman Catholic Archdiocese of

Indianapolis.  (Filing No. 1, Compl. ¶ 15).  Fitzgerald worked at Roncalli, primarily as a

Guidance Counselor and Co-Director of Guidance, from 2004-2019.  (Filing No. 1,

Complaint ¶ 27-28).  Her employment contract was subject to renewal on an annual basis.

(*Id.* ¶ 29).  A few years ago, the Archdiocese directed Roncalli to implement uniform

"morals clauses" in its employee contracts.  (*Id.* ¶ 49).

In 2017, the Archdiocese and Roncalli replaced the standard employment contract

with a "School Guidance Counselor Ministry Contract" and an "Archdiocese of

Indianapolis Ministry Description" for school guidance counselors.  (*Id.* ¶ 50; Filing No.

42-2, School Guidance Counselor Ministry Contract, "Contract"; Filing No. 42-3,

Archdiocese of Indianapolis Ministry Description, "Job Description").  The Job

Description specified that "[a]s role models for students, the personal conduct of every

school guidance counselor . . . must convey and be supportive of the teachings of the

Catholic Church," which includes "the belief that all persons are called to respect human

sexuality and its expression in the Sacrament of Marriage as a sign of God's love and

fidelity to His Church."  (Job Description ¶ V).  Accordingly, an employee would be in

default of her contract if she violated the Church's teachings on marriage.  The Contract
provided:

> 6.  **Defaults.** The School Guidance Counselor shall be deemed
> to be in default under this contract in the event of any breach
> of duty hereunder, including, but not limited to the following:
> . . .
>> i.      Relationships that are contrary to a valid
>>          marriage as seen through the eyes of the Catholic
>>          Church; and
>>
>> j.      . . . any personal conduct or lifestyle at variance
>>          with the policies of the Archdiocese or the moral
>>          or religious teachings of the Roman Catholic
>>          Church.

(Contract, at 2).  The Catholic Church instructs that marriage is a "covenant" between a
"man and a woman."  Code of Canon Law, Canon 1055.  The Catholic Church also
believes that homosexual acts are "contrary to natural law" and "do not proceed from a
genuine affective and sexual complementarity."  Catechism of the Catholic Church ¶
2357.  "Under no circumstances can they be approved."[1]  *Id.*

Fitzgerald has been married to a woman since 2014.  (Compl. ¶ 51).  On August
10, 2018, Roncalli President Joseph Hollowell and Principal Chuck Weisenbach met with
Fitzgerald and informed her they knew of her marriage.  (*Id.* ¶ 52).  They presented her
with four options: she could resign, dissolve her marriage, keep quiet until her contract
was up at the end of year, or she could be fired.  (*Id.* ¶ 53).  They explained that her

---

[1] The court takes judicial notice of the Code of Canon Law and the Catechism of the Catholic
Church.  Fed. R. Evid. 201.

marriage violated her employment contract because it was contrary to the teachings of the Catholic Church.  (*Id.* ¶ 54).

Fitzgerald refused to resign, keep quiet, or dissolve her marriage, so Defendants placed her on paid administrative leave on August 10, 2018.  (*Id.* ¶ 55-56).  On May 2, 2019, Roncalli informed Fitzgerald that her employment contract, which expired on July 31, 2019, would not be renewed.  (*Id.* ¶ 66).

## II.   Legal Standard

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014).  "To survive a motion to dismiss, a complaint must 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

## III.   Discussion

As mentioned above, Defendants' motion presents the same issues and arguments as those presented in *Starkey*.  First, Defendants' argue they are entitled to judgment on the pleadings on Fitzgerald's Title VII claims because those claims are barred by § 702(a) of Title VII, which provides an exemption for religious institutions.  *See* 42 U.S.C. § 2000e-1(a).  Religious exemptions aside, Defendants next argue that they had a neutral, nondiscriminatory reason for their employment decision: Fitzgerald violated her

employment contract by entering a same sex marriage.  Defendants next argue that

Fitzgerald's Title IX retaliation claim is preempted by Title VII and otherwise barred by

Title IX's exemption for religious schools.  *See* 20 U.S.C. § 1681(a)(3).  Finally,

Defendants argue Fitzgerald's claims are barred by various First Amendment doctrines:

the right of religious autonomy, the prohibition on government entanglement in religious

questions, and the freedom of association.

    Given the factual and legal overlap between this case and *Starkey*, the court adopts

the reasoning and conclusions in its entry on Defendants' motion to dismiss in *Starkey*.

Specifically, the court concludes that Title VII's religious exemption does not bar

Fitzgerald's Title VII claims.  The exemption prohibits claims of religious discrimination

against religious employers when the employer favored a coreligionist, but it does not

allow religious employers to discriminate on the basis of other protected characteristics,

such as sexual orientation.  The court also concludes Fitzgerald has carried her burden of

pleading sufficient facts to support a plausible claim of a Title VII violation.

    Next, the court concludes that the First Amendment does not bar Fitzgerald's

claims on the pleadings.  It is premature to conclude whether religious autonomy bars

Fitzgerald's claims because there is a factual dispute regarding Fitzgerald's role at

Roncalli.  It would be similarly premature to dismiss Fitzgerald's claims on excessive

entanglement grounds because the parties dispute what Fitzgerald's role as a guidance

counselor entailed.  As for freedom of association, the court concludes that it is

inapplicable in the employment context.

Finally, the court concludes Fitzgerald's Title IX retaliation claim is preempted by Title VII.  The court, therefore, need not consider whether Title IX's exemption for religious schools applies.

## IV.    Conclusion

The court concludes that Title VII's religious exemption does not bar Fitzgerald's Title VII claims.  The court also concludes that Fitzgerald has alleged sufficient facts to support her Title VII claims of sexual orientation discrimination, retaliation, and hostile work environment.  But it is premature to conclude whether the First Amendment bars Fitzgerald's claims.  Finally, the court agrees with Defendants that Title VII preempts Fitzgerald's retaliation claim under Title IX.

Accordingly, Defendants' Motion for Judgment on the Pleadings (Filing No. 41) is **GRANTED in part** and **DENIED in part**.

**SO ORDERED** this 31st day of March 2021.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04291-RLY-DLP |
| | ) | |
| RONCALLI HIGH SCHOOL, INC., | ) | |
| and the ROMAN CATHOLIC | ) | |
| ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ..................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................ 2

    A.  The Archdiocese and Roncalli ..................................................... 2

    B.  Faculty and Staff at Roncalli ....................................................... 3

    C.  Fitzgerald's Role in Guidance ...................................................... 4

    D.  Fitzgerald's Role in Roncalli's Senior Leadership ..................... 13

    E.  Fitzgerald's Non-Renewal ......................................................... 15

STANDARD OF REVIEW ...................................................................... 17

ARGUMENT ........................................................................................... 17

I.  Fitzgerald's claims are barred by the ministerial exception. .......... 17

    A.  The ministerial exception bars claims by ministers suing over
        their employment. .................................................................... 18

    B.  Fitzgerald was a minister. ......................................................... 20

        1.  Fitzgerald performed the functions of a minister. .............. 20

        2.  Other considerations confirm Fitzgerald was a minister. ... 27

    C.  All of Fitzgerald's claims are barred. ........................................ 29

II.  Fitzgerald's federal claims are barred by RFRA. ........................... 30

III.  Fitzgerald's Title VII claims are barred by Title VII. ..................... 31

IV.  Fitzgerald's claims are barred by the First Amendment. ................ 34

CONCLUSION ....................................................................................... 35

CERTIFICATE OF SERVICE ................................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. City of Indianapolis,*
    742 F.3d 720 (7th Cir. 2014) ................................................................. 17

*Alicea-Hernandez v. Catholic Bishop of Chi.,*
    320 F.3d 698 (7th Cir. 2003) ........................................................... 18, 27

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................................................. 17

*Archdiocese of Miami v. Miñagorri,*
    954 So.2d 640 (Fla. Dist. Ct. App. 2007) ............................................. 26

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................. 17

*Bear Creek Bible Church v. EEOC,*
    No. 4:18-cv-00824, 2021 WL 5052661 (N.D. Tex. Oct. 31, 2021) ............. 31, 32, 35

*Black v. St. Bernadette Congregation of Appleton,*
    360 N.W.2d 550 (Wis. Ct. App. 1984) ................................................. 27

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) ................................................................. 30, 32-33

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000) ............................................................................. 35

*Bryce v. Episcopal Church in the Diocese of Colo.,*
    289 F.3d 648 (10th Cir. 2002) .............................................................. 34

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ............................................................................. 30

*Christian Legal Soc'y v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ....................................................... 30, 31, 33

*Conlon v. InterVarsity Christian Fellowship,*
    777 F.3d 829 (6th Cir. 2015) ................................................................ 27

*Dayner v. Archdiocese of Hartford,*
    23 A.3d 1192 (Conn. 2011) ................................................................. 26

*Demkovich v. St. Andrew the Apostle Parish,*
   3 F.4th 968 (7th Cir. 2021) (en banc) ............................................................ 21, 34

*EEOC v. Catholic Univ. of Am.,*
   3 F.3d 455 (D.C. Cir. 1996) ................................................................................ 31

*Fratello v. Archdiocese of N.Y.,*
   863 F.3d 190 (2d Cir. 2017) ........................................................ 18-19, 26, 28

*Grussgott v. Milwaukee Jewish Day Sch., Inc.,*
   882 F.3d 655 (7th Cir. 2018) ..................................................................*passim*

*Hoffman-Dombrowski v. Arlington Int'l Racecourse,*
   254 F.3d 644 (7th Cir. 2001) ............................................................................ 17

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
   565 U.S. 171 (2012) ..................................................................................*passim*

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.,*
   665 F.3d 930 (7th Cir. 2012) ............................................................................ 17

*Korte v. Sebelius,*
   735 F.3d 654 (7th Cir. 2013) .......................................................... 18, 30, 34

*Leitgen v. Franciscan Skemp Healthcare, Inc.,*
   630 F.3d 668 (7th Cir. 2011) ............................................................................ 33

*Listecki v. Off. Comm. of Unsecured Creditors,*
   780 F.3d 731 (7th Cir. 2015) ............................................................................ 30

*NLRB v. Catholic Bishop,*
   440 U.S. 490 (1979) ............................................................................................ 35

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   140 S. Ct. 2049 (2020) ............................................................................*passim*

*Pardue v. Ctr. City Consortium Schs. of Archdiocese of Wash., Inc.,*
   875 A.2d 669 (D.C. 2005) ................................................................................ 26

*Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.,*
   819 F.2d 875 (9th Cir. 1987) ............................................................................ 30

*Petruska v. Gannon Univ.,*
   462 F.3d 294 (3d Cir. 2006) ............................................................................ 26

*Religious Sisters of Mercy v. Azar,*
   513 F. Supp. 3d 1113 (D.N.D. 2021) ............................................................ 31

*Sabatino v. St. Aloysius Par.*,
   672 A.2d 217 (N.J. Super. Ct. App. Div. 1996) ..................................................... 27

*Schleicher v. Salvation Army*,
   518 F.3d 472 (7th Cir. 2008) ................................................................................. 18

*Scott v. Harris*,
   550 U.S. 372 (2007) .............................................................................................. 17

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
   363 F.3d 299 (4th Cir. 2004) ................................................................................. 18

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
   No. 1:19-cv-03153-RLY-TAB, ___ F. Supp. 3d ____, 2021 WL
   3669050 (S.D. Ind. Aug. 11, 2021) ................................................................*passim*

*Sterlinski v. Catholic Bishop of Chi.*,
   934 F.3d 568 (7th Cir. 2019) .......................................................................... 18, 24

*Vore v. Ind. Bell Tel. Co.*,
   32 F.3d 1161 (7th Cir. 1994) ................................................................................. 33

*Yin v. Columbia Int'l Univ.*,
   335 F. Supp. 3d 803 (D.S.C. 2018) ................................................................. 19, 22

**Statutes**

42 U.S.C. § 2000bb-1 ...................................................................................................... 31

42 U.S.C. § 2000e ........................................................................................................... 32

42 U.S.C. § 2000e-1 ........................................................................................................ 32

**Other Authorities**

1983 Code of Canon Law ..................................................................................... 3, 6, 16

Catechism of the Catholic Church .................................................................... 11, 16

Fed. R. Civ. P. 56(a) ...................................................................................................... 17

L.R. 56-1 ......................................................................................................................... 16

Second Vatican Council's *Gravissimum Educationis* (Oct. 28, 1965) ......................... 3

## INTRODUCTION

This case strikes at the heart of the First Amendment's protections for religious autonomy. The Plaintiff, Shelly Fitzgerald, was a leader and Co-Director of Guidance at Roncalli Catholic High School. She lost her job after entering a same-sex union in knowing violation of her contract and Church teaching. She now sues, seeking to penalize the Archdiocese of Indianapolis for a religious decision about who can lead and transmit the faith in its Catholic schools.

Not surprisingly, this suit is barred by multiple protections for religious freedom. First, it is barred by the ministerial exception, which applies to employment claims by "any 'employee' who leads a religious organization" or has a "role in conveying the Church's message and carrying out its mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2063 (2020). Just three months ago, in what this Court called a "virtually identical" lawsuit brought by Fitzgerald's own Co-Director of Guidance, Dkt. 98 at 1, this Court held "that the Co-Director of Guidance at Roncalli falls within the ministerial exception" and entered judgment for the Archdiocese on all claims. *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, No. 1:19-cv-03153-RLY-TAB, ___ F. Supp. 3d ____, 2021 WL 3669050, at *7 (S.D. Ind. Aug. 11, 2021). As this Court explained, the Co-Director is "designated" as a "minister of the faith" and "charged" with "'fostering the spiritual growth' of her students"—including "communicating the Catholic faith to students, praying with and for members of the Roncalli community, teaching and celebrating Catholic traditions, [and] modeling the example of Jesus.*" Id*. at *5 (cleaned up). The Co-Director draws on "matters of faith and doctrine" while "help[ing] students with their 'most sensitive' and 'personal issues.'" *Id*. And the Co-Director is "a senior leadership role" that "help[s] shape the religious and spiritual environment at the school and guide[s] the school on its religious mission." *Id*. at *7. Thus, "it is apparent that the ministerial exception covers [that] role." *Id*. at *4.

That decision in *Starkey* is fully controlling in this "virtually identical" case. Dkt. 98 at 1. Fitzgerald fulfilled the *same role* with the *same duties* at the *same school* at the *same time* as the *Starkey* plaintiff. Thus, her claims are barred under the same analysis. If anything, Fitzgerald has generated even more evidence of her own religious duties. She highlighted in her performance reviews that she discussed "personal and social issues … and faith formation" with students; that she "consistently use[s] spiritual life and resources in my counseling conversations as well as sharing my own spiritual experiences" with students; and that her willingness to share her belief and love of God "is a strength when working with young people who are seeking direction." App.44, 47. She helped lead a senior retreat—an intimate multi-night gathering focused on faith formation—where she gave a deeply personal talk on her own spiritual journey and reflected on Scripture. App.298-314 at 157:2-4, 165:4-166:13, 167:16-169:6, 170:22-171:2, 172:21-173:11; App.483; App.601-03. And at least one family independently praised her for "always preach[ing] the message of the gospel" in her work as counselor to their children. App.606. All this evidence only underscores that the *Starkey* decision fully applies here.

In addition, this suit is also barred by the Religious Freedom Restoration Act (RFRA), Title VII's religious-employer exemption, and several First Amendment doctrines that apply regardless of whether Fitzgerald was a minister. Because this Court in *Starkey* ruled in the Archdiocese's favor on the ministerial exception, it declined to address or revisit these issues, 2021 WL 3669050, at *3, and it may follow the same course here. Nevertheless, we address them briefly as they confirm why summary judgment for the Archdiocese is required.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The Archdiocese and Roncalli

The Roman Catholic Archdiocese of Indianapolis is a religious community led by the Archbishop of Indianapolis, subject to the "Roman Catholic Pontiff," and governed

under the Roman Catholic "Code of Canon Law." *See* App.634-36. The Archdiocese's mission is to "live the Gospel" by "[w]orshipping God in word and sacrament"; "[l]earning, teaching and sharing [the Catholic] faith"; and "[s]erving human needs." App.677.

Founded in 1969, Roncalli High School is a Catholic school "under the auspices of the Roman Catholic Archdiocese of Indianapolis." App.677-78. Its purpose is "supporting and otherwise furthering the mission and purposes of" the Archdiocese, including "faith formation." App.628. Per its mission statement, Roncalli seeks "to form Christian leaders in body, mind, and spirit," to challenge students to "respond to the call of discipleship," and "to make God's love complete among us." App.677; *accord* App.19-20 ¶9. Its student handbook states that "the most important program at Roncalli is our spiritual formation program" and that "true education is aimed at the formation of the human person in the pursuit of his ultimate end." App.137, App.762 (adapted from the Second Vatican Council's *Gravissimum Educationis* (Oct. 28, 1965), App.640-48); *see* App.680 (similar language in faculty handbook).

## B. Faculty and Staff at Roncalli

Catholic canon law requires Catholic educators "to be outstanding in correct doctrine and integrity of life." 1983 Code c.803, §2. Accordingly, Roncalli's faculty handbook emphasizes that a "foundational element" of Catholic education is "[t]he evangelizing witness of faith in action that is so obvious in the life of our teachers." App.680. The handbook charges Roncalli's principal with "[h]ir[ing] faculty and staff whose values are compatible with the mission of Roncalli High School." App.693. The principal prefers whenever possible to hire faithful Catholics in teaching, administrative, and guidance counseling roles, and expects all teachers and guidance counselors to be "actively seeking opportunities to be involved in the faith formation and overall development of our students even outside school hours." App.24-25 ¶¶32-34; App.137, 762 (student handbook) (staff participation in "Liturgies, Retreat

Experiences, Adoration, Community Service, Service Learning, Days of Reflection and Penance Services").

Teachers and guidance counselors at Roncalli are typically employed under one-year contracts, which incorporate job descriptions. *E.g.*, App.507-14. When this dispute arose, the job descriptions for both teachers and guidance counselors required them to "[c]ommunicate[] the Catholic faith to students," "[p]ray[] with and for students," "[p]articipate[] in religious instruction," and "carr[y] out [the Church's] mission by modeling a Christ-centered life." App.509 (guidance); App.501 (teachers); *see also, e.g.*, App.505 (guidance counselors "are being held accountable for 97% of the same expectations as the teacher," "with the exceptions being daily lesson plans and efficient classroom routines"). Likewise, these descriptions indicate that teachers' and guidance counselors' "personal conduct … both at school and away from school, must convey and be supportive of the teachings of the Catholic Church." App.503-04, 512.

### C. Fitzgerald's Role in Guidance

Plaintiff Shelly Fitzgerald began working at Roncalli in 2004 as Guidance Counselor. App.517-18. She was raised Catholic, attended Catholic schools from first grade until graduating high school, and listed herself as Catholic on her job application. App.155 at 14:1-12; App.418. In applying for a position at Roncalli, she touted her experience helping high-schoolers "deal with issues of divorce, sexual identity and awareness, pregnancy, and academic difficulty," App.425, on the belief that part of her job as a Roncalli counselor would be to help students with similar "personal and sensitive issues," App.175-76 at 33:19-35:20.

In 2007, Fitzgerald was promoted to Co-Director of Guidance. App.161 at 20:12-19. Principal Chuck Weisenbach states that Fitzgerald's Catholic upbringing, Catholic education, and "track record of [her] commitment to and leadership in these areas of faith formation was a part of what made [him] comfortable elevating" her. App.26-27 ¶43.

As Co-Director of Guidance, Fitzgerald held a supervisory role, as all guidance counselors are "responsible to the Director of Guidance." App.437. In that role, Fitzgerald "[s]upervise[d]" and "participate[d] in the performance appraisal of" the other guidance counselors. App.436; *see* App.162 at 21:2-7, App.272 at 131:14-132:3, App.289 at 148:1-8. She also attended department chair meetings as a department chair. App.19 ¶¶6-7; App.164 at 23:9-15. She answered directly to the Principal and was part of the school's Administrative Council. App.435-36; App.18 ¶4; App.161 at 20:20-21:1. Fitzgerald held each of these positions—guidance counselor, Co-Director/Chair of Guidance, and Administrative Council member—for 11 years before this dispute arose. *See* App.161 at 20:12-19.

In May 2018, Fitzgerald signed a "School Guidance Counselor Ministry Contract." App.507-08; *see* App.261 at 120:12-121:7. The contract states that she "acknowledges having been provided with a copy of the Faculty Handbook" and "agrees that conscientious observance of the Faculty Handbook … is an expressed duty of [her] performance of this contract." App.507; *see* App.513 (similar). The faculty handbook provides that the Director of Guidance and Guidance Counselor "assist[] the students in strengthening and developing their social, emotional, intellectual and Christian development," with the non-Director Counselors being "responsible to the [Co-]Director," Fitzgerald, in this task. App.435, 437.

The Guidance Counselor Ministry Contract signed by Fitzgerald also states that "School Guidance Counselor also acknowledges receipt of the ministry description that is attached to this contract and agree[s] to[]fulfill the duties and responsibilities listed in the ministry description." App.507. Fitzgerald acknowledges having seen that description by "June 2018." App.671; *see* App.937-38 at 125:19-126:11 (Co-Director Starkey confirming she saw description "in May 2018").

The ministry description states that the guidance counselor is "a minister of the faith." App.509. The first "Role" listed in the description is that a guidance counselor "Facilitates Faith Formation," which includes the following responsibilities:

- "Communicates the Catholic faith to students and families through implementation of the school's guidance curriculum … [and] offer[s] direct support to individual students and families in efforts to foster the integration of faith, culture, and life."
- "Prays with and for students, families, and colleagues and their intentions.[1] Participates in and celebrates liturgies and prayer services as appropriate."
- "Teaches and celebrates Catholic traditions and all observances in the Liturgical Year."
- "Models the example of Jesus, the Master Teacher, in what He taught, how He lived, and how He treated others."
- "Conveys the Church's message and carries out its mission by modeling a Christ-centered life."
- "Participates in religious instruction and Catholic formation, including Christian services, offered at the school …" *Id.*

The ministry description includes several other responsibilities relating to personal and spiritual counseling duties, such as: (1) "Uses techniques and methods that foster a Christ-centered atmosphere"; (2) "Participates in spiritual retreats, days of reflection, and spiritual formation programs"; (3) Coordinates "bullying awareness and prevention, suicide awareness and prevention, substance abuse awareness and prevention"; (4) "Proactively identifies and addresses physical, social, emotional, and spiritual needs"; and (5) "Display of Gospel values." App.510-12.

The ministry description also states that "Catholic schools are ministries of the Catholic Church, and school guidance counselors are vital ministers sharing the mission of the Church. School guidance counselors are expected to be role models and are expressly charged with leading students toward Christian maturity and with teaching the Word of God." App.512 (must be "credible witnesses of the Catholic faith"). The description says that "[a]s role models," the "personal conduct" of guidance

---

[1]   An "intention" is a Catholic term for the object of a prayer. *See* 1983 Code c.945-51.

counselors "both at school and away from school, must convey and be supportive of the teachings of the Catholic Church," including the "call[ing] to respect human sexuality and its expression in the Sacrament of Marriage." *Id.*

Angela Maly, a Guidance Counselor at Roncalli since August 2018, confirms that the ministry description "is a fair description of the day-to-day expectations" of the job, including the "role in facilitating faith formation among students." App.1, 7 ¶¶2, 39, 40; *accord* App.23 ¶¶25-27. Maly describes her "day-to-day work" in faith formation as a Guidance Counselor as "specifically geared toward modeling and teaching not just a generic 'Christian' faith but the Catholic faith specifically": "I pray with and for them. I join with them in liturgies and prayer services. … And I try to help them understand and be formed in the Catholic faith." App.7 ¶40.

Consistent with the expectation that she participate in religious services offered at the school, Fitzgerald regularly attended monthly Masses at Roncalli, receiving Holy Communion along with the rest of the Roncalli community, including most of her students and counselors who reported to her. App.209-10 at 68:16-69:22; *see* App.22 ¶24.

Fitzgerald also attended "Days of Reflection." App.356-57 at 215:22-216:11. These are gatherings at the beginning of the year for "faculty who are impacting kids in their spiritual life on a day-to-day basis." App.21-22 ¶¶19-22. Counselors are included. App.22 ¶22; *see also* App.8 ¶44 (Maly declaration); App.982-83 at 170:18-171:19 (Co-Director Starkey "generally attended" these Days, including the "liturgy," "to prepare for the year ahead"). Supported by campus ministry, the day features an outside Catholic speaker and a liturgy, or Mass, with Holy Communion, and has also featured church visits. App.8 ¶44; App.21-22 ¶¶19-21; *see also* App.982-83 at 170:24-171:19; App.660-61 ¶13 (Fitzgerald confirming attendance for recent speaker).

At the Day of Reflection, Roncalli's Principal Weisenbach delivers a "call-and-response Commissioning Prayer" to the assembled faculty. App.22 ¶21. In a typical

prayer, the faculty state that they "embrace the responsibilities of my ministry," "promise to willingly share my faith with others," and "promise to form youth and support families in the faith by following the example of our Master Teacher, Jesus Christ." App.36; App.22 ¶21. The leader then states: "I hereby commission you to faithfully and joyfully serve as ministers of the faith." App.36; *see also* App.8 ¶45.

The guidance department is the only department at Roncalli whose members meet one on one with every student every school year. App.870-71 at 58:19-59:9; *accord* App.23 ¶28. Consistent with contract expectation, Roncalli Guidance Counselors under Fitzgerald's leadership were closely engaged in tracking and managing students' "'most sensitive' and 'personal issues.'" *Starkey*, 2021 WL 3669050, at *5; *see* App.44. One way they did so was through the Student Assistance Program, or SAP (recently renamed STAND UP). App.180-85 at 39:15-44:1; App.3-4 ¶¶14-18.

SAP helps identify and address students "experiencing physical, social, emotional or spiritual difficulties," App.795, including, for example, "mental health issues" or substance abuse. App.183 at 42:2-10; *see also, e.g.*, App.860 at 48:12-16 ("dysfunction in their homes," "death of a loved one"). All five counselors participate in SAP, along with the campus minister, the social worker, and several administrators and teachers. App.185 at 44:2-9. SAP usually identifies at-risk students "through a referral process," and during her time at Roncalli Fitzgerald was the point of contact for anonymous referrals. App.181 at 40:10-16; App.443; App.191-92 at 50:9-51:15.

Roncalli Guidance Counselor Angela Maly has taken on a "leadership role" within SAP/STAND UP. App.3 ¶15; *compare* App.860-61 at 48:24-49:10 (similar leadership role for former Guidance Counselor Starkey). She describes her direct-guidance role as "assist[ing] students with their social, mental, academic, emotional, and spiritual needs" and "showing the face of Christ to the Roncalli family." App.2 ¶¶4-5. That assistance has included discussions of "anxiety, stress, depression, romantic relationship issues, thoughts of suicide, sexual orientation, gender identity, and questions

39A

and doubts about the Catholic faith and its moral teachings." App.2 ¶6. Representative conversations included: (1) talking a student through "how to rely on God" during a breakup; (2) encouraging students facing academic challenges to pray, emphasizing "that God has a plan bigger than we can imagine"; and (3) assuring students "struggling to reconcile their sexual orientation with their faith" that they are loved by God "no matter what" and "not define[d]" by their orientation. App.2-3 ¶¶7-12. One student recently emailed Maly, thanking her for "play[ing] a huge role in shaping the person [she is] today," and including a reflection that she shared with the entire school, where she thanked Maly for encouraging her to spend time in the chapel alone with God each day. App.4-5 ¶22.

Maly "regularly pray[s]" with students, reminding them to "offer the struggle up to Christ through prayer." App.2 ¶9; App.3 ¶13. Those prayers "often incorporat[e] traditional Catholic prayer practices" like "prayer cards" or intercessory prayer using "'tiny saints,' small keychains with an image of a saint." App.3 ¶13. She understands prayer with counselees to be an "essential component[]" of her job. App.2 ¶10.

Prayer is also "a huge part of [Maly's] daily life and work at Roncalli" even outside of counseling meetings, including leading students and faculty in morning rosaries and adoration of the Blessed Sacrament; daily all-school prayer; opening every Guidance meeting with prayer; praying at STAND UP meetings; and participating in monthly Mass. App.4-6 ¶¶18-32. Maly also states that she is "instructed and encouraged by Roncalli to" "put[] faith into action." App.6 ¶33. To that end, she has engaged in charitable endeavors with students, including at a food pantry and a weeklong mission trip with students focused on service projects and prayer. App.6 ¶¶33-34.

As Co-Director of Guidance, Fitzgerald affirmed on multiple occasions the faith-formation component of Roncalli Guidance Counselors' work discussed by Maly. *E.g.*, App.498; App.527. For example, in May 2016, Fitzgerald was part of an email conversation with Roncalli administrators on how to classify the school's guidance

counselors under the Fair Labor Standards Act. App.499-500; *see* App.919-21 at 107:4-109:19. As part of that conversation, Fitzgerald's Co-Director, Starkey, transmitted a letter to Principal Weisenbach over her and Fitzgerald's signatures, explaining why "school counselors qualify for a salaried contract to the same degree as … teachers do." App.498; *see* App.920 at 108:8-12, App.926-27 at 114:4-115:12. This letter referenced "ArchIndy's Ministry Description for 'Teacher' (2.22.2016)," and explained that "[i]f school counselors had a Ministry Description, it would be identical to that of teachers, except for III.B.2 (daily lesson plans) and III.C.5 (efficient classroom routines)." *Id.*; *see* App.922-23, 930 at 110:5-111:3, 118:7-15; App.501-04. The duties in the Teacher Ministry Description that Fitzgerald and Starkey identified as "identical" substantially match all of the counselor duties noted in bullet points above (*supra*, p.6), and also include "[p]articipates in spiritual retreats, days of reflection, and spiritual formation programs"; "[d]isplays" "Gospel values"; and "[l]ead[s] their students toward Christian maturity" and "teach[es] the Word of God." App.501-04; *compare* App.509-12 (later-adopted Ministry Description for Guidance Counselors).

Weisenbach shared Fitzgerald and Starkey's letter with Archdiocesan staff, saying it "sets out some very clear reasons why a guidance counselor qualifies for the same ministerial exemption as the teachers." App.499; *accord* App.252-53 at 111:13-112:4. Weisenbach went on: "There are 67 items listed on the archdiocesan ministry description for a teacher. A guidance counselor fulfills 65 of the 67…. Given they are being held accountable for 97% of the same expectations as the teacher, being granted the same exemption as the teacher makes sense to me." App.499. In response, Fitzgerald emailed Weisenbach thanking him for taking her and Starkey's "side" on this matter. App.505. Weisenbach has since reaffirmed that Starkey and Fitzgerald's letter "characterized their roles accurately," including their roles in "forming the faith of students." App.27 ¶46.

The Fitzgerald–Starkey letter also noted that "school counselors are evaluated using the … school counselor version of the Catholic *Educator* Advancement Program," or CEAP. App.498. CEAP "allows educators"—both teachers and guidance counselors—"to advance in their career levels and pay scale based on their performance[.]" App.25 ¶¶36-37. When the CEAP was extended to counselors, Fitzgerald participated in drafting and establishing the performance criteria. App.654; *see also* App.37 (performance review thanking Fitzgerald "for taking the initiative on this"). Those criteria included the following for a "Distinguished School Counselor":

- "School counselor embraces, embodies and lives out the spirit of Saint John XXIII as evidenced by their living out of his traits in their ministry at Roncalli."
- "School counselor connects with students' spiritual life and resources in counseling (e.g. retreat, church, youth ministry, mission work)."
- "School counselor consistently attends Sunday mass or their denominational church service … ."

App.527. As discussed below, Fitzgerald herself was designated a Distinguished School Counselor after being evaluated by her own metric. App.272 at 131:11-13.

Counselors at Roncalli were in fact evaluated according to these religious criteria, under the CEAP and otherwise. App.583-99; App.573-81. For example, one former Guidance Counselor—in completing the CEAP-required self-assessment of her performance in "Spirit of Roncalli Formation"—explained that she fulfilled these criteria by "highly encourag[ing] students to attend retreat," and "encouraging faith with my students." App.597; *see* App.287 at 146:5-12. The counselor pointed out that she had become "more confident in" doing so by "[o]bserving retreat" herself, going through the Rite of Christian Initiation of Adults (the process for entering the Catholic Church as an adult), and Mass attendance. App.597 (also discussing the "charisms of St. John XXIII I live out most").[2]

---

[2] "[C]harisms" are "graces of the Holy Spirit which directly or indirectly benefit the Church," by which the Holy Spirit "makes the faithful 'fit and ready to undertake various tasks and offices for the renewal and building up of the Church.'" Catechism of the Catholic Church §§ 798-99.

Similarly, Angela Maly testified that "[o]ne of my goals is always spiritually based" in her annual review. App.8 ¶43; *see* App.583. And in one of Fitzgerald's own performance reviews, the Principal commended her success in "find[ing] more ways to celebrate Christ, specifically through reading, journaling, praying, etc.," and directed her to "[k]eep your focus strong here." App.37. The review then shared the Principal's own efforts "to include Christ in more of my daily life." *Id.*

Fitzgerald also went through CEAP. App.40-48; *see* App.26 ¶42. In her self-assessment, Fitzgerald explained that she meets with students individually at least once a year "but often times, much more" and discusses "personal and social issues … and faith formation." App.43-44 ("personal and social counseling" can include "serious crisis situation[s]"). As for "Spirit of Roncalli Formation," Fitzgerald stated that she "love[s] … sharing [her] experience and faith with others," and was "working the first retreat of the year, and plan[ning] to help more with St. Vincent de Paul." App.47; *see* App.6 ¶33 ("St. Vincent DePaul Food Pantry"). She also emphasized:

> I consistently attend Sunday church service, all masses at Roncalli, and morning communion services when I am able. I consistently use spiritual life and resources in my counseling conversations as well as sharing my own spiritual experiences. … I am faithful, and have no problems sharing my beliefs and my love of God. In a faith-based school, I feel this definitely is a strength when working with young people who are seeking direction.

App.47. Fitzgerald's narrative closes on her four "Goals" for the coming year, which included "[w]ork[ing] a senior retreat." App.48.

The senior retreat is called the "Christian Awakening Retreat," which Fitzgerald's complaint describes as "a deeply personal and emotional experience" aimed at "spiritual growth." Dkt. 1 ¶¶98-99; *see* App.363-64 at 222:11-223:2. Principal Weisenbach agrees, stating the retreat is "the cornerstone of the senior experience." App.26 ¶41. Its "ultimate goal … is to help students understand how Christ is present in their daily life." App.6 ¶35. The retreat lasts three-and-a-half days and is held at either the "Fatima Retreat House" or the "Benedict Inn Center." App.303-04 at 162:15-163:3;

*see* App.600. During one of the evenings while their children are on retreat, parents gather in Roncalli's chapel for a "Prayer Vigil." App.600. Fitzgerald served as an "Adult Team Leader[]" on the retreat in 2016. *Id.* At the retreat, Fitzgerald gave "the very first talk of the opening night" entitled "Graph of Life," which discussed how her "relationship with God shifted throughout [her] life" and was designed to convey to retreatants that "[a] person's relationship with God has highs and lows … , and those shape the sort of personal relationship that person has with God in the present." App.298 at 157:11-13; App.308-14 at 167:21-173:11; App.602-03. Fitzgerald chose a Scripture passage—"2 Corinthians 12:9-10"—to reference in the talk. App.601. Afterward, students went "off to a quiet place and work[ed] on their own Graph of Life," based on Fitzgerald's discussion. App.317-18 at 176:19-177:7.

### D. Fitzgerald's Role in Roncalli's Senior Leadership

As Co-Director of Guidance, Fitzgerald was the Department Co-Chair. App.161-62 at 20:20-21:4. That meant she was responsible to oversee the Guidance Department, including conducting monthly department meetings, formulating the guidance curriculum, managing the budget, and working with the Principal in the hiring and supervision of all Guidance personnel. *Id*; *see* App.727.

Fitzgerald also served on Roncalli's Administrative Council—"[t]he main leadership body within the school." App.18 ¶4. It includes the Principal, Campus Minister, Chaplain, two Assistant Principals, Dean of Students, Athletic Director, and Co-Directors of Guidance. *Id.* During Fitzgerald's tenure, the Council met weekly and always opened in prayer. App.198 at 57:7-14; App.204 at 63:13-15.

Principal Weisenbach states that "[m]ost faculty and staff recognize the Administrative Council as the lifeblood of decision-making at the school," and that "the Administrative Council and the Department Chairs are responsible for 95% of Roncalli's daily ministry, education, and operations." App.19 ¶¶5-7. Along with the Principal

and Assistant Principal for Academic Affairs, the Director of Guidance (Fitzgerald's role) "is the only staff member who serves on both those bodies." *Id.*

During Fitzgerald's tenure, as today, the Council informed key decisions relating to the life of the school, including issues core to Roncalli's religious mission. For example, the Council helped plan "all-school liturg[ies]," including by discussing who should serve "as Eucharistic ministers"; "[h]ow to get [students] more involved in the mass," especially with respect to "music"; and whether to include "Eucharistic adoration." App.208-09 at 67:16-68:15; App.220-21 at 79:16-80:19; App.224-25 at 83:22-84:20; App.447; App.487-88; App.137. Likewise, the Council discussed how to handle a student "morality survey" on important Catholic beliefs regarding sexual activity, dishonesty, and drug use. App.241-42 at 100:8-101:12. And the Council discussed other aspects of the school's religious identity and faith formation programming, such as whether "we [should] have information about the charisms [of St. John XXIII] on our web site" (App.495) and the "Senior Religion Capstone Project" for the Religion Department (App.496-97).

Council agendas show Fitzgerald's input on issues of faith, mission, and student challenges. *E.g.*, App.445. Indeed, in contemporaneous performance evaluations, Principal Weisenbach praised Fitzgerald's "input on the administrative council," App.613, and "the insights and ideas that [she] br[ought] to our weekly meetings." App.615. After the Parkland shooting, for example, Fitzgerald encouraged holding a "prayer service to honor kids who were killed." App.446-47; *see also* App.20 ¶13; App.205-06 at 64:8-65:12. In another meeting, Fitzgerald weighed in on a draft Archdiocesan policy dealing with transgender issues, expressing "concern" over a portion of the policy requiring school employees who learn of a student's identifying as transgender "to notify the youth's parents." App.229-31 at 88:18-90:14; App.491.

As Administrative Council member, Fitzgerald was also invited to deliver all-school prayers. App.21 ¶18. Principal Weisenbach asked each member of the Council

45A

to deliver a personal reflection and prayer to all students "about once every nine weeks." *Id*. Although Fitzgerald states she declined the invitation, her Co-Director, Starkey, offered the reflection multiple times. *Starkey*, 2021 WL 3669050, at *3.

Further, Fitzgerald participated in a Council discussion group on a book called *Living as Missionary Disciples: A Resource for Evangelization*. App.659-60. That book is a publication of the United States Conference of Catholic Bishops and is designed to assist "pastoral leaders" as they "develop, enhance, and review their own local strategies" to pursue evangelization. App.895-96 at 83:21-84:10 (Co-Director Starkey agreeing with description); *see* App.20-21 ¶¶14-17. Fitzgerald and Principal Weisenbach also exchanged books on religious and theological topics, including on outreach to "the LGBTQ community." App.327-29 at 186:22-188:20; App.341-42 at 200:18-201:15. Roncalli "sen[t]" Fitzgerald and one other employee to a "workshop about bringing LGBTQ people into the church." App.329 at 188:11-20; App.336-39 at 195:19-198:8; App.666. And in 2018, Fitzgerald was assigned to a newly-created "diversity council" aimed in part at addressing "LGBT issues," as well as issues of "race," "ethnicity," and religious diversity at Roncalli. App.329 at 188:11-20; App.343-46 at 202:18-205:2.

### E. Fitzgerald's Non-Renewal

In May 2018, Roncalli renewed Fitzgerald's employment for another year, and Fitzgerald signed the "School Guidance Counselor Ministry Contract." App.507-08. The contract stated: "The School Guidance Counselor shall be deemed to be in default under this contract in the event of … any personal conduct or lifestyle at variance with the policies of the Archdiocese or the moral or religious teachings of the Roman Catholic Church." App.508. A default provision like this was included in Fitzgerald's annual employment contracts ever since she started at Roncalli. *See, e.g.*, App.517-18 (2004-05 contract); App.261-69 at 120:20-128:19.

Fitzgerald's contract also provided that she would "be in default under this contract" if she engaged in "any breach of duty," including "[r]elationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church." App.508 The Catholic Church defines marriage as a "covenant" "by which a man and a woman form with each other an intimate communion of life and love." Catechism of the Catholic Church § 1660; *accord* 1983 Code c.1055.

In August 2018, Roncalli leadership learned that Fitzgerald had entered a same-sex civil union. Dkt. 1 ¶52; Dkt. 29 ¶52.[3] Because this conduct violated Fitzgerald's contract and Church teaching, Fitzgerald was placed on "paid administrative leave" for the remainder of her one-year contract, which was not renewed. Dkt. 1 ¶¶56, 66; Dkt. 29 ¶¶56, 66.

Fitzgerald states that since she was placed on administrative leave in August 2018, she has "taken an active role in opposing" the Archdiocese's policy requiring its educators to uphold Catholic teaching on the nature of marriage. Dkt. 1 ¶69. After Fitzgerald was placed on administrative leave, several Roncalli students "formed a non-profit advocacy group known as 'Shelly's Voice,'" Dkt. 1 ¶73, for which Fitzgerald serves as "an active mentor." App.213 at 72:13-15. According to Fitzgerald, the group seeks "to advocate for" LGBTQ people "married … to their partners." Dkt. 1 ¶73; App.195 at 54:8-11. Likewise, Fitzgerald today works for a "philanthropic foundation" that funds LGBTQ causes. App.158-59 at 17:5-18:18. Her employer's website notes that her background "in youth education and counseling" "serves as a springboard for her current dedication to LGBTQ+ activism and advocacy." App.608; App.321 at 180:2-6; *see* App.320-21 at 179:17-180:1 (Fitzgerald affirming that she is "in fact dedicated to LGBTQ+ activism and advocacy").

---

[3]   The Archdiocese stipulates to the facts in this paragraph "only for the purpose of the motion for summary judgment"; the stipulations "are not intended to be otherwise binding." S.D. Ind. L.R. 56-1(g).

## STANDARD OF REVIEW

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Hoffman-Dombrowski v. Arlington Int'l Racecourse*, 254 F.3d 644, 650 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "Facts must be viewed in the light most favorable to the nonmoving party only if" they are genuinely disputed. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014). Thus, a claim must be dismissed if the complaint fails to "state a 'plausible' claim for relief" or "sets out all of the elements of an affirmative defense." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934-35 (7th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## ARGUMENT

### I. Fitzgerald's claims are barred by the ministerial exception.

Three months ago, this Court granted summary judgment for the Archdiocese on identical claims brought by Fitzgerald's Co-Director of Guidance, holding "that the Co-Director of Guidance at Roncalli falls within the ministerial exception." *Starkey*, 2021 WL 3669050, at *7. Because Fitzgerald had the same role with the same duties at the same school at the same time as the *Starkey* plaintiff, the *Starkey* decision is controlling here.

48A

## A. The ministerial exception bars claims by ministers suing over their employment.

The First Amendment protects religious organizations' "autonomy with respect to internal management decisions that are essential to [their] central mission." *Our Lady*, 140 S. Ct. at 2060. One "component" of this doctrine is the "ministerial exception." *Id.* at 2060-61; *see also Korte v. Sebelius*, 735 F.3d 654, 677-78 (7th Cir. 2013).

Under this exception, "courts are bound to stay out of employment disputes involving" religious institutions and "those holding certain important positions" within them. *Our Lady*, 140 S. Ct. at 2060. Intervention in such disputes amounts to "[r]equiring a church to accept or retain an unwanted minister." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). And doing so violates both Religion Clauses: the Free Exercise Clause, "which protects a religious group's right to shape its own faith and mission through its appointments"; and the Establishment Clause, "which prohibits government involvement in such ecclesiastical decisions." *Id.*

The ministerial exception isn't limited to "ordained ministers." *Id.* at 203 (Alito, J., concurring); *see also id.* at 202 ("mere shorthand"). Rather, it covers any employee of a religious organization who "perform[s] religious functions." *Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568, 571 (7th Cir. 2019). Thus, the Seventh Circuit has applied the exception to a wide array of employees—from an organist (*Sterlinski*) to a rehabilitation-center administrator (*Schleicher v. Salvation Army*, 518 F.3d 472 (7th Cir. 2008)) to a press secretary (*Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698 (7th Cir. 2003)); *see also Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 308-09 (4th Cir. 2004) (staff of Jewish nursing home; collecting cases).

Many of the leading cases—including both decided by the Supreme Court—have applied the exception to the same type of employee as at issue here: educators at religious schools. *See, e.g.*, *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2d Cir. 2017)

(principal); *Yin v. Columbia Int'l Univ.*, 335 F. Supp. 3d 803 (D.S.C. 2018) (program director); *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655 (7th Cir. 2018) (teacher). That is because "educating young people in their faith, inculcating its teachings, and training them to live their faith" are "vital" religious functions. *Our Lady*, 140 S. Ct. at 2064. Thus, religious organizations "must be free to choose those" who perform these functions. *Hosanna-Tabor*, 565 U.S. at 196.

*Our Lady* demonstrates the point. There, the Supreme Court considered whether the Religion Clauses barred discrimination claims by two teachers at Catholic elementary schools. The Ninth Circuit had held that it didn't, noting the teachers lacked "clerical titles" and had limited "formal religious schooling." 140 S. Ct. at 2067.

The Court reversed, explaining that for the ministerial exception, "[w]hat matters, at bottom, is what an employee does." *Id.* at 2064. And on this understanding, the plaintiffs were ministers. "Educating and forming students in the Catholic faith lay at the core of the mission of the schools where [the plaintiffs] taught," and the plaintiffs' "employment agreements and faculty handbooks specified in no uncertain terms that they were expected to help the schools carry out this mission." *Id.* at 2066. Moreover, the plaintiffs "prayed with their students, attended Mass with the students, and prepared [them] for their participation in other religious activities." *Id.* In short, since the plaintiffs' roles involved "educating young people in their faith" and "inculcating its teachings," entertaining their claims would "threaten[] the [defendant] school[s'] independence in a way that the First Amendment does not allow." *Id.* at 2064, 2069.

This aspect of *Our Lady* is sufficient to resolve this case, also involving an educator at a Catholic school charged with helping to form students in the Catholic faith. But *Our Lady* also made clear that while an educator's function alone can trigger the ministerial exception, certain "other … circumstances" may also "shed light on" the inquiry. *Id.* at 2063 (citing *Hosanna-Tabor*, 565 U.S. at 191). These other "considerations" include the plaintiff's "formal title," "the substance reflected in that title," and

"her own use of that title." *Hosanna-Tabor*, 565 U.S. at 192*; but see Our Lady*, 140 S. Ct. at 2064 (these considerations may have "less significance in some cases"). All of these considerations confirm that Fitzgerald's claims are barred by the ministerial exception.

## B. Fitzgerald was a minister.

To determine whether Fitzgerald falls within the exception, "[w]hat matters, at bottom, is what [she] d[id]." *Our Lady*, 140 S. Ct. at 2064. And here, undisputed evidence shows that, in her role as Co-Director of Guidance and member of Roncalli's Administrative Council, the Archdiocese "entrust[ed Fitzgerald] with the responsibility of educating and forming [Roncalli] students in the [Catholic] faith." *Id.* at 2069.

### 1. Fitzgerald performed the functions of a minister.

First, as this Court noted in *Starkey*, "religious instruction and formation are central to Roncalli's philosophy and mission, and [Fitzgerald's] employment documents 'specified in no uncertain terms' that Roncalli expected her to perform a variety of religious duties and to help carry out the school's mission." *Starkey*, 2021 WL 3669050, at *4 (quoting *Our Lady*, 140 S. Ct. at 2066). Her job description identified the "guidance counselor" as "a minister of the faith," charged with "foster[ing] the spiritual … growth of the children entrusted in his/her care." App.509. And it listed as the top duties "[c]ommunicat[ing] the Catholic faith to students and families through implementation of the school's guidance curriculum" and through "direct support"; "[p]ray[ing] with and for students"; and "[t]each[ing] and celebrat[ing] Catholic traditions and … observances." *Id.*; *see also* App.7 ¶¶38-40; App.23 ¶¶25-26. Thus, as this Court observed, Fitzgerald "was 'expressly charged' with 'leading students toward Christian maturity and with teaching the Word of God.'" *Starkey*, 2021 WL 3669050, at *5 (quoting *Hosanna-Tabor,* 565 U.S. at 192, and the guidance counselor ministry description (citation omitted)).

Moreover, like the teachers in *Our Lady*, Fitzgerald's work was "evaluated to ensure that [she was] fulfilling" these religious responsibilities. 140 S. Ct. at 2066; *see, e.g.*, App.573-81. Indeed, Fitzgerald herself helped develop the relevant evaluations. According to performance criteria instituted by Fitzgerald, a counselor cannot advance to the highest pay level unless she "embraces, embodies and lives out the spirit of Saint John XXIII," "consistently attends Sunday mass or their denominational church service," and "connects with students' spiritual life and resources in counseling." App.527. These criteria "confirm[] that the school expected her to play an important role in 'transmitting the [Catholic] faith to the next generation.'" *Grussgott*, 882 F.3d at 661 (quoting *Hosanna-Tabor*, 565 U.S. at 192); *see also* App.580 (Fitzgerald's evaluation according to these criteria); App.597 (evaluation of another guidance counselor according to these criteria).

*Our Lady* also emphasized that the teachers there did not just "provide instruction about the Catholic faith" but "were also expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith." 140 S. Ct. at 2066. So too here. Fitzgerald was expressly charged with "assist[ing] the students in … Christian development." App.435. An "essential component[]" of her job was thus to bring Catholic faith, prayer, and teaching to bear on students' aspirations and struggles, including those touching directly on their formation in and adherence to the faith. App.2-7; *see also* App.23; *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 978 (7th Cir. 2021) (en banc) ("No other employer, besides a religious one, could impose this type of work requirement upon [the plaintiff].").

And Fitzgerald did, in fact, do so, as this Court noted in its *Starkey* opinion:

> Shelly Fitzgerald … explained that she met with students individually "at least once a year, but often times, much more" and discussed "personal and social issues … and faith formation." Fitzgerald also "consistently use[d] spiritual life and resources in [her] counseling conversations as well as sharing [her] own spiritual experiences." She explained that "in a faith-based school," her

52A

willingness to share her beliefs and love of God "is a strength when working with young people who are seeking direction."

*Starkey*, 2021 WL 3669050 at *5; App.43-44, 47.

Beyond that, Fitzgerald helped lead a senior retreat—an intimate multi-night gathering focused on faith formation—where she gave a deeply personal talk on her own spiritual journey and reflected on Scripture. App.298-314 at 157:2-4, 165:4-166:13, 167:16-169:6, 170:22-171:2, 172:21-173:11; App.483; App.601-03. At least one family independently praised her for "always preaching the gospel" in her work as counselor to their children. App.606; *see Our Lady*, 140 S. Ct. at 2066 (plaintiffs "prayed with their students, attended Mass with the students, and prepared the children for their participation in other religious activities"). And Fitzgerald's contract required her "personal conduct" itself to "convey and be supportive of the teachings of the Catholic Church," App.508, 512—the provision whose breach gave rise to this suit. *See Yin*, 335 F. Supp. 3d at 816 (school employee a minister where she was expected "to live, teach, and promote a life of godly choices"); *see also Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., joined by Kagan, J., concurring) ("A religion cannot depend on someone to be an effective advocate … if that person's conduct fails to live up to the religious precepts that he or she espouses.").

As this Court noted in *Starkey*, Roncalli's guidance counselors (including Fitzgerald) "worked with students … through the Student Assistance Program," which "helps guidance counselors identify and support 'at risk' students who may be struggling with issues such as dysfunction at home, the death of a loved one, or substance abuse." *Starkey*, 2021 WL 3669050 at *5; *see* App.183 at 42:2-10; App.860 at 48:12-16. Because guidance counselors are the only faculty who meet with every student one-on-one at least once a year, App.23 ¶28; App.43-44, they are "often the first to identify when students are grappling with difficult social, mental, academic, emotional, family, or spiritual issues." App.23 ¶28. They are expected to "show[] the face

of Christ," App.2 ¶¶4-9, while "help[ing] students with their 'most sensitive' and 'personal issues.'" *Starkey*, 2021 WL 3669050 at *5; App.44; *see* App.527 (Fitzgerald's counselor evaluation metric encouraging "connecting with students' spiritual life and resources"). Thus, as this Court held in *Starkey*, "Roncalli plainly anticipated that matters of faith and doctrine would inform a guidance counselor's approach to working with students struggling with sensitive personal issues." *Starkey*, 2021 WL 3669050 at *5.

Further, like Starkey, Fitzgerald served as a Department Chair and member of the Administrative Council, which are senior leadership positions "responsible for 95% of Roncalli's daily ministry, education, and operations." App.18-19 ¶¶3-8. As Department Chair, Fitzgerald oversaw the entire Guidance Department, including formulating the guidance curriculum and working with the Principal in the hiring and supervision of all Guidance personnel. App.161-62 at 20:20-21:4; App.727. And as a member of the Administrative Council, Fitzgerald "was one of a select group of school leaders responsible for guiding Roncalli in its mission." *Starkey*, 2021 WL 3669050, at *5. As the Court noted in *Starkey*, this included participation in "book discussions to better understand [the Catholic] faith and develop ways to transmit the faith to others"; discussions on how to "serve[] the students' spiritual, academic, and personal needs and [how] to form them in the Catholic faith"; helping plan "all-school liturgies" and determining "the qualifications for who could serve as Eucharistic ministers"; and determining how to respond "to students in crisis and distress" and "how to address the personal and spiritual struggles of faculty members." *Id.* at *6; App.444-48, 472-74, 487-97; *see* App.221, 226-27, 883-85. "Nearly every week," these senior leadership roles required her to help address sensitive student crises—"mental, emotional, physical, spiritual, academic"—"in light of [the school's] Catholic faith." App.18-20 ¶¶3-12; *see also, e.g.*, App.229-31 at 88:18-90:14; App.491 (Fitzgerald, in her Administrative Council capacity, airing concerns over the Archdiocese's draft

transgender policy). As this Court held: "[Fitzgerald's] role on the Council and her work in helping shape Roncalli's educational and spiritual environment weigh heavily in favor of applying the ministerial exception." *Starkey*, 2021 WL 3669050, at *6.

In the face of all this, Fitzgerald's complaint asserts that her "positions as Guidance Counselor and Co-Director of Guidance did not include any religious duties" or "any religious component," Dkt. 1 ¶¶32, 35, which suggests she intends to claim that communicating the Catholic faith to students, helping them through their most sensitive and personal issues, sharing her own spiritual experiences, leading a spiritual retreat, and helping lead a Catholic school are somehow not "religious." But Fitzgerald's Co-Director made the same argument in *Starkey*—trying to "downplay[] the religious nature of her role, and highlight[] her secular duties"—and this Court rightly rejected it as foreclosed by precedent. *Starkey*, 2021 WL 3669050, at *6.

As the Seventh Circuit has repeatedly explained, it is the *employer's* understanding of the religious importance of the plaintiff's job duties that counts; to hold otherwise would be to impermissibly "second-guess[]" "a church's characterization of its own theology and internal organization." *Sterlinski*, 934 F.3d at 570; *see also Grussgott*, 882 F.3d at 661 ("[I]t is the school's expectation—that Grussgott would convey religious teachings to her students—that matters."). Likewise, this Court held in *Starkey* that "it would be inappropriate for this court" to second-guess "what qualifies as secular or religious guidance in the context of a Catholic high school." *Starkey*, 2021 WL 3669050, at *7. And the Supreme Court in *Our Lady* confirmed this point, noting that "both [plaintiffs'] schools expressly saw them as playing a vital part in carrying out the mission of the church, and *the schools' definition and explanation of their roles is important*." 140 S. Ct. at 2066 (emphasis added).

Indeed, this case is in many respects even easier than *Our Lady*. For one thing, the teachers in *Our Lady* were ministers even though they characterized their duties as primarily just teaching "religion from a book" in a classroom rather than exercising

"close guidance and involvement" in "students' spiritual lives." 140 S. Ct. at 2068 (internal quotation marks omitted). Here, however, Fitzgerald's role was precisely to exercise "close guidance and involvement" in "students' spiritual lives." Guidance counselors don't provide guidance *en masse*; they meet "one-on-one" with students—and in fact are the only part of the faculty who meets with every student one-on-one at least once a year. App.23 ¶28. And in counseling students, Roncalli guidance counselors were required (under Fitzgerald's own performance criteria) to "connect[] with students' spiritual life," App.527—a task they often must undertake in the course of addressing students' personal "struggles" on matters of profound moral and spiritual consequence in the Catholic faith, and even on "the Catholic faith and its moral teachings" themselves. App.2-4 (also listing, *e.g.*, "depression," "thoughts of suicide," and sexuality). Thus, even if individualized spiritual guidance were required to trigger the exception—and *Our Lady* makes clear it is not—Fitzgerald's role would nonetheless fit the bill, as this Court recognized in *Starkey*. *See Starkey*, 2021 WL 3669050, at *7 ("Employees in [Fitzgerald's] position met with every student throughout the year and discussed some of the most sensitive issues in a young person's life.")

This case is also more straightforward than *Our Lady* because Fitzgerald was not an ordinary school employee but one of a handful of Roncalli's "key, visible leader[s]." App.23-24 ¶30. The *Our Lady* plaintiffs were teachers, and their central religious function was teaching a religion class (along with the rest of the curriculum). 140 S. Ct. at 2057, 2059. But Fitzgerald was elevated above a teacher role to one of the most senior leadership positions in the school. App.18-19. At the time she was nonrenewed, she co-directed the guidance department (thus also serving in Roncalli's Department Chairpersons group), *and* was one of nine members of Roncalli's core decision-making body, the Administrative Council, *and* held the only position (aside from the Principal and Assistant Principal) that served on *both* leadership bodies. App.19 (Administrative Council is "lifeblood of decision-making at the school").

Fitzgerald's leadership role alone disposes of this case. As Justices Alito and Kagan explained in *Hosanna-Tabor*, the ministerial exception "should apply to any 'employee' who"—*inter alia*—"leads a religious organization." 565 U.S. at 199. And even the two *Our Lady* dissenters recognized that the exception applies to a religious organization's "leaders." *See* 140 S. Ct. at 2067 n.26. This makes good sense, since if an organization's very purpose is to pass along a religious faith, then its leaders by definition perform "important religious functions" in directing its operations to that end. *Hosanna-Tabor*, 565 U.S. at 192; *see also Petruska v. Gannon Univ.*, 462 F.3d 294, 307 n.10 (3d Cir. 2006) ("To the extent that [an employee] supervises spiritual functionaries, at least some of the functions he performs are, by definition, spiritual ones.").

Here, as this Court explained in *Starkey*, the Co-Director of Guidance "served in a senior leadership role in which she helped shape the religious and spiritual environment at the school and guided the school on its religious mission." *Starkey*, 2021 WL 3669050, at *7. Fitzgerald led, managed, and evaluated Roncalli's guidance department. And as a member of the Administrative Council, she helped steer the entire religious mission of the school. These are leadership roles "distinct from that of most" Roncalli employees, requiring her to "personify" its beliefs in an especially important way. *Hosanna-Tabor*, 565 U.S. at 188, 191, 195. Thus, as this Court held, "the Co-Director of Guidance at Roncalli falls within the ministerial exception." *Starkey*, 2021 WL 3669050, at *7; *see also Fratello*, 863 F.3d at 209 (Catholic school principal was subject to the ministerial exception because she "managed" and "evaluated" subordinate staff to help "execute the School's religious education mission").[4]

---

[4]   Many other courts have likewise recognized that the ministerial exception applies to the unique leadership role of senior administrators at religious schools. *Dayner v. Archdiocese of Hartford*, 23 A.3d 1192 (Conn. 2011); *Pardue v. Ctr. City Consortium Schs. of Archdiocese of Wash., Inc.*, 875 A.2d 669 (D.C. 2005); *Archdiocese of Miami v. Miñagorri*, 954 So.2d 640 (Fla.

### 2. Other considerations confirm Fitzgerald was a minister.

All the evidence above goes to religious function, which *Our Lady* establishes is alone sufficient to trigger the ministerial exception. 140 S. Ct. at 2063-66; *Alicea-Hernandez*, 320 F.3d at 703. But three other "considerations" identified in *Hosanna-Tabor* further confirm that Fitzgerald qualifies as a minister.

***Title.*** First, the Court in *Hosanna-Tabor* looked to whether the plaintiff's school "held [her] out as a minister," which it evaluated by looking to her "title." 565 U.S. at 191. Here, Fitzgerald's job title was Co-Director of Guidance, and Roncalli "held her out as a minister" by titling her contract a "Ministry Contract," App.507, and by expressly identifying her in her job description as a "minister of the faith." App.509.

Beyond that, her title of Co-*Director* of Guidance reflected her leadership "role[,] distinct from … most" other Roncalli employees. *Hosanna-Tabor*, 565 U.S. at 191. And as this Court said in *Starkey*, "the term itself—Director of *Guidance*—suggests that those who fill that role are tasked with guiding students as they mature and grow into adulthood." *Starkey*, 2021 WL 3669050, at *7. The title consideration, then, confirms that Fitzgerald was a minister. *See also Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 835 (6th Cir. 2015) (finding that an individual was "clearly" a minister where she performed religious functions and had a religious title).

***Substance reflected in title.*** This consideration asks whether "the substance of [the plaintiff's] title as conveyed to her and as perceived by others entails" the passing on of faith. *Grussgott*, 882 F.3d at 660. In *Grussgott*, for example, the court concluded that this consideration cut in favor of ministerial status because Grussgott was "expected … to integrate religious teachings into [her] lessons" and had "significant religious teaching experience" when hired. *Id.* at 659.

Dist. Ct. App. 2007); *Sabatino v. St. Aloysius Par.*, 672 A.2d 217 (N.J. Super. Ct. App. Div. 1996); *Black v. St. Bernadette Congregation of Appleton*, 360 N.W.2d 550 (Wis. Ct. App. 1984).

The same is true here. Fitzgerald's performance criteria and job description show she was expected to—and agreed to—"foster the integration of faith" in her students' lives and "[c]ommunicat[e] the Catholic faith to students and families through" her "guidance curriculum." App.509-12, 498, 527. Moreover, she was raised in an engaged Catholic family, attended Catholic schools, played an active role in forming students in the Catholic faith, and had a "track record" of "commitment to and leadership in these areas of faith formation"—all of which played a crucial role in her promotion. App.26-27 ¶43.

Further, serving on the Administrative Council required Fitzgerald to undertake continued religious education, which consisted of participating in book studies on the "principles of evangelization and missionary discipleship" and forming others in the Catholic faith. App.895-96 at 83:21-84:10; *see* App.20-21 ¶¶14-17; App.481-82. Finally, that Fitzgerald's position would have been "perceived by others" to reflect a religious role, *Grussgott*, 882 F.3d at 660, is demonstrated by the Teacher Handbook, which identifies the Co-Director of Guidance as specifically responsible for "assist[ing] the students in … Christian development," App.435, and by the fact that "[t]he Director or Co-Director of the Guidance Department is recognized by faculty and staff as a key, visible leader of the school" as a whole, App.23-24 ¶30.

***Employee's use of title.*** This consideration asks whether the employee "held herself out" as a minister. 565 U.S. at 191-92. The answer here is yes: Fitzgerald "understood that she would be perceived as a religious leader." *Fratello*, 863 F.3d at 208.

For one thing, Roncalli guidance counselors participate in an annual ceremony in which the assembled faculty publicly commits in prayer to serve as a "minister of the faith." App.21-22, 33-36, App.356-57 at 215:22-216:11; App.660-61 ¶13 (Fitzgerald's participation in Day of Reflection).

Moreover, just as the *Hosanna-Tabor* plaintiff identified as a minister to claim a "housing allowance on her taxes," 565 U.S. at 191-92, so Fitzgerald joined Starkey in

identifying Roncalli guidance counselors as ministers in seeking a financial benefit. In 2016, discussion arose within Roncalli about moving guidance counselors to hourly pay. Resisting this change, Starkey transmitted to Principal Weisenbach, over her and Fitzgerald's signatures, a strongly worded letter to the rest of Roncalli leadership, arguing that "school counselors qualify for a salaried contract to the same degree as [Roncalli] teachers do," because they perform the same "Ministry" functions. App.498. The Principal agreed, stating that Fitzgerald and Starkey provided "very clear reasons why a guidance counselor qualifies for the same ministerial exemption as the teachers." App.139-40. And Fitzgerald thanked the Principal for supporting "our side." App.505; *see* App.260 at 119:1-5.

*   *   *

This Court correctly held that "it is apparent that the ministerial exception covers Starkey's role as Co-Director of Guidance." *Starkey*, 2021 WL 3669050, at *4. Fitzgerald held the same role. Thus, the ministerial exception equally applies.

### C. All of Fitzgerald's claims are barred.

As this Court has already noted, "if the ministerial exception applies," "all of Fitzgerald's claims will be barred" (Dkt. 117 at 4)—just as this Court held in *Starkey*. *Starkey*, 2021 WL 3669050, at *7-8. Indeed, Fitzgerald brings the same five claims challenging the same employment action as the Plaintiff in *Starkey*: "(1) Title VII discrimination; (2) Title VII retaliation; (3) Title VII hostile work environment; (4) intentional interference with contractual relationship; and (5) intentional interference with employment relationship." *Id.* at *7; Dkt. 1 ¶¶77-117, 125-37. As this Court explained in *Starkey*, the ministerial exception bars "claims that result in the government's interference with a church's selection or supervision of its ministers." *Starkey*, 2021 WL 3669050, at *8. "Here, the decision to not renew [Fitzgerald's] employment contract goes to the heart of the church's right to 'select and control who will minister

to the faithful.'" *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 194-95). Thus, "the ministerial exception bars all of [Fitzgerald's] claims." *Id.*[5]

## II. Fitzgerald's federal claims are barred by RFRA.

The Religious Freedom Restoration Act (RFRA) provides "very broad protection for religious liberty" by exempting religious objectors from federal laws that substantially burden the exercise of their religious beliefs. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RFRA "operates as a kind of super statute" that applies to all of federal law and "might supersede Title VII's commands in appropriate cases." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020). This is such a case.[6]

Fitzgerald's Title VII claims substantially burden the Archdiocese's exercise of religion. A "substantial burden" occurs when application of federal law "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Korte*, 735 F.3d at 682 (cleaned up). This includes significant financial pressure "undermin[ing]" a religious organization's "ability to give witness to [its] moral teachings." *Id.* at 683. Here, accepting Fitzgerald's claims would substantially burden the Archdiocese's beliefs. Indeed, there "can be no clearer example of an intrusion into the internal structure or affairs of a[ religious] association than" forcing it either to "accept members it does not desire," *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861, 863 (7th Cir. 2006), or have its religious exercise declared "unlawful" and incur damages if it resists, *see Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 881-82 & n.6 (9th Cir. 1987); *see* Dkt. 1 at 12-13.

---

[5]   Following its identical ruling in *Starkey*, *Starkey*, Dkt. 93 at 23-25, this Court has already held that Fitzgerald's Title IX claim (Dkt. 1 ¶¶118-24) is preempted by Title VII. Dkt. 98 at 6.

[6]   A panel of the Seventh Circuit held that "RFRA does not apply when the 'government,' as defined in RFRA, is not a party to the action." *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015). This is now questionable in light of *Bostock* and contrary decisions of other circuits.

Courts have thus had "no difficulty" finding that such intrusions on the religious beliefs and expression of a religious group can constitute a "significant[] burden," as they "would cause the group as it currently identifies itself to cease to exist." *Walker*, 453 F.3d at 862-63 (quoting *Dale*). For instance, in *EEOC v. Catholic University of America*, the D.C. Circuit found that imposing Title VII's "secular standards" on a religious school's selection of its religious faculty imposes a substantial burden (and violates RFRA). 83 F.3d 455, 467 (D.C. Cir. 1996). And in *Bear Creek Bible Church v. EEOC*, a federal court held that it is a substantial burden—and a RFRA violation— to apply Title VII to "[f]orc[e] a religious employer to hire, retain, and accommodate employees who conduct themselves contrary to the employer's views regarding homo-sexuality." No. 4:18-cv-00824, 2021 WL 5052661, at *23-25 (N.D. Tex. Oct. 31, 2021); *see also Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1147-48 (D.N.D. 2021) (Title VII liability for religiously motivated conduct "indisputably qualifies as a substantial burden").

Under RFRA, these substantial burdens are permissible only if Fitzgerald can show they are the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The pleadings show Fitzgerald cannot meet that standard. *Walker*, 453 F.3d at 863 (non-discrimination policy failed strict scrutiny); *see also Bear Creek*, 2021 WL 5052661, at *24 & n.22 (Title VII's "carve outs under-mine" a strict-scrutiny showing).

## III.  Fitzgerald's Title VII claims are barred by Title VII.

Fitzgerald's claims are also foreclosed by Title VII. Although the Court initially rejected most of the Archdiocese's Title VII arguments on the pleadings by "adopt[ing] the reasoning and conclusions … in *Starkey*" (Dkt. 98 at 1-2), the Archdiocese re-quests reconsideration and incorporates its prior briefing by reference (Dkt. 42, Dkt. 55, Dkt. 80). The Archdiocese also renews its Title VII argument that the Court's

prior order appeared not to address—that Fitzgerald failed to plead "but-for" causation with respect to her Title VII retaliation claim. Dkt. 107, Dkt. 113.

*First*, Fitzgerald's claims are barred by Title VII's religious exemption. The exemption says Title VII "shall not apply" to a religious "educational institution" when it employs "individuals of a particular religion." 42 U.S.C. § 2000e-1(a). Title VII then defines "religion" to include "all aspects of religious observance and practice, as well as belief." *Id.* § 2000e. Thus, when a religious organization hires based on an individual's particular religious belief, observation, or practice—as the Archdiocese did here—it is protected by Title VII. Dkt. 42 at 8-12.

In ruling otherwise, this Court expressed concern that this interpretation of the religious exemption would "swallow Title VII's rules," amounting to a "complete exemption" from claims based on "race, color, sex or national origin" discrimination. *Starkey*, Dkt. 93 at 9-11. But that concern rests on a false dichotomy. The choice here is not between a "complete exemption" from all claims of race, sex, or national origin discrimination on the one hand, versus confining the exemption to claims of religious discrimination on the other. Rather, the text of Title VII offers a third way: religious employers are exempt when their hiring decision is based on an individual's particular religious belief, observance, or practice (regardless of what type of claim is brought); but they remain subject to all types of Title VII claims when it is not.

This interpretation is not only required by the exemption's plain text (Dkt. 55 at 9), but also supported by scholars and other courts. *Starkey*, Dkt. 95-1 at 12-14; *see also Bear Creek*, 2021 WL 5052661, at *6 ("The plain text of this exemption … is not limited to religious discrimination claims; rather, it also exempts religious employers from other form of discrimination under Title VII, so long as the employment decision was rooted in religious belief."). And it is supported by *Bostock*, in which the Supreme Court said that Title VII's "express statutory exception for religious organizations" may be relevant "in cases like ours"—*i.e.*, cases alleging sexual-orientation

63A

discrimination. 140 S. Ct. at 1753-54. This statement makes no sense unless Title VII's religious exemption can extend beyond claims of religious discrimination.

*Second*, Fitzgerald was dismissed for a legitimate, nondiscriminatory reason: she violated her employment contract. Dkt. 42 at 13-14. There has never been any dispute that Fitzgerald violated her contract. *Id.* Thus, the Archdiocese had nondiscriminatory grounds for nonrenewal.

*Third*, the Archdiocese's decision was based on Fitzgerald's conduct—not status. *Id.* at 14-16. As previously explained, there is no factual dispute that "the Archdiocese placed Fitzgerald on paid leave and declined to renew her contract not because of her 'sexual *orientation*' but because of her '*conduct*' in entering into a same-sex union and rejecting Church teaching." *Id.* at 15 (quoting *Walker*, 453 F.3d at 860-61). When an employment decision is based on "any reason other than" a protected characteristic, "no federal claim is implicated." *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994). Thus, judgment for the Archdiocese is warranted.

*Fourth*, Fitzgerald failed to plead "but-for" causation with respect to her Title VII retaliation claim, because the challenged employment decisions were made *before* her alleged protected activity took place. Dkt. 42 at 16-18; Dkt. 107 at 3-5. According to the complaint, the complained-of adverse employment actions—paid leave, conditions on returning to campus, and nonrenewal—simply carried out the Archdiocese's "statement of intent in the meeting with Fitzgerald on August 10, 2018." Dkt. 1 ¶¶54, 67. Meanwhile, Fitzgerald's activities opposing the Archdiocese's policies have occurred "*[since]* August 10, 2018." *Id.* ¶¶69-76 (emphasis added). Because a retaliation "theory doesn't work" if the allegedly retaliatory decision "precedes the protected activity," *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011), Fitzgerald's Title VII retaliation claim must be dismissed.

## IV. Fitzgerald's claims are barred by the First Amendment.

Fitzgerald's claims are also foreclosed by several more First Amendment defenses. Dkt. 42 at 21-34. Although the Court said it was "premature" to resolve these defenses absent further information on "Fitzgerald's role at Roncalli" (Dkt. 98 at 5), those duties are now clear. Accordingly, the Archdiocese renews its request for judgment and incorporates its prior briefing by reference (Dkt. 42, Dkt. 55, Dkt. 80).[7]

*First*, Fitzgerald's claims are barred by religious autonomy, which protects religious organizations' right to "govern themselves in accordance with their own doctrines." *Korte*, 735 F.3d at 677. This includes the right to select not only "ministers" under the ministerial exception, but also *non-ministers* "based on religious doctrine." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656-60, 658 n.2 (10th Cir. 2002); Dkt. 42 at 22-26. Here, the Archdiocese's decision was indisputably based on religious doctrine—Fitzgerald's rejection of Church teaching on marriage, Dkt. 1 ¶45—so her claims are barred even if she isn't a minister.

In finding this argument premature in *Starkey*, this Court said that applying religious-autonomy doctrine to non-ministers "would render the ministerial exception superfluous." *Starkey*, Dkt. 93 at 18. But the ministerial exception is limited to *ministers* and allows dismissal for *any* reason—including *non-religious* reasons. *See Our Lady*, 140 S. Ct. at 2059; *Hosanna-Tabor*, 565 U.S. at 178-79. By contrast, religious autonomy also protects decisions regarding a *broader* range of employees for *narrower* reasons—namely, *non-ministers* dismissed for *religious* reasons. This doesn't render the ministerial exception "superfluous"; it provides a different (and more limited) type of protection for different employees. Many courts have so recognized. *Starkey*, Dkt. 95-1 at 15-18.

---

[7]   In rejecting the Archdiocese's First Amendment defenses in *Starkey*, this Court invoked the *Demkovich* panel opinion. *Starkey*, Dkt. 93 at 17. However, that opinion has been vacated and rejected by the en banc Seventh Circuit. *Demkovich*, 3 F.4th at 985.

65A

*Second*, adjudicating Fitzgerald's claim would impermissibly entangle the Court in religious questions. Dkt. 42 at 28-30. Fitzgerald says she was treated worse than heterosexual employees in relationships violating Catholic teaching. *Id.* at 29-30. But for Fitzgerald to prevail, the Court (or jury) would have to decide whether Catholic theology sees all violations of sexual morality as equivalent—which a court cannot do. *Id.*

*Third*, Fitzgerald's claim is barred by freedom of association, which protects the freedom of the Archdiocese and Roncalli to disassociate from someone who would undermine their ability to communicate their views. *Id.* at 30-34; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Here, forcing the Archdiocese to retain Fitzgerald, especially given her senior leadership role and dedication to advocating positions contrary to Church teaching, would undermine its ability to communicate the Church's teaching on marriage. And although this Court rejected the expressive-association defense on the ground that it doesn't apply in the "employment context" (Dkt. 98 at 5), multiple courts have held the opposite. *Starkey*, Dkt. 95-1 at 20-21; *accord Bear Creek*, 2021 WL 5052661, at *28 (rejecting claim "that freedom of association is no defense to a claim of discrimination under Title VII").

*Finally*, even if it weren't clear that Fitzgerald's claims are barred by the First Amendment, they at least present "serious constitutional questions"—meaning that constitutional avoidance requires the Court to interpret Title VII to avoid reaching them. *NLRB v. Catholic Bishop*, 440 U.S. 490, 501 (1979); Dkt. 42 at 34-35.

## CONCLUSION

Judgment should be rendered for the Archdiocese.

Respectfully submitted.

John S. (Jay) Mercer, #11260-49
Wooton Hoy, LLC
13 North State Street, #2A
Greenfield, IN 46140
(317) 439-0541

/s/ Luke W. Goodrich
Luke W. Goodrich (DC # 977736)
Daniel H. Blomberg (DC # 1032624)
Joseph C. Davis (DC # 1047629)
Christopher C. Pagliarella (DC # 273493)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
(202) 955-0095
(202) 955-0090 fax

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following on

November 22, 2021 by this Court's electronic filing system:

David T. Page
1634 W. Smith Valley Road, Suite B
Greenwood, IN 46142
(317) 885-0041

Mark W. Sniderman
Findling Park Conyers Woody &
Sniderman, P.C.
151 N. Delaware St., Suite 1520
Indianapolis, IN 46204
(317) 231-1100

Richard B. Katskee
Bradley Girard
Adrianne M. Spoto
Americans United for Separation of
Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-3234

By: /s/ Luke W. Goodrich
Luke W. Goodrich
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
(202) 955-0095
(202) 955-0090 fax



Deposition of:
# Michelle Fitzgerald

*October 29, 2021*

In the Matter of:

# Fitzgerald vs Archdiocese of Indianapolis

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com  |

Page 1

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF INDIANA

3                   INDIANAPOLIS DIVISION

4     _____

5     MICHELLE FITZGERALD,

6              Plaintiff,

7         v.                             Case No.

8     RONCALLI HIGH SCHOOL, INC.,        1:19-cv-4291-

9     and the ROMAN CATHOLIC             RLY-TAB

10    ARCHDIOCESE OF INDIANAPOLIS,

11    INC.,

12             Defendants.

13    _____

14              VIDEOCONFERENCE DEPOSITION OF

15                 MICHELLE FITZGERALD

16    DATE:         Friday, October 29, 2021

17    TIME:         10:03 a.m.

18    LOCATION:     Remote Proceeding

19                  Washington, D.C. 20005

20    REPORTED BY:  Terrell Lee, Notary Public

21    JOB NO.:      4841011

22

```
                                               Page 2

 1               A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFF MICHELLE FITZGERALD:

 3         MARK W. SNIDERMAN, ESQUIRE (by videoconference)

 4         Findling, Park & Associates

 5         151 North Delaware Street, Suite 1520

 6         Indianapolis, Indiana 46204

 7         msniderman@findlingpark.com

 8

 9         BRADLEY GIRARD, ESQUIRE (by videoconference)

10         Americans United for Separation of Church and

11         State

12         1310 L Street Northwest, Suite 200

13         Washington, DC 20005

14         girard@au.org

15

16         ADRIANNE M. SPOTO, ESQUIRE (by videoconference)

17         Americans United for Separation of Church and

18         State

19         1310 L Street Northwest, Suite 200

20         Washington, DC 20005

21

22
```

Page 3

1                 A P P E A R A N C E S (Cont'd)

2   ON BEHALF OF DEFENDANTS RONCALLI HIGH SCHOOL, INC., AND

3   THE ROMAN CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, INC.:

4        JOSEPH C. DAVIS, ESQUIRE (by videoconference)

5        Becket Religious Liberty For All

6        1919 Pennsylvania Avenue Northwest, Suite 400

7        Washington, DC 20006

8        jdavis@becketlaw.org

9

10       LUKE W. GOODRICH, ESQUIRE (by videoconference)

11       Becket Religious Liberty For All

12       1919 Pennsylvania Avenue Northwest, Suite 400

13       Washington, DC 20006

14       lgoodrich@becketlaw.org

15

16

17

18

19

20

21

22

Page 14

1       Q     And I just want to ask a couple questions

2   about your education.  Have you ever attended a

3   Catholic school?

4       A     I have.

5       Q     What school?

6       A     I -- for grade school, I attended Nativity

7   in Indianapolis first through eighth grade.  And then

8   went to Roncalli in my freshman through senior year of

9   high school.

10      Q     Okay.  So it's Catholic schools for first

11  grade through the end of high school, right?

12      A     Yes, sir.

13      Q     All right.  And where did you go to college?

14      A     I did my undergraduate work at University of

15  Southern Indiana in Evansville.

16      Q     And what did you study in undergrad?

17      A     Teaching and physical education along with

18  exercise science.

19      Q     All right.  And do you have any

20  post-undergrad education?

21      A     I do.  I have my master's in school

22  counseling.

Page 15

1        Q     Where did you do that program?

2        A     It's IUPUI.  It's Indiana University

3    satellite campus.

4        Q     And that's in Indianapolis, right?

5        A     Yes, sir.

6        Q     All right.  And so were you raised Catholic?

7        A     My, my family was Catholic.  My parents were

8    Catholic.  So yes.

9        Q     And is that why they sent you to Catholic

10   school?

11       A     I can't really say exactly why they sent me

12   to Catholic school.

13       Q     Okay.  When you were at Catholic school from

14   first grade through the end of high school, did you

15   learn about the Catholic faith?

16       A     I don't recall anything specifically, but

17   I'm certain that I did.

18       Q     And you say you don't remember anything

19   specifically.  But I assume you took religion classes

20   throughout that whole time, right?

21       A     Correct.

22       Q     And I assume there were religious services

Page 21

1         A     Yes, sir.

2         Q     Okay.  And then, that also means that you

3    were a department chair; is that right?

4         A     Correct.

5         Q     Okay.  What responsibilities came with being

6    a department chair?

7         A     Overseeing my department specifically.  I,

8    as the department chair -- Ms. Starkey and I had

9    separated the job responsibilities for the department

10   chair.  So my specific requirements were master

11   schedule and I did all of the schedule balancing.  I

12   was in charge of the -- all standardized testing as

13   well.

14        Q     Got it.  Ms. Starkey, just for the record,

15   that's Lynn Starkey, she was your co-director of

16   guidance?

17        A     Correct.

18        Q     And when you said you oversaw the guidance

19   department, that means that in some sense the other

20   guidance counselors answered to you as the department

21   chair?

22        A     Could you be more specific about answering

Page 22

1     to me?

2          Q     In the sense that you were able to make

3     decisions about the department, evaluate their work,

4     things along -- and you used the word oversaw.  So

5     maybe I'll scratch that and just ask you what you

6     meant by oversaw.

7          A     We just made sure that everyone had

8     basically everything they needed to, to be a good

9     guidance counselor.  So we -- if they had issues, you

10    know, with testing or students or -- they would come

11    to Lynn and I depending on which counselor, you know,

12    was available.

13         Q     And would you mentor the younger counselors

14    or the counselors that were just guidance counselors

15    and not director of guidance like you?

16         A     I think in the first couple of years, they

17    would come to us more often with questions about

18    specific things about their job, but mostly, we kind

19    of did our own thing separately and if questions

20    arose, they would come to one of us.

21         Q     Okay.  Did the principal ever ask you how

22    the other guidance counselors were performing, how

Page 23

1    they were doing?

2        A    Well, we would have an evaluation that we

3    would give to him and then -- but not, not ongoing

4    talk.  He would -- it would mostly be a narrative.

5        Q    So you would evaluate the counselors in your

6    department and that would be input that you would give

7    to the principal?

8        A    Sometimes, yes.

9        Q    As department chair, did you meet with the

10   other department chairs at the other departments at

11   the school?

12       A    Yes.  Once a month we had a department chair

13   meeting.  But I didn't -- we didn't go to every one.

14   Lynn and I would kind of split those depending on what

15   our schedules were.

16       Q    Got it.  Did the principal attend those

17   meetings?

18       A    Yes.

19       Q    And what would be discussed at those

20   meetings?

21       A    It might be -- it might be specific to a

22   bell schedule.  It was really the goings-on of school.

Page 24

1    And then like anything that was overarching for the

2    entire school.  If we were having an assembly or, you

3    know, there, there were going to be different

4    schedules, things like that.  We didn't -- that's --

5    yeah.  That's it.

6        Q    Okay.  So these overarching things, the

7    different departments would come together at these

8    department meetings and would you offer input to the

9    principal on how to run the overarching items that you

10   were mentioning just now?

11       A    They would, yes.

12       Q    What do you mean they?

13       A    The other department chairs.  It, it really

14   more was about academics in their particular -- the,

15   the -- I don't really know how to state it.  But the

16   guidance department was really just there if we had --

17   they had questions about standardized testing or

18   guidance coming into classrooms for -- you know, to

19   talk about the standardized testings.

20       Q    Okay.  Did the department chair meetings,

21   did those begin with a prayer?

22       A    Yes.  Likely.

Page 25

1      Q    Okay.  Who would lead that prayer?

2      A    It would be different by month.  They would

3   ask someone to volunteer to say the prayer.

4      Q    Did you ever volunteer to say the prayer?

5      A    No, sir.

6      Q    But it wasn't the principal every time, it

7   was a different department chairperson?

8      A    Correct.

9      Q    Purely a volunteer basis, no rotation?

10     A    Correct.

11     Q    Okay.  All right.  I think I want to mark

12  our first exhibit here.  Just give me one moment.

13  I'll try to make this run more smoothly for the later

14  exhibits.  All right.  So you should now be able to

15  see Exhibit 1.

16     A    Yes.

17  //

18              (Exhibit 1 was marked for

19              identification.)

20              MR. DAVIS:  Great.

21              MR. SNIDERMAN:  Counsel, can you wait

22  just a moment?

Page 40

1    SAP or SAP?

2         A    We said SAP.  Students said they got sapped.

3    So that's why I giggled because it's -- we always said

4    SAP.  But you can call it SAP if you want.

5         Q    I'll use SAP.  Thank you.  All right.  And

6    what was the SAP's function?

7         A    It was a collective group of people from

8    different parts of the school that came together and

9    maybe discussed some of our more at-risk students.

10        Q    Okay.  And how would the SAP identify

11   at-risk students?

12        A    Usually through a referral process.  So we

13   had referrals that they could fill out physically, or

14   they could go to someone on the SAP team and refer a

15   student verbally.  But most of the time it was

16   probably through the SAP referral sheet.

17        Q    Okay.  And who could refer a student to the

18   SAP?

19        A    Anyone really.  It could be -- and when I

20   say anyone, I mean that.  It could be someone, you

21   know, from within the school.  It could be someone

22   from within the community.  It could be a teacher, a

Page 41

1    friend, a parent, et cetera.

2        Q    Okay.  And then once they were referred to

3    the SAP, what would the SAP then do with that

4    referral?

5        A    So whoever was -- kind of headed the SAP

6    program, which at the time was our assistant principal

7    for student life or student activities, she would take

8    that packet or that, that form and she would create a

9    packet that included, you know, grades, discipline.

10   There was a sheet to fill out whether or not they had

11   any type of, you know, like bloodshot eyes, things

12   like that that each of their teachers would fill out.

13   And then they -- she would collate those materials and

14   pass that packet out to the SAP team at the time of

15   our meeting.

16       Q    Got it.  And then at the meeting, the SAP

17   team would get together and discuss how to address

18   whatever difficulties the student was experiencing?

19       A    Yes.

20       Q    Okay.  And just circling back.  You said it

21   was about at-risk students.  Can you just expand a

22   little bit on what at-risk means?

Page 42

1      A    Well, it kind of depends on who was writing

2   the referral.  But it could be someone who was going

3   through a tough time, struggling academically.

4   Someone that they thought might be using drugs or

5   alcohol.  Just those types of issues.

6      Q    Okay.  Mental health issues?

7      A    Yeah.  Sometimes mental health issues as

8   well.

9      Q    Like depression, things like that?

10     A    Yes.

11     Q    Okay.  What about spiritual difficulties?

12     A    I don't ever recall discussing spiritual

13  issues in SAP at all.

14     Q    Okay.  But a student that was struggling

15  spiritually, that would be within the realm of

16  something that could be referred to the SAP team; is

17  that right?

18     A    Not generally.  In fact, I can't think of a

19  single instance where we did discuss spirituality

20  because those issues generally would go to the

21  chaplain or the campus minister or they would discuss

22  it with their religion teachers.

Page 43

1        Q     Okay.  So issues of mental health,

2   depression we've discussed.  Eating disorders, would

3   that be the kind of thing that would fall into that

4   realm?

5        A     It could have been, but I, I don't remember

6   any specific instances of that.  But it certainly

7   could have been.

8        Q     Okay.  What are some other specific --

9   obviously without naming any students, some other

10  specific instances of the kinds of problems?  We said

11  academic.  We said mental health.  We said maybe

12  depression.  Anything else that you can think of?

13       A     Those are -- academic, drug use, alcohol

14  use.  Those were really the big ones.  Drug use and

15  alcohol use were the biggest ones.

16       Q     And then what's an example of a way that the

17  SAP might intervene?  So say a kid has a drug use

18  problem, what would the SAP then do?

19       A     So we would discuss the specific instance.

20  We would either -- for drug use in particular, vote on

21  whether or not we thought a student should be drug

22  tested.  And then almost always the guidance

Page 44

1    counselors were the ones to drug test the students.

2        Q    Okay.  Who else served on the SAP besides

3    the guidance counselors?

4        A    So it was the campus -- let's see.  It was

5    the dean of students, the assistant principal for

6    student activities, the campus minister.  Going around

7    the table.  The, the five counselors, the social

8    worker, and then there were generally two teachers on

9    SAP as well.

10       Q    Got it.  Those are maybe rotating teacher

11   spots?  Is that accurate?  Or was it the same two

12   teachers the whole time?

13       A    One of the teachers was the same the whole

14   entire time.  One of the teachers that was there the

15   whole entire time moved to campus minister.  So he was

16   on the whole entire time and then we put a new teacher

17   on.

18       Q    Okay.  And was there someone that was sort

19   of the lead facilitator at the meetings just like to

20   lead the meetings?

21       A    Yeah.  Our assistant principal for student

22   activities.  Her name was Shellie as well.  But she

Page 45

1   was S-H-E-L-L-I-E, so --

2       Q    Got it.  And so she was the lead facilitator

3   the entire time that you were at Roncalli?

4       A    That I remember.

5       Q    Okay.

6       A    I mean, in my early days I don't recall who,

7   who would have been in charge.

8       Q    Got it.  All right.  I'm going to mark

9   another exhibit here.

10      A    I got it.

11      Q    Great.  And we may have just covered some of

12  this in the questions, but this purports to be a

13  description of the SAP -- of the SAP and it's from one

14  of the documents produced in this litigation.  I think

15  it's from the student handbook, but there's also a

16  similar page on the Roncalli website.  So it's

17  possible it's from there.  Can you just take a look at

18  it and let me know if you think it accurately

19  describes the SAP?

20      A    Although I recognize that it says that we

21  identify students experiencing physical, emotional,

22  social and spiritual difficulties, as I stated before,

Page 46

```
 1   I do not recall us speaking about spiritual

 2   difficulties with students.

 3                  (Exhibit 3 was marked for

 4                   identification.)

 5   BY MR. DAVIS:

 6       Q    Okay.  You don't recall a specific instance

 7   of that, but you recognize that it says that's within

 8   the jurisdiction, so to speak, of the SAP?

 9       A    I read that -- I read that currently, yes.

10       Q    Okay.  All right.  I'm going to mark one

11   more.  Should be available to you.

12       A    Okay.  I have it.

13                  MR. SNIDERMAN:  I have it.  Thank you.

14                  (Exhibit 4 was marked for

15                   identification.)

16   BY MR. DAVIS:

17       Q    Great.  Ms. Fitzgerald, you can take a

18   moment to review it.  But I wanted to ask whether

19   you've seen these two e-mails before?

20       A    You're looking at the guidance team roles

21   and responsibilities?

22       Q    That's right.  I think there's two e-mails
```

Page 47

1    put together.  There's one on the first page and then

2    another that begins on the second page.

3        A    Okay.  Give me just a second to read these,

4    please.

5        Q    Sure.

6        A    Okay.  I'm finished reading it.

7        Q    Great.  Have you ever seen these e-mails

8    before?

9        A    I have not.

10       Q    Okay.  But just from looking at them, it

11   looks like they are e-mails from Lynn Starkey to Chuck

12   Weisenbach; is that right?

13       A    It appears that way.

14       Q    Okay.  And we discussed earlier, Lynn

15   Starkey was your co-director of guidance?

16       A    Correct.

17       Q    And Chuck Weisenbach, who is that?

18       A    He's the principal at -- was the principal

19   at Roncalli.

20       Q    And these e-mails, they're about the roles

21   and responsibilities of the guidance team, just

22   looking at the subject line?

Page 48

1     A     It says the roles and responsibilities, but

2   it looks like they're discussing who is going to take

3   over portions of my job since I'm gone.

4     Q     Right.  And that's what these attachments

5   are about; is that right?

6     A     Yes.  It appears so.

7     Q     Okay.  And it looks like in the second of

8   the e-mails, this is the one labeled Fitzgerald 1012,

9   it describes the second of these two attachments as

10  being a list of the responsibilities within the

11  guidance team from the beginning of this year while it

12  was still anticipated that you would be on the team;

13  is that right?

14    A     Yeah.  Correct.  But this was -- this was

15  redone after I left.  And I only know that because we

16  didn't update it.  Angela Hage who is Angela Maly now

17  was new so we hadn't updated this.  So this is not a

18  document that I had seen before.

19    Q     So that's the first of these two

20  attachments, right?  But I think --

21    A     Correct.

22    Q     -- if you read the third paragraph, it says

Page 49

1    the one from the outset of the year and I think that's

2    before you had left.  And so I think that's the one

3    that -- I'm asking you, does that reflect your

4    responsibilities before you left, that second

5    attachment?

6              MR. SNIDERMAN:  Counsel, I'm sorry.

7    Just so I'm following and for the record, can you

8    point me to a Bates stamp when you say second?

9              MR. DAVIS:  Sure, Mark.  So I'm looking

10   first at Bates stamp 1012 and it says, "Our plan is

11   attached (along with how this was at the outset of the

12   year, in case that's helpful.)"  And then it appears

13   to me that there's two attachments here.  One at Bates

14   stamp 1013, one at Bates stamp 1014.  And I'm asking

15   Ms. Fitzgerald if the one at Bates stamp 1014 appears

16   to her to be the responsibilities at the outset of the

17   year before she left Roncalli?

18             MR. SNIDERMAN:  Thank you.

19             THE WITNESS:  Both have Angela's name

20   on them and so those would have been changed after I

21   left because they were not changed before I left.

22   Potentially, it could have been -- Angela was hired in

Page 50

1    place of Kathy Heath.  And so that could have been

2    Kathy Heath's name just deleted and Angela's put in.

3    But this document was not produced before I left.

4    BY MR. DAVIS:

5        Q    Okay.  I still want to ask you, if you look

6    in the top left of that page Bates stamped 1014, it

7    has your name on it, right?

8        A    Correct.

9        Q    And if you look down that list, is that your

10   understanding of how the Guidance Department's roles

11   and responsibilities were divided before you left

12   Roncalli?

13       A    It was.

14       Q    Okay.  And I just want to ask about the

15   item, route SAP referrals and follow-ups.  Do you see

16   that?

17       A    Yes.

18       Q    And what does that mean?

19       A    If referrals came anonymously, they would

20   come to me and then I would send them to Shellie

21   Hartford.  So that people knew if they were sending

22   people -- like students, teachers, if they knew they

Page 51

1    were sending in an anonymous and filled out the sheet,

2    they knew to turn that in to my mailbox and then I

3    would send it on to Shellie Hartford.

4        Q    Got it.  So you were the contact for

5    anonymous SAP referrals?

6        A    Only by paper.  The students wouldn't come

7    to me.  They would just fill out the paper and put it

8    in my mailbox.

9        Q    Got it.  But it was communicated to them

10   that if they wanted to make an anonymous SAP referral,

11   they should send it to you and then you would get

12   it --

13       A    They should put it --

14       Q    -- where it needs to be?

15       A    Correct.  Sorry.

16       Q    Apologize.  Okay.  Great.  I want to flip

17   back to that first page.  And I wanted to ask you

18   about one more thing here.  It looks to me like the

19   last sentence of the paragraph numbered four says --

20   and this is again Lynn Starkey to Chuck Weisenbach.

21   "Lastly, I really do have concerns about the welfare

22   of our at-risk Shelly students and LGBT students and

Page 57

1    came out to you?

2        A    It wasn't, no.

3        Q    But it happened to other counselors that

4    you're aware of?

5        A    I can't say for sure.  I should say I don't

6    know of any specific instances or specific students.

7        Q    What is the -- earlier we spoke about the

8    Administrative Council.  I want to shift gears a

9    little bit.  What is the Administrative Council at

10   Roncalli, Ms. Fitzgerald?

11       A    It was a -- you know, a group of people from

12   around the school that kind of saw the overall

13   day-to-day logistics of the school.  We met once a

14   week.

15       Q    Okay.  So it was a group of certain school

16   employees that would meet.  And would the principal

17   come to those meetings?

18       A    Yes.

19       Q    Okay.  And what would happen at those

20   meetings?  What would the school employees do with

21   respect to the principal?

22       A    We would just discuss the -- you know, the

Page 58

1    day-to-day kind of ongoing logistics of how the school

2    runs once a week.  So the topics varied, you know,

3    depending on what day it was.

4        Q    Okay.  And so were there decisions made at

5    these meetings about the topics that were raised?

6        A    Sometimes, yes.

7        Q    Okay.  Was it kind of a voting dynamic or

8    was it a consensus of the group dynamic or did it

9    depend on the item?

10       A    I think it depended really more on the item.

11   I can't remember it being a -- you know, a specific

12   instance where there was a vote.  More of a

13   conversation.  Ultimately, the principal had the last

14   say.

15       Q    Okay.  But the other members of the council

16   would advise the principal, give their view, he would

17   take those things into account, then make decisions?

18       A    Yeah.  I think advise is strong, but we

19   would certainly discuss it.

20       Q    Okay.  And then, who was on the

21   Administrative Council?

22       A    Okay.  Let me go around the table.  So the

Page 59

1    principal, the -- both assistant principals, the

2    student -- for academics.  The assistant principal for

3    student activities.  The athletic director, the dean,

4    the campus minister, the V -- I can't remember his

5    exact title.  But like the VP for Mission and

6    Ministry.  I think that was the title.  And Lynn and

7    I, co-directors of guidance or director of guidance,

8    whoever that would be.  I think that's it.  The

9    chaplain sometimes would come if we had one and they

10   weren't busy.

11        Q    Okay.  All right.  And you may have already

12   touched on this, but what are the kinds of things that

13   in your view the Administrative Council would discuss?

14        A    Mostly day-to-day things like school

15   calendar, assembly logistics, school safety,

16   standardized testing, things like that.

17        Q    Okay.  Did Roncalli have a daily schoolwide

18   prayer?

19        A    Yeah.  They -- yes.  There was a prayer over

20   the PA every day.

21        Q    Okay.  Do you know who led that prayer?

22        A    It was -- most of the time Mr. Weisenbach,

Page 60

1    the principal at the time led it.  But there would be

2    different people that would lead it.  Sometimes it

3    would be students.  Sometimes it would be the

4    president.  Sometimes it would be, you know, different

5    teachers who wanted to -- you know, who, who want to

6    pray.  And then sometimes the campus minister or the

7    chaplain.

8         Q    Would this be over the school's PA system?

9         A    It was, yes.

10        Q    Okay.  And do you recall that members of the

11   Administrative Council sometimes led the prayer?

12        A    They were asked to if they wanted to, to

13   lead the prayer.  It was offered to them to be able to

14   do so.

15        Q    Was it ever offered to you?

16        A    It was offered to me, yes.

17        Q    And did you ever lead the prayer?

18        A    No, I did not.

19        Q    You declined the offer?

20        A    I did.

21        Q    Why is that?

22        A    I declined the offer.  I'm sorry?

Page 61

1      Q     Sorry.  I spoke over you.  Excuse me.  Why

2    is that?

3      A     I just wasn't interested.  I didn't -- I

4    didn't want to pray over the PA in front of students.

5      Q     Okay.  I'm going to mark another exhibit

6    here.  Let me know when you have it.

7      A     This is 5, correct?

8      Q     That's right.

9                 MR. SNIDERMAN:  Yes.  Thank you.

10                THE WITNESS:  I have it as well.

11                (Exhibit 5 was marked for

12                identification.)

13   BY MR. DAVIS:

14     Q     Great.  And do you recognize what this

15   document is?

16     A     Yes.  An Administrative Council agenda.

17     Q     Okay.  Is the agenda something that was sent

18   out before the meetings to direct what would be

19   discussed at the meeting?

20     A     Yes.

21     Q     Great.  And this particular agenda, I want

22   to start with the one toward the bottom, it's dated

Page 62

1    April 18, 2017; is that right?

2         A    Yes.

3         Q    Okay.  Will you turn to the page with the

4    label Fitzgerald 1390, so the last page of this

5    exhibit.  Do you see the material under the heading,

6    "Follow up with juniors"?

7         A    I'm sorry.  Can you tell me again where you

8    are?  Oh.  Yes, I do.  Yes, I do.

9         Q    Great.  Thank you.  Can you take a moment to

10   just review that material.  And then the question I

11   want to ask is, what do these initials represent?

12        A    Those are the initials of the people who,

13   who spoke.

14        Q    Got it.  So would SF, that would be you?

15        A    That would be me.

16        Q    Great.  And do you recall what's being

17   discussed here?  It looks like there's multiple people

18   weighing in.  Do you know what this item was about?

19        A    I don't specifically.  It doesn't ring a

20   bell.  Obviously, it's about students making bad

21   decisions, but I'm not sure what it's based off of.

22        Q    Okay.  Just looking at the line that's

Page 63

1   attributed to you, SF, "Kids know where the parties

2   are, but choose not to go due to 21st Century

3   Scholars."  I'm just curious, what is 21st Century

4   Scholars?

5       A    Yeah.  So it's a -- it's a program here in

6   Indiana that allows students who are lower

7   socioeconomic and have good grades and no drug or

8   alcohol violations to -- at the time it was to get

9   free tuition to a state school, but it is -- it's

10  basically financially driven for them to attend

11  college at a lower rate if they have all of those

12  components.

13      Q    Got it.  It looks like from this agenda that

14  the meetings would begin with prayer; is that right?

15      A    Yes.

16      Q    Okay.  Who would lead that prayer?

17      A    The principal always.

18      Q    Okay.  All right.  I'm going to mark Exhibit

19  6.

20              MR. SNIDERMAN:  Got it.  Thank you.

21              THE WITNESS:  I do.  I have it.

22              (Exhibit 6 was marked for

Page 64

1              identification.)

2    BY MR. DAVIS:

3        Q    Great.  And this is another Administrative

4    Council agenda, right?

5        A    Yeah.  It appears to be, yes.

6        Q    Okay.  This one is dated March 6, 2018?

7        A    Yes, it is.

8        Q    Okay.  I want to direct your attention to

9    the item that begins, "Plans for March 14."  Do you

10   see that?

11       A    I do.

12       Q    Okay.  And right below that it says, "SF -

13   prayer service to honor kids who were killed?"  Do you

14   see that?

15       A    I do.

16       Q    Okay.  And SF, again, that would be you on

17   these agenda?

18       A    That's me.  Correct.

19       Q    Okay.  Do you recall what this item was

20   about?

21       A    I do.  This was -- I believe it was after

22   the shooting, the school shooting in Florida, and

Page 65

1   there was kind of an uproar of students in general

2   across the country that were staging a walkout and our

3   students were, were talking about that too.  And we

4   were trying to figure out how to keep them from

5   walking out of the building, whether it be a

6   disciplinary issue or things that we could supplement

7   for them in order to stay in the building and not

8   become a liability.

9        Q    Okay.  And your suggestion for that it looks

10  like was a prayer service?

11       A    That was one of my suggestions that the

12  students lead that.  There were -- there were lots of

13  discussions going on, but I was specifically trying to

14  find a way to let them gather amongst themselves

15  because they didn.t want teachers or anything

16  involved.  The students just wanted to go try to --

17  try to let them gather themselves, trying to figure

18  out a way to do that without leaving the building.

19       Q    Okay.  And it says here, a prayer service to

20  honor the kids who were killed, right?

21       A    That, that was an idea, yeah.

22       Q    Well, the point of the service would be to

Page 66

1   honor the kids who were killed in the Parkland

2   shooting, right?

3       A    I think that -- to honor the kids was one of

4   the reasons that they wanted to meet, correct.

5       Q    When you say they wanted to meet, this is

6   your suggestion to have a prayer service, right?

7       A    The students wanted to find a way to honor

8   the students that had been killed and to recognize

9   school violence as an issue and this was one of the

10  ways that they -- that I had spoken out loud that they

11  could potentially do that.

12      Q    Got it.  And there's no other suggestion if

13  you just review this material from you about a

14  different way to respond to the Parkland shooting, is

15  there?

16      A    Do something in the hallways wasn't

17  necessarily about a prayer service.  It was allow --

18  allowing them to gather so that they could meet as a

19  collective group and without administration or

20  teachers around to kind of debrief.

21      Q    Okay.  Do you know what happened?  How did

22  Roncalli respond to the Parkland shooting?

Page 67

1        A     I know there was a small group of students

2    that did go outside, and one of the students I think

3    led the entire thing.  There were no -- I wasn.t

4    involved in it.  So I'm not sure exactly what

5    happened.  But I know they -- if they got permission

6    from their parents, they were allowed to go outside.

7    Otherwise, I can't remember if there was a, a prayer,

8    you know, said over the PA.  I don't recall.

9        Q     Okay.  I want to look at the next page, and

10   this is Bates labeled 1270.  Excuse me.  That will be

11   1269.  Same page.  A couple of items down.  Do you see

12   the item, music at all school liturgies?

13       A     I do.

14       Q     Do you remember what that item was about?

15       A     I do not specifically.

16       Q     Okay.  Would the Administrative Council from

17   time to time consider the music used at the all school

18   liturgies?

19       A     Not specifically like what music was used.

20   But again, with the logistics.  It might be whether

21   kids could clap or whether the music -- the students

22   thought the music was boring.  How to get them more

Page 68

1    involved in the mass, you know, regarding music.  We

2    would not talk about music selection specifically.

3        Q    Okay.  But if you came to the Administrative

4    Council and said, hey, the students think the music is

5    boring, the suggestion would be, let's change the

6    music and use different music at the liturgies?

7        A    No.  The suggestion would be talk to Joey

8    Newton who was in charge of the musical liturgies and

9    who would go and talk to him, whether it would be the

10   campus minister or the principal.

11       Q    Got it.  So that input, the students think

12   the music is boring, the Administrative Council would

13   discuss that, pass that along to the person that

14   selected the music for the liturgies?

15       A    Yes.

16       Q    Great.  What are the all school liturgies?

17       A    I'm sorry.  Did you say what are?

18       Q    Yes.

19       A    It's a monthly gathering mass for the entire

20   school and community.

21       Q    Okay.  All the students would attend?

22       A    Most of the students would attend, yes.

Page 78

1    mental health initiative and those as possible things

2    to improve your mental health as ideas.  I don't know

3    if those actually went into anything.

4         Q    All right.  And then at the bottom of the

5    same page, 1352, do you see the item, January 17, Mass

6    with Archbishop Thompson?

7         A    I do.

8         Q    Okay.  What is that item about?

9         A    I would imagine that it's about the

10   logistics of what the mass when Archbishop Thompson

11   comes.  We would often discuss like seating and

12   handicapped parking and, and things of that nature,

13   logistical things of the nature if we talked about

14   mass at all or assemblies.

15        Q    Okay.  So the Administrative Council would

16   have been planning for that visit with Archbishop

17   Thompson and planning the mass that would take place

18   when he came?

19        A    If -- we would not be planning the mass.

20   No.  That is incorrect.  We would be planning the

21   logistics of seating and, you know, parking and things

22   like that.  But not specifically the mass.  That was

Page 79

1    done by the campus ministry team.

2        Q    What do you mean by -- the distinction

3    you're drawing there between specifically the mass and

4    the logistics of the mass.  So when you say

5    specifically the mass, do you mean the readings, the

6    homily?  What do you mean by that?

7        A    Yes.

8             MR. SNIDERMAN:  Object to the form.

9    Excuse me.  I'm sorry.  Object to the form.  The

10   witness may answer if the witness understands.

11       A    We, we would not plan Eucharistic ministers,

12   songs, readings, homily, anything that had to do with

13   the, the actual mass.  It would -- it would be more

14   about the logistics of, you know, who was where and

15   when.

16       Q    Okay.  I want to mark -- I'm going to stay

17   with this exhibit for one or two more questions.  Just

18   underneath Mass with Archbishop Thompson, you see

19   Praise & Worship Assembly with Chessie LaRosa and

20   Friends?

21       A    I do.

22       Q    Okay.  And it's got alumni in parentheses?

Page 89

1        Q     Do you remember what that draft policy was?

2        A     We were told that this was a very early

3    draft and that the concern specifically that I had

4    here was that they were telling -- the written

5    document said that if anybody was expressing any kind

6    of transgender thoughts or -- to anybody, that they

7    would have to notify the youth's parents.

8        Q     Okay.  And SF on the item directly below

9    that heading, that's you, right?

10       A     That is me.

11       Q     And you expressed concern over the part of

12   having to tell the transgender youth's parents; is

13   that right?

14       A     Correct.

15       Q     Okay.  Why did you express that concern?

16       A     Because in my job as a counselor, we have

17   ethical responsibilities of confidentiality and I felt

18   like this was breaking that confidentiality.

19       Q     Got it.  So you felt like if a student

20   identified to you as transgender, then as a guidance

21   counselor, you would have a responsibility not to

22   inform the student's parents?

Page 90

1      A    Could you rephrase that, please?

2      Q    Sure.  If a student at -- I think what you

3   just said was you felt like you had ethical

4   responsibilities of confidentiality as a counselor; is

5   that right?

6      A    I felt like it was a conflict in my -- yes

7   is the answer.  I did feel like I had ethical

8   responsibilities and I felt that this was a conflict

9   in that.

10      Q    Got it.  So you felt like those ethical

11   responsibilities would include keeping confidential

12   that a student had told you that they were

13   transgender?

14      A    It was a concern of mine at the time, yes.

15      Q    Okay.  And did a student ever tell you that

16   they were transgender?

17      A    No.

18      Q    Okay.  Why was the Archdiocese's draft

19   policy discussed at the Administrative Council

20   meeting?

21      A    I can't say for sure why that was discussed.

22      Q    Okay.  I mean, did it strike you that the

Page 106

1    my screen.

2         A    Okay.

3         Q    All right.  This is a letter dated May 31,

4    2016; is that right?

5         A    Yes.

6         Q    Who is it signed by?

7         A    I see Lynn Starkey's name at the bottom and

8    mine.

9         Q    Okay.  Did you write this letter?

10        A    I did not.

11        Q    Okay.  But you signed it, right?

12        A    I did not.

13             MR. SNIDERMAN:  I object.  That

14   misstates -- excuse me.  I object.  It misstates the

15   prior testimony.  The witness may answer.

16        Q    Your name appears at the bottom of it,

17   right?

18        A    My name appears at the bottom.

19        Q    Did you review it beforehand?

20        A    I don't recall reviewing it beforehand.

21        Q    Okay.  How did your name appear at the

22   bottom?

Page 107

1          MR. SNIDERMAN:  Object.  Ambiguous.

2     The witness may answer.

3          A    I imagine that it was typed in there by Lynn

4     Starkey who edited -- who authored it.

5          Q    Okay.  So did Lynn Starkey ask you for your

6     permission to put your name at the bottom?

7          A    No, she did not.

8          Q    Okay.  So your representation is that Lynn

9     Starkey just attributed your name to this letter that

10    she drafted and sent?

11         A    Correct.

12         Q    Have you seen it before?

13         A    Just through, through reading it through

14    here, through the things that have been produced for

15    my case.

16         Q    Did you discuss its content with Lynn

17    Starkey before she drafted it?

18         A    I don't remember discussing the specific

19    content with her.  The overall content we did discuss,

20    yes.

21         Q    Okay.  And what do you mean by the overall

22    content?

Page 108

1          A     The discussion of counselors moving to

2     hourly pay and not getting paid through the summers

3     and having to track our hours came up and we were

4     against it.  And so they asked us to -- I mean, they

5     asked us questions specifically about why we should be

6     on the same qualified for salary contract as, as the

7     rest of the teachers do and we were making a case for

8     it.

9          Q     Okay.  And part of -- and you say we were

10    making a case for it.  And part of the way you made

11    that case was this letter; is that right?

12         A     Lynn sent this.  I did not send this.  I

13    didn't author it.  So this would have been a way that

14    she would have been trying to push that forward.

15         Q     Okay.  And the thing that the letter says

16    that has your name and Lynn's name at the bottom of it

17    is, item 1, "ArchIndy's Ministry Description for

18    "Teacher" (2.22.2016)."  And then there's a bullet

19    point underneath that.  If school counselors had a

20    Ministry Description, it would be identical to that of

21    teachers, except for these two items.  III.B.2, daily

22    lesson plans, III.C.5, efficient classroom routines.

Page 112

1    reasons why a guidance counselor qualifies for the

2    same ministerial exemption as the teachers.  Do you

3    see that?

4         A    I do.

5         Q    Okay.  And then a little further down it

6    says, "Having read the materials provided to me by

7    Lynn and Shelly, I would offer the following insights

8    in their support.  There are 67 items listed on the

9    archdiocesan ministry description for a teacher.  A

10   guidance counselor fulfills 65 of the 67 with the

11   exceptions being daily lesson plans and efficient

12   classroom routines."  Do you see that?

13        A    I do.

14        Q    Okay.  And so that's consistent with that

15   same item No. 1 in the May 31st letter that we were

16   just discussing; is that right?

17        A    The -- I don't see on the Exhibit 15 that

18   the attachment of the 67 items listed is on there.

19        Q    Okay.  But you see it says, "except for

20   daily lesson plans and efficient classroom routines,"

21   right?

22        A    Yeah.  I mean, what I would agree with is

Page 113

1    that's what it says.  But without having gone through

2    that checklist, I can't say that we did all 67 of

3    those items.

4        Q    Okay.  Well, we can go through them.  We can

5    pull up the checklist.

6        A    Okay.

7        Q    I'm going to mark Exhibit 17.

8        A    Okay.  I have that now too.

9             (Exhibit 17 was marked for

10            identification.)

11   BY MR. DAVIS:

12       Q    And you still have Exhibit 15 on your

13   screen?

14       A    I have, yes.  15 -- 14, 15 and -- no.  15,

15   16, and 17.

16       Q    Great.  That's perfect.  So on 15 you see

17   where it says, "ArchIndy's Ministry Description for

18   "Teacher" (2.22.2016)"?

19       A    I do.

20       Q    And then I want to flip over to 17.  And the

21   title of this document appears to be Archdiocese of

22   Indianapolis Ministry Description Teacher 02.22.2016;

Page 114

1    is that right?

2         A    Yes.

3         Q    Okay.  And there are a number of items

4    listed here, two of them are circled, the rest of them

5    have checkmarks next to them; is that right?

6         A    It appears that way, yes.

7         Q    Okay.  And the two that are circled are

8    prepares daily lesson plans and that's item III.B.2?

9         A    Correct.

10        Q    And then establishes efficient classroom

11   routines, and that's item III.C.5; is that right?

12        A    That's correct.

13        Q    Okay.  And if you flip over to Exhibit 15

14   again, this is the letter above your and Lynn's name,

15   and it says, "If school counselors had a Ministry

16   Description, it would be identical to that of

17   teachers, except for III.B.2 (daily lesson plans) and

18   III.C.5 (efficient classroom routines)," right?

19        A    I see that, yes.

20        Q    Okay.  So that's referring to these two

21   items that were circled in Exhibit 17; is that right?

22        A    Correct.

Page 115

1       Q    Okay.  And the letter is saying that the

2  other items apply to guidance counselors as well as

3  teachers.  That's what the letter is representing; is

4  that right?

5       A    That's what the letter represents, yes.

6       Q    Okay.  And then back to Exhibit 16.  This is

7  Principal Weisenbach's letter.  And Principal

8  Weisenbach says in No. 1, "There are 67 items listed

9  on the archdiocesan ministry description for a

10  teacher.  A guidance counselor fulfills 65 of the 67

11  with the exceptions being daily lesson plans and

12  efficient classroom routines," right?

13      A    Correct.

14      Q    And Principal Weisenbach is offering that as

15  insight in support of you and Shelly, right?

16      A    Of Lynn?

17      Q    You and Lynn.  Excuse me.

18      A    Yes.  It appears that way, yes.

19      Q    So it appears that Principal Weisenbach is

20  agreeing with that point made in the letter that was

21  sent by Lynn; is that right?

22      A    I can't -- I mean, I can't speculate --

Page 116

1  he -- I mean, we weren't evaluated on all of those

2  things.  So I think he was probably just taking the

3  letter at word.

4      Q    Well, he says, doesn't he, "I would offer

5  the following insights in their support," right?

6      A    Correct.

7          MR. SNIDERMAN:  Sorry.  I don't see

8  where you are.

9          MR. DAVIS:  Oh, sure.  I'm on 1157

10 above No. 1.

11         MR. SNIDERMAN:  Thank you.  I'm with

12 you.

13 BY MR. DAVIS:

14     Q    All right.  And then he says what I just

15 read and I won't belabor again.  But he says, "I would

16 offer the following insights in their support."  And

17 then he says, a guidance counselor fulfills 65 of the

18 67 items on that teacher ministry description except

19 for the two that we just discussed, right?

20     A    That's what it says, yes.  But again, I

21 would say that we were not evaluated on all 67 of

22 those.

Page 143

1    if I've read it accurately.  "In a faith-based school,

2    I feel" -- excuse me.  Let me start over.

3         "I am faithful and have no problems sharing

4    my beliefs and my love of God.  In a faith-based

5    school, I feel this definitely is a strength when

6    working with young people who are seeking direction."

7    Is that what it says?

8         A    It does say that, yes.

9         Q    Okay.  And so there, are you saying that

10   students -- you're saying that students seek direction

11   from guidance counselors; is that right?

12        A    No.  That's not what I'm saying.  I, I think

13   that saying that I'm open-minded and welcoming to all

14   and then going on -- you know, I'm willing to do all

15   of those things where appropriate.  At the time I was

16   willing to do all those things.  They just never were

17   a part of my job.

18        Q    Okay.  Well, you said, when working with

19   young people who are seeking direction, so the

20   expectation is that some of the young people that you

21   were working with would be seeking direction; is that

22   right?

Page 182

1      Q     Okay.  So in addition to the Administrative

2   Council meetings that we went over in some detail

3   before, you also attended like guidance team meetings

4   in particular, right?

5      A     Yes, sir.

6      Q     How often were those held?

7      A     We had them weekly when we could.  Most of

8   the time weekly.

9      Q     Okay.  Did those meetings also begin with

10  prayer?

11     A     Sometimes they did.

12     Q     Okay.  Did you ever lead that prayer?

13     A     I did not.

14     Q     Who often did?

15     A     Kathy Heath usually did.  She was one of the

16  counselors.

17     Q     So the guidance team meetings were

18  specifically between -- the only attendees would have

19  been members of the guidance team, not anybody else;

20  is that right?

21     A     In general.  But sometimes we would have

22  guests come and visit as well.  And if we had

Page 185

1    efforts - great job.  As I have sought out ways to

2    include Christ in more of my daily life (radio, books,

3    prayer, conferences, et cetera), I am consistently

4    amazed at how he drops little things into my life to

5    help me in this area such as the book you gave me

6    recently.  Keep your focus strong here - you will not

7    regret it."  Is that right?  Is that what the

8    paragraph says?

9        A    That's what it says, yes.

10       Q    Okay.  And so Principal Weisenbach would

11   have drafted that language?

12       A    He would have, yes.

13       Q    Okay.  And so why do you think he would have

14   commended you for the success you were having with

15   your goal to find more ways to celebrate Christ?

16       A    I, I can't speculate as to why he would put

17   anything honestly.

18       Q    Okay.  But that's a goal that you had

19   expressed to him to find more ways to celebrate

20   Christ?

21       A    I'd have to look at my goals.  I doubt that

22   I said it that way.  But I always gave a personal goal

Page 186

1    as well as my professional goals.  It wasn't -- it

2    wasn.t asked, but I always gave him one.  So that

3    sounds like something that would have potentially been

4    a personal goal.

5        Q    I mean, you assume that he accurately

6    recounted what you had told him before he responds to

7    it in this performance review, right?

8        A    I, I would assume so.

9        Q    Okay.  Did you write down your goals before

10   your performance reviews?

11       A    I would have sent them to him, yes.

12       Q    Okay.  Have you looked for -- do you have

13   access to those documents today?

14       A    I, I don't.

15       Q    They would be in your sent folder in your

16   e-mail?

17       A    I'm not -- I'm not positive if those goals

18   were produced by us or anybody else.  I can't say for

19   sure 'cause I've seen different goals and I'm not -- I

20   don.t know specifically if this one was part of our

21   production or not or yours.

22       Q    Okay.  It says in this paragraph, "I am

Page 201

1    with cancer called A Case of Faith, I think.  I can't

2    remember.  But, but it was a book that I -- that, you

3    know, my dad had given me to read and I gave it to

4    Chuck.  But I, I don't remember specifically the other

5    books.

6        Q    A Case for Faith?

7        A    Yeah.

8        Q    Okay.  All right.  What was that book about?

9        A    So the series of A Case for Faith by Lee

10   Strobel is an atheist who was trying to disprove first

11   Christ and then faith and then resurrection and

12   through his findings -- through his research, you

13   know, talked about his experience of, of faith.  Like

14   specifically why do good -- why do bad things happen

15   to good people.

16       Q    Got it.  And what other books -- that's

17   another book that you remember giving Principal

18   Weisenbach.  Do you remember any other books that you

19   remember Principal Weisenbach giving you?

20       A    No, not specifically.

21       Q    Okay.  Why did the two of you exchange books

22   on occasion?

Page 202

1       A    I mean, specific to that -- to Building a

2    Bridge by James Martin, he gave it to me on the heels

3    of a conversation that he and I just had had about my

4    sexuality and thought that, you know, would be

5    something that I would enjoy reading and wanted my

6    thoughts on it.

7       Q    But in general, right, you gave him a book

8    it sounds like that doesn't have much to do with LGBT

9    issues in the church, the Lee Strobel book.  Why did

10   you share those kinds of books with Principal

11   Weisenbach?

12      A    I only remember sharing that one with him

13   and as I said, it was because my dad was in the

14   hospital with cancer.  It was a -- he probably asked

15   me how my dad was doing and, and just shared.  There

16   wasn't -- there wasn't anything behind it other than

17   just, hey, this is a good book.

18      Q    Okay.  What was the Diversity Council that

19   you said you were assigned to?

20      A    Well, I'm not sure what it turned into

21   because I was assigned to it the summer before I was

22   placed on leave.  So we only had one meeting and it

Page 214

1    gave at the faculty meeting?

2         A    I do not recall.  I can't tell.  I don't

3    know who it was from.  I don't remember hearing this

4    talk.

5         Q    Okay.  Were there --

6         A    Sorry.

7         Q    Go ahead.  I want to hear the rest of your

8    answer to that question.

9         A    I was just going to say, once the nuts and

10   bolts were finished and we took a break, the guidance

11   counselors would go back and were -- and, and we had

12   senior appointments so we would go back to our offices

13   and work with our seniors and our families.  So there

14   may have been things that, that we missed after nuts

15   and bolts that I hadn't seen before.

16        Q    What do you mean you had senior

17   appointments?  What are senior appointments?

18        A    So every year we meet with our seniors and

19   hopefully their parents to discuss like where they are

20   on track for their diploma, colleges that they're

21   applying to.  Just senior stuff that they needed to

22   know.  And so since we offered those for every single

Page 215

1    one of our seniors, and if their parents wanted to

2    come, we didn't have enough time to get those all in

3    in the summer before school started.  So Mr.

4    Weisenbach gave us permission, guidance counselors to,

5    to miss that -- the part of the nuts and bolts day or

6    day of reflection so that we could meet with our

7    seniors.

8         Q    How long would the senior meetings take?

9         A    They were an hour each senior.

10        Q    How long would the faculty meetings take?

11        A    Well, the nuts and bolts was all in the

12   morning.  It depended on the year.  If they crammed it

13   into one year, it would take all day long.  If they

14   did it in two days, it was usually one and a half

15   days.

16        Q    Okay.  I'm going to turn to page Fitzgerald

17   1092.

18        A    Okay.  I have it.

19        Q    Great.  And do you see the line there,

20   schedule for faculty day/evening of reflection?

21        A    I see it, yes.

22        Q    Okay.  What is the day of reflection?

Michelle D. Fitzgerald
6711 W 1000 North
McCordsville, IN 46055
fitzgirl@hotmail.com
Phone 317/335-9275

April 23, 2004

Dear Mr. Weisenbach,

Please consider my application for the Guidance Counselor position at Roncalli High School. I have enclosed my resume and application for your review.

I am currently in the Masters level School Counseling Program at Indiana University-Purdue University at Indianapolis, and will complete my required coursework at the end of this summer (August 2004). I have recently completed my practicum experience at Indiana Youth Group, where I worked with a variety of young adults refining my counseling skills through individual and group counseling, academic advising, and crisis intervention. In order to complete the program and attain my school counseling license, I must only complete a two-semester internship.

As my resume indicates, I have ten years' experience in education, representing an ongoing effort to refine my professional focus. Although I have not completely fulfilled the requirements for licensure as a counselor, you will see that my experience in education more than qualifies me to competently satisfy the responsibilities of a Guidance Counselor. I am currently a licensed teacher and have additional experience as a high school coach..

Moreover, as a sixteen year member of the Roncalli family I have come to see that qualities I value in a school program are the same qualities that make Roncalli a perfect fit for me. Additionally, as a Roncalli alumna, I come to this position already a member of a loyal tight-knit family and come equipped with the life skills and values I acquired as a Roncalli student. Specifically, I am a dedicated and hard worker; I am a responsible, moral person of great integrity; I am persistent, strong-willed, self-critical and eager to learn. I have life experience that is invaluable and irreplaceable. I believe I would be a tremendous asset to the Roncalli counseling program.

I welcome the opportunity for a personal interview to further discuss my qualifications. Thank you for your time and consideration. I look forward to hearing from you.

Sincerely

*Shelly Fitzgerald*

SHELLY D. FITZGERALD

# Michelle Fitzgerald



**Phone**

## Objective

Experienced, energetic professional counselor and educator seeking to secure a school counseling position at the middle school, junior high or high school level.

## Education

**Pending: M.S. in School Counseling,** Indiana University-Purdue University, Indianapolis, (IUPUI)
*All classes completed with the exception of Internship, Graduation Date: 05/05*
B.S. Physical Education (K-12) University of Southern Indiana, Evansville, IN *(December 1996)*
B.S. Non-teaching Physical Education/Corporate Fitness University of Southern Indiana, Evansville, IN *(December 1996)*
Graduate Roncalli High School, Indianapolis, IN *(May 1991)*

## Degrees & Certifications

**Pending: Indiana School Counselors License,** K-12 *(upon completion of internship, May 2005)*
Indiana Teachers License, Standard K-12 Physical Education *(Valid 3/16/01-03/16/06)*
American School Counselors Association (ASCA), *present*
Indiana School Counselors Association (ISCA), *present*
Indiana Counseling Association (ICA), *present*
Chi Sigma Iota, *pledge*

## Professional Experience

### Indiana Youth Group (IYG) – Practicum Experience

*Jan 2004-present*

Practicum Responsibilities Include: Individual counseling, group counseling, academic advising, parent conferences, mediation/conflict resolution, crisis intervention, career counseling, individual supervisions, consultations, research/professional reading, staff meetings, and report writing/case notes.

### Employment Consultant/Special Education Work Study Program Lawrence North High School

*2000 - 2001 school year*

Job Responsibilities Include: teaching and assisting students in the Work Study Program with skills needed to enter the work force. Assisting with completion of resumes, applications, interview skills, training on job sites, evaluating performance at places of employment, and communication with employers from initial contact through the end of the school year.

### Special Education Instructor Lawrence North High School

*2nd Semester 1999 school year* (Mid term replacement for an instructor on medical leave)
Job Responsibilities: instructing Health, Reading and English classes to children with special needs.

### Physical Education/Weights and Conditioning Instructor Lawrence North High School

*2nd Semester 1999 school year (*Mid-term replacement for a reassigned instructor)
Job Responsibilities: instruction of skills, rules and strategy; test writing and skills testing; grading; classroom management and discipline; preparing daily lesson plans.

### Assistant Varsity Softball Coach for Lawrence North High School

*1999 Season - present*

### Permanent Full-Time Substitute Teacher for Lawrence North High School

*August 1999-January 2000*

Job Responsibilities: coverage for any absent instructor; administering tests; classroom management, instruction and work with special education classes

( 12 )
125A

**Director of Softball and Instructional Services** Triple Crown
*June 2000-May2003*
Job Responsibilities:  instruction (private lessons, classes and clinics); hiring and training staff.

**Manager/Health Fitness Instructor** for the National Institute for Sports and Fitness (NIFS)
*January 1999-August 1999*

**Fitness Specialist** for Health Fitness Corporation at Kraft Foods
*June 1997-January 1999*

**Senior Coordinator and Instructor** for Heart Zone Training Seminar with Sally Edwards
*January-July 1998*

**Assistant Varsity Softball Coach** for Roncalli High School
*Spring 1997*

**Fitness Specialist** for Mead-Johnson/Bristol Myers Squibb
*April-December 1996*
Job Responsibilities:  Intern position.

**Student Teacher** for Castle High School, Newburgh, Indiana
*Fall/Winter 1996*

**Field Sport Coordinator/Camp Counselor** in Keene, New Hampshire
*Summers 1992-1994*
Job Responsibilities: counseling duties including group lodging, chaperoning and complete responsibility
for individuals' well being; instructing and coaching numerous field and water sports; organized sporting
events schedules; instructed classes in strength training, health and nutrition, circuit training, and
cardiovascular exercise.

**College Honors and Activities**
- Member of the University of Southern Indiana Women's Fast Pitch Softball team (1991-1994); Great
  Lakes Valley Champions (1993)
- Student manager of the University of Southern Indiana Women's basketball team (1992-1993)
- Received athletic scholarship from University of Southern Indiana for Softball (1991-1994)
- Received the Ed and Virginia Fritz Athletic Scholarship (1991-1995)
- Panelist/Guest Speaker at the University of Southern Indiana; Topic:  Career Choices

**Computer Proficiencies**
- Microsoft Word
- Microsoft Excel
- Microsoft Power Point
- Lotus Notes
- CFP-7
- Internet research
- Cyber Sports Statistics

# 2018-2019 SCHOOL GUIDANCE COUNSELOR MINISTRY CONTRACT
## RONCALLI HIGH SCHOOL

*(For use by Schools ministries affiliated with the Roman Catholic Archdiocese of Indianapolis)*

NOTE: This ministerial contract is for use between schools and professionals licensed under and performing duties aligned with the Indiana Department of Education requirements and guidance offered at https://www.doe.ingov/student-services/student-assistance/school-counselor-licensure (website version active on 3/31/18)

School Guidance Counselor Name: MICHELLE FITZGERALD            Phone:
Address:
City, State Zip:

|  |  | |
|---|---|---|
|  | Daily Rate | $249.64 |
|  | (Includes Holidays & Professional Days) Contracted Days | x 192 |
|  | Base Pay | $47,930.00 |
| Extra Duty Pay | 13 Additional Days | $3,245.00 |
|  | Guidance Co-Director | $7,169.00 |
|  | 6th Class | $5,804.00 |
| Coaching Pay |  |  |
|  |  |  |
|  |  |  |
|  | Extra Duty Total | $16,218.00 |
|  | Coaching Total |  |
| (26) Equal payments of $2,467.23 | School Guidance Counselor Salary Total | $64,148.00 |

Contract & benefits date begins August 1, 2018 ends July 31, 2019
Pay date begins August 3, 2018 ends July 19, 2019

| Indiana License #: 1420064 | Degree:       MA | Kind: Professional |
|---|---|---|
| Date of Issue:      11/8/2016 | Subject Area(s):  School Counselor | Grade Levels: K-12 |
| Expires:       11/8/2021 | Status: Full-time / Salary Exempt | CEAP Level:  D3 |
| Teaching Assignment: Secondary | Subject Area(s): Guidance Counselor |  |

IN ACCORDANCE with the declarations above, the employer agrees to hire and the School Guidance counselor agrees to serve as the School Guidance Counselor in the school for the term of this contract on the following terms:

1. Duties. Under the supervision of the school principal and pastor, the School Guidance Counselor shall:

    a. Faithfully perform all duties of a School Guidance Counselor in the school, using such texts as are prescribed and supplied;
    b. Be accountable to the principal for curricular plans;
    c. Observe proper decorum as befits the profession;
    d. Observe the regulations and schedules of the school, the school commission or board, and/or the deanery high school board
    e. Continue professional growth and professional development sponsored by the archdiocesan Office of Catholic Schools
    f. Be responsible for keeping accurate records as prescribed by the school;
    g. Make all reports required by the principal, the school commission (or board), and laws of Indiana; and,
    h. Maintain licensure and renewal as needed.
    i. Comply in a timely manner with all employment screening and training expectations, including state and archdiocesan requirements.

2. Compensation. For each full day of service, the employer shall pay the School Guidance Counselor Salary at the Daily Rate designated above. Total compensation for the contract year shall not exceed the School Guidance Counselor Salary Total amount. School Guidance Counselor only shall receive compensation for actual days of service plus those days set forth in Section 5.Compensation shall be paid to School Guidance Counselor in accordance with the regular payroll procedures offered by the Roman Catholic Archdiocese of Indianapolis, as service provider, ("Service Provider"). In the event School Guidance Counsellor's total compensation received exceeds the total number of days of service plus the available leave days multiplied by the Daily Rate, the employer is entitled to seek a setoff or refund of the amounts overpaid.

3. Benefits. All benefits are offered as published by the Service Provider. Benefit coverage begins on the contract date as determined in Contract Term date section above. Benefit coverage will terminate on the contract end date as determined in the contract term section above. All health benefits will begin on the 1st of the month.

4. Policies. School Guidance Counselor acknowledges having been provided with a copy of the Faculty Handbook and is familiar with the contents thereof in all matters pertaining to the school's philosophy of education, objectives, moral and ethical standards and procedures. School Guidance Counselor agrees that conscientious observance of the Faculty Handbook, as well as the Rules and Regulations of the school is an expressed duty of the School Guidance Counselor's performance of this contract. School Guidance Counselor acknowledges that the school reserves the right to amend and modify the Faculty Handbook and the Rules and Regulations upon reasonable notice to the School Guidance Counselor. In the event there is a conflict of any provision of this contract with any of the provisions of the above referred to policies, this contract shall control. School Guidance Counselor also acknowledges receipt of the ministry description that is attached to this contract and agree tofulfill the duties and responsibilities listed in the ministry description.

5. Paid Leave. If this contract is for a full two-semester term, the School Guidance Counselor may take nine (9) days sick leave with pay, except the first year, new School Guidance Counselors receive ten (10) days of sick leave with pay, plus the accumulated balance from the immediately preceding year, plus two (2) days for personal reasons. Unused personal leave is forfeited at the end of the school year. A maximum of nine (9) days of unused sick leave per contract year may be accumulated to a total of 90 days. After all sick leave has been used, a full day's pay shall be deducted from the School Guidance Counselor's salary for each day missed. In addition, the School Guidance Counselor may take five (5) days leave with pay for the funeral in case of a death in the immediate family. The immediate family includes parents, spouse, sibling, child, grandparent, grandchild and in-laws to the same degree. If the School Guidance Counselor is hired after the first day of school, the School Guidance Counselor may take one (1) day of sick leave per eighteen (18) current year contract days worked, up to a maximum of nine (9) days. Paid time off for part time employees will be prorated.   Please reference ( 18 ) chdiocese handbook for details on appropriate use of time.

App.507                                      127A

6. **Defaults.** The School Guidance Counselor shall be deemed to be in default under this contract in the event of any such default, including, but not limited to the following:

a. Failure to perform or neglect of duties;
b. Unprofessional conduct;
c. Insubordination;
d. Falsification of employment application or other documents or other misrepresentation;
e. Violation of a rule or policy of the school or Archdiocese;
f. Unsatisfactory attendance;
g. Reporting to work under the influence of alcohol or drugs, or being under the influence of alcohol or drugs while overseeing youth at any church/school activities;
h. Conduct endangering the safety of students or others;
i. Relationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church; and
j. Any conduct in or out of school tending to reflect great discredit on the School Guidance Counselor or the school or tending to seriously impair the School Guidance Counselor's continued effectiveness as a School Guidance Counselor; and, any personal conduct or lifestyle at variance with the policies of the Archdiocese or the moral or religious teachings of the Roman Catholic Church.

On any such default, the school principal and the pastor may, at their discretion and without notice, suspend or terminate the employment of the School Guidance Counselor.

7. **Liability for Default.** Schools affiliated with the Roman Catholic Archdiocese of Indianapolis dedicate substantial resources annually in the recruitment and retention of its School Guidance Counselors. The termination of School Guidance Counselor Contracts by School Guidance Counselors without cause during the term of the contract, results in significant organizational and financial detriment to the schools. School Guidance Counselor and the School acknowledge that the cost and detriment to the school is not easily calculated and that liquidated damages in the sum of 10% of the annual salary of the School Guidance Counselor is a fair and accurate estimate of the detriment suffered by the School in the event the School Guidance Counselor Contract is prematurely terminated by the School Guidance Counselor.

a. **In the event School Guidance Counselor terminates this School Guidance Counselor Contract without just cause (which shall be determined by the School in its sole discretion), prior to the expiration of the contract term,** School Guidance Counselor agrees to pay to the School as liquidated damages, a sum equal to 10% of the School Guidance Counselor's annual salary (hereinafter referred to as "Liquidated Damages") within 30 days of the date of termination.

b. In the event School Guidance Counselor fails to pay the Liquidated Damages in full within 30 days of the date of termination, the School shall be entitled to such additional sums, including payment of interest at the rate of 10% per annum, cost of collection and attorney fees.

c. This Section 7 shall be governed by and interpreted in accordance with the laws of the State of Indiana. School Guidance Counselor and School hereby consent to the exclusive jurisdiction of the state courts located in Marion County, Indiana and waive any objection which may have been based on improper venue or forum non-conveniens to the conduct of any court proceedings.

_MDF_ School Guidance Counselor shall initial and date here to indicate that he/she has read and accepts Section 6 - Defaults and Section 7 - Liability for Defaults.

8. **Term** This contract is not automatically renewable. The School Guidance Counselor has no right to, or the promise of, a contract exceeding the school year. No compensation shall be paid for unused sick or personal leave. No one may waive this paragraph.

9. **Entire Agreement** This contract supersedes all prior oral or written agreements and can be modified only by a mutual agreement in writing signed by both parties.

10. **Conflicting Provisions** In the event there is a conflict of any provision of this contract in any provision of the above refered to policies, this contract shall control.

11. **Dispute Resolution** The School Guidance Counselor and school agree that the Superintendent of Catholic Schools is appointed by the parties to resolve dispute concerning the terms of this contract. In the event of a dispute concerning the terms of this contract, the School Guidance Counselor agrees to submit the dispute for mediation by the Superintendent of Catholic Schools for the Archdiocese of Indianapolis. The decision of the Superintendent concerning any dispute is a final decision. Mediation of a dispute is not applicable to the termination, withdrawal or non-renewal of this contract.

IN WITNESS WHEREOF, the parties have hereunto set their hands at Indianapolis, Indiana.

Dated _5/25/18_

EMPLOYER'S NAME:     Roncalli High School
                     3300 Prague Road
                     Indianapolis, IN 46227

_Michelle D. Fitzgerald_
Printed Name of School Guidance Counselor

_[signature]_
Signature of School Guidance Counselor

_[signature]_
Principal/Administrator

( 19 )

# ARCHDIOCESE OF INDIANAPOLIS
## MINISTRY DESCRIPTION
### School Guidance Counselor
FINAL 05.08.2018

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| Title: | Catholic School Guidance Counselor |
| Status: | Part-time or Full-time, Exempt |
| Reports To: | Principal and, if applicable, Department Director |

**EXHIBIT 3**

## II. PRIMARY FUNCTIONS

The school guidance counselor, a minister of the faith, is a professional educator licensed under and performing duties aligned with Indiana Department of Education requirements and guidance offered at https://www.doe.in.gov/student-services/student-assistance/school-counselor-licensure (website content active on 3/31/18).

Adhering to mission, and within the school's supervisory structure, including the school principal and pastor or high school principal and president,  the school guidance counselor will collaborate with parents and fellow professional educators to foster the spiritual, academic, social, and emotional growth of the children entrusted in his/her care.

## III. POSITION CONTENT
{Note:  Recognizing that Catholic schools differ in their programming and structures, site-specific position content may also be provided by the school administration.)

### A.  Role: Facilitates Faith Formation
1.  Communicates the Catholic faith to students and families through implementation of the school's guidance curriculum, academic course planning, college and career planning, administration of the school's academic programs, and by offering direct support to individual students and families in efforts to foster the integration of faith, culture, and life.
2.  Prays with and for students, families, and colleagues and their intentions. Participates in and celebrates liturgies and prayer services as appropriate.
3.  Teaches and celebrates Catholic traditions and all observances in the Liturgical Year.
4.  Models the example of Jesus, the Master Teacher, in what He taught, how He lived, and how He treated others.
5.  Conveys the Church's message and carries out its mission by modeling a Christ-centered life.
6.  Participates in religious instruction and Catholic formation, including Christian services, offered at the school. Non-Catholic school guidance counselors are expected to participate to the fullest extent possible (e.g., non-Catholics would come forward to receive a blessing instead of Holy Communion in the Catholic Mass).

### B.  Role: Designs and Plans the School's Guidance Curriculum and Programming
1.  Participates in ongoing assessment of guidance department quality and uses archdiocesan and state standards, including diploma and graduation pathway requirements, for long-range and short-range planning.
2.  Develops and communicates the school's guidance department goals and calendar to all constituencies.
3.  Prepares daily, weekly, and/or monthly plans for the implementation of the school's guidance curriculum and submits them to the principal per the principal's directive.
4.  Develops varied strategies to meet the needs of diverse learners and families, using data to inform professional practice.
5.  Chooses high quality and appropriate materials for use with students and families aligned with the

Exhibit 0020

school's mission and the school's guidance curriculum.

6. Plans, if appropriate, field trips that enrich the school's guidance curriculum.

**C.** Role: <u>Implements and Manages the School's Guidance Curriculum and Programming</u>

1. Ensures high quality academic planning, including class/course scheduling aligned with progress toward graduation and attainment of goals for all learners and families.

2. Conducts, as appropriate and necessary, large group, small group, and individual school guidance counseling initiatives to meet the needs of all learners and families.

3. Uses a variety of methods and strategies suited to diverse students and families and aligned with the goals of the school's guidance programming.

4. Encourages the exploration of diverse curricular and extracurricular learning opportunities along with the exploration of diverse higher education and career pathways.

5. Uses media and technology to support learning, as appropriate.

6. Establishes efficient routines to maximize impact of the school's guidance curriculum and programming.

7. As directed by the principal, assists in the development of, follows, and ensures the implementation by each teacher of ISPs, CSEPs, and Catholic School Accommodation Plans for students who have them.

8. Is available to support students and families learning outside of traditional school hours (before and after school meetings and programming, etc.).

9. Works with incoming students and families to develop academic plans and to assist with induction into the life of the school.

10. As directed by the principal, coordinates and/or assists in the coordination of and implementation of assessments, including state and other standardized testing, and accommodations.

11. Works with students and families for post-high school educational and career placements, including assisting with identifying and applying for scholarships, college/university applications, and job applications.

12. Follows best practices and ethical responsibilities of the school guidance counseling profession, including following all mandatory reporting requirements.

**D.** Role: <u>Assesses and Communicates Results</u>

1. Uses both formal and informal methods to evaluate and document the progress of students toward graduation and the formation of students aligned with the mission of the school. Adjusts programming and methods in response to the needs of learners and families.

2. Aligns student and family programming with guidance curriculum objectives and uses data to enhance programming for the growth of all learners.

3. Provides frequent and useful feedback on progress to students and parents along with specific suggestions for improving performance.

4. Coordinates and/or participates in the school's Response to Intervention / Multi-Tiered System of Supports programming for all learners, as directed by the principal.

5. Communicates, as appropriate, progress according to the quarterly and interim school schedule.

6. Communicates individual and school-wide progress as per the principal's and/or president's directive.

7. Communicates the school's guidance department goals and programming to students, families, and colleagues.

8. Initiates conferences with parents/guardians, both proactively and reactively, as necessary and as aligned with the school's guidance curriculum.

9. Maintains accurate permanent records for students.

**E.** Role: <u>Develops and Maintains a Positive Learning Environment</u>

1. Maintains a caring rapport and relationship with students and families and demonstrates enjoyment in working with them.

2. As directed by the principal, coordinates safe environment programming and education for students and families, including Circle of Grace, bullying awareness and prevention, suicide awareness and prevention, substance abuse awareness and prevention, and other appropriate safe environment

programming.

3. Contributes positively to the learning environment of the entire institution.
4. Supports teachers, staff members, and administrators in developing and implementing developmentally-appropriate practices and policies to ensure well-being and responsiveness to student needs.
5. Proactively identifies and addresses physical, social, emotional, and spiritual needs of individuals and of the community of learners, engaging other professionals as appropriate.
6. Uses techniques and methods that foster a Christ-centered atmosphere and the internalization of self-discipline and a sense of personal responsibility.
7. Maintains and communicates high academic and behavioral expectations and supports students in meeting those expectations.
8. Develops and maintains a stimulating, safe, and engaging environment that is neat, orderly, and attractive, including appropriate and engaging bulletin boards and displays.
9. Supports positive student behavior so that goals can be accomplished.
10. Addresses behavior and academic issues in an effective, consistent, and fair manner.
11. Documents and communicates issues and concerns to parents and the principal in a timely and appropriate manner.
12. Provides supervision and engages students outside of the classroom and as assigned by the principal.

### F.  Role: Professional Growth and Development

1. Commits to lifelong learning and demonstrates a passion for ongoing professional growth and development.
2. Maintains proper certification and licensure as required by the State of Indiana.
3. Meets the Archdiocese of Indianapolis's professional growth requirements and all local requirements as determined by the principal and/or his/her designee(s).
4. Maintains records of Professional Growth Points (PGPs) and submits them to the IDOE in collaboration with the principal or his/her designee.
5. Participates fully in faculty meetings and professional development meetings/in-services, contributes to school-wide goals, and supports colleagues and administrators in their own professional growth.
6. Participates fully in the school's performance appraisal processes for educators.
7. Participates in spiritual retreats, days of reflection, and spiritual formation programs as directed by the principal and as required by Archdiocesan faith formation expectations.

### G.  Role: Additional Professional Responsibilities

1. Follows local protocols as published in the faculty/staff handbook, student/family handbook, and in other related policies, protocols, rules, and regulations.
2. Serves on school committees and in other capacities as directed by the school principal.
3. Assists as requested with school fundraisers and development efforts.
4. Prepares for, attends, and participates in Registration, Open House, Christmas Program, Graduation, etc. as directed by the school principal.
5. Prepares, attends, and participates in grade level specific events/programs/initiatives, etc.

### H.  Communication and Interpersonal Effectiveness

1. Contributes positively to morale and to the culture of the Catholic school in service of the mission in all communications and actions.
2. Demonstrates loyalty to the school and its mission above individual views.
3. Openly and respectfully communicates concerns at the appropriate level.
4. Collaborates with and supports fellow school guidance counselors, teachers, staff members, and administrators.
5. Proactively engages parents in the formation of their children.
6. Communicates effectively with parents and works to resolve concerns or disagreements in a constructive manner.

7. Respects and maintains confidentiality.
8. Maintains the good reputation of the parish, school, and archdiocese.

## IV. POSITION SPECIFICATION/REQUIREMENTS

### A. MINISTERIAL EXPECTATIONS
1. Display of Gospel values, good judgment, diplomacy, and the safeguarding of confidential information are required.
2. Has the potential and talent to be an effective Catholic school guidance counselor.

### B. EDUCATION, TRAINING, AND/OR EXPERIENCE
Licensure/Degree
1. Holds an advanced degree and license as prescribed by the Indiana Department of Education's Office of Educator Effectiveness and Licensing (https://www.doe.in.gov/student-services/student-assistance/school-counselor-licensure; content as of 3/31/18).
2. Progress toward a degree and emergency licensure may be sufficient as prescribed by the Indiana Department of Education's Office of Educator Effectiveness and Licensing (https://www.doe.in.gov/student-services/student-assistance/school-counselor-licensure; content as of 3/31/18).

Other Training/Expectations
1. "Safe and Sacred" Child Protection Training
2. Criminal Background Check
3. Acknowledgment of this Ministry Description document for School Guidance Counselors
4. Ongoing professional development and faith formation

## V. WORKING ENVIRONMENT

A. Catholic schools are ministries of the Catholic Church, and school guidance counselors are vital ministers sharing the mission of the Church. School guidance counselors are expected to be role models and are expressly charged with leading students toward Christian maturity and with teaching the Word of God. As role models for students, the personal conduct of every school guidance counselor, teacher, administrator, and staff member, both at school and away from school, must convey and be supportive of the teachings of the Catholic Church. These teachings include, but are not limited to: honoring the dignity of each human life from conception to natural death, care for God's creation, and the belief that all persons are called to respect human sexuality and its expression in the Sacrament of Marriage as a sign of God's love and fidelity to His Church. The Seven Themes of Catholic Social Teaching can be found at http://www.usccb.org/beliefs-and-teachings/what-we-believe/catholic-social-teaching/seven-themes-of-catholic-social-teaching.cfm. A thorough description of Catholic Church teaching can be found in the *Catechism of the Catholic Church*.

B. Determining whether a school guidance counselor is conducting him/herself in accordance with the teachings of the Catholic Church is an internal Church matter and is at the sole discretion of the principal and/or president, pastor / deanery dean, and/or Archbishop.

C. The Archdiocese recognizes that many school guidance counselors, who contribute positively to the mission of the Church in forming young people through our Catholic schools, are not practicing Catholics. For school guidance counselors of other faith traditions, there remains an expectation that, regardless of their personal religious affiliations and beliefs, they will become knowledgeable of Catholic Church teachings, will be credible witnesses of the Catholic faith, and will be models of Christian values.

# RONCALLI HIGH SCHOOL

Uli

**Catholic Teacher Advancement Program**

**Academic Counseling Observation Checklist**

***Observed Counselor 's name*** Shelly Fitzgerald

***Observer's name*** Elaine Jerrell

***Time observed***
***Date observed*** August 3, 2015

***OBJECTIVE***

Specific to the grade level of the student

Extensive meeting, approximately one hour. Covered the following topics - review of transcript, scheduling of SAT, ACT, standardized test prep, student career interests, post secondary institutions student is interested in, scheduling institution visits, history of student's extracurricular and service activities at Roncalli, post secondary goals. Structured to meet the academic needs of a junior beginning to make post-secondary plans.

Objective is communicated to the student -- Yes

List the objective below - Reviewing tasks to be completed in preparation for high school graduation and entering post-secondary education

***STUDENT ENGAGEMENT***

Yes strong student engagement

There was a very good balance of providing information and engaging the student through questioning.. Shelly often followed up on a comment by the student to

Exhibit
0025

be certain she understood his statement.

Yes
conversation tone – welcoming, positive, informative.

The interaction with the student was definitely a dialogue. Shelly responded specifically to his questions. The conversation was personalized to his specific needs and questions.

Yes student questions are encouraged - requests for questions were offered at the end of each segment of the meeting as well as within the conversation.

***CHECKING FOR
UNDERSTANDING***

Yes  Questions directed to student - see below.

Quality of questions Very appropriate-- helped to keep the meeting on task to make sure that all topics that needed to be covered were completed. But Shelly also took time to engage the student about the quality of his extracurriculars and how those activities might influence career interests.

Yes Student comments are followed up Shelly encouraged the student to talk about a secondary career goal he had been considering for a while and how he felt about pursuing that goal now or later.

othe
r

Example 1: What colleges are you interested in?

Example 2: When are you planning on taking college visits?

Example 3: Have you scheduled the SAT, ACT?

### *LEVEL OF PREPARATION*

Yes Student file clearly previewed as to grades, career interests, extracurricular activities, goals, graduation plan

Good beginning by reviewing the student's transcript - checking to see if there could be any courses he might need.

Yes

Necessary handouts provided

When Shelly asked the student about the ACT and SAT she had information handy in case the student needed a handout. She reviewed a checklist of items that should be done with specific deadlines.

Yes

Suggestions for follow-up action by student

Shelly suggested that the student pursue standardized test prep online - particularly the Kahn Academy site. During the career interest segment, Shelly offered several alternative related careers for the student to consider.

### *KNOWLEDGE OF CONTENT/ INFORMATION*

Ability to answer questions and / or research information if needed

Example - Shelly gave the student some great tips on how to organize a college visit - schedule a visit at least one week in advance and be sure to sit in on a class - and if possible zero in on a class that might pertain to the academic area you are interested in.

She also offered very helpful tips on items to include on a resume.

135A

*CLOS*
*URE*

Includes the
following:

Y
e
s

Sumar
y

Y
es

Final request for questions from student: "Anything you
need from me?"

Yes Tasks for student Talk to your parents; set up a
college visit; sign up for the ACT, SAT.

**COMMENTS** This counseling session was done very professionally; was
student-centered: engaged the student in a very helpful discussion; covered important
topics; was held in a welcoming, positive environment.

R0NCALLI HIGH SCHOOL **Catholic Educator**

136A

## Advancement Program - Observation Checklist

*Observed teacher's name Shelly Fitzgerald Observer's name Kathy Arruda Class/period observed  Period 7 Combined class of Juniors in Media Center Date observed Aug. 16, 2016*

**PRAYER** No Time, setting, and large group would have made this difficult.

**OBJECTIVE**

Printed on top of handout --*Junior College Planning* Communicated to all students throughout presentation

**TYPES OF INSTRUCTION  OBSERVED** *Stressed the importance of campus visits preferably in Sept. or Oct. before the weather gets bad. Handout provides details for setting this up. College visitation form is included in packet. Students are given detailed information about registration, dates and the importance of preparation for the ACT and SAT test. Mrs. Fitzgerald walks about the class as she explains.*

**OBSERVED USE** *OF TECHNOLOGY (BY TEACHER AND/OR STUDENTS) Not observed.*

**CLASSROOM MANAGEMENT ISSUES (If applicable)**

*None. Students were interested in the topic.*

137A

## STUDENT ENGAGEMENT

Some student engagement/some attentiveness Attentive students

## CHECKING FOR UNDERSTANDING

Not applicable in this observation

### PACING OF THE INSTRUCTION

Appropriate

## CLOSURE

Thorough Mrs. Fitzgerald went back over material a second time and had the students circle/and or highlight important information and dates.

### ADDITIONAL COMMENTS Mrs. Fitzgerald and the entire counseling staff work hard to give the students the best information as they prepare for college, apply, and look for scholarships. She presents the message that she is there for the assistance of the students. She encourages them to take the ACT and/or SAT tests at Roncalli for a "home field advantage" of being familiar with the setting as they take these very important tests.

This was a larger group than the other periods but she made it work and look easy. She reminded students that if they are on free lunch or 21st Century Scholars to see their counselor about a fee waivers to take the AC*T/S*A*T* tests for free.

The importance of junior year grades was discussed. Anything that was stated was also covered in the handout.

All this material was discussed in half the period Mrs Currens took over for the second half of the program.

### RᴏNCALLI HIGH SCʜOOL Catholic Educator Advancement Program - Observation Checklist

*Observed teacher's name Shelly Fitzgerald* Observer's name C. Wasenbach *Class/period observed assem* Aug. 16, 2016 *Date observed*

*PRAYER*

Yes

*No*
*Not present at the start of class*

*OʙJECTIVE*

Posted for all students Communicated to all students *talk about* AC*T/SA*T *and how to meet with college reps* Not present at start observe

*9/9*

Shelly Fitzgerald

## CEAP - Evidence of Professional Development

2016:

1) CollegeBoard Fall Counselor Workshop - Sept. 29, 2015

This is a full day presentation with national updates for PSAT, SAT, AP and state updates for financial aid. This is a critical professional development opportunity for me as the AP and PSAT coordinator. The past three years, I have been the only counselor to attend this workshop. I will then take a department meeting to update counselors on the most important updates for the year. Each year I attend this meeting, I receive
CollegeBoard updates imperative for my position as coordinator, as well as Guidance Director and counselor.

2) Indiana counselor update meeting - Sept. 18, 2015

This is a full day presentation with updates from the Indiana Department of Education. Some of these include topics of recent legislation, changes in curriculum or diploma requirements, testing, graduation, and items critical for counselors and schools to know for the current school year. The information given in these sessions is extremely important and specific to counselors. Typically, I get frustrated with communication from IDOE throughout the year, but this has consistently been a very helpful workshop.

3) Guidance Counselor Visit - University of Louisville and Bellarmine University -

Oct. 23, 2015

As new Co-Directors of Guidance, Lynn and I implemented this about
seven years ago. For the same reasons we recommend students to take
college visits, as a department, we are visiting two colleges a year. The
purpose of these visits is to gain more knowledge about the universities,
along with getting a feel for the physical campus, which is helpful in
recommending specific students to specific schools. Over the past few
years we have visited: University of Kentucky, University of Dayton, University
of Miami (OH), Xavier University, Cincinnati, Bellarmine, University of Louisville,
University of Southern Indiana, University of Evansville, Notre Dame, St. Mary's,
and Holy Cross. In addition, in the past four years, I have visited the campuses of
Indiana University, Purdue University, Butler University, Marian University,
University of Indianapolis, IUPUI, UCLA, University of Chicago, Loyola University
Chicago, Northwestern University, and Arizona State University.

4) College informational sessions: University of Kentucky, Indiana University,
Purdue University

These are the informational sessions I attended this year. These sessions are
with a group of admissions representatives presenting information and updates
about their universities. They are specific to counselors and the information
counselors need to help students through the admissions process, along
with information about specific departments within the school.

Yearly:

1) CollegeBoard Fall Counselor Workshop - see above 2) Indiana
counselor update meeting - see above

3) Guidance counselor college visit - see above

4) Indiana Association for College Admissions Counseling (IACAC) yearly conference - this was
the first year since being a counselor I did not attend this conference because they
changed congress to the spring because it is now offered in the spring during

scheduling. I will likely begin attending every other year if it remains in the spring. This is a two-day conference for College and High School Counselors. The break out sessions each year range in topics, but the ones I tend to focus on are NCAA/NAIA updates, ACT updates, Financial Aid and any sessions offered which are specific to helping me grow in my specific counselor responsibilities.

5) College Informational sessions - see above

6) SAP webinars – mental health, drugs and alcohol

Professional resources:

1) An Adolescent Mental Health & Wellness Curriculum

- This is the resource used in the implementation of the over-arching mental health curriculum through SAP. This, specifically, was the primary source in developing the "lights" program.

2) Association for College Admissions Professional School Counselor Monthly Journals

3) ASCD Smart Brief

4) CAPE Outlook 5) NACAC Professional Journals / Bulletins

Shelly
Fitzgerald

**CEAP - Self Assessment**

**1.**

**Professional Development**

The professional development component of my job is one of the most critical. As both a counselor and the co-director of the department, it is imperative that I am constantly and intentionally pursuing professional development experiences to enhance my knowledge and skills. Graduation

requirements, course selections, standardized tests, college admissions requirements, individual College/University information, scholarship and financial aid information and career information are examples of areas in our job that change (update) frequently.

I try each year to take full advantage of many of the worthwhile opportunities available to counselors to stay updated on the most current information. In order for counselors to be able to accurately guide students in areas of academic, career and post-secondary counseling, the most updated knowledge is needed.

It is impossible for every counselor to attend all of these workshops and conferences, so our department divides the opportunities and reports on the most important information to the entire department. I am responsible for all CollegeBoard updates (AP, PSAT, SAT), and attending the workshop this year was more important than ever because of the PSAT and SAT test changes.

There is a plethora of professional development opportunities through reading as well. Professional journals and resources, along with IDOE emails, counselor list serves, and on line articles are an important avenue of receiving the most current information.

I believe the two most beneficial professional development opportunities, to my position specifically, would be the CollegeBoard annual workshop, as well as all of the important professional reading materials available to me throughout the year.

I
I
.

**Individual Student Guidance**

This area of my job is easily my favorite. I meet with each student individually at least once a year, but often times, much more.

In late winter, I conduct a yearly planning meeting with all current students. In this meeting, we discuss college and career planning goals, academic and

TO:        Shelly Fitzgerald
FROM:    Chuck Weisenbach
RE:       Performance Appraisal Narrative
DATE:     May 22, 2017

Shelly, I always enjoy the opportunity to sit down and talk family, life, and Roncalli with you.  Our latest conversation was no exception.  I apologize to you for the delay in getting this written narrative back to you.

We started our discussion off by reviewing your goals for the year.

*Goal - Complete the CEAP program and advance to the Distinguished Level* - This goal was accomplished successfully.

*Goal - Create a detailed AP coordinator task list* - This goal was on the verge of being completed when we met.

*Goal - Continue visiting colleges* - This goal was accomplished as well.

The next part of our conversation centered on the feedback received from department chairpersons, Kathy Arruda and the others in the Guidance Department.  I might add that, while never stopping to count, I do not believe I have ever received more positive comments about an employee when seeking feedback than I did when getting feedback from folks about their working with you!!   What a great compliment that is to you!!

The following are just some of the comments shared with me:

- ❖ *Shelly does a very good job interacting with students and helping the feel comfortable to talk to her. She is very helpful when dealing with any issues regarding students and parents. She always sticks up for the teacher,*
- ❖ *I have always found her to be approachable, helpful, caring, knowledgeable and through.*
- ❖ *Guidance involves many things and Shelly is always on top of everything. She remains calm no matter what the situation. And we have had some strange student situations!!*
- ❖ *Shelly is always on top of her game. She works hard, is always very professional, and it is obvious that she really cares about all of her students.*
- ❖ *It is always a positive experience when I work with Shelly. She is a great asset to Roncalli.*
- ❖ *Shelly excels at communication.  She handles all issues, even challenging conversations, with a calm, logical, understanding, and empathetic attitude.*
- ❖ *I can go to her with any problem or concern, and I know that I will be able to have a helpful and practical conversation to move towards a positive resolution.*
- ❖ *She is a huge "team player," which has such a positive impact on our entire Department. I trust and respect Shelly as our Guidance Director, and she is one of the main reasons that our team works as well as it does.*

Exhibit
0033

❖ *Organized, proactive, excellent advocate for students, open to suggestions for STARS students, realistic expectations for students, able to adjust based on student need, easy to work with, team player, quick thinker.*

❖ *Her welcoming personality allows students to trust her and bring their honest opinions and concerns to her. She's a problem solver and works hard to improve all that the guidance department offers.*

❖ *Shelly is a joy to work with. Her presentation skills with students are excellent. She keeps groups focused and clearly communicates important information.*

❖ *She leads by example, always meeting deadlines and being thorough in what she is undertaking.*

❖ *Shelly is incredibly organized, knowledgeable, accessible for questions and concerns, and flexible. She is open to conversations, she listens, and she considers all aspects of an issue.*

❖ *Shelly is also very clear in her expectations of her students, and she is clear in her communications with teachers.*

❖ *I always feel comfortable discussing student concerns or course issues with Shelly.*

❖ *She can easily think through technical and/or complicated situations and find effective solutions when others can't.*

❖ *She makes working fun while also being productive. I admire her connections and relationships with her students and parents, especially with alumni as it demonstrates that her students and families value her as a counselor and miss her guidance once they leave Roncalli.*

## Strengths

❖ There is great respect for you on all fronts for a variety of reasons but if I had to cite one common thread it would be your ability to be caring and supportive of the students but also holding them accountable at the same time and not coddling them. This is a very tricky balance to find but many of us appreciate the way you do it!

❖ Passion & Energy - One person shared the following comment with me. "She displays an energy that engages others." Again, there are many of us that feel that way. Your passion and positive energy make you fun to be around. Your love for life and for Roncalli make invaluable to our school!

❖ Professional - People see you as a consummate professional and a most trustworthy peer!.

❖ An unmatched combination of organization and efficiency!

❖ A problem solver and one who is always willing to lend a helping hand! These are huge assets of yours! While we have a wonderful school we will always have our fair share of conflicts and challenging situations. It takes folks with an even temperament and wisdom to help us navigate through these challenges. Thanks for being one of those folks!

❖ Similar to the point above, I do value you immensely as a member of our administrative team. We have a variety of personalities on the administrative team. Sometimes I do not

do the best job in working with all of these different personalities. I appreciate your ability to consistently try to find a middle ground or to offer suggestions for us to consider.

## Areas for growth

Availability - Heard back from a handful of folks that spoke of the difficulty catching you after school if they have an issue they wish to discuss. As was discussed at a guidance department meeting earlier this school year, we need all of our counselors available to students, teachers and staff from 7:15 to 3:30 on a daily basis.

Delegating situations with conflict - As noted in our conference your peers greatly admire and appreciate the excellent skills you have in the area of conflict resolution; seems like the messier the situation, the better you are! However, it also could be a situation where by the messier the situation, the more the department falls back to "Let's have Shelly handle that one." The sense is that while no one is probably jumping up to tackle some of these challenging situations the department (and you) would be well served by having some other folks begin to hone their skills in this area.

Shelly, you are a wonderful person with a tremendous skill set!! We owe you a world of gratitude for the multitude of ways in which you positively impact our school on a daily basis! Thank you for working so diligently on developing and sharing so many of the gifts that God has given you! It is a joy and a pleasure working alongside you!

May God bless you with a relaxing, enjoyable summer!

TO:     Shelly Fitzgerald

FROM:  Chuck Weisenbach

RE:     Performance Appraisal Narrative

DATE:   January 22, 2014


Thank you for taking time to meet with me on Monday to discuss your work as co-director of the guidance department.   I always enjoy the opportunity to visit with you and talk about family, life and Roncalli!   Not many benefits to having another snow day but one is that I was able to get to this narrative prior to the weekend!

This narrative is broken up into three areas:  (1) goals and your work toward those goals, (2) strengths in your work and (3) areas of growth or improvement.

### Goals

A fair amount of our discussion was spent on discussing your goals and your efforts in reaching these goals.  I commend you on the goals that you set for yourself.  Each of them is directly linked to your work and when accomplished should lead to growth and/or increased job satisfaction, both of which are positives.

I encourage you to force yourself to schedule the campus visits you wish to make.  If you wait for an opening in your schedule, it will not happen.  I like the idea of grabbing another counselor (or more) when making the visit and make it an enjoyable, relaxing trip.  Better yet, take Sofi with you on the trip. It does not have to have a "totally business" feel to it.

Kudos to you for the success you are having with your goal to find more ways to celebrate Christ, specifically through reading, journaling, praying, etc.  I cannot think of a better goal or one that can have a more profound impact on your happiness as a person.  Better yet, congratulations on the good work you are doing in working toward fulfilling this goal.  It sounds like you are finding joy and peace through much of your efforts -- great job!!  As I have sought out ways to include Christ in more of my daily life (radio, books, prayer, conferences, etc.), I am consistently amazed at how he "drops" little things into my life to help me in this area, such as the book you gave me recently.   Keep your focus strong here – you will not regret it.

Thank you for your efforts to work with Elaine on adapting our Catholic Educator Advancement Program to be a fit for our guidance counselors.    That will be a significant step forward for our school when accomplished.  Thanks again for taking the initiative on this.   When done, this could possibly be a topic on which you could speak on at INPEC, NCEA or a counselors' conference.

**Exhibit 0034**

## Strengths

*Enthusiastic approach to life* – God blessed you with a real zest for life and you have cultivated and shared that blessing marvelously. I love working with people who consistently have a positive energy about them and you certainly fit this bill. You mentioned in our conference that a variety of personality types exist in the guidance office. This is probably healthy. I am certain that your positive, energetic approach to life and work is appreciated by all.

*Action oriented* – The second characteristic of a person that I enjoy and appreciate working with is that of being an initiator! I have come to really value and appreciate those on our faculty who see what needs to be done and get busy doing it. Again, this fits you perfectly. I appreciate your "action oriented" approach to your work. There is much truth to the old axiom of "find good people and get out of their way." Thank you for consistently being someone that gets things done without having to be asked, cajoled or supervised!!

*Leadership* - You and Lynn have done a fine job with your leadership of the guidance department. I get a sense on occasion that you might sell yourself a bit short in this area. You have strong, instinctive leadership skills. I encourage you to continue to seek out ways – some subtle; some not so subtle – that allow your leadership skills to emerge and have a positive impact on the department as a whole, on individuals in the department and on our school in general.

*Voice* – I have shared with you before and will again – I appreciate your input on the administrative council. I respect and value your opinion, and the group needs your opinion as we try to make decisions that are best for our school.

## Areas of growth or improvement

Balance – You noted this as an area of focus for you in the way of growth and/or improvement. Finding a healthy balance of work, family, friends and faith will be an on-going challenge for anyone that works in such a high energy, high octane, high expectations place like Roncalli. We really do need to support one another in this area and assist each other in working toward this balance. When successful in this area, everyone benefits! I encourage you always to keep prayer and your strong desire to have Christ as a vibrant part of your day as a part of the equation. I don't think you will ever stray too far in the area of balance if this is the case.

Accentuate your experience – I noted leadership as a strength for you, which it is. However, in the coming years we will need you to be even more deliberate and more pronounced in your leadership areas. Next year when Angie Toner steps down as the co-chairperson of the math department you and Lynn will be the most veteran department chairpersons with the exception of Family & Consumer Science, Health/Physical Education, Industrial Technology and Fine Arts. All the department chairs and co-department chairs in *all* of the core academic areas (math, English, social studies, science, world languages, religious studies) have less experience at RHS than you or less department chair experience

than you. While I am very excited about the new emerging leadership found in this group of new department chairs, there are critical times when there is no replacement for experience and the wisdom that comes with it. I encourage you to be reflective of your role in this area and attentive to ways you can use your experience to best guide our discussions and our decisions.

Shellie, I thank you investing your professional life in Roncalli! We are a better school because of you, your work and your passion. As noted, I enjoy working with you in trying to make Roncalli the best it can be. I look forward to assisting you in any way possible as you seek to continue to grow as a Christian and in your profession.

God bless you and let's make it a great second semester!

Shelly Fitzgerald

1/22/14

Date

Chuck Weisenbach

1/22/14

Date

Please note that your signature indicates that you have read this document. It does not denote any agreement or disagreement with the contents of the document. Please return a signed copy to Chuck's mailbox within two school days.

TO:     Shelly Fitzgerald

FROM: Chuck Weisenbach

RE:     Performance Appraisal Follow-up

DATE:   May 4, 2010


Thanks for meeting with last week to review your work this past year as Co-Director of our Guidance Department.

This narrative serves as a follow-up to our conversation.

Roncalli High School continues to be well served by the leadership provided by you and Lynn in our Guidance Department.  The two of you complement each other well in terms of your gifts and talents!

I applaud the efforts made this year to move our scheduling on-line.  While it had some significant glitches initially, it proved to be a solid step forward for our school in the long run.  Having all of the key information available to us sooner was a real blessing especially this year, of all years, given our budget issues and cutting of staff positions.    I am confident that we have worked together to address the miscues in the program this year in hopes we have a smoother process next year.

I applaud the efforts made by you and Lynn in regard to streamlining aspects of the work done by the guidance department and attempting to relieve some of "walking on eggshells" climate that previously existed.  I get a good feeling of "us" as I enter the guidance area.  I feel we have a strong, cohesive guidance team that is working well together!

I applaud the efforts made by you and Lynn in overcoming two significant staffing issues this year with Autumn's maternity leave and Virginia's sudden departure.  The fact that our school and specifically the guidance department absorbed both of these issues without missing a beat speaks to the "team effort" alluded to in the previous paragraph. The proactive leadership provided by you and Lynn in handling both of these issues is greatly appreciated.

I appreciate your continued presence on the administrative council.  I value the insights and ideas that you bring to our weekly meetings.  I encourage you to speak your mind at the meetings as every person has "a piece of the truth."  To withhold that piece is not good for the school.

With regard to areas of potential growth in your work, I would encourage you to continue to mentor both Kathy Heath and Autumn Currens. Both of them have outstanding skill sets and are valuable members of the guidance team.  But, your work experience at Roncalli and years of affiliation with the school allow you to provide them with timely insights that can help them do their job even better.

We are making headway in our efforts to create a "college culture" amidst our community from the day they first sit down to register for their freshman year classes.  I like the direction the department is pushing our school and encourage you to continue to be bold and visionary in your leadership in this area.

**Exhibit 0035**

Shelly, it remains a great pleasure to work with you on a daily basis. I have great admiration and respect for the work you do and the way you do your work!

May God continue to bless you in every good way!

_____     5/5/10
Shelly Fitzgerald                                    Date

_____     5/4/10
Chuck Weisenbach                                Date

Please note that your signature indicates that you have read this document. It does not denote any agreement or disagreement with the contents of the document. Please return a signed copy to Chuck's mailbox within two school days.

TO:      Shelly Fitzgerald

FROM:  Chuck Weisenbach

RE:      Follow up to mid year performance appraisal conference

DATE:   December 17, 2008


Thanks for meeting with me to review your work as a co-guidance director through the first semester of this school year.   I always enjoy sitting down with you and discussing Roncalli, guidance, life and anything else that captures our attention.

## Fresh, passionate approach

I appreciate the fresh, passionate approach that you and Lynn have brought to your work as co-guidance directors.   There was obviously great work being done by Mary Hall in her role as guidance director but there is a freshness to many things that are coming out of the guidance office this year that is healthy.

I have respected and admired your passion since your first days as a member of our faculty. It clearly has set you apart from so many others!   You certainly carried that passion with you in to your work as co-guidance director.  It is a strength and blessing.

## Organization, communication

I commend you and Lynn on the outstanding level of communication that I have seen coming out of the department this year. I also commend you on the organizational skills that you have shown in your work. The department and office is benefitting from your strengths in this area as well.

## Vision

I love the visionary approach that you and Lynn have brought to your work as co-guidance directors. You have our students and their families at the heart of your decision making. This is always healthy.   I love the way that you keep ideas coming at me and others. I also appreciate your understanding when not all of those ideas can come to fruition (at least not at that time).

We are being served well by you and Lynn as our co-guidance directors! I am excited about the future of the department under your leadership.

May God bless you with a joyous Christmas, restful break and a wonderful second semester.

**Exhibit 0036**

TO:      Lynn Starkey, Shelly Fitzgerald

FROM: Chuck Weisenbach

RE:      Mid-year Performance Appraisal

DATE:   January 6, 2010

Thank you for meeting with me today to review your work as co-guidance directors during this first
semester of the 2009-10 school year.

I remain very pleased with the leadership you are providing the guidance department as well as the
vision you continue to put in front of the department and our school. Your efforts in both of these areas
(leadership and vision) are the catalyst for the on-going improvements and enhancements that we
continue to see in our guidance department and the services they are providing our students, families,
teachers and community.

I appreciate your efforts as members of the administrative council. I value your opinions and the
feedback that you provide at these meetings. I especially appreciate the input that you have provided
us this year as we have attempted to become even more focused on our prospective students and
families as well as our current students and families.

I applaud the work that was done by all in the department to cover for Autumn while she was away on
maternity leave. Her efforts to stay on top of letters of recommendation were laudable but I am sure
there was a steady stream of loose ends to attend to while she was away.

Thanks for your continued efforts to build a team approach to the work coming out of the guidance
department as opposed to work being done in isolation by seven different people. It is a real win-win as
it makes for a better product for our students and families and tends to lessen the stress on each
individual. I know that building a team climate is not always easy but I encourage you to continue to
remain firm in your efforts in this area.

Let's cross our fingers that our anticipated improvements in the scheduling process unfold the way we
hope they do. That would be a real positive step forward for everyone! Thanks for your hard work in
making this possible and for your patience in allowing it to play out the way it has.

Keep up the great work and let's **make it** a great second semester!

Dear Shelly,                                              October 3, 2016

Congratulations on reaching the Distinguished School Counselor career level in the
Catholic Educator Advancement Program (CEAP).   Your success in achieving this goal
is a tribute to your diligence and dedication to the field of education.  More importantly, it
demonstrates your devotion to the assistance  of young people.

Strengths that you have exhibited include:
- Leadership
- Strong communication skills
- Complimentary talents with Lynn Starkey
- Approachability
- Sincerity
- Ability to be "present" even when your schedule is full
- Skill in managing a crisis
- Strong pulse on school, students, and situations

Possible growth areas/opportunities for you to consider

- Attend the AP conference on some sort of rotating basis
- Continue college campus visits
- Be reflective in setting your personal and professional goals to insure that they
  will challenge you
- Strive to be as reflective in your professional life as you are in your personal life;
  be sure to feed your passions
- Seek out ways to continue to build or expand your professional network

Roncalli continues to be blessed to have you in your role as guidance counselor,
co-director of the guidance department and as a member of the school's leadership
team!

May God continue to bless you abundantly in all parts of your life.

Chuck Weisenbach                              Kathy Arruda

154A
FITZGERALD 1097

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04291-RLY-TAB |
| | ) | |
| RONCALLI HIGH SCHOOL, INC., and | ) | |
| the ROMAN CATHOLIC | ) | |
| ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF MICHELLE FITZGERALD**

I, Michelle Fitzgerald, declare:

1. I am over 18 years old and legally competent to testify.

2. I know these facts to be true based on my own personal knowledge, except for facts that I believe to be true upon information and belief. If called as a witness, I could competently testify to these facts.

**My Employment at Roncalli**

3. I started working at Roncalli as a guidance counselor in Fall 2004.

4. Guidance counselors at Roncalli were required to have a master's degree in school counseling from a nationally accredited program. I received my master's in school counseling from Indiana University Purdue University of Indianapolis. There was no religious component in my school-counseling program.

5. I was not required to have any religious training or qualifications to work at Roncalli. Nor did I in fact have any religious training or qualifications. To my knowledge, religious training or qualifications have never been a requirement for Roncalli guidance-counselor positions. Multiple members of the counseling department were not Catholic or Christian. I was never a certified catechist.

6. Once I had my job at Roncalli, I was not required to attend any religious training or religious-professional-development events. I did not receive any training

on the tenets of the Catholic faith, nor was I required to do so. Unlike for teachers, there were no archdiocesan or Catholic professional development opportunities for guidance counselors.

7. In Fall 2007, my fourth year at the school, I became Co-Director of Guidance, along with Lynn Starkey. Principal Chuck Weisenbach asked each of us individually if we were willing to be the director, and we both declined. We asked if we could be co-directors instead, which is what we ultimately did.

8. From my understanding, Principal Weisenbach offered me the director role, and later the co-director role, because of seniority. He never mentioned my (or Lynn's) being Catholic or any religious factor playing into that decision. Nor did I have any track record of faith formation at that time, or any other time in my employment.

9. I was not required to have any religious training or qualifications to become Co-Director of Guidance. I did not receive any religious training before or after I became Co-Director of Guidance.

10. I never received a copy of the Faculty Handbook. I do not remember it being attached to my contract or shared with me electronically at any time.

11. While employed as Co-Director of Guidance, I received the same contract as the other guidance counselors. I never received an administrator contract. And while I did receive a stipend for my work as co-director, I did not receive the stipend that other administrators were given.

12. The previous Director of Guidance had been there for about twenty years. My understanding of my roles, both as a counselor and then as co-director, largely came from what I knew the previous director did and how she had run the department for many years. And from my understanding, based on my work with her, none of what she had the department do involved religion or faith formation.

## My Job Responsibilities

### A. *Meetings with Students*

13. My counseling responsibilities were focused on scheduling, academic counseling, standardized-test coordination, and college and career guidance.

14. Each guidance counselor at Roncalli had an assigned group of students, based on the students' last names. My group included just under 300 students, out of nearly 1200 total. We would have a brief meeting with each of our assigned

students each year. For seniors, the yearly meeting was dedicated to college applications and admissions. For freshmen, sophomores, and juniors, the yearly meeting was for scheduling their classes for the next year.

15. In addition to the yearly meetings, I would meet with some students more often. Most often, these meetings would be with students who were struggling in their classes, wanted to change their classes, or had other concerns regarding academics. We discussed study skills, test-taking skills, homework, and effort. We didn't discuss anything related to religion or spirituality.

16. For most of my assigned students, the yearly appointment was the only time I would meet with them individually.

17. We would have the senior appointments in late summer up through the start of the school year in August. Each appointment lasted about one hour. We would talk with each senior about college applications and admissions, standardized testing, college-decision-making, and career goals. There wasn't enough time to talk about students' personal issues during these meetings—we had to keep the conversation focused on college and post-graduation planning.

18. I *never* talked about religion, faith, or spirituality with students during senior appointments. Nor, to my knowledge, was I supposed to. And nothing related to religion was included in the checklist of topics we would cover during senior appointments. That checklist was already being used by the counselors when I started working at Roncalli.

19. For roughly the first twenty minutes of the senior appointment, each senior would watch a video about the college-application and financial-aid processes, to prepare for the rest of the meeting. While I worked at Roncalli, the video never included anything about senior retreat, religion, or spirituality. The videos described as "2012 Senior Conference Video" and "2011 Senior Conference Video" in the Supplemental Appendix are representative of the videos we used for senior appointments throughout my time at Roncalli.

20. The other counselors and I spent November and December preparing for the scheduling appointments for freshmen, sophomores, and juniors. We would give presentations to groups of students about the scheduling process and how to prepare for their scheduling meetings. Many students would email me questions about classes and schedules before their official scheduling meeting. Some students would come to my office to ask those questions in person, but most just sent emails.

21. During November and December, I also worked on preparing the master schedule of classes for the next year. This was one of the responsibilities I took on as Co-Director of Guidance. It involved figuring out how many sections of each class were needed based on student interest and then fitting them into the weekly class schedule alongside teachers' planning periods and other scheduling needs.

22. In working on the master schedule, I did not determine how many sections were needed for any religion class. Roncalli students took set religion classes according to their grade level, so those numbers were already set. The only role I played with respect to religion classes was figuring out which scheduling block the religion classes would be placed in.

23. The master schedule would go out to students in December. But we would continue to revise it in the following months as students scheduled their classes. The master schedule usually was not finalized until the start of the next school year.

24. During scheduling meetings, I would talk with students about which classes they had already taken, which courses they might want to take the next year, I was responsible for scheduling about 275 students—freshmen, sophomores, juniors, and incoming freshmen (eighth graders)—for their classes.

25. We started the scheduling meetings with juniors in January and February. These meetings were about 15-20 minutes long. My conversations were focused solely on academics and scheduling: which classes to take, which diploma track they were on, and how to approach college visits and applications, among other academic topics.

26. We shifted to scheduling sophomores in February and March. These meetings would last about 15 minutes. We talked about academics and scheduling. In addition to scheduling classes, we discussed the students' extracurricular involvement, college and career plans, and resumes.

27. In March and April, we would meet to schedule the freshmen. These meetings were about 10-15 minutes long. We talked about scheduling and academics—including study skills, if needed. As with sophomores, we would also spend some time talking about their extracurricular involvement, college and career plans, and resumes.

28. During the scheduling appointments, there was absolutely no time to talk about any personal issues students may be experiencing. If students had any personal or social issues during the months when we held the scheduling

appointments, it was very difficult for us to meet with them. They would typically go to the school social worker instead.

29. I *never* talked about religion, faith, or spirituality with students during scheduling appointments. Nor did Roncalli ever convey to me that I was expected to do so. And nothing related to religion was included in the checklist of topics we would cover during scheduling meetings. That checklist was already being used by the counselors when I started working at Roncalli.

30. I didn't incorporate Catholic doctrine and teachings into my meetings with students. Nor did I incorporate or use religious or spiritual resources during those meetings. That wasn't part of my job. No one at Roncalli ever told me that I needed to do so. And I was never reprimanded for not including religion in my counseling work.

31. I never prayed with students during counseling meetings or at any other time. I also never suggested that a student pray in response to anything they brought up during a meeting. No one at Roncalli told me I needed to pray with students or suggest to students that they pray.

32. No one at Roncalli ever gave me a prayer book to use with students or any guidance on how to pray with students.

33. I did not give students prayer cards, rosaries, religious keychains, or other religious memorabilia. No one at Roncalli told me I needed to do so. And no one at Roncalli ever gave me religious items to give to students.

34. Students didn't come to me with religious or spiritual needs, issues, or questions. That was never part of my job. If a student had come to me with religious or spiritual questions, I would have suggested they talk to a religion teacher, the chaplain, or the campus minister. Although I discussed various career options with Roncalli students, if a student told me that they wanted to pursue a religious career, I would always send them to the chaplain or campus minister, as I was instructed to do by the school to do. That happened approximately four times during my fifteen years at Roncalli.

35. The other counselors and I were not required to encourage students to attend the senior retreat—or any other retreat—during counseling appointments. Nor did I ever do so. We were not required to give students the senior retreat application during counseling appointments.

36. No one told me I needed to address religious or spiritual issues during my counseling sessions. I never received—from Roncalli or anyone else—direction or training on how to counsel on spiritual issues.

37. Because so much of my time was filled with prescheduled meetings with students about academics, I had very little time for any personal or social counseling. This was especially true once I became co-director and took on additional responsibilities related to scheduling and test coordination.

38. The majority of students did not go to another guidance counselor or me about any personal issues at all. In my experience, teachers or administrators were often the first to learn that a student was struggling, not guidance counselors. And teachers and administrators sometimes didn't tell us when they learned something.

39. Generally, if a student was dealing with a more serious personal issue—something more than just a disagreement with a friend, for example—the other counselors and I would send the student to the social worker. She was the expert on those kinds of issues.

40. I never brought up or incorporated religion or religious topics when personal issues came up during meetings with students. Nor did I approach students' personal issues from a Catholic or otherwise religious perspective.

41. No one at Roncalli ever told me that I needed to approach students' personal issues from a religious perspective or that I needed to incorporate religious or spiritual resources in discussing personal issues with students.

42. If I had been working at a public school, I could have approached students' personal issues in the same way I was supposed to—and did—at Roncalli.

43. Student issues related to sexual orientation and gender identity were not a part of my job at Roncalli. I do not remember any student ever coming out to me. Nor do I remember any conversation about a student's sexual orientation. And no student ever came to me to discuss anything related to gender identity.

44. We also had scheduling meetings with our subset of eighth graders who would be starting at Roncalli the next year. These meetings were about a half hour long and were very similar to those for the current students. We would discuss the student's ninth grade schedule, current classes, and extracurricular involvement.

45. As with the other scheduling meetings, I did not discuss anything related to religion, faith, or spirituality during scheduling meetings with incoming ninth graders. Nor was I expected to do so.

46. If an incoming ninth grader had not attended one of our diocese's schools, such as if they had attended a public school or an out-of-diocese Catholic school, they would be interviewed before being admitted to Roncalli. Administrators, representatives from the advancement office, and counselors would be present for these interviews.

47. During these interviews, one of the administrators would usually ask about the role faith plays in the student's life. The other counselors and I would generally ask about academics. The other counselors and I were not expected to ask questions related to religion or faith, nor did I ever do so.

48. I never knew of anyone being denied admission to Roncalli, including students of different faiths. For example, we had Sikh and Muslim students at Roncalli while I worked there.

49. During my time at Roncalli, one of the religion teachers had proposed to Principal Weisenbach the idea of her becoming a spiritual guidance counselor for the school. She had explained to Principal Weisenbach that the other guidance counselors and I were not praying with students or talking about God or religion during counseling appointments. Her proposal was not implemented. At no point during or after that proposal did Principal Weisenbach tell the other guidance counselors or me that we needed to pray with students, talk about God or religion in our counseling appointments, or otherwise perform our counseling work from a religious perspective.

### B. *Administrative Council*

50. As Co-Director of Guidance, I served on the school's Administrative Council. Administrative Council generally met during the school year about once a week, though sometimes there would be a couple of weeks between meetings.

51. My understanding of my role on the Administrative Council was to talk about logistical issues related to the work of the guidance department and related to academics more generally. Some topics I remember contributing to discussion on include: (a) the potential use of virtual learning days in place of snow days; (b) nominations and awards for academic scholarships, both internal and external; (c) logistics for the high school placement test (such as the number of children who would be participating and who would be available to proctor); (d) standardized testing; (e) the grading scale; and (f) logistics for graduation practice.

52. I was not expected to contribute to the discussion on matters not related to academics or the guidance department. As a result, I often did not have much to contribute during Administrative Council meetings.

53. I was not expected or required to share any input on matters related to religion or mission during my time on the Administrative Council.

54. To my knowledge, no one at the school described Administrative Council as a religious body. Nor do I know of anyone describing Council members in their role as Council members—as opposed to their other roles, such as campus minister—as religious leaders. I wouldn't have described us in that way either—that's not the kind of role we played.

55. Administrative Council was not the main leadership body within the school. There were a number of different bodies at the school that handled different things. And the President, Principal, Dean, and Assistant Principals were the main decisionmakers for the school overall. While Lynn Starkey and I were able to make decisions for the guidance department, we did not make decisions for the school as a whole.

56. I have never heard anyone describe Administrative Council as the lifeblood of decision-making for the school. I would not have considered Administrative Council the lifeblood of decision-making at the school.

57. I do not agree with the statement that the Administrative Council and Department Chairs were responsible for 95% of Roncalli's daily ministry, education, and operations. From my experience, Administrative Council as a body did not play a role in Roncalli's ministry or religious mission. Individual members of the Council, such as the campus minister, would contribute to Roncalli's ministry and religious mission in their respective roles—but that was not the role of the Administrative Council itself. As for the Department Chairs, aside from the chair of the religion department, the Department Chairs did not play a role in Roncalli's ministry or religious mission.

58. I was not expected to contribute to Roncalli's ministry or religious mission as a member of the Administrative Council or as a Department Chair.

59. To my knowledge, those at Roncalli who *were* responsible for Roncalli's daily ministry, religious mission, and religious direction were the Vice President of Mission and Ministry, the campus minister, the Campus Ministry team, the chaplain, and the religion department.

60. I never led prayer during an Administrative Council meeting. Principal Weisenbach would lead a prayer at the start of the Council meetings—no one else would.

61. Because Administrative Council members also filled other roles in the school and worked together on other tasks and projects, some members would use Council meetings as a convenient opportunity to discuss other matters relevant to their work but not relevant to the Council as a whole. Other members of the Council were not expected to contribute anything when those sorts of side conversations would come up.

62. For example, Administrative Council did not decide who could serve as Eucharistic ministers during all-school liturgies and other religious services. That was handled by the Campus Ministry team. Because the campus minister was also on the Administrative Council, he might have sometimes taken the opportunity to talk with Principal Weisenbach about Eucharistic ministers or other plans for liturgies during Administrative Council meetings. But that was not something the rest of Administrative Council took part in, or was supposed to take part in.

63. Sometimes the *logistics* of school liturgies or other worship services would be discussed during Administrative Council meetings—such as seating, parking, and other similar concerns. When that came up, it was generally a conversation between the campus minister, the dean (who was in charge of the student set-up crew), and the athletic director (who was in charge of the gym). I was not expected to have any input even on logistics for school liturgies, nor did I in fact give any input.

64. Sometimes an item would be placed on the Administrative Council agenda as an opportunity to keep Principal Weisenbach and the other Council members informed or to provide an update. When that happened, there generally would not be further discussion or input. For example, I would give updates on PSAT and AP testing.

65. At one meeting, the campus minister gave us information about the religion department's senior capstone project. I do not recall any other Council members having any input on it. Nor did I give any input of my own. To my knowledge, the campus minister was just giving us this information to keep us informed.

66. I do not remember ever discussing a student's spiritual distress during an Administrative Council meeting. We also did not discuss the personal or spiritual struggles of faculty or staff.

67. After the Parkland shooting, Administrative Council learned that Roncalli students were planning on walking out of the building along with other students across the country. In response, we talked through ideas on how to keep them in the school building, for safety reasons. I did not suggest a "prayer service" specifically. Rather, I suggested letting them gather together among themselves to talk, pray, or do whatever else they needed to do to cope without leaving campus. Aside from making this suggestion as a potential idea, I did not participate in planning any response to the Parkland shooting. I did not attend the event that ultimately happened, nor am I aware of any staff participating.

68. I do not remember Administrative Council ever discussing how to infuse faith formation into the athletic program. If that topic had come up, I do not believe I would have been expected to have any input.

69. I did not discuss whether to include Eucharistic Adoration in school events as a member of Administrative Council. To the extent that came up in a Council meeting, it was not at all related to academics or the guidance department, and so not something I would have been expected to have input on.

70. I do not remember discussing information about the charisms of St. John XXIII on the Roncalli website. To the extent that topic came up in a Council meeting, it was not something I would have been expected to contribute to.

71. For about three of the fifteen years I worked at Roncalli, the school administered a morality survey to students. That was mainly handled by the Assistant Principal for Student Activities. I did not have any input on the decision to start administering the survey or the decision to stop it. Nor would I have been expected to. The only thing I remember that would have been relevant to me would have been looking at the percentage of students who shared that they had used drugs. But since the surveys were anonymous, we would not have had any other details about the percentages.

72. Generally, the work of deciding how Roncalli could set itself apart from public schools in the area—or other local high schools—was done by the advancement team rather than Administrative Council. To the extent Administrative Council dealt with this topic, it was focused on academics. The school generally sought to set itself apart through strong academics: SAT and ACT scores, AP exam scores, and college acceptances.

73. I remember Administrative Council discussing one book: *Living as Missionary Disciples*. Members would read somewhere between a few pages and a chapter before the meeting, and then during the meeting Principal Weisenbach

would ask for thoughts. A couple Council members might share something, but from what I remember the discussion was very brief. I do not remember saying anything about the book myself. It was not a "book study." Nor was it treated as any form of religious education or training.

74. Administrative Council did not do any evangelizing while I was a member. To my knowledge, Administrative Council did not take any action based on the book or implement it in any way at the school.

75. Other than that one book, I don't remember Administrative Council discussing or reading any books.

### C.   *Department Chairs*

76. As Co-Directors of Guidance, Lynn and I sat in on the meetings for the school's Department Chairs. Department Chair meetings were held about once a month. Lynn Starkey and I split this duty, but Lynn attended more of those meetings than I did.

77. These meetings were generally focused on what was going on at the school. They were generally focused on matters relevant to the Department Chairs for the core academic subject areas.

78. I didn't often play an active role in Department Chair meetings. The main reason for having someone from guidance there was to answer questions from the other Department Chairs about standardized testing or classroom presentations on testing and scheduling. I rarely had something to share or comment on during the meetings I attended.

79. Department Chair meetings did not include discussion of anything related to religion, including the religion curriculum. That's not what the Department Chair meetings were about

80. Likewise, I never talked about anything related to religion during a Department Chair meeting. Nor was I expected to do so—that's not why I was there.

81. Neither the chaplain, the campus minister, nor the Vice President of Mission and Ministry attended Department Chair meetings.

82. Department Chair meetings did not involve making decisions about or shaping the school's religious mission.

83. I never led prayer as part of a Department Chair meeting.

### D. *Department Meetings*

84. During my time at Roncalli, we had weekly guidance department meetings. We would use these meetings to talk about a variety of things relevant to our work, such as upcoming tasks or updates from the school.

85. We never discussed any religious or spiritual topics during guidance department meetings.

86. I was not required or expected to lead prayer during our guidance department meetings.

87. The guidance department did not have any department-wide retreats during my time at Roncalli. Nor did we have an "Angelo Group" or any other required gathering to discuss religious topics.

### E. *SAP*

88. Roncalli had a Student Assistance Program, called SAP. Members of the SAP team included the guidance counselors, the Dean of Students, the campus minister, the social worker, two rotating teachers, and the Assistant Principal for Student Activities. When I was at Roncalli, the person in charge of SAP was the Assistant Principal for Student Activities, Shellie Hartford.

89. SAP met to discuss at-risk students and connect them with resources and support. The most common student issues discussed by SAP were alcohol and drug use.

90. We also talked a lot about students struggling academically.

91. If a student was put in SAP based on substance use, they would generally be drug tested. Guidance counselors would often be the ones to administer the drug test—in those circumstances, the student would be called down to the counselor's office. I never discussed anything related to religion when drug testing students, nor was I supposed to do so.

92. Other than for drug testing, students in SAP were not required to meet with a guidance counselor. Instead, the SAP team would often refer students to outside therapists or to other people with whom a student had a strong personal relationship and might be helpful to talk to.

93. When I worked at Roncalli, SAP never addressed students' religious or spiritual issues. We never received any referrals related to religious or spiritual struggles. That's not what SAP was there for. Instead, students with religious or spiritual issues would generally reach out to the chaplain, the campus minister, the Vice President of Mission and Ministry, or a religion teacher.

94. We never prayed about specific students' struggles or experiences during SAP meetings.

95. When I worked at Roncalli, SAP never addressed any student's personal issues related to sexual orientation or gender identity. We never received any referrals related to issues of sexual orientation or gender identity.

96. To my knowledge, no one ever described the SAP team as religious leaders or as playing a religious role while I was working at Roncalli.

97. We used my mailbox for collecting anonymous paper referral forms for SAP: Students or others who wanted to submit an anonymous paper referral could leave the form in my mailbox, and I would just pass it along to Shellie Hartford. Students would not come to me personally to refer students to SAP. And in submitting a referral, they would not interact with me at all.

### F. Test Coordinator

98. As Co-Director of Guidance, I was responsible for coordinating most of the standardized testing at Roncalli.

99. Between August and October, the majority of my time was dedicated to PSAT testing for freshmen, sophomores, and juniors. Coordinating the PSAT was a full-time responsibility during these months. Before the test, I was in charge of preparation, including: ordering tests, organizing the testing day and setting the schedule for the day, and training proctors. I also directed the test day. After the tests were done, I handled shipping them back to the graders and, later, getting the results back to students and teachers with results and training them on what to do with the results.

100. I was also the primary person responsible for coordinating the Advanced Placement exams at Roncalli. I had to do some work related to AP exams throughout the year. For example, I would collect test fees from those students whose exams were not paid for by the state, send reminders to students who had not yet paid, assist with accommodations requests for students with disabilities, and figure out where we would administer each exam. My AP responsibilities were

the most time-consuming for me between March and May—during those months it was nearly a full-time job.

101. Both the PSAT and the AP exams are also administered at public schools and secular private schools.

102. The state of Indiana paid for all freshmen, sophomores, and juniors to take the PSAT. Indiana also paid the fees for some AP exams: It covered the fees for math, science, and English AP exams for all students, and any other AP exams taken by students in the free and reduced lunch program.

103. I never led any prayers while administering standardized tests. I never instructed any of the proctors to lead prayers before or during standardized testing. Nor was I supposed to instruct them to do so.

### G.  College Visits

104. Throughout the year, I would visit colleges to help inform my conversations with students about their college searches, and to develop relationships with those colleges' admissions staff.

105. I would visit about 2-3 colleges per year. Those visits would include public colleges and private colleges.

### Evaluations by Roncalli

106. Principal Weisenbach would give me a performance appraisal roughly once every three years. My performance appraisals were generally very positive.

107. During my performance appraisals, Principal Weisenbach never indicated that I needed to incorporate religion, spiritual resources, or prayer in my counseling work.

108. Principal Weisenbach asked us to set goals each year. I am a very goal-oriented person, and so I would use that as an opportunity to set goals for my own personal benefit too. So I would always include a personal goal in addition to my professional goals. Principal Weisenbach did not require or ask me to set a personal goal. We would sometimes discuss my progress on my personal goal(s) during my performance appraisals.

109. I remember one year my personal goal was related to my faith. I never included anything related to religion or spirituality in my professional goals. And

Principal Weisenbach never indicated that I needed to include religion in my professional goals.

110. He did not require or ask us to set a spiritual goal.

## CEAP

111. When the school first introduced the Catholic Educator Advancement Program, it was available for teachers only, as a way for teachers to get raises. Counselors, other staff, and administrators were not eligible for CEAP at that time.

112. Because counselors were not eligible for CEAP, we had no way of rising in the pay scale. So Lynn Starkey and I approached Principal Weisenbach to request that counselors have an opportunity to seek raises too. Principal Weisenbach told us that we could edit the teachers' CEAP to be used for counselors.

113. In editing CEAP for counselors, we were told that we could not remove the criteria in the eighth domain, "Spirit of Roncalli Formation," because that would not be fair to the teachers. We could change the wording, but the content had to stay the same.

114. To my knowledge, Roncalli had no intention of including counselors in CEAP or setting up a similar program for counselors until Lynn Starkey and I approached Principal Weisenbach.

115. After we had drafted up the new version of CEAP for counselors, Principal Weisenbach was, from my understanding, uncertain about whether it would work for counselors. My understanding was that it was not a priority for him. So I offered to go through CEAP myself to test it.

116. I spent about a year and a half going through CEAP. I was observed during in-classroom presentations, group presentations, scheduling appointments, and senior appointments. None of those evaluations involved any religious criteria.

117. None of my CEAP observations involved any personal counseling work. Nor were they supposed to.

118. After I had finished the CEAP process, I had a meeting with Principal Weisenbach and Elaine Jerrell, who oversaw CEAP at Roncalli, about my results. They did not mention anything related to religion. Nor did they indicate that any religion-related factors played a role in my evaluation.

119. While I was at Roncalli, one other counselor—Autumn Currens—went through CEAP. I conducted one of her observations. She did not pray with her student or incorporate religion in her conversation with that student during the observation. I did not take any religious criteria into account in evaluating her performance, nor was I supposed to do so.

120. After a counselor finished CEAP, there would be a meeting between Principal Weisenbach, Elaine Jerrell, and the counselor's other observers to discuss whether the counselor should advance to next level. Because I was one of Autumn Currens's observers, I was a part of that meeting for her. Nothing related to religion or faith formation was discussed during that meeting. She ultimately was advanced to the next level.

### Ministry Contracts and Descriptions

121. I do not remember receiving the ministry description for teachers with my contracts for the 2016-17 or 2017-18 school years.

122. My job responsibilities did not change after the ministry description for teachers was introduced. I was not told that I needed to do my job differently or that I needed to incorporate religion more in my work. I do not even remember seeing or reading the ministry description for teachers until after I filed my lawsuit.

123. I have reviewed the ministry description for teachers. Many of the items listed in the description—including the religious items—did not align with counselors' job duties or the school's expectation for us as I understood it. For example, at the very least, the following duties from Section III did not apply to counselors: A(1)-(6); B(1)-(2) or (4)-(6); C(5); D(6); E(3)-(4), (6), or (9)-(10); F(3) or (6)-(7); or G(3).

124. I have reviewed the letter written by Lynn Starkey dated May 31, 2016. I did not write that letter. I did not sign it, she did not ask to put my name on it, and I did not review it before she sent it. In fact, I do not believe I read the letter until after I filed my lawsuit. And I do not agree with her characterization of counselors' duties: As explained above, many of the items listed in the teacher ministry description were not part of our job duties.

125. I have reviewed the email sent by me to Principal Weisenbach on May 31. When I sent that email, I wasn't agreeing with the way he had described counselors' role—I couldn't have done so, seeing as I had not even read the teacher ministry description he was describing. Instead, I was thanking him more generally for trying to make sure counselors could remain salaried employees rather than

becoming hourly. Switching to hourly pay would have meant no longer receiving pay over the summer (though the annual pay total would remain the same) and having to track our hours.

126. I have also reviewed Lynn Starkey's email from October 6, 2017, about Mary Sheets, who was a registrar at Roncalli. To my knowledge, Mary Sheets did not have any religious duties, and she was not expected to contribute to students' faith formation. Many of the items in the teacher ministry description did not apply to the registrar, including the religious items. Aside from greeting students when they came to the guidance department, her role was primarily administrative.

127. When I received my contract for the 2018-19 school year in May 2018, it was labelled "School Guidance Counselor Ministry Contract."

128. I did not see or receive the School Guidance Counselor Ministry Description until after I had signed my 2018-19 contract. No one told me that these ministry descriptions were coming, and no one asked for my input on them.

129. No one from Roncalli or the Archdiocese explained the ministry contract or ministry description to me.

130. The duties listed in Section III.A of the ministry description under "Role: Facilitates Faith Formation" were not part of my job either before or after this ministry description was introduced:

   a. I was not expected to, nor did I, "[c]ommunicate the Catholic faith to students and families through implementation of the school's guidance curriculum, academic course planning, college and career planning, administration of the school's academic programs, [or] by offering direct support to individual students and families in efforts to foster the integration of faith, culture and life." Indeed, the school's guidance curriculum did not include any religious content.

   b. I was not expected to "[p]ray with and for students, families, and colleagues and their intentions." Nor did I do so.

   c. To the extent that I "[p]articipate[d] in and celebrate[d] liturgies and prayer services as appropriate," I did so as an individual attendee and not as a requirement for my job.

   d. I was not expected to, nor did I, "[t]each[] . . . Catholic traditions and all observances in the Liturgical Year." To the extent I "celebrate[d]" Catholic

traditions and observances, I did so as an individual and not as a requirement for my job.

e.  I was not expected to "[m]odel the example of Jesus, the Master Teacher, in what He taught, how He lived, and how He treated others." That wasn't one of my job duties.

f.  I was not expected to "[c]onvey[] the Church's message and carr[y] out its mission by modeling a Christ-centered life." That wasn't part of my job.

g.  I was not expected to, nor did I, "[p]articipate[] in religious instruction and Catholic formation." Nor did I do so.

131. The other religious items listed in the ministry description for guidance counselors did not reflect my actual job duties as expressed by Roncalli or as I performed them. Specifically:

a.  I did not play any role in fostering students' religious growth or faith formation.

b.  I did not play any role in "[p]roactively identif[ying] and address[ing] . . . spiritual needs of individuals and of the community of learners."

c.  I was not responsible for "foster[ing] a Christ-centered atmosphere."

d.  To my knowledge, the Archdiocese of Indianapolis did not have "professional growth requirements" for counselors.

e.  I was not required to "participate[] in spiritual retreats, days of reflection, and spiritual formation programs."

132. My job responsibilities did not change after the ministry contract was introduced or after I saw the ministry description for guidance counselors. I was not told that I needed to do my job differently or that I needed to incorporate religion more in my work.

133. I did not receive any religious training after the ministry contract and description were introduced.

134. I never considered myself a minister or faith leader at Roncalli. I never referred to myself as a minister or faith leader. I did not think it would be appropriate to describe myself that way given my understanding of my role. I never held myself out as a minister in any way.

135. To my knowledge, no one at Roncalli—students, teachers, staff, or administrators—ever referred to me as a minister or faith leader. To my knowledge, I was never described as a minister or faith leader on the school's website or staff lists.

## Activities at Roncalli

136. There was an all-school liturgy every month. Students were required to attend. Faculty and staff were welcome to attend, as were parents, grandparents, other members of the Roncalli community, and anyone else who wished to attend.

137. Whether or not I attended the all-school liturgies usually depended on how heavy my workload was. I missed about one-third of the all-school liturgies. No attendance was taken during those liturgies, and no one ever talked to me about having missed any liturgies or disciplined me for not attending.

138. My involvement during the all-school liturgies was the same as it would be for any ordinary attendee at a Catholic Mass. I never distributed communion or ashes, gave the readings, sang in the choir, or delivered prayer during the all-school liturgies or any other Roncalli worship service. When I attended, I generally sat in the back separate from the students.

139. I did not bring any students to the all-school liturgies. Nor was I ever responsible for preparing students to participate in the all-school liturgies or any other religious activities.

140. I never attended an Adoration service or penance service at Roncalli.

141. I never planned a mass or communion service—or any other kind of religious service—while at Roncalli.

142. I never led the morning prayer over the school's public-address system. I never prayed in front of the school community.

143. Like the other counselors, I would sometimes give presentations in classrooms or to larger groups of students. I never led a prayer before, during, or after one of those presentations.

144. Roncalli had a Campus Ministry team that planned liturgies, retreats, and other religious activities at the school. I never served on the Campus Ministry team.

145. During my time working at Roncalli, I attended one senior retreat, in September 2016. Guidance counselors were not required to work seniors retreats when I worked at Roncalli.

146. Because that was my first (and only) retreat, I was an observer instead of an adult leader. I was not given my own assigned group of students. Instead, I observed Jeff Traylor's group.

147. Each group on the retreat also had assigned student leaders—college students who had previously attended Roncalli. The student leaders, not the adult leaders or observers, led the small groups in discussion,. The student leaders would also sit with the small groups throughout the retreat, while the adult leaders and observers would sit in the back.

148. During the retreat, I gave one talk, called the Graph of Life. I talked about the ups and downs of my own life, as well as about how my own personal faith connected to that.

149. I do not remember leading any prayer during the retreat.

150. I was not required or encouraged to do community service as part of my job. I did not do any community service, with students or otherwise, connected to my job at Roncalli.

151. In 2017, I attended a conference that dealt with faith and sexuality. The Assistant Principal for Student Activities, Shellie Hartford, had planned to attend. She and I were close friends, and she had suggested that I come along, letting me know she thought it would be good for me on a personal level. To my knowledge, I was invited to go for personal reasons rather than professional. The conference was not specific to the Catholic faith. Principal Weisenbach gave us permission to attend, since it happened during the school week. I did not talk about the conference with Principal Weisenbach afterwards. Nor did I use anything I heard during the conference in my counseling work. And I did not count that conference toward my professional-development requirement.

152. My faith was and is part of my life. But it was never a part of my job or my job responsibilities.

### Annual Faculty Meeting/Days of Reflection

153. There would be an annual meeting at the start of each school year called the Day of Reflection.

154. The annual meeting would start with a "nuts-and-bolts" section, where Principal Weisenbach would talk about news, policies, and updates for the new school year. I don't remember there being any religious training involved.

155. The other guidance counselors and I would generally leave after the nuts-and-bolts part rather than staying for the activities. Principal Weisenbach excused us from the rest of the day because we were often too busy with senior appointments at the start of the year.

156. I don't remember attending any of the other activities for the last four years I was working at Roncalli before being placed on leave. I don't remember attending the faculty mass for my last six years before being placed on leave.

157. After the nuts-and-bolts part, there would be activities, which varied from year to year. At one of the Days of Reflection I did attend, earlier in my time at Roncalli, I remember one involved taking pictures of things, like bushes and parks, in small groups. To my recollection, the activity was about seeing things from a different perspective and taking a more careful look at things. I don't remember there being a religious or spiritual component to that activity. Some people went into churches to take pictures, but I did not. And that was not the point of the assignment.

158. I also remember attending one presentation about ten years ago by Dan Elsener, the president of Marian University. I don't remember his talk being about religion or spirituality. It wasn't any kind of religious training, or training of any sort. No attendance was taken during the presentation.

159. None of the Day of Reflection events I attended included anything related to forming students in the Catholic faith. Nor did they include religious training.

160. Very early in my career, for roughly my first three years at Roncalli, the Day of Reflection was held at a different school in the diocese rather than on campus. When that happened, the faculty mass would be held at the church to which that school was connected. To my knowledge, other than that circumstance, none of the Day of Reflection activities involved visits to local churches.

161. To my knowledge, the Day of Reflection activities after the nuts-and-bolts meeting were planned by the Campus Ministry team for at least the last three years of my employment.

162. Administrative Council did not meet during the summer, which is when the Day of Reflection would be planned. Administrative Council didn't plan any Day

of Reflection while I was on the Council. And I do not remember Administrative Council giving any input at all on any Day of Reflection.

163. I was never "Commissioned" as a "Minister of the Faith" during a Day of Reflection or otherwise.

## Interactions with Principal Weisenbach

164. Principal Weisenbach and I knew each other already from my own time attending Roncalli. Between that and our many years working together, I considered us friends, and we had a lot of personal conversations.

165. Because of that friendship, we would sometimes recommend books that we thought the other would appreciate. These recommendations weren't tied to our professional responsibilities or our roles at Roncalli.

166. In Summer 2016, I came to Principal Weisenbach's office to talk with him about my relationship with my wife, Vic. I specifically expressed to him that I was sorry if this put him in a position to have to fire me. He said that it wasn't a problem and that she was welcome at any events I felt comfortable bringing her to, including gatherings at his house.

## My Termination

167. In August 2018, Principal Weisenbach and President Hollowell called me in for a meeting. During that meeting, they told me that the Archdiocese had learned about my marriage to my wife. I was told that I could: (a) dissolve my marriage, which they wrongly referred to as a "civil union"; (b) resign; (c) keep quiet about why I was being fired until my contract for the year was up and then be let go; or (d) be fired immediately. No one said anything about me not fulfilling my job responsibilities or otherwise mentioned any problems with my performance.

168. I refused to take any of the four "options" given during the meeting.

169. After the meeting, I told some of my coworkers and family members about what had happened. But I did not make any public statements yet.

170. A couple days after the August meeting, Roncalli issued a press release indicating that I had been placed on administrative leave.

171. Later on, I was told that my contract would not be renewed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 24, 2022, in Indianapolis, Indiana.

Michelle D. Fitzgerald

Michelle Fitzgerald

**23**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHELLE FITZGERALD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:19-cv-04291-RLY-TAB |
| | ) |
| RONCALLI HIGH SCHOOL, INC., and | ) |
| the ROMAN CATHOLIC | ) |
| ARCHDIOCESE OF | ) |
| INDIANAPOLIS, INC., | ) |
| | ) |
| Defendants. | ) |

### DECLARATION OF AUTUMN CURRENS

I, Autumn Currens, declare:

1. I am over 18 years old and legally competent to testify.

2. I know these facts to be true based on my own personal knowledge, except for facts that I believe to be true upon information and belief. If called as a witness, I could competently testify to these facts.

### My Employment at Roncalli

3. I am a former School Counselor/Guidance Counselor at Roncalli High School. I worked at Roncalli from August 1, 2007 to July 31, 2019.

4. I converted to Catholicism in the spring of 2018. Prior to that time, I was not Catholic.

5. I did not have any formal religious credentials when applying to or while working at Roncalli. I attended state universities where I earned my bachelor's degree in sociology. I obtained my master's degree in school counseling from Indiana University Purdue University of Indianapolis.

6. Roncalli had informed one of my professors from my master's program that the school was hiring a guidance counselor. My professor let my classmates and me know about it, so I applied for the job.

7. The application form included a line asking about my religious affiliation or church. I listed a non-Catholic church.

8. During my interview, I think I was asked whether I was comfortable attending the all-school masses. I do not remember anything else about religion or Catholicism coming up during my interview. No one told me about any religious duties or expectations for guidance counselors during the interview. No one told me that Roncalli expected guidance counselors to play a role in the religious formation of students.

9. With the exception of my first year of employment, my direct supervisors were Shelly Fitzgerald and Lynn Starkey, the Co-Directors of Guidance. I interacted with Ms. Fitzgerald at work daily.

10. Each guidance counselor was assigned a subset of students, based on the students' last names.

11. As a guidance counselor, my job duties and responsibilities consisted of the following: (i) scheduling students for classes, including one-on-one meetings with students to discuss course selections; (ii) assisting students with decisions relating to college applications and selections; (iii) providing SAT and ACT test prep tools to students; (iv) administering AP exams; (v) career guidance to students; and (vi) personal counseling.

12. Of our responsibilities, scheduling students' classes—and helping make sure they were on track to meet graduation requirements—was the main focus of our work, as well as helping students with the college admissions process.

13. I do not recall a time where I ever prayed with a student during a one-on-one meeting, nor did Roncalli expect me or the other counselors to do so.

14. I don't remember ever telling a student to go home and pray about anything. I wasn't directed or encouraged by the school to suggest that students pray either.

15. Roncalli holds school-wide prayers over the PA system twice per day. I never led any of these prayers, nor were counselors expected to do so.

16. Roncalli holds school-wide Mass once per month. I attended Mass and participated in prayer during Mass. I never led prayer during Mass, and counselors were not expected to do so.

17. I would lead classroom presentations (with another counselor) to students related to topics such as college planning and SAT/ACT testing. Occasionally, a teacher would lead the class in prayer while I was present. I observed and prayed along (to

2

179A

myself) but did not lead the prayer. I recall this occurring approximately 10 times during my 12 years at Roncalli. As a counselor, I was never responsible for leading prayer in the classroom. That was the teacher's responsibility.

18. Roncalli permits students to pray at the Chapel during study time in the middle of the school day. I attended Chapel services during study time once or twice during my twelve year career at Roncalli. Attending Chapel services was not part of my job responsibilities as a counselor. When I did attend, it was a personal choice.

19. I was a member of the Student Assistance Program. SAP was there to help address students' academic struggles, substance use, or other issues. I did not provide religious or spiritual guidance or advice to students as part of SAP. The only time I can recall anything religion-related coming up in SAP was a suggestion that we ask a student who came in if they had talked to their priest, minister, or other adult at church about their issues. In general, we did not direct that student or any others in SAP to talk to religious resources.

20. Shellie Hartford, who was in charge of the SAP team for much of my time at Roncalli, would often lead a short prayer at the start of SAP team meetings. But I do not remember ever praying for a specific student during an SAP meeting.

21. If a student was in SAP due to drug or alcohol issues, they would be referred to an outside drug and alcohol counselor.

22. To my knowledge, a program like SAP could exist in a public school. From my understanding, a public-school program would be able to approach students' issues in the same way we did, assuming they had the time and resources.

23. In September of 2017, I attended a Senior Retreat. It was the only time during my twelve year career that I attended a Senior Retreat. I was an observer and not a group leader. I was assigned to a small group of about seven students, along with a religion teacher. As an observer, I mainly watched the retreat: I was mostly just paying attention and helping the students follow the rules.

24. It was not part of my day-to-day responsibilities in my job to assist students with their religious or spiritual needs, to aid students in their Christian development, or to provide advice or counseling related to the Catholic faith or from a Catholic perspective. Roncalli did not expect me or the other counselors to incorporate Catholic beliefs or teachings in our counseling work.

25. I didn't talk with students about religion, nor do I remember having conversations about students' faith. I do not remember any time I incorporated Catholic religious beliefs or teachings in my counseling work.

3

26. If a student had come to me with questions about Catholicism or other religious questions, I would have referred them to a religion teacher, priest, or the campus minister. But I don't recall any time when a student actually did come to me with a religious question.

27. When I converted to Catholicism, I had to take RCIA (Rite of Christian Initiation of Adults) classes in 2017 and 2018. Taking RCIA classes and becoming Catholic was not a requirement for my job—it was a decision I made for my own personal faith life. I did not use anything I learned in my RCIA classes in my counseling work with students.

28. I was never told that I wasn't including religion enough in my job duties and responsibilities, or that I needed to do it more. Instead, I was expected to help make sure my students had the information and resources they needed for academic success at Roncalli and in college. I never received any corrective action or discipline during my employment at Roncalli.

29. When I would talk with students about personal issues they were dealing with, it was generally with an eye to academic concerns. For example, if a student was going through a hard time at home, I might see if they wanted me to let their teachers know so that their teachers could take that into account in assignments and grading.

30. I could have done my counseling work (including any personal counseling) the same way had I been working in a public school, assuming the school had enough resources.

31. To the best of my knowledge, guidance counselors were excused multiple times, with permission, from attending Faculty Days of Reflection, including the prayer service at the end of the day, because we had to schedule appointments with senior and transfer students and their parents for class scheduling purposes.

32. I do not recall ever being "Commissioned" as a "Minister of the Faith" during my employment at Roncalli. Nor do I remember Ms. Fitzgerald ever being "Commissioned" as a "Minister of the Faith."

33. I never saw myself or the other guidance counselors as religious leaders at the school.

34. Religion was a part of other aspects of the school. There would be prayers in the morning and before lunch, along with monthly liturgies. Students had religion classes every day. But religion wasn't a part of the guidance department. We were focused on academics.

4

181A

35. At the end of the 2018-2019 school year, Roncalli offered to renew my contract to continue working as a guidance counselor for the 2019-2020 school year, but I decided not to renew my contract or continue my employment with Roncalli. My last day of work at Roncalli was May 29, 2019.

36. I have reviewed Angela Maly's declaration in this case. The way she described the guidance department is not how the department functioned before Ms. Fitzgerald was placed on leave. Most notably, the other counselors and I were not responsible for helping students understand the Catholic faith, for forming students in the Catholic faith, or for helping students with their spiritual needs. Prayer was not an essential component of my work or the work of the other counselors, and we were not expected to pray with students during counseling sessions.

## Ministry Contracts and Descriptions

37. I was not designated as a "ministerial" employee for eleven of my twelve years working at Roncalli. In May 2018, Roncalli introduced new job descriptions and contracts for guidance counselors that included "ministry" in the title. I was required to sign the new contract as a condition of keeping my job, starting with the 2018-19 school year.

38. I do not remember anyone from the school talking to the other counselors or me about the ministry description for guidance counselors. Roncalli did not provide us with any explanation of the new contracts or job descriptions, nor did it give us any training related to them.

39. I do not recall any changes to my job duties and responsibilities after Roncalli changed to "ministry" contracts and job descriptions for the guidance counselors. Both before and after the ministry contracts and job descriptions were introduced, counselors were not expected to pray with students or incorporate religious doctrine in our counseling work.

40. Many of the items listed in the guidance counselor ministry description for guidance counselors were not part of my job or job expectations. For example:

> I did not foster students' religious or spiritual growth. Students were not coming to me to discuss religion.

> I was not actively "[c]ommunicat[ing] the Catholic faith to students or families." That was not a part of my job.

> I did not pray with students or parents. I never felt like I was expected to do so, nor did I feel pressured to do so.

5

182A

> I did not "[t]each[] . . . Catholic traditions and all observances in the Liturgical Year." Nor was I required to do so—this is not something that the other counselors or I would have anything to do with. I do not even think all the teachers did this.

> I did not "[m]odel the example of Jesus, the Master Teacher," or otherwise try to emulate Jesus in my interactions with students. Nor was I supposed to do so.

> I was not required to "[p]roactively identif[y] and address[] . . . spiritual needs of individuals and of the community of learners."

41. My understanding was that signing my contract each year was a formality. The school would inform me that they were asking me to come back for the year, letting me know what my pay would be and the number of days I would be required to work for the year. Then I would sign it.

42. I never thought there was any opportunity for me to negotiate the terms of my contract.

43. I do not remember ever receiving a teacher ministry description.

### My Work with Michelle Fitzgerald

44. Ms. Fitzgerald's responsibilities included scheduling students for their classes, coordinating standardized testing (including Advanced Placement testing), and—along with Ms. Starkey—serving on the Administrative Council.

45. While Ms. Fitzgerald was at Roncalli, the guidance department was like a well-oiled machine. She worked hard and was always trying to improve the department's academic service to students.

46. To my knowledge, Ms. Fitzgerald did not incorporate Catholic doctrine or teachings in her work as a counselor or co-director or give any religious advice to students. Nor do I believe she was expected to do so, given my own understanding of our counseling duties.

47. To my knowledge, Ms. Fitzgerald did not pray with students during counseling meetings.

48. We had weekly department meetings. Ms. Fitzgerald facilitated those meetings. She did not discuss religious doctrine or other religious topics during those meetings.

6

183A

49. Sometimes Ms. Fitzgerald, along with Ms. Starkey, would bring information from the school's Administrative Council back to the guidance department during our weekly meetings. For example, one time the Administrative Council had discussed potentially adding a new AP course, so we discussed the practicalities related to that—which students might be interested, how the course might affect other class sizes, and so on.

50. After Ms. Fitzgerald was placed on leave in August 2018, the rest of us in the guidance department divided responsibility for her counselor and co-director tasks. None of those tasks involved religion, prayer, or faith formation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 23 2022, in Indianapolis, Indiana.

*Autumn Currens*

Autumn Currens

7

184A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04291-RLY-TAB |
| | ) | |
| RONCALLI HIGH SCHOOL, INC., and | ) | |
| the ROMAN CATHOLIC | ) | |
| ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF KELLY MEYER

I, Kelly Meyer, declare:

1. I am over 18 years old and legally competent to testify.

2. I know these facts to be true based on my own personal knowledge, except for facts that I believe to be true upon information and belief. If called as a witness, I could competently testify to these facts.

### My Employment at Roncalli

3. I am a former College Counselor at Roncalli High School. I worked at Roncalli from August 2017 to June 2019. I worked closely with the rest of the counseling team at Roncalli, including Michelle Fitzgerald, a Co-Director of Guidance.

4. My biggest responsibility was to supplement the other guidance counselors' college counseling work. The other guidance counselors would handle a lot of the college counseling for the juniors and seniors with more straightforward goals. This included students interested in state schools, as well as other schools that had straightforward application processes and to which Roncalli had experience sending students. Meanwhile, I would focus a lot of my time on the students who needed more individual attention: students interested in the military academies, music, theatre, or other specialized programs, as well as students who were completely unsure what they wanted to do. I also coordinated the school's ACT testing, college planning programming, and graduation.

1

5.  I never incorporated Catholic doctrine, religion, or spirituality in my counseling work with students. I wouldn't have been comfortable with that. Nor was I expected to do so.

6.  I did not pray with students during counseling sessions, nor was I expected to do so.

7.  I was not, and am not, a Catholic. I did not have any religious qualifications or training when I got my job at Roncalli. Nor did I receive any religious training while working at Roncalli.

8.  When Roncalli officially promoted or advertised the guidance department to students and parents, they framed the guidance department as being focused on academics and college admissions—getting students into the best colleges possible. For example, one of my responsibilities was to tally up the total dollar value of all the scholarships offered to our students each year. That number was a real point of pride for the school, as was the list of colleges—both private and public—to which Roncalli students were admitted.

9.  From what I saw, Roncalli did not encourage students to attend religious universities more than other universities.

10. While I was at Roncalli, the school never promoted the guidance department as a religious resource or as there to provide religious guidance.

11. Based on my observations, the Roncalli administration placed far more emphasis and attention on the guidance department's academic counseling than on any social and emotional counseling.

12. At the beginning of the school year, Roncalli used to have something called a Day of Reflection. The day usually included teambuilding activities, lunch, and a short faculty Mass. Attendance was not mandatory. I attended the faculty Mass during my first year at Roncalli, but I did not attend during my second year.

13. Other than the faculty Mass, I don't remember any religious component to the Day of Reflection.

14. I do not remember a "Commissioning Prayer" being delivered during that faculty Mass. I do not recall ever being "Commissioned" as a "Minister of the Faith" during my employment at Roncalli.

15. I never volunteered at one of the school's senior retreats, nor was I required to do so.

2

16. To my knowledge, the other counselors and I could have done the same work we did at Roncalli, in the same way, at a public school.

### Guidance Counselor Ministry Contract and Description

17. To my knowledge, I received and signed the same contract as the guidance counselors.

18. In May 2018, Roncalli introduced a new "School Guidance Counselor Ministry Contract" and an "Archdiocese of Indianapolis Ministry Description" for school guidance counselors.

19. Many of the items listed in the ministry description for guidance counselors did not apply to me, including the religious ones:

    a. I did not play any role in fostering students' spiritual growth.

    b. I did not fulfill any of the items listed in Section III.A of the ministry description under "Role: Facilitates Faith Formation" except for attending Roncalli's monthly all-school liturgies. I typically chose to attend the all-school liturgies during my first year because I enjoyed them at the time. During my second year, after Ms. Fitzgerald was placed on leave, I decided not to attend some of them. No one approached me or reprimanded me for not attending those liturgies.

    c. I did not play any role in "[p]roactively identif[ying] and address[ing] . . . spiritual needs of individuals and of the community of learners."

    d. I was not responsible for "foster[ing] a Christ-centered atmosphere."

    e. I was not required to "participate[] in spiritual retreats, days of reflection, and spiritual formation programs."

20. No one ever asked if I was fulfilling the religious items listed in the ministry description. And I was never told I needed to do anything in addition to or different from what I had been doing, none of which had been religious.

21. To my knowledge, the religious items listed in the ministry description did not match what the guidance counselors, including Ms. Fitzgerald, did or what they were expected to do by the school.

22. Section III.A.1 of the ministry description states that counselors should "[c]ommunicate[] the Catholic faith to students and families through the implementation

3

of the school's guidance curriculum." But the school's guidance curriculum had nothing to do with faith formation.

23. Roncalli did not provide us with any explanation of the new contracts or job descriptions, nor did it give us any training related to them. I was not given an opportunity to negotiate the terms of the contract or the items in the ministry description.

### My Work with Michelle Fitzgerald

24. I interacted with Ms. Fitzgerald almost every day when we were both working at Roncalli. To my understanding, she, like the other guidance counselors, was responsible for advising students related to academics—scheduling, test preparation, and college—as well as some social and emotional counseling. As co-director, she also coordinated the school's Advanced Placement testing each year.

25. I never heard Ms. Fitzgerald lead any prayers during my time at Roncalli, nor, to my knowledge, was she required to do so.

26. To my knowledge, Ms. Fitzgerald did not pray in counseling sessions with students. She and the other counselors approached their work based on their training for their master's degree in school counseling, which generally are secular programs.

27. To my knowledge, Ms. Fitzgerald did not incorporate Catholic doctrine or teachings in her work as a counselor or co-director, nor was she expected to do so.

28. We had weekly guidance department meetings. I wouldn't necessarily attend the full meeting since some of the topics wouldn't apply to me, but I would receive all the agendas. These meetings were quick and to-the-point because we all had busy schedules.

29. Topics I remember from our guidance department meetings include changes to the statewide graduation requirements and the course catalog. I don't remember us ever discussing anything related to religion during a guidance department meeting. I don't remember anything related to religion being on the agenda either.

30. Often, Kathy Heath would say a brief prayer or recite a short reading at the start of the guidance department meeting. Ms. Fitzgerald never led any prayers during our guidance department meetings. I never led a prayer either, since I had no interest in doing so.

31. My direct supervisor was Principal Weisenbach. He was the person who would conduct my performance appraisals, with Ms. Starkey and Ms. Fitzgerald generally sitting in. Nothing related to religion came up during my performance appraisals.

4

32.  I would go to Ms. Fitzgerald and Ms. Starkey with questions related to our work. I never went to them with any questions related to religion or spirituality. Those topics just weren't relevant to the work we were doing.

33.  I didn't understand Ms. Fitzgerald to be a religious leader or to be playing a religious role at the school.

34.  To my knowledge, Ms. Fitzgerald and the other guidance counselors only had professional development opportunities through completely secular organizations, such as the Indiana School Counseling Association.

35.  In August 2018, I learned that Roncalli had confronted Shelly Fitzgerald about her sexuality and marriage to a female spouse. Ms. Fitzgerald gathered the counseling team together and told us what happened. Everyone present at the meeting was very upset over what had happened, including myself. Shortly thereafter, Ms. Fitzgerald was placed on administrative leave.

36.  I now work in college admissions, and so I interact with many different high school counselors. I have never worked with high school counselors as good as Ms. Fitzgerald and Ms. Starkey. I also work with counselors from both religious and secular schools—I have not seen any difference between the way Ms. Fitzgerald performed her work as Co-Director of Guidance and the way directors and counselors from secular schools do. Nor, to my knowledge, did Roncalli expect Ms. Fitzgerald or the other guidance counselors to perform their work differently from these secular school counselors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 31, 2022, in Terre Haute, Indiana.

Kelly Meyer

5

189A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04291-RLY-TAB |
| | ) | |
| RONCALLI HIGH SCHOOL, INC., and | ) | |
| the ROMAN CATHOLIC | ) | |
| ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF KELLEY FISHER

I, Kelley Fisher, declare:

1.  I am over 18 years old and legally competent to testify.

2.  I know these facts to be true based on my own personal knowledge, except for facts that I believe to be true upon information and belief. If called as a witness, I could competently testify to these facts.

3.  I was a Social Worker at Roncalli High School from August 2004 through May 2019.

4.  My role at the school was to help address students' mental health struggles, substance use, and other personal issues. Unlike the guidance counselors, I did not deal with academics or class scheduling.

5.  I sometimes discussed students' concerns related to sexual orientation and gender identity during my personal sessions.

6.  I worked closely with the rest of the counseling team at Roncalli, including Michelle Fitzgerald, a former Co-Director of Guidance.

7.  Although I reported to Ms. Fitzgerald and Lynn Starkey—the other Co-Director of Guidance—my direct supervisor worked for Catholic Charities. Any performance evaluations were conducted by Catholic Charities, not Ms. Fitzgerald or Ms. Starkey.

8.  I was part of the school's Student Assistance Program. The most common issues for which a student would be referred to SAP were substance use and academic issues.

9.  SAP did not address students' religious issues or struggles. To my knowledge, no student was ever referred to SAP for religious struggles.

10.  In SAP, we would not direct students to a religious resource. Sometimes we would suggest a student speak with a particular teacher or staff member with whom they already had a close relationship, who could serve as a mentor. If a student already had a close personal relationship with the Roncalli priest we might suggest that the two talk. But it would be for personal reasons, based on their pre-existing relationship, not religious reasons. That suggestion would be no different than if we suggested a student talk to a science teacher with whom the student had a personal relationship, for example.

11.  We did not discuss students' struggles related to sexual orientation or gender identity in SAP. I cannot recall the topic ever coming up.

12.  A public school could have a program similar to Roncalli's SAP. To my knowledge, this kind of program definitely exists in public schools.

13.  Roncalli held a meeting at the beginning of the year for faculty and staff. No one talked about ministry during the meeting—it was just a regular back to school meeting. Although there was a Mass at the end of the day, the meeting at the beginning of the day did not address religious topics.

14.  I have observed Ms. Fitzgerald in the performance of her job duties. To my knowledge, her job duties as a school guidance counselor did not include any religious duties or teaching duties.

15.  I didn't understand Ms. Fitzgerald as having a religious role at Roncalli. I did not view Ms. Fitzgerald as a religious leader at Roncalli, nor, to my knowledge, did the teachers, staff, or students see her that way.

16.  Roncalli had a priest, minister, and religion department. I, and most people, understood them as the religious leaders at the school.

17.  To my knowledge, Ms. Fitzgerald did not integrate religious teachings or doctrine into her interactions with students. During Ms. Fitzgerald's time at Roncalli, the school did not require the guidance counselors or me to incorporate religious doctrine in our sessions with students.

18. If a student was struggling with their faith or with religious questions, I would direct them to a priest at their parish or the Roncalli chaplain. I would not send them to the guidance counselors.

19. I don't know of any times when Ms. Fitzgerald prayed with students. The school did not require me to incorporate prayer into my meetings with students. Nor, to my knowledge, did it require guidance counselors to incorporate prayer into their meetings with students.

20. I would attend the weekly guidance department meetings. During these meetings, we would discuss any matters relevant to the department's work, such as upcoming AP examinations, college meetings, or the scheduling process.

21. To my knowledge, religious topics or issues were never discussed during the weekly guidance department meetings.

22. The work of Ms. Fitzgerald and the other guidance counselors was very similar to that of public-school guidance counselors. After I left Roncalli, I worked at a public school, and that school's guidance department functioned very similarly to Roncalli's.

23. In August 2018, I learned that Roncalli had confronted Ms. Fitzgerald about her sexuality and marriage to a female spouse. Shortly thereafter, Roncalli placed Ms. Fitzgerald on administrative leave.

24. On or about February 8, 2019, I filed a Charge of Discrimination with the EEOC against the Archdiocese and Roncalli for retaliating against me for my support of Ms. Fitzgerald and Ms. Starkey.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 5, 2022, in City, State. Indpls. IN

Kelley Fisher

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MICHELLE FITZGERALD,                    )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )          Case No. 1:19-cv-04291-RLY-TAB
                                         )
RONCALLI HIGH SCHOOL, INC., and )
the ROMAN CATHOLIC                       )
ARCHDIOCESE OF                           )
INDIANAPOLIS, INC.,                      )
                                         )
          Defendants.                    )

## DECLARATION OF CHARISSE PHILLIPS

I, Charisse Phillips, declare:

1. I am over 18 years old and legally competent to testify.

2. I know these facts to be true based on my own personal knowledge, except for facts that I believe to be true upon information and belief. If called as a witness, I could competently testify to these facts.

### My Employment at Roncalli

3. I am a former teacher at Roncalli High School. I taught math at Roncalli from Fall 2002 to Spring 2018.

4. My annual Teacher Contract included a "morals clause," which stated that I was expected to adhere to the teachings of the Roman Catholic Church.

5. I interviewed with Principal Chuck Weisenbach for a teaching position in the Summer of 2002. Before signing my first Teacher Contract, I disclosed to Principal Weisenbach that I was on birth control and intended to continue taking birth control. I asked whether this would create any conflicts with respect to the "morals clause" in the contract I was expected to sign. I explained that birth control is permitted under my own religion.

6. Principal Weisenbach responded that I did not have anything to worry about with respect to the "morals clause" as long as I wasn't engaging in some form of

public advocacy (attending a rally, giving an interview, etc.) involving an issue that violates Catholic Church teachings while holding myself out as a representative of Roncalli High School.

7. During my 16 years of employment at Roncalli High School, I never received any discipline, corrective action, counseling, or other negative employment action relating to any failure or alleged failure to adhere to the "morals clause" in my contract.

8. As a teacher at Roncalli, I was required to attend an annual faculty meeting at the beginning of each school year, known as a Day of Reflection. At that time of year, to my knowledge, the guidance counselors were very busy with senior appointments.

9. The first part of the annual meeting was a "nuts-and-bolts" section, which mainly went over procedural changes from the prior year and major rule changes. It also included reminders about the importance of rigor in the classroom, communication with parents, and treating the parents and families as customers. The only religious content I can remember from the nuts-and-bolts section was that Principal Weisenbach would usually begin or end it with a brief prayer and that he would remind teachers about the expectation that we start our classes with prayer.

10. The next part of the Day of Reflection varied from year to year but often included icebreakers and activities geared toward getting to know each other. We would also use part of the day for department meetings and work.

11. At the end of the Day of Reflection, there would be a Mass.

12. I do not remember any "Commissioning Prayer" being delivered during the Mass. I do not remember being "Commissioned" as a "Minister of the Faith" during the Day of Reflection or otherwise.

13. I don't remember Ms. Fitzgerald being present during the Mass after the annual faculty meetings, nor do I remember her being "Commissioned" as a "Minister of the Faith" then or at any other time.

14. In approximately 2016 or 2017, in the middle of the school year, Roncalli put a contract addendum in all of the teachers' mailboxes on a Monday and said that we needed to sign them and return them by that Friday. I reviewed the addendum and it intended to designate me as a minister. We were not told anything about the contract addendum beforehand. The school did not warn us it was coming, nor did the school explain what any of the terms meant.

2

15. After reviewing the contract addendum, I met with Dean of Students Tim Puntarelli. I told him I was uncomfortable signing the addendum, since I am not Catholic and did not consider myself a minister of the faith. I also told him that some of my religious beliefs—regarding abortion, for example—differed from those of the Catholic Church, so I did not want to sign something that would get me in trouble for my own religious beliefs. Dean Puntarelli told me that I had nothing to worry about.

16. I signed the addendum as a condition of keeping my job. The school did not give me an opportunity to share my input on the contract addendum or to negotiate the terms. To my knowledge, no other teacher had that opportunity either.

17. My job duties did not change after the contract addendum was introduced.

18. The school did not give me any religious training related to the contract addendum or any ministerial role. I wasn't required to have any religious training before the school introduced the contract addendum either.

19. The school did nothing to enforce the duties in the contract addendum.

20. The school never discussed the duties from the contract addendum in my evaluations.

21. In short, I did not consider myself a minister before being forced to sign the ministerial contract addendum. Before signing the addendum, I wasn't expected to teach my students about the Catholic faith or doctrine. Nothing about the day-to-day responsibilities of my job changed after the addendum. And I did not consider myself a minister after signing the addendum.

22. Roncalli had an Administrative Council. To my knowledge, the Administrative Council handled matters related to the running of the school, educational matters, and outreach. They dealt with the everyday questions related to running a school.

23. To my knowledge, Administrative Council and the Department Chairs were not responsible for 95% of Roncalli's daily ministry. My understanding was that the campus pastor, religion department, and priest handled the school's ministry.

24. I would not have described the Administrative Council as the lifeblood of decision-making at the school.

3

## My Work with Michelle Fitzgerald

25. Guidance counselors at Roncalli were focused on academics, scheduling, and post-graduation planning. They also helped students having academic struggles to get back on track.

26. Unlike others at Roncalli, such as the religion teachers and the campus ministry team, I did not understand Roncalli's guidance counselors as playing a role in conveying the Catholic faith to students.

27. I didn't see the guidance counselors or the Co-Directors of Guidance as religious leaders at the school. To my knowledge, no one in the Roncalli community saw them that way.

28. I sometimes sat in on meetings between Ms. Fitzgerald and students. During those meetings, I did not see her explicitly relying on religious doctrine to guide the meetings. I taught in public schools for seventeen years, and, to my knowledge, everything I heard come up during Ms. Fitzgerald's conversations with students and parents would have been allowed at a public school.

29. I don't know of any times when Ms. Fitzgerald talked about religious doctrine or religious teachings with students.

30. When a student came to me with questions about the Catholic faith or other religious or spiritual questions, I would answer them myself if they were basic questions. If their questions went beyond what I could handle myself, I would refer them to a religion teacher, the campus minister, or the school's priest.

31. I would not send a student with religious questions or who needed religious advice to Ms. Fitzgerald or the other guidance counselors, nor was I supposed to do so. That was what the religion department was there for. It wasn't the purpose of the guidance department.

32. I don't remember hearing Ms. Fitzgerald lead any prayers during my time at Roncalli.

33. Ms. Fitzgerald was an amazing counselor. She had excellent rapport with the students and teachers.

4

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2022, in Seville, Ohio.

_____
Charisse Phillips

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04291-RLY-TAB |
| | ) | |
| RONCALLI HIGH SCHOOL, INC., and | ) | |
| the ROMAN CATHOLIC | ) | |
| ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF EMILY DUNHAM

I, Emily Dunham, declare:

1. I am over 18 years old and legally competent to testify.

2. I know these facts to be true based on my own personal knowledge, except for facts that I believe to be true upon information and belief. If called as a witness, I could competently testify to these facts.

### My Employment at Roncalli

3. I am a former teacher at Roncalli High School. I taught Spanish and English as a Second Language at Roncalli from August 2017 to July 2019.

4. I attended Roncalli's annual faculty meetings at the beginning of each school year. The meetings occurred in the school auditorium. Principal Chuck Weisenbach led the meetings.

5. Teachers were required to attend these annual meetings, but I don't remember if guidance counselors were. The guidance counselors would be meeting with seniors around that time of year.

6. There would be a "nuts-and-bolts" part of the annual meeting, as well as all our other regular faculty meetings (which were held about once a month). What I remember of the nuts-and-bolts part of the annual faculty meeting was very similar to what it would be at a public school: information on enrollment and staffing, introducing new staff members, updates from the summer, and other things relevant to running any school.

7. After the nuts-and-bolts part of the meeting, we would have academic meetings, trainings, and teambuilding activities.

8. At the end of the annual faculty meetings, we moved to the chapel, where we had Mass as a faculty. Principal Weisenbach led us in a prayer for a good school year. This Mass was the only religious activity I can remember occurring during the annual faculty meetings I attended.

9. After the Mass, we were free to work in our classrooms.

10. I do not remember any "Commissioning Prayer" being delivered during that faculty Mass. I do not remember Roncalli ever communicating to me that I was being "Commissioned" as a "Minister of the Faith." I do not remember anyone at Roncalli telling me I was a minister or describing me as a minister. At no time did I understand that I was being "Commissioned" as a "Minister of the Faith."

11. I don't remember Ms. Fitzgerald being "Commissioned" as a "Minister of the Faith" during that annual Mass or otherwise.

12. Before Roncalli, I worked for a youth ministry in Spain, called Young Life. Young Life formally commissioned me as a minister while I worked there. If I had been commissioned as a minister by Roncalli, I believe I would have noticed.

2

13.  As a teacher, I was told to begin my classes with a prayer once a week. The school offered to give me a prayer book that I could use for those weekly prayers.

14.  During my time working at Roncalli, I wouldn't have considered the Administrative Council to be the lifeblood of decision-making at the school.

15.  I disagree with the statement that the Administrative Council and the Department Chairs are responsible for 95% of Roncalli's daily ministry, education, and operations. That ignores the work of the many other staff members. Also, my department chair would share information from the Department Chair meetings with me. To my knowledge, my department chair was not involved in ministry.

16.  Roncalli offered me a contract to teach for the 2019-2020 school year. I declined to sign it because I disagreed with its treatment of Shelly Fitzgerald and Lynn Starkey. I no longer work for Roncalli.

### My Work with Michelle Fitzgerald

17.  To my knowledge, the role of Ms. Fitzgerald and the other guidance counselors was mainly related to scheduling and other academic issues.

18.  I did not see Ms. Fitzgerald or the other guidance counselors as playing a role in conveying the Catholic faith to students. I never heard Ms. Fitzgerald talk about religious doctrine or teachings with students.

19.  I would send students to Ms. Fitzgerald and the other guidance counselors if they were having scheduling issues or other academic concerns. I don't remember ever sending a student to a guidance counselor for a nonacademic purpose.

20.  If a student ever came to me with questions about religion, spirituality, or the Catholic faith, I might ask them some questions to help them think through it themselves, or I would suggest they ask their religion teacher. I

would never send a student in need of religious advice to Ms. Fitzgerald or the other guidance counselors, nor was I directed to do so.

21.     If a student was struggling with personal or family issues, I would send that student to the school's social worker.

22.     Ms. Fitzgerald and the other Roncalli guidance counselors played a very similar role to guidance counselors at a public school.

23.     Ms. Fitzgerald was very professional, great to work with, and was an excellent guidance counselor.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 13, 2022, in Indianapolis, Indiana.

Emily Dunham

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| MICHELLE FITZGERALD,       ) | |
|            ) | |
|      Plaintiff,       ) | |
|            ) | |
| v.            ) | Case No. 1:19-cv-04291-RLY-TAB |
|            ) | |
| RONCALLI HIGH SCHOOL, INC., and ) | |
| the ROMAN CATHOLIC       ) | |
| ARCHDIOCESE OF         ) | |
| INDIANAPOLIS, INC.,       ) | |
|            ) | |
|      Defendants.      ) | |

**DECLARATION OF BLAKELY PHILLIPS-POWELL**

I, Blakely Phillips-Powell, declare:

1. I am over 18 years old and legally competent to testify.

2. I know these facts to be true based on my own personal knowledge, except for facts that I believe to be true upon information and belief. If called as a witness, I could competently testify to these facts.

3. I was a student at Roncalli from Fall 2014 through Spring 2018.

4. During my time at Roncalli, Ms. Fitzgerald was my guidance counselor. I met with her at least once per semester, and sometimes once per quarter.

5. I understood Ms. Fitzgerald's role as being focused on academics and post-graduation plans. We would talk about how my classes were going, whether I needed academic help with classes, and what my options were for after graduation (whether that was college, work, military service, or another program). She was focused on how she could help me achieve my goals.

6. My first meeting with Ms. Fitzgerald was before my freshman year. We talked about what kinds of classes I should take, as well as extracurriculars I might be interested in.

7. After that, we would meet once per year to schedule classes.

8.  If my grades were slipping below my norm, Ms. Fitzgerald would call me to her office to talk about working harder to meet my goals. I also went to Ms. Fitzgerald a few times without an appointment if I had questions about grades, academics, or college admissions.

9.  Ms. Fitzgerald never presented herself as a religious leader at Roncalli. I did not at all view Ms. Fitzgerald as a religious authority, nor do I know of any other students who did.

10.  The school did not present or advertise guidance counselors as playing a religious or spiritual role or being there to discuss religion with students. My understanding was that the school's only goal for guidance counselors was to get the college acceptance rate as high as possible.

11.  I never went to Ms. Fitzgerald with questions about religion or spirituality, and we never discussed religion during our counseling sessions. She never pushed religion, and I wouldn't have expected her to since the school presented counselors as focused on academics and college.

12.  If students did have questions about religion or spirituality, there were plenty of people at Roncalli we were encouraged to go to: religious sisters, a priest, the dean, the principal, or the religion teachers. But we weren't encouraged to go to Ms. Fitzgerald or the other guidance counselors with religious questions, and I wouldn't have thought to do so.

13.  I never prayed with Ms. Fitzgerald. I don't know of any other students who did pray with her, and I doubt that any did. To my knowledge, no one thought that was what the counselors were there for. That wasn't the role of guidance counselors at the school as I understood it or as Roncalli presented it.

14.  I was also in the school's Student Assistance Program. I was put in SAP during my sophomore year after my friend was caught drinking at a football game and implicated me. I remained in SAP for the rest of my time at Roncalli.

15.  Although the school would sometimes describe the SAP program as something more, I understood it to be exclusively a program for drug testing students.

16.  While in SAP, I would be called out of class randomly for drug testing, either by Ms. Fitzgerald or by the dean. When Ms. Fitzgerald would call me for drug testing, we would talk about whether I would pass the drug test and sometimes about my thoughts on the process. We didn't talk about religion or spirituality.

2

17. I almost never spoke with Ms. Fitzgerald about personal, non-academic issues. One rare example of a time that our conversation was not limited to academic issues was after an upsetting conversation I had with the Dean. My mother died during my junior year. The Dean called me down to his office and, among other things, told me that I was going to be drug tested. Afterward, I went and spoke with Ms. Fitzgerald to express my anger that I was being drug tested at that time, especially considering I had never failed a drug test. Our conversation did not include anything religious.

18. There was a different school employee, who I believe was named Mrs. Fisher, whose role it was to discuss personal issues, especially mental health, with students. She was more like a therapist and was not a guidance counselor. I understood that if the school thought a student was struggling with mental health issues, including risk of suicide, the student would be referred to her.

19. I didn't attend a senior retreat. Some other seniors didn't attend either.

20. While at Roncalli, I attended school masses. I did not understand the role of the teachers or staff at mass to be religious in any way. The role of the teachers and staff who attended school masses was disciplinary—their job was to make sure students stayed quiet and behaved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 3rd, 2022, in Indianapolis, Indiana

Blakely Phillips-Powell

3

204A

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

MICHELLE FITZGERALD,                    )
                                        )
        Plaintiff,              )
                                        )
  v.                                    )          Case No. 1:19-cv-04291-RLY-TAB
                                        )
RONCALLI HIGH SCHOOL, INC., and )
the ROMAN CATHOLIC                      )
ARCHDIOCESE OF                          )
INDIANAPOLIS, INC.,                     )
                                        )
        Defendants.             )

**DECLARATION OF BENJAMIN PESTO**

I, Benjamin Pesto, declare:

1. I am over 18 years old and legally competent to testify.

2. I know these facts to be true based on my own personal knowledge, except for facts that I believe to be true upon information and belief. If called as a witness, I could competently testify to these facts.

3. I was a student at Roncalli from Fall 2015 through Spring 2019.

4. Ms. Fitzgerald was my guidance counselor during my time at Roncalli. I met with her about once or twice per year to schedule my classes. I also met with her once or twice at the start of my senior year to talk about colleges and the resources she and the school could share to help with applications.

5. A typical meeting with Ms. Fitzgerald would last about 20 minutes. Most of the time we talked about matters related to scheduling and academics: which courses were available, how best to sequence different courses, grades, and colleges.

6. I understood Ms. Fitzgerald's and the other counselors as there to provide resources related to my academic needs, review my course schedules, and help me reach my academic and college goals.

7. I never went to Ms. Fitzgerald with personal or mental-health issues.

8.  Ms. Fitzgerald never described herself as a religious leader at Roncalli at any point. And she did not act as though she considered herself one.

9.  I did not see Ms. Fitzgerald as any kind of religious leader or religious authority.

10. The school did not present Ms. Fitzgerald as a religious leader or as playing a religious or spiritual role.

11. I never talked about religion or spirituality with Ms. Fitzgerald. I wouldn't have thought Ms. Fitzgerald was someone to go to with religious questions, especially because there were so many people available as religious resources at Roncalli.

12. If I did have questions about religion or spirituality, I would have gone to a priest or the religion teachers—those were the people at Roncalli who were most invested in faith.

13. No one at the school encouraged us to go to Ms. Fitzgerald or the other guidance counselors with religious questions.

14. I never prayed with Ms. Fitzgerald. Although prayer wasn't out of the ordinary at the school, it wasn't something we did in guidance.

15. I attended the monthly all-school masses at Roncalli. Students performed most of the roles during these masses (distributing communion, for example), with teachers sometimes performing some of the roles if there weren't enough student volunteers. From my understanding, the teachers mainly just tried to make sure all the students stayed quiet.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 6th, 2022, in Greenwood, Indiana.


Benjamin Pesto

2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHELLE FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-04291-RLY-TAB |
| | ) | |
| RONCALLI HIGH SCHOOL, INC., and | ) | |
| the ROMAN CATHOLIC | ) | |
| ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF SARAH SHOVER

I, Sarah Shover, declare:

1.  I am over 18 years old and legally competent to testify.

2.  I know these facts to be true based on my own personal knowledge, except for facts that I believe to be true upon information and belief. If called as a witness, I could competently testify to these facts.

3.  I was a student at Roncalli from Fall 2014 through Spring 2018.

4.  Lynn Starkey was my guidance counselor for my first year at Roncalli. Ms. Fitzgerald was my counselor for the rest of my time at the school. While Ms. Fitzgerald was my guidance counselor, we met roughly once or twice per year, with each meeting generally lasting about 15 to 20 minutes.

5.  My understanding of the role of Ms. Fitzgerald and the other guidance counselors is that they were there to help us with academics. Our conversations were always related to academics. They were focused on scheduling my classes, answering any academic questions I had, and working through my college and career goals.

6.  Ms. Fitzgerald never presented herself as a religious leader at Roncalli.

7.  I did not view Ms. Fitzgerald as playing a religious role. I would be surprised if others viewed her role as being at all a religious one.

8.  The school did not present Ms. Fitzgerald as a religious leader or as playing a religious or spiritual role. Instead, the school presented her and the other counselors as playing an academic role, focused on classes, careers, and college.

9.  I never went to Ms. Fitzgerald with questions about religion or spirituality, and we never discussed religion. I wouldn't have thought it made sense to go to Ms. Fitzgerald with religious questions because I understood her role to be providing academic guidance, not religious guidance.

10.  Roncalli had a whole department dedicated to religion, which students could use as a resource for any faith-related questions. If I ever had questions about religion or spirituality, I would have gone to one of the religion teachers or the school's priest.

11.  We weren't encouraged by anyone at Roncalli to go to Ms. Fitzgerald or the other guidance counselors with religious questions.

12.  I never prayed with Ms. Fitzgerald. In a lot of my classes, the teacher would pray before class. But, in my experience, no one prayed before guidance appointments.

13.  There was only one time when I met with Ms. Fitzgerald about a personal issue. During my senior year, I joined the cross-country team. Between that, my heavy course load, and my other extracurriculars, I was very stressed. My parents noticed and emailed Ms. Fitzgerald about it. Ms. Fitzgerald called me to her office to talk about what we could do to make my schedule more manageable. We did not talk about religion or faith during that meeting, nor would I have expected to do so.

14.  Roncalli had a social worker. If I had questions about personal or relationship issues, I would have gone to the social worker since she had the expertise in dealing with those kinds of issues.

15.  I was aware of the school's Student Assistance Program. To my knowledge, it mainly dealt with drug use.

16.  I attended a senior retreat in 2017. Teachers and recent Roncalli graduates volunteered at the retreat. During the retreat, the students were divided into small groups. Each group had a teacher, as well as two recent graduates. The teachers sat with their assigned group during the big talks, but they generally did not sit in on the small group discussions. Instead, the small group discussions were led by the recent graduates.

17. To my knowledge, teachers could also "observe" a retreat. I believe we had a teacher observing at my retreat.

18. After the retreat, I did not see the teachers or recent graduates as religious leaders.

19. I attended the monthly all-school liturgies at Roncalli. Students were responsible for delivering the readings, singing in the choir, and serving at the altar. Some teachers would help distribute communion, but most of the individuals distributing communion were Roncalli seniors.

20. I don't remember Ms. Fitzgerald ever having a role at the all-school liturgies. I don't recall if counselors even attended the liturgies.

21. I do remember some teachers who regularly helped give out communion at the liturgies. Ms. Fitzgerald was not one of them.

22. From my perspective, most teachers and staff played the same role during the all-school liturgies as anyone just attending a Catholic Mass.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 30, 2021, in Greenwood, IN.

Sarah Shover

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MICHELLE FITZGERALD,                    )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  )     Case No. 1:19-cv-04291-RLY-TAB
                                        )
RONCALLI HIGH SCHOOL, INC., and         )
the ROMAN CATHOLIC                      )
ARCHDIOCESE OF                          )
INDIANAPOLIS, INC.,                     )
                                        )
            Defendants.                 )

DECLARATION OF **ELLEN SCHRADER**

I, Ellen Schrader, declare:

1. I am over 18 years old and legally competent to testify.

2. I know these facts to be true based on my own personal knowledge, except for
   facts that I believe to be true upon information and belief. If called as a
   witness, I could competently testify to these facts.

3. I was a student at Roncalli from Fall 2015 through Spring 2019.

4. Ms. Fitzgerald was my counselor from my first year at Roncalli through Fall
   2018 when she was placed on leave.

5. During my freshman and sophomore years, I met with Ms. Fitzgerald about
   once per year to talk about my schedule. This was usually a pretty quick
   meeting. We would discuss what classes I had already taken, what my grades
   had been in those classes, and which classes Ms. Fitzgerald thought would be
   a good idea for me to take next based on my past classes and my career goals.

1

6. Ms. Fitzgerald was very helpful during my scheduling meetings. She was always prepared with suggestions for what classes would make sense for my next year.

7. We never talked about religion during those scheduling meetings. I don't think we were there long enough for religion to even come up, since the scheduling meetings were short.

8. I don't remember ever praying with Ms. Fitzgerald. I can't remember ever praying with anyone in the guidance office.

9. During my junior year, I met with Ms. Fitzgerald more often—between once a week and once a month. I was struggling with depression, mostly related to school stress. I would go to Ms. Fitzgerald to think out loud and to bounce ideas off her.

10. Ms. Fitzgerald helped me work on coping skills to ease my stress and depression. She would ask how my classes were going, make sure I was getting enough sleep, and give me a chance to eat something if I didn't have breakfast that morning. With my permission, she also reached out to my teachers to make sure they knew what was going on.

11. I can't remember Ms. Fitzgerald ever bringing up anything explicitly religious or faith-related when I would see her my junior year (or any other time). She never offered to pray with me.

12. If Ms. Fitzgerald and I had both been at a public school, I think we could have approached our discussions about my mental health in the same way as we did at Roncalli.

13. I believe I was placed in the Student Assistance Program after I met with the school social worker once during my junior year, when Ms. Fitzgerald wasn't available and I was having a rough day.

14. At no point during my time in SAP was I given religious counseling, brought in to discuss spirituality or religion with the guidance counselors, or

2

told how religion played any role in my struggles at the time. I don't remember anyone suggesting that I pray as part of SAP.

15.     Around when I think I was placed in SAP, the school asked me to go to therapy and recommended several outside therapists. Ms. Fitzgerald was not present when the school made that request. I don't believe any of the therapists they recommended were faith-based.

16.     Aside from the therapy recommendation, the main difference from before I was in SAP was that my teachers were more forgiving. One would not punish me when I fell asleep during her class and another would grant me extensions on papers.

17.     To my knowledge, SAP did not include any required appointments with the Roncalli counselors. I continued meeting with Ms. Fitzgerald regularly, but I would decide when to go see her myself. Nothing about my meetings with Ms. Fitzgerald changed after I was in SAP.

18.     During my senior year, I was placed on SAP again after my friends and I were caught drinking at homecoming. This time, being in SAP just meant that I had to get drug tested. Aside from the drug testing, being in SAP did not include any required appointments with the Roncalli counselors.

19.     I never sought out Ms. Fitzgerald for religious guidance while I was struggling with my mental health or at any other time.

20.     Like many teens, there were times during high school when I was questioning my religious beliefs. When I wanted to talk about that, or if I had questions about the Catholic faith, religion, or spirituality, I would go to my religion teacher.

21.     I didn't go to Ms. Fitzgerald with questions about religion or Catholic beliefs. That's not what I viewed Ms. Fitzgerald as being there for. There were plenty of religious leaders or religious educators at Roncalli who could

3

help me with those questions, but I didn't think of Ms. Fitzgerald as one of
them.

22.　　I remember Ms. Fitzgerald giving a presentation about the resources the
guidance department had, what they were there for, and how they could help
us. A lot of the presentation was about preparation for college. I don't
remember her beginning or ending that presentation with a prayer or
discussing religion at all.

23.　　Roncalli held monthly school liturgies. Some staff members and teachers
wouldn't attend the liturgies. I didn't look at teachers or staff differently for
going or not going to the liturgies.

24.　　My understanding of the role of teachers and staff at the school liturgies
was that they were there as regular participants, like everyone else.

25.　　I don't remember noticing whether Ms. Fitzgerald was or wasn't present
at the school liturgies.

26.　　I don't remember Ms. Fitzgerald ever playing any of the roles during the
liturgy. A lot of the time, those roles were filled by students.

27.　　I didn't think of Ms. Fitzgerald as a religious leader at Roncalli. It never
occurred to me to think of Ms. Fitzgerald in that way.

28.　　I can't think of any times when someone at the school held Ms.
Fitzgerald out as a religious leader or authority.

29.　　The school held an open forum a few weeks or a month after Ms.
Fitzgerald's removal from Roncalli became public. I don't remember anyone
saying that Ms. Fitzgerald had prayed with them or that she served any
religious role. I left with the overwhelming sense that she was a valued
person at Roncalli, but not with the sense that she had been a religious
leader at the school.

I declare under penalty of perjury that the foregoing is true and correct.

4

213A

Executed on January **22**, 2022, in Bloomington, Indiana.

_____

Ellen Schrader

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MICHELLE FITZGERALD,                        )
                                            )
            Plaintiff,                      )
                                            )
    v.                                      )       Case No. 1:19-cv-04291-RLY-TAB
                                            )
RONCALLI HIGH SCHOOL, INC., and )
the ROMAN CATHOLIC                          )
ARCHDIOCESE OF                              )
INDIANAPOLIS, INC.,                         )
                                            )
            Defendants.                     )

## DECLARATION OF BRIGID PARKER

I, Brigid Parker, declare:

1. I am over 18 years old and legally competent to testify.

2. I know these facts to be true based on my own personal knowledge, except for facts that I believe to be true upon information and belief. If called as a witness, I could competently testify to these facts.

3. I was a student at Roncalli from Fall 2015 through Spring 2019. My father, Daniel Parker, was one of the school's board members until August 2018.

4. Ms. Fitzgerald was my guidance counselor from when I started at Roncalli up until she was placed on leave.

5. While Ms. Fitzgerald was my guidance counselor, I met with her at least once per year to talk about my classes and college goals.

6. My understanding of the role of the guidance counselors, including Ms. Fitzgerald, was that they were there to help us with college admissions and to help us with any academic issues. For example, if there was a class I wasn't doing well in, I could go to her.

7. Ms. Fitzgerald was an amazing counselor. She was a good listener, compassionate, and very helpful in planning for my classes and career.

1

8. I did not ever talk about religion or spirituality with Ms. Fitzgerald. She never brought up Catholic teachings or doctrine in our meetings. We never prayed during meetings.

9. Ms. Fitzgerald did not help shape my spiritual life as a counselor. She did not inspire or guide me in my spiritual life.

10. Ms. Fitzgerald never preached the message of the Gospel in any of our meetings.

11. I did not understand Ms. Fitzgerald to be a minister of the Catholic Church's teachings in her role as a guidance counselor.

12. If I had questions about religion or spirituality, I would have gone to the chaplain, one of the religion teachers, or possibly another teacher. I believe Roncalli encouraged the other students and me to go to the chaplain or religion teachers with those kinds of questions.

13. I would not have gone to Ms. Fitzgerald with questions about religion or spirituality. I didn't think of her as being there to answer religious questions. Instead, she was there to help me plan for my future classes, college, and career.

14. Ms. Fitzgerald never encouraged me to come to her with questions about religion or to talk about religion or spirituality.

15. To my knowledge, no one at the school encouraged the other students or me to go to Ms. Fitzgerald or the other guidance counselors with religious questions or to seek religious advice.

16. I did not see Ms. Fitzgerald as a minister or religious leader at Roncalli. To my knowledge, the other students did not see her that way either.

17. Ms. Fitzgerald never presented herself as a religious leader at Roncalli. No one else at the school ever presented Ms. Fitzgerald as a religious leader or a religious authority either.

18. I do not remember going to Ms. Fitzgerald with any personal issues.

19. I attended one of Roncalli's senior retreats. I remember someone giving a talk about their "Graph of Life" at the retreat. From what I remember, it was about the ups and downs of their life. The speaker may have made some brief references to religion, but I mainly remember the talk being about the speaker's own personal life.

2

20. After the retreat, I did not see the teachers or recent graduates from the retreat as religious leaders.

21. While at Roncalli, I attended the monthly school masses. I remember sometimes seeing Ms. Fitzgerald in the back during the Mass. I understood her to be playing the same role as anyone attending a Catholic Mass.

22. I do not remember Ms. Fitzgerald ever leading prayer, delivering a reading, or filling any of the other roles at Mass. Nor do I remember her ever leading prayer at any other time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 23, 2022, in Florence, Italy.

_Brigid Parker_

Brigid Parker

3

217A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| MICHELLE FITZGERALD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:19-cv-04291-RLY-TAB |
| ) | |
| RONCALLI HIGH SCHOOL, INC., and ) | |
| the ROMAN CATHOLIC ) | |
| ARCHDIOCESE OF ) | |
| INDIANAPOLIS, INC., ) | |
| ) | |
| Defendants. ) | |

**DECLARATION OF DOMINIC CONOVER**

I, Dominic Conover, declare:

1.  I am over 18 years old and legally competent to testify.

2.  I know these facts to be true based on my own personal knowledge, except for facts that I believe to be true upon information and belief. If called as a witness, I could competently testify to these facts.

3.  I was a student at Roncalli from Fall 2015 through Spring 2019.

4.  My guidance counselor for my freshman through junior years was Kathy Heath. My guidance counselor for my senior year was Angela Maly.

5.  During the first semester of my senior year, I met with Ms. Maly about once or twice a month, mainly to talk about college applications.

6.  During the second semester of my senior year, I started meeting with Kelly Meyer, the school's college counselor, for more advice about college admissions.

7.  I saw the guidance counselors as people to go to with questions about scheduling classes, staying on track to receive a diploma, and planning for college and post-graduation. To my knowledge, most other students saw the guidance counselors' role like I did.

8.  During my counseling sessions with Ms. Heath and Ms. Maly, we always talked about academics, not faith. There was no religious portion of our meetings.

9.  I wouldn't have gone to a guidance counselor about religious questions.

10.  If I had a question about religion, faith, or spirituality, I could have gone to a religion teacher. The school encouraged us to bring religious questions to our religion teachers, the chaplain, or a priest.

11.  Unlike in class, we never prayed during guidance meetings, whether with Ms. Heath, Ms. Maly, or Ms. Meyer. And I wasn't aware of any students who prayed with their guidance counselors.

12.  Ms. Heath, Ms. Maly, and Ms. Meyer never gave me any prayer cards, saint imagery, or other religious memorabilia. Nor did I hear of any students during my time at Roncalli ever getting religious memorabilia of any kind from a guidance counselor after a meeting.

13.  I didn't see the guidance counselors as religious leaders at Roncalli.

14.  I didn't go to Ms. Heath or Ms. Maly with personal issues. Instead, I went to Kelley Fisher, the school's social worker. Most of my issues were related to coming out as gay, and I never felt that going to the guidance counselors about that made sense.

15.  I am gay and was out during my junior and senior years. I never spoke with Ms. Maly or the other guidance counselors about my sexual orientation. Ms. Maly never asked about it either, although I believe she was aware that I am gay.

16.  During my time at Roncalli, to my knowledge, the Student Assistance Program was mostly associated with drug and alcohol use.

17.  The school held all-school liturgies once a month. The campus minister organized the liturgies, with the help of the religion teachers.

18.  To my knowledge, teachers and staff weren't required to attend the all-school liturgies. Some would stay in their classrooms or offices during that time. I don't remember seeing the guidance counselors at the liturgies, though some may have chosen to go.

19. A couple teachers and staff members helped distribute communion during the liturgies, but most of the people distributing communion were seniors. I don't remember Ms. Fitzgerald ever distributing communion.

20. My understanding was that teachers and staff were on the same level as students during the liturgies—they were doing the same thing as us.

21. I knew of Ms. Fitzgerald, but I didn't know her personally before she was placed on leave.

22. I didn't see Ms. Fitzgerald as a religious leader or playing a religious role at the school. I don't think the school community saw her as a religious leader either.

23. The school never held Ms. Fitzgerald out to us as a religious leader. They would direct us to the religion teachers or the priest.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 4, 2022, in Indianapolis, Indiana.


Dominic Conover

3

Pages: 238

Filed: 01/26/2023

Document: 16

Case: 22-2954

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MICHELLE FITZGERALD,                )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )        Case No. 1:19-cv-4291-RLY-TAB
                                    )
RONCALLI HIGH SCHOOL, INC.,         )
and the ROMAN CATHOLIC              )
ARCHDIOCESE OF                      )
INDIANAPOLIS, INC.,                 )
                                    )
        Defendants.                 )

## DECLARATION OF ANGELA MALY

Pursuant to 28 U.S.C. § 1746, I, Angela Maly, declare the following:

1. I am over 21 years old and fully capable and competent to make this declaration. I have not been convicted of a felony or been convicted of a crime of dishonesty. I have personal knowledge of all the contents of this declaration.

2. I joined Roncalli High School as a Guidance Counselor in August 2018, and I have worked in that capacity at Roncalli at all times since then.

3. Before joining Roncalli, I worked at Port Huron High School in Port Huron, Michigan (Fall 2012 – Spring 2017), and Rushville Consolidated High School in Rushville, Indiana (Fall 2017 – Spring 2018), as a guidance counselor. I earned my bachelor's degree in 2007 at the University of Dayton, and my master's degree in Counseling with an endorsement in School Counseling at the University of Detroit Mercy. Both institutions, like Roncalli, are Catholic institutions. And I understand that Roncalli viewed it as a positive during my interviewing and hiring process that I attended Catholic institutions. After my masters, I also went on to complete two years of AmeriCorps that I served in Metro-Detroit.

Pages: 238

Filed: 01/26/2023

Document: 16

Case: 22-2954

4. As a guidance counselor at Roncalli, I am required to, and do, assist students with their social, mental, academic, emotional, and spiritual needs.

5. Being welcoming to the sharing of struggles, and being kind and open in doing so, is part of showing the face of Christ to the Roncalli family, which I strive to do in my work.

6. Personal topics I have discussed with students in my role as guidance counselor at Roncalli, in just the last three-and-a-half years, have included anxiety, stress, depression, romantic relationship issues, thoughts of suicide, sexual orientation, gender identity, and questions and doubts about the Catholic faith and its moral teachings.

7. For example, I have been approached by a female student who was going through a breakup and wanted to discuss that with me. I talked her through how to not only get through the breakup, but more broadly how to rely on God, seek his wisdom through prayer, and trust his plan through difficult times.

8. I have also worked with students who are struggling to reconcile their sexual orientation with their faith. Guided by Catholic teaching, I have open conversations with these students, assuring them that their sexuality does not define them and that God loves them no matter what.

9. When students are struggling to come to an answer on a topic, whether academic, social, emotional, spiritual or personal, I work with them on processing their struggle and working through the issue, and often recommend that we "offer the struggle up to Christ through prayer."

10. Faith and prayer are also essential components of the academic and career counseling aspects of my job. For example, one of my students was up for a major, competitive scholarship that would have given her a full ride to one of many competitive schools in the country. Through the process, we prayed and focused on the fact that God has a plan bigger than we can imagine. Though she was not awarded this scholarship, she has told me on several occasions that the process helped her realize that God is in control, and she is currently enrolled at a university that is fulfilling her academically, socially and spiritually.

**Guidance Team Agenda**          **1.6.16**          **Period 2 & 3**

1. Prayer

2. Current student scheduling
   - Continue PR this week, encouraging scheduling questions and *submitting AP & 8 Period forms by Friday*
   - Scheduling materials for freshmen today during Ch 1
   - Scheduling materials for sophomores/juniors Fri – practice sheet, checkoff sheet, master schedule
   - Assisting with Ch 1 presentations today: 5A-Shelly, 5B-Kathy, 6A-Lynn, 6B-Autumn (video during 5B?)
   - Application form for RHS online coursework[1]
   - Updates: AP Env Science (re: Algebra 2 prereq -keep as is); Spanish 5 (Chuck will discuss with Gina)
   - PSAT results
   - Do we have any transfer students which Kory needs to put in his scheduling system for Jan 23?  (If so, when do they need to register by?)

3. Threat assessment[2]- Request for Administrative Council consideration
   - Purpose of our request
   - Threat assessment process: ArchIndy document – Any additional thoughts/edits, before we share this with Chuck?
   - Supplementary materials – Is there anything else we should offer?

4. Quicker items
   - Budget[3]
   - Reminder:  Promote ACT ZAPS (Jan 11 & 12), and overall ACT/SAT prep for the Feb 6 RHS ACT and Mar 5 SAT, since this junior class has the least ACT/SAT practice (no PLAN, old soph PSAT)
   - E-newsletter blurb re: report cards distributed (with link to Top Ten Study Skills)?
   - Updated Guidance Dept fax form?[4]


**Coming up next – Any assistance/discussion needed?**

| | |
|---|---|
| Wed Jan 6 | e-Blast registration "postcard;" registration goes live |
| Wed Jan 6 | Freshman scheduling presentation during Ch 1 periods; updated master schedule distributed |
| Fri Jan 7 | Distribute updated scheduling info to sophomores and juniors via English classes |
| Fri Jan 8 | Algebra 1 III and English recommendations due; all forms due – AP, 8 Classes, C9 |
| Sat Jan 9 | Out of Deanery interviews |
| Mon Jan 11 | Report card distribution |
| M-Tu Jan 11-12 | ACT ZAPS |
| Tues Jan 12 | Auditions for Adv. Women's Chorus, Show Choir and Theatre Production (if needed); Waiver exams for Music Theory (AP) and Adv. Computer Science; Portfolios due for Studio Art (AP) |
| Wed Jan 13 | Run transcripts for counselors; Junior credit check report (if possible) |
| Thurs Jan 14 | Notification of approval for 8 Classes, Advanced Placement coursework, choral/theatre audition results, and waiver results |
| Thurs Jan 14 | Recommending Teachers' Meeting 3:30-4:30 |
| Tues Jan 19 | Distribute freshman & transcript checkoff forms, and Soph/Jr Level I checkoff forms too? (in classroom??) |
| Wed Jan 20 | Last day for scheduling changes |
| Wed Jan 20 | Meet with those who haven't registered; practice run with Kory |
| Fri Jan 22 | Incoming freshman applications moved to Mary (or Jan 29 if we use SM Admissions module) |
| Sat Jan 23 | Online course requests – 8 am juniors, 9 am sophomores, 9:30 am freshmen |

FITZGERALD 1024

**Guidance Team Agenda          8.22.16          Periods 2 & 3**

1. Prayer

2. NMSQT presentation for high-scoring juniors – Wed Sept 7
   - Location?, identify high-scoring juniors, update cover letter[1], decide time and invite Chuck to speak, prepare passes, notify Jennifer

3. Accuplacer for Vincennes dual credit, specifically Anatomy & Physiology

4. Follow-up items
   - Sophomore presentation materials – due to Autumn on Thursday
     - Cover sheet[2], campus visits, Explorer Post
   - IU Common Application – anything more we should do?
   - ECA Communication plan – approved[3]
   - Transfer students repeating CCP due to lack of Naviance and/or lack of keyboarding (No; see curriculum clarifications – Business)
   - AP exam without taking an AP class (No; see curriculum clarifications - AP)   Recommend CLEP instead.
   - Tutoring update
     - Chuck is seeking volunteers
     - Need Google doc:  Contact info, subject area(s), location (RHS or specific public place), when available, cost; anything else?
     - Need caveat statement re: RHS can't insure quality (?) of tutoring nor safety
     - Jane to maintain Google doc and check references?
       - Tutors need to complete Safe and Sacred before they can be added to the tutor listing
   - CLEP[4] – Should we be communicating this "opportunity" to student/parents?  If so, when/how?
   - Tracking IDOE communication - draft

| | |
|---|---|
| ECA/ISTEP – James & Autumn | Special needs – Pat & Michelle |
| State reporting – James | Curriculum – Lynn (& Kathy?) |
| WIDA - James | AP – Shelly |
| Accuplacer – James & Autumn | Career readiness - ? |
| Guidance – Lynn & Shelly | Other?? |

   - AP summer work completion statement - draft
     - If you drop an AP course in the summer or within the first 10 school days, your placement into HON is not assured, given that classes are often full.  There is a very good chance that your only option will be CP.
     - (Proposal to Dept Chairs to be confirmed) AP summer work counts as your first substantial AP grade, and if you change levels, this grade (which could be a zero if the summer work was not completed) will carry over to your new class.  Especially important for AP Eng Lit and APUSH.
   - Translating documents into Spanish for parents – Chuck will bring this to President's Council

5. Quicker items
   - F grades for online summer courses – Need to insure that RHS/AVA/IOA materials clearly state that withdraw deadline and the fact that the grade will appear on their RHS transcript
   - Students without internet[5]

**(over)**

**Coming up next – Any assistance/discussion needed?**

M/T Aug 29/30      ZAPS ACT
Mon Aug 29         Sophomore classroom presentations
Thurs Sept 1       Check Voucher vs F/R lunch rosters
Fri Sept 2         Progress reports
Wed Sept 7         NMSQT presentation to high-scoring juniors
Thurs Sept 8       Paying for College, 7 pm
M/T Sept 12/13     ZAPS SAT
Wed Sept 14        ZAPS Study Smart
Thurs Sept 15      National College Fair
Mon Sept 19        College Go Week

FITZGERALD  1028

**Guidance Team Agenda**  **1.4.17**  **Period 2 & 3**

1. Prayer

2. Freshman scheduling presentation[1]
   - Materials needed – Updated master schedule, cover sheet, practice sheet(?), PowerPoint, anything else?
   - 4A announcement (and what to bring); check Auditorium request, powerpoint capability, mic
   - Who will assist with each Study period (video-record: who/when)
   - Bring application forms for RHS online coursework

3. Return ACT and PSAT with concordance – Any discussion needed?

4. Scheduling items
   - PR re: encouraging scheduling questions this week; submit AP and 8 period forms by Friday deadline – (Submit AP form if interested in the class, and think you may meet the prereq)
   - Updated materials to sophs/jrs on Fri (?) – practice sheet, checkoff sheet, updated master schedule
   - ESS (9, 11, 12) - Chuck's observation[2]
   - *Incoming* freshman counselor recommendation check-off form[3]
   - Do we have any transfer students which Kory needs to put in his scheduling system for Jan 21?

5. Quicker items
   - Recommending Teachers' Meeting[4]
   - ACT/SAT fee waivers for juniors?
   - PR re: ACT ZAPS (Jan 23-24) and Study Smart (Feb 7)
   - IACAC registration for Tues Feb 21
   - ExtraordinAIRy Treasures Scholarship (Williams Comfort Air)[5]

6. Ongoing radar items  - Check these to be sure we're OK

   **C9 obstacles/promotion - any updates**
   o   RHS field trip to C9
   o   Tuition reduction for C9 students – Chuck is asking Joe
   o   Central Nine/RHS bus?

   **Preparing for Junior Planning Appt Homeroom – Wednesday, January 18**
   o   Check IT; create 10 minute video - LB; Presenter – AC; Create planning appt questionnaire (9-11)  KH

   **Coming up next – Any assistance/discussion needed?**
   Wed Jan 4        Freshman scheduling presentation during Study periods – Lisa (Lynn)
   Wed Jan 4        Scheduling e-Blast to parents
   Thurs Jan 5      Grades due – noon
   Fri Jan 6        All forms due; English and Algebra 1 HON recommendation forms due (any others?)
   Mon Jan 9        Report card distribution
   Mon Jan 9        Run transcripts
   Tues Jan 10      Auditions, etc
   Thurs Jan 12     Audition results posted
   Thurs Jan 12     Recommending Teacher Meeting, 3:30 – 4:30 pm
   Mon Jan 16       Free!
   Tues Jan 17      Freshman/transfer scheduling check-off forms distributed
   Tues Jan 17      **Guidance Dept mtg Per 7 & 8**
   Wed Jan 18       Call down students who haven't registered; last day for 2nd sem schedule changes; practice run (Kory);
   Wed Jan 18       Homeroom assembly for Juniors re: planning appt
   Fri Jan 20       Inc frosh info (Advancement to Mary)
   Sat Jan 21       PR free ACT
   Sat Jan 21       Online course requests
   M-T Jan 23-24    ZAPS ACT

**Guidance Team Agenda**   2-23-18          **Period 5B & 6AB  (11:00 – 12:15)**

1. Prayer

2. College counselor items
   - Alabama college visits update
   - IACAC Congress next week

3. Corinna Vonderwell – Central Nine Career Center updates

4. Current student scheduling
   - Sophomore planning appt surveys (Monday Per 5AB & 6AB)
   - Cadet Teaching:  Ivy Tech course code ECED 101 ("Intro to Teaching"), IDOE course code 5408 ("Education Professions"). Teacher requirements are a Masters in Education, no certification required; Heather Morrison thinks this is "very doable to begin offering this course as dual credit."  Next steps?
   - Encourage AP Computer Science Principles
   - Next steps - Process steps

5. Preparing for Junior planning appts  (for Mon Feb 26)
   - Meet with conflicts and progress reports first (any others?)
   - ACT/SAT prep options[*]
   - PR to juniors re: register for ACT *and* SAT (March SAT deadline is Feb 9) and schedule *at least* one college visit
   - Dual credit listing needed?

6. Incoming freshman scheduling – Sat Feb 24 & Sat Mar 3
   - Senior volunteers at the Main entrance and in Guidance
   - Any discussion needed?

7. Quicker items
   - Website – Do we need to check any areas of the website
   - Donna Smith – Lunch invitation?


8. **Coming up next – Any assistance/discussion needed?**

| | |
|---|---|
| Mon Feb 26 | Junior planning appts begin (2/26-2/28, 3/1-3/2, 3/5-3/7) |
| Mon Feb 26 | Sophomore planning appt surveys |
| Thurs Mar 8 | Sophomore planning appts begin (3/8-3/9, 3/12-3/16, 3/19-3/20) |
| Mon Mar 12 | Freshman planning appt surveys |
| Wed Mar 21 | Freshman planning appts begin (3/21-3/23, 3/26-3/30) |

227A

FITZGERALD  1025

Roncalli Human Resources Office for further information.

## 6.3 FINANCIAL ASSISTANCE & SCHOLARSHIPS

In an attempt to make available a Roncalli High School education to as many students and families as possible, the school offers a significant amount of need-based financial assistance. A family must submit a complete financial aid application to be eligible to receive any need-based financial assistance. Contact the Business Office for a financial assistance packet.

The school does have a limited number of scholarships available to incoming and current students as well as graduating seniors. These scholarships have a wide variance of criteria such as academics, extracurricular participation, leadership, mental attitude, etc. Please contact the Assistant Principal for Student Activities for a complete listing of scholarships and specific criteria.

# 7.0 Spiritual Formation Program

Since "true education is aimed at the formation of the human person in the pursuit of his ultimate end" a spiritual formation program is at the heart of Catholic education. Hence, the most important program at Roncalli is our spiritual formation program. It is comprised of two components: religious instruction and religious activity. All students receive instruction in the essential teachings of the Catholic faith from certified catechists. Students also have the opportunity to participate in activities designed to help them personally claim their Catholic faith. These activities are supported by the participation of the entire Roncalli staff. Religious activities include: Liturgies, Retreat Experiences, Adoration, Community Service, Service Learning, Days of Reflection and Penance Services. These activities are under the supervision of the Roncalli Campus Ministry Office.

Through this holistic program of religious instruction and religious activity, Roncalli seeks to form the Young Church for intelligent leadership and generous service.

228A

Case 1:19-cv-04291-RLY-TAB   Document 125-19   Filed 01/24/22   Page 2 of 3 PageID #: 2080
Case 1:22-cv-02954   Document 6   Filed 01/26/2023   Pages: 238





# Services Offered

## Academic Counseling

- Individual meetings to discuss scheduling, career plans, goals, service, leadership involvement, and appropriate course work
- Assistance for study skills/test taking improvement

## Post-Secondary Planning Opportunities

- Individualized high school and post-secondary planning
- Advanced Placement and dual credit coursework (toward college credits)
- College financial planning presentations (e.g. FAFSA, Paying for College, scholarships)
- College planning for Twenty-First Century Scholars
- College planning for students with special academic needs (STARS)
- College representative visits and presentations from 100+ colleges and universities
- Camp College (juniors) - summer
- Presentations from military representatives, including military academies and ROTC

## Personal Counseling

**Catholic Charities social worker**

- Personal counseling consultations
- Support groups
- Student Assistance Program
- Professional referrals

## Career Counseling

- Career exploration inventories
- Career exploration resources
- Career fair
- Career counseling referrals
- Armed Services Vocational Aptitude Battery (ASVAB career assessment)

## Naviance/College and Career Connections

**An online family resource for researching and preparing for college and careers, including:**

- Free ACT/SAT practice test and preparation
- Scholarship information
- Personality and career assessments
- Career exploration
- College research and exploration
- Resume building
- Document Library

## Standardized Testing

**Incoming Freshmen:**

- High School Placement Test

**Freshmen:**

- EXPLORE assessment [pre-ACT]

**Sophomores:**

**Today's Events**

General (2)

- AP English Language - AM
  Time: All Day
- Lunch Gyros/ Papa John's Pizza
  Time: All Day

View General Calendar

Athletics (8)

Service (6)

Co-curriculars (3)

Fine Arts (0)

### Guidance Navigation

- Guidance Home
- Guidance Staff
- Services Offered
- Helpful Websites
- Graduation Guide
- Guidance Videos
- Course Catalog
- Transcripts
- Student Assistance Program

229A

- PSAT/Preliminary Scholastic Assessment Test [pre-SAT]

**Juniors:**

- PSAT/National Merit Scholarship Qualifying Test (NMSQT) [pre-SAT]
- End of Course Assessments/Graduation Qualifying Exam (ECA/GQE) – Algebra 1 and English 10

**ACT/SAT Preparation Opportunities**

- ACT /SAT preparation classes (ZAPS) – **www.zaps.com**
- College and Career Connections: ACT/SAT "Method Test Prep" (free)
- Princeton Review Practice ACT/SAT (free)
- Testing results interpreted during computer lab presentations

**Additional Opportunities**

- Advanced Placement Exams
- Independent Study/Online Coursework
- Learning & Study Skills Inventory (LASSI)

## Scholarship Delivery System

- Bi-monthly senior newsletter ("Scholarship Opportunities for Seniors") available to seniors and their parents via email
- College and Career Connections: interactive scholarship system
- *Scholarship of the day* school-wide announcements
- Selected scholarship hardcopy updates available in the guidance area carousel

## College Planning Mini-Workshops

(Small group presentations available to students during Channel One)

- College representative visits
- Preparing for the College Visit
- The College Fair—Expectations and Hints for Success
- Using  the Common Application
- The College Essay
- Scholarships: The Search and Hints for Success
- Opportunities for Twenty-First Century Scholars
- First Generation College-bound Students and College Planning
- Student Athletes: NCAA, NAIA and a Student's Responsibilities

## The Role of our College Counselor

The role of the college counselor is primarily focused upon designing and implementing a freshman through senior college planning program which serves Roncalli High School students and their parents in large-scale, overarching ways, including:

- Student and parent presentations
- A scholarship delivery system
- ACT/SAT test preparation
- Building and fostering relations with college admission offices in the Midwest and beyond

Secondly, the college counselor may serve as a resource to students and their parents, upon referral by their school counselor, if needed, to address specific questions or concerns which would warrant an individual appointment with the college counselor.



The Update Magazine is a vehicle to showcase  the talents, gifts and achievements of our students and alumni.

View Updates




Sign up to receive our weekly e-newsletter.

Email:

Go





Roncalli has been three times recognized as a Blue Ribbon School of Excellence by the U.S. Department of Education

**Contact Information**

Roncalli High School
3300 Prague Road
Indianapolis, IN 46227
p: (317) 787-8277
e: info@roncalli.org
**Contact List**

230A



# ASCA Ethical Standards
# for School Counselors

(Adopted 1984; revised 1992, 1998, 2004 and 2010, 2016)

## Preamble

The American School Counselor Association (ASCA) is a professional organization supporting school counselors, school counseling students/interns, school counseling program directors/supervisors and school counselor educators. School counselors have unique qualifications and skills to address preK–12 students' academic, career and social/emotional development needs. These standards are the ethical responsibility of all school counseling professionals.

School counselors are advocates, leaders, collaborators and consultants who create systemic change by providing equitable educational access and success by connecting their school counseling programs to the district's mission and improvement plans. School counselors demonstrate their belief that all students have the ability to learn by advocating for an education system that provides optimal learning environments for all students.

All students have the right to:

- Be respected, be treated with dignity and have access to a comprehensive school counseling program that advocates for and affirms all students from diverse populations including but not limited to: ethnic/racial identity, nationality, age, social class, economic status, abilities/disabilities, language, immigration status, sexual orientation, gender, gender identity/expression, family type, religious/spiritual identity, emancipated minors, wards of the state, homeless youth and incarcerated youth. School counselors as social-justice advocates support students from all backgrounds and circumstances and consult when their competence level requires additional support.

- Receive the information and support needed to move toward self-determination, self-development and affirmation within one's group identities. Special care is given to improve overall educational outcomes for students who have been historically underserved in educational services.

- Receive critical, timely information on college, career and postsecondary options and understand the full magnitude and meaning of how college and career readiness can have an impact on their educational choices and future opportunities.

- Privacy that should be honored to the greatest extent possible, while balancing other competing interests (e.g., best interests of students, safety of others, parental rights) and adhering to laws, policies and ethical standards pertaining to confidentiality and disclosure in the school setting.

- A safe school environment promoting autonomy and justice and free from abuse, bullying, harassment and other forms of violence.

## PURPOSE

In this document, ASCA specifies the obligation to the principles of ethical behavior necessary to maintain the high standards of integrity, leadership and professionalism. The ASCA Ethical Standards for School Counselors were developed in consultation with state school counseling associations, school counselor educators, school counseling state and district leaders and school counselors across the nation to clarify the norms, values and beliefs of the profession.

The purpose of this document is to:

- Serve as a guide for the ethical practices of all school counselors, supervisors/directors of school counseling programs and school counselor educators regardless of level, area, population served or membership in this professional association.

- Provide support and direction for self-assessment, peer consultation and evaluations regarding school counselors' responsibilities to students, parents/guardians, colleagues and professional associates, schools district employees, communities and the school counseling profession.

- Inform all stakeholders, including students, parents/guardians, teachers, administrators, community members and courts of justice of best ethical practices, values and expected behaviors of the school counseling professional.

## A. RESPONSIBILITY TO STUDENTS

### A.1. Supporting Student Development

School counselors:

a. Have a primary obligation to the students, who are to be treated with dignity and respect as unique individuals.

b. Aim to provide counseling to students in a brief context and support students and families/guardians in obtaining outside services if the student needs long-term clinical counseling.

c. Do not diagnose but remain acutely aware of how a student's diagnosis can potentially affect the student's academic success.

d. Acknowledge the vital role of parents/guardians and families.

e. Are concerned with students' academic, career and social/emotional needs and encourage each student's maximum development.

f. Respect students' and families' values, beliefs, sexual orientation, gender identification/expression and cultural background and exercise great care to avoid imposing personal beliefs or values rooted in one's religion, culture or ethnicity.

g. Are knowledgeable of laws, regulations and policies affecting students and families and strive to protect and inform students and families regarding their rights.

h. Provide effective, responsive interventions to address student needs.

i. Consider the involvement of support networks, wraparound services and educational teams needed to best serve students.

j. Maintain appropriate boundaries and are aware that any sexual or romantic relationship with students whether legal or illegal in the state of practice is considered a grievous breach of ethics and is prohibited regardless of a student's age. This prohibition applies to both in-person and electronic interactions and relationships.

## A.2. Confidentiality

School counselors:

a. Promote awareness of school counselors' ethical standards and legal mandates regarding confidentiality and the appropriate rationale and procedures for disclosure of student data and information to school staff.

b. Inform students of the purposes, goals, techniques and rules of procedure under which they may receive counseling. Disclosure includes informed consent and clarification of the limits of confidentiality. Informed consent requires competence, voluntariness and knowledge on the part of students to understand the limits of confidentiality and, therefore, can be difficult to obtain from students of certain developmental levels, English-language learners and special-needs populations. If the student is able to give assent/consent before school counselors share confidential information, school counselors attempt to gain the student's assent/consent.

c. Are aware that even though attempts are made to obtain informed consent, it is not always possible. When needed, school counselors make counseling decisions on students' behalf that promote students' welfare.

d. Explain the limits of confidentiality in developmentally appropriate terms through multiple methods such as student handbooks, school counselor department websites, school counseling brochures, classroom lessons and/or verbal notification to individual students.

e. Keep information confidential unless legal requirements demand that confidential information be revealed or a breach is required to prevent serious and foreseeable harm to the student. Serious and foreseeable harm is different for each minor in schools and is determined by students' developmental and chronological age, the setting, parental rights and the nature of the harm. School counselors consult with appropriate professionals when in doubt as to the validity of an exception.

f. Recognize their primary ethical obligation for confidentiality is to the students but balance that obligation with an understanding of parents'/guardians' legal and inherent rights to be the guiding voice in their children's lives. School counselors understand the need to balance students' ethical rights to make choices, their capacity to give consent or assent, and parental or familial legal rights and responsibilities to make decisions on their child's behalf.

g. Promote the autonomy of students to the extent possible and use the most appropriate and least intrusive method to breach confidentiality, if such action is warranted. The child's developmental age and the circumstances requiring the breach are considered, and as appropriate, students are engaged in a discussion about the method and timing of the breach. Consultation with peers and/or supervision is recommended.

h. In absence of state legislation expressly forbidding disclosure, consider the ethical responsibility to provide information to an identified third party who, by his/her relationship with the student, is at a high risk of contracting a disease that is commonly known to be communicable and fatal. Disclosure requires satisfaction of all of the following conditions:

1) Student identifies partner, or the partner is highly identifiable

2) School counselor recommends the student notify partner and refrain from further high-risk behavior

3) Student refuses

4) School counselor informs the student of the intent to notify the partner

5) School counselor seeks legal consultation from the school district's legal representative in writing as to the legalities of informing the partner

i. Request of the court that disclosure not be required when the school counselor's testimony or case notes are subpoenaed if the release of confidential information may potentially harm a student or the counseling relationship.

j. Protect the confidentiality of students' records and release personal data in accordance with prescribed federal and state laws and school board policies.

k. Recognize the vulnerability of confidentiality in electronic communications and only transmit student information electronically in a way that follows currently accepted security standards and meets federal, state and local laws and board policy.

l. Convey a student's highly sensitive information (e.g., a student's suicidal ideation) through personal contact such as a phone call or visit and not less-secure means such as a notation in the educational record or an e-mail. Adhere to state, federal and school board policy when conveying sensitive information.

m. Advocate for appropriate safeguards and protocols so highly sensitive student information is not disclosed accidentally to individuals who do not have a need to know such information. Best practice suggests a very limited number of educators would have access to highly sensitive information on a need-to-know basis.

n. Advocate with appropriate school officials for acceptable encryption standards to be utilized for stored data and currently acceptable algorithms to be utilized for data in transit.

o. Avoid using software programs without the technological capabilities to protect student information based upon currently acceptable security standards and the law.

## CERTIFICATE OF SERVICE

I certify that on January 26, 2023, this appendix was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

*/s/ Bradley Girard*