No. 22-2954

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

MICHELLE FITZGERALD,

*Plaintiff-Appellant*,

v.

RONCALLI HIGH SCHOOL, INC., AND ROMAN
CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, INC.,

*Defendant-Appellee.*

On Appeal from a Final Judgment of the
United States District Court for the Southern District of Indiana
Case No. 1:19-cv-04291-RLY-TAB Hon. Richard L. Young

## BRIEF OF NATIONAL EMPLOYMENT LAWYERS ASSOCIATION AND THE NATIONAL EMPLOYMENT LAW PROJECT AS *AMICI CURIAE* SUPPORTING APPELLANT AND REMAND

Michael Foreman
*Counsel of Record*
Penn State Law Civil Rights Appellate Clinic
329 Innovation Boulevard, Suite 118
University Park, PA 16802
(814) 865-3832

*Counsel for Amici Curiae*

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: No-22-2954

Short Caption: Fitzgerald v. Roncalli High School

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   National Employment Lawyers Association and The National Employment Law Project

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Michael L. Foreman, Director Penn State Law, Civil Rights Appellate Clinic

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

      n.a.

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      n.a.

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   n.a.

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   n.a.

Attorney's Signature: s/MIchael L. Foreman   Date: 1/31/2023

Attorney's Printed Name: Michael L. Foreman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [ ]

Address: Penn State University, Civil Rights Appellate Clinic, 329 Innovation Park, Suite 118, University Park, PA

   16802

Phone Number: 814-865-3832   Fax Number: 814-865-3831

E-Mail Address: mlf25@psu.edu

rev. 12/19 AK

TABLE OF CONTENTS

APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS ................................. i

TABLE OF AUTHORITIES ............................................................................................... iii

INTEREST OF THE *AMICI CURIAE* ............................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................................... 2

ARGUMENT .................................................................................................................. 4

I.    The district court misapplied *Starkey* and disregarded Supreme Court and Seventh Circuit precedent by articulating a standard that places undue weight on one factor, thereby creating a "rigid formula," rather than taking "all relevant circumstances into account." ............................. 4

    A.    The ministerial exception's purpose is not served where an employee does not perform acts that further the religious faith or mission of the religious institution.................................... 6

    B.    If *Starkey* is interpreted to create a one-factor test—what an employee is hypothetically entrusted to do—then *Starkey* sharply contradicts Supreme Court precedent and this Court's previous decision in *Grussgott*..................................................................................... 9

II.    *Fitzgerald's* unjustified expansion of the ministerial exception would potentially strip millions of religious organization employees of their federally protected rights to be free from invidious workplace discrimination. .......................................................................... 11

    A.    Religious organizations employ millions of workers in various sectors of the economy. 13

    B.    If courts focused solely on *Starkey's* "entrusted to do" language, religious organizations could discriminate against most, if not all, of their employees, including secretaries, maintenance workers, librarians, food service workers, and more ............................. 15

CERTIFICATE OF COMPLIANCE .................................................................................. 19

CERTIFICATE OF SERVICE ........................................................................................ 20

TABLE OF AUTHORITIES

<u>Cases</u>

*Cannata v. Cath. Diocese of Austin*, 700 F.3d 169 (5th Cir. 2012) ............................................. 12

*Connecticut v. Teal*, 457 U.S. 440 (1982) ...................................................................................... 4

*Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968 (7th Cir. 2021)……....5, 6, 7

*DeWeese-Boyd v. Gordon Coll.,* 163 N.E.3d 1000 (Mass. 2021) ................................................. 14

*Fitzgerald v. Roncalli High Sch., Inc.*, No. 1:19-cv-04291-RLY-TAB, 2022 WL 16707372 (S.D.

 Ind. Sept. 30, 2022) ................................................................................................... 3, 8, 10, 11

*Grussgott v. Milwaukee Jewish Day Sch., Inc*., 882 F.3d 655, (7th Cir. 2018) ................... 3, 4, 12

*Heart of Atlanta Motel, Inc. v. U. S.,* 379 U.S. 241 (1964) ......................................................... 12

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 565 U.S. 171 (2012). passim

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952) 2, 6

*Nation Ford Baptist Church Incorporated v. Davis*, 382 N.C. 115 (2022) ................................. 18

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020) .......................... passim

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) ..................... 13

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S.

 440 (1969) .............................................................................................................................. 18

*Runyon v. McCray,* 427 U.S. 160 (1976) ...................................................................................... 2

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022)………..3

………………………………………………………………………………….8, 11, 13

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 553 F. Supp. 3d 616 (S.D. Ind.

 2021), *aff'd*, 41 F.4th 931 (7th Cir. 2022). ............................................................................... 3

*Sterlinski v. Cath. Bishop of Chicago,* 934 F.3d 568 (7th Cir. 2019) .......................................... 14

*Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985) .......................... 14

*Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021 (10th Cir. 2022) ............................... 19

*Watson v. Jones*, 80 U.S. 679  (1871) ................................................................. 6

*Zerante v. DeLuca*, 555 F.3d 582 (7th Cir. 2009) ............................................... 7

Statutes

42 U.S.C. § 2000(e)-10 ............................................................................. 19

The Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 ...................... 13

The Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101................................ 13

The Civil Rights Act of 1991, 42 U.S.C. § 1981 .......................................................... 13

The Equal Pay Act of 1963, 29 U.S.C. § 206(d) ......................................................... 13

The Genetic Information Nondiscrimination Act (GINA) of 2008, 42 U.S.C. § 200ff................ 13

The Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e.................................... 13

The Rehabilitation Act of 1973, 29 U.S.C. § 791 ....................................................... 13

Other Authorities

Brian J. Grim & Melissa E. Grim, *The Socioeconomic Contribution of Religion to American Society: An Empirical Analysis*, 12 INTERDISC. J. OF RSCH. AND RELIGION  3 (2016).............. 14

*Digest of Education Statistics: Table 205.60*, NAT'L CTR. EDUC. STATS. (June 2013), http://bit.ly/3DpGFC2 ........................................................................ 16

*May 2021 National Industry-Specific Occupational Employment and Wage Estimates*, U.S. BUREAU OF LAB. STATS. (Mar. 31,  2022), http://bit.ly/3HjbKs0 ................................ 15

*Opening for a Custodian*, BETHLEHEM BAPTIST CHURCH, https://bit.ly/3XKTvCZ (last visited Jan. 16, 2023)........................................................................ 17

Sabine Tsuruda, Disentangling Religion and Public Reason: An Alternative to the Ministerial Exception, 106 CORNELL L. REV. 1255 (2021) ........................................ 13

Tess Solomon, MPH, et al., *Bigger and Bigger: The Growth of Catholic Health Systems*, Cmty. Catalyst (2020), https://bit.ly/3RbBMSJ ............................................................ 15

Transcript of Oral Argument at 19-21, *Hosanna-Tabor*, 565 U.S. 171 (2012) (No. 10-553) ...... 19

*U.S. Catholic Health Care,* Cath. Health Ass'n of the U.S., https://bit.ly/3RcJ7RO (last visited Jan. 20, 2023) ............................................................................................. 15

## Treatises

Am. Hosp. Ass'n, *AHA Hospital Statistics* 10 (2022 ed.) ........................................... 15

\* \* \*

INTEREST OF THE *AMICI CURIAE*[1]

Founded in 1985, the National Employment Lawyers Association (NELA) is the largest bar association in the country focused on empowering workers' rights attorneys. NELA and its 69 circuit, state, and local affiliates have a membership of over 4,000 attorneys who are committed to protecting the rights of workers in employment, wage and hour, labor, and civil rights disputes. NELA and its members, who litigate these issues on behalf of employees, advocate for protecting religious freedom while ensuring continuity in the application of antidiscrimination laws. NELA has a particular interest in the current attempt to broaden the ministerial exception, as the proposed exception would strip countless workers of the workplace protections guaranteed by our Nation's laws.

The National Employment Law Project ("NELP") is a non-profit legal organization with over 50 years of experience advocating for the employment and labor rights of low-wage and unemployed workers. NELP seeks to ensure that all employees, especially the most vulnerable ones, receive the full protection of labor and employment laws, including protections against discrimination. NELP has a particular focus on a text-based and broad interpretation and application of labor and employment laws, so that exemptions are read narrowly and most employers and workers are covered, as intended. NELP has litigated and participated as amicus curiae in numerous cases in federal and state circuit courts and the U.S. Supreme Court, addressing the importance of equal access to labor and employment protections for all workers. Given *Amici's* efforts to protect employees who suffer religious discrimination, *Amici* understand the importance of religious freedom but similarly recognize the critical importance of providing

---

[1] All parties have consented to the filing of this brief by blanket consent or letter. No counsel for a party has authored this brief in whole or in part, and no person other than *Amici curiae*, its members, and its counsel have made monetary contributions to the preparation or submission of this brief.

workplaces free from invidious discrimination. Because of these unique perspectives, *Amici* believe their insights will assist the Court in addressing this vital issue.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The "power to decide . . . free from state interference, matters of church government as well as those of faith and doctrine" is undoubtedly a principal tenet of religious autonomy in the United States. *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). The ministerial exception plays an important role in protecting this autonomy. The ministerial exception's purpose, however, is not to immunize religious institutions from liability against any and all claims that may arise in the workplace—particularly promises that Title VII will provide employees a workplace free of invidious discrimination. *Runyon v. McCray,* 427 U.S. 160, 190-91 (1976) (Stevens, J., concurring) ("The policy of the Nation as formulated by the Congress in recent years has moved constantly in the direction of eliminating [discrimination] in all sectors of society.").[2] Instead of stripping countless employees of their federal anti-discrimination protections, this Court should retain the balance between preserving First Amendment protections for religious organizations and safeguarding Congress's goal of preventing invidious workplace discrimination.

The Court in *Hosanna-Tabor* established four relevant considerations for determining whether a religious organization employee should be considered a "minister" for purposes of the exception: (1) "the formal title given [] by the Church," (2) "the substance reflected in that title," (3) "[the employee's] use of that title, and" (4) "the important religious functions [the employee] performed for the Church." *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*,

---

[2] Although *Runyon* involved racial segregation, the policy holds true for all forms of unlawful discrimination.

565 U.S. 171, 192 (2012).[3] Applying the *Hosanna-Tabor* factors, the Seventh Circuit adopted a

totality-of-the-circumstances test which included "tak[ing] all relevant circumstances into

account" when determining whether an employee is a minister. *See Grussgott v. Milwaukee*

*Jewish Day Sch., Inc.*, 882 F.3d 655, 661 (7th Cir. 2018); *Our Lady of Guadalupe Sch. v.*

*Morrissey-Berru*, 140 S. Ct. 2049, 2067 (2020).

 This is the appropriate test for continuing to strike the delicate balance between religious

and employment protections. The district court here, misapplying *Starkey*, failed to retain this

balance and assigned undue weight to one factor—what an employee is "entrusted to do."

*Fitzgerald v. Roncalli High Sch., Inc.*, No. 1:19-cv-04291-RLY-TAB, 2022 WL 16707372, at *5

(S.D. Ind. Sept. 30, 2022) (quoting *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41

F.4th 931, 945 (7th Cir. 2022)). Yet, as the Supreme Court has repeatedly emphasized, the

analysis is not a "rigid formula" nor does it "assign any one circumstance particular weight."

*Morrissey-Berru*, 140 S. Ct. at 2067; *Starkey v. Roman Catholic Archdiocese of Indianapolis,*

*Inc.*, 553 F. Supp. 3d 616, 623 (S.D. Ind. 2021), *aff'd*, 41 F.4th 931 (7th Cir. 2022). Permitting

the court to avoid the totality-of-the-circumstances test creates a dangerous precedent, allowing

employers to thwart all anti-discrimination laws, not just Title VII's ban on sex-based

discrimination, thereby improperly expanding the ministerial exception well beyond its purpose.

 Religious organizations encompass a large portion of the U.S. economy, employing over

1.7 million people. An unconstrained ministerial exception would force employees who are not

actually ministers—nurses, janitors, librarians, coaches, camp counselors, food service workers,

---

[3] *Amici* recognize that "every religion in the world is represented in the population of the United States,
[and] it would be a mistake if the term 'minister' . . . w[as] viewed as central to the important issue of
religious autonomy . . . ." *Hosanna-Tabor*, 565 U.S. at 198. However, for clarity "minister" is used
throughout this brief as term of art for "religious leaders."

school resource officers, alumni and media relations coordinators, guidance counselors, administrative assistants, admissions directors, and music department staff members—to fall within the ambit of the exception and strip them of protection against workplace discrimination.

A system where any employee of a religious organization may be considered a minister goes well beyond the First Amendment's protection of religious freedom and gives employers "license to discriminate." *Connecticut v. Teal*, 457 U.S. 440, 455 (1982). The First Amendment's safeguards for religious institutions would be distorted if the ministerial exception were expanded, and the workplace rights for many religious organizations' employees—eliminated.

*Amici* urge this Court to follow precedent and remand the case to consider "all relevant circumstances" when analyzing a case in which the ministerial exception may apply. *See Morrissey-Berru*, 140 S. Ct. at 2067 (2020); *Grussgott*, 882 F.3d at 661.

## ARGUMENT

I.      The district court misapplied *Starkey* and disregarded Supreme Court and Seventh Circuit precedent by articulating a standard that places undue weight on one factor, thereby creating a "rigid formula," rather than taking "all relevant circumstances into account."

Counsel for Fitzgerald discusses in detail why the grant of summary judgement to Roncalli ignored established summary judgment standards since, as the district court noted, there are contested issues of material fact. Appellant Br. at 33. Beyond that error, *Amici's* concern is that if this Court upholds the district court's incorrect reading of *Starkey*—that provisions in employee handbooks and contracts trump all the other factors that the Supreme Court has said are required—it would be a misapplication of Supreme Court precedent. This Court must correct that misinterpretation.

The First Amendment's Establishment and Free Exercise Clauses protect the right of religious groups to shape their own faith and mission. *Hosanna-Tabor*, 565 U.S. at 188. The First

Amendment protects this right in the employment context by requiring courts to avoid intruding upon a religious organization's employment decisions affecting ministerial employees.[4] The Supreme Court has carved out a narrow exception to federal employment discrimination laws, allowing religious organizations some discretion in employment decisions to protect the organization's religious character. This exception is meant to be narrow because "ministerial employment is fundamentally distinct" from secular employment. *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 978 (7th Cir. 2021).[5] It was created for a specific purpose and must be tailored to that purpose. *See Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring) (stating the ministerial exception should be tailored to the purpose of allowing religious groups to choose employees who are essential to the performance of key religious functions).

The ministerial exception "recognize[s] . . . a religious entity's ability to choose its faith leaders . . . free from government interference" but not at the expense of essential workplace protections for employees acting in non-religious capacities. *Morrissey-Berru*, 140 S. Ct. at 2073 (Sotomayor, J. dissenting). Although the First Amendment may require courts to defer to a religious organization's decision to terminate an employee who "lies at the heart of [its] work and workplace," and "imbue[s] [that organization] with spirituality," it does not authorize courts to allow employers to discriminate against employees who do not significantly promote the institution's message. *Demkovich*, 3 F.4th at 981, 979. Therefore, an analysis that "takes all relevant circumstances into account," as outlined by the Court in *Morrissey-Berru*, allows lower courts to differentiate between those employees who are "chief instrument[s]" in fulfilling the

---

[4] *Morrisey-Berru*, 140 S. Ct. at 2060 (stating religious institutions enjoy "autonomy with respect to internal management decisions that are essential to the institution's central mission").

[5] *See also* discussion infra I.A (discussing how the exception is reserved for those employees who perform vital religious duties and serve an important role in transmitting the faith and furthering the mission of the church).

church's mission, and those that are secular. *Morrissey-Berru*, 140 S. Ct. at 2067; *Demkovich,* 3 F.4th at 978.

    A.    The ministerial exception's purpose is not served where an employee does not perform acts that further the religious faith or mission of the religious institution.

    The judiciary avoids involvement in matters affecting church governance. Otherwise, courts would be prompted to inquire into "the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination." *Watson v. Jones*, 80 U.S. 679, 733 (1871). Such a thorough examination of religious doctrine would deprive religious institutions of the right to interpret their own rules. The ministerial exception is intended to "ensure[] that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,' is the church's alone." *Hosanna-Tabor*, 565 U.S. at 194-195 (quoting *Kedroff,* 344 U.S. at 119).

    Conversely, where an employee does not actively minister, inquiry into religious doctrine, usage, and customs is not required by the courts since non-ministerial employees are not part of church governance. Review of a religious group's potentially unlawful employment decisions affecting non-ministerial employees is not only appropriate, but necessary. The ministerial exception is reserved for those employees in the religious institution who serve an important role in transmitting the faith and furthering the mission of the institution. *Hosanna-Tabor*, 565 U.S. at 192; *Morrissey-Berru*, 140 S. Ct. at 2060 ("[C]ourts are bound to stay out of employment disputes involving those holding certain *important* positions with churches and other religious institutions.") (emphasis added). The exception covers employees "who will personify [the church's] beliefs" and "perform[] *vital* religious duties." *Hosanna-Tabor*, 565 U.S. at 188; *Demkovich*, 3 F.4th at 976 (quoting *Morrissey-Berru*, 140 S. Ct. at 2066) (emphasis added).

The district court's application of *Starkey* improperly expands the ministerial exception to apply to employees with minimal nonsecular tasks by relying too heavily on what an employee may hypothetically be entrusted to do through job descriptions, handbooks, or other employment documents. *Starkey,* 41 F.4th at 931. Because *Starkey* and *Fitzgerald* are so factually distinct, this Court should reverse the district court's grant of summary judgment in favor of Roncalli. The district court's overreliance on *Starkey*, despite these factual distinctions, renders this reliance misplaced.[6]

On a superficial level, *Starkey* and *Fitzgerald* appear to be similar because both plaintiffs were guidance counselors and signed similar ministry contracts. However, after examining what each actually did—which the Supreme Court has noted is the correct analysis—it is clear they are markedly different. *See Morrissey-Berru*, 140 S. Ct. at 2064 ("[w]hat matters, at bottom, is what an employee does."). As a guidance counselor, Starkey delivered a morning prayer over the school's public address system on multiple occasions. *Starkey*, 41 F.4th at 936. As Roncalli's Co-Director of Guidance, Starkey "discussed religious topics with staff and administration." *Id.* Further, she "instructed staff how to prepare students of different faiths for the Catholic liturgy." *Id.* She attended monthly school masses during which she received Communion and sang with the congregation. *Id.* Overall, Starkey played a central role in shaping Roncalli's mission, having "participated in discussions. . . about how Roncalli should present itself as a Catholic option for faith formation and religious education." *Id.* at 937. In sum, Starkey was deemed a minister because more than half of her job responsibilities were exclusively religious in nature.

---

[6] This case comes to the Court on an appeal of summary judgement. As such, all reasonable inferences are to be made in the Appellant's, here Michelle Fitzgerald's, favor. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (reiterating summary judgment requires the court to review the record in the "light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor").

On the other hand, Fitzgerald's job responsibilities were drastically distinct from Starkey's and included almost no exclusively religious tasks. While Fitzgerald may have been "entrusted" on paper to carry out Roncalli's religious mission, "she never prayed or discussed religious doctrine as part of work, and [] students did not come to her with religious or spiritual issues at all." *Fitzgerald*, 2022 WL 16707372, at \*1 (S.D. Ind. Sept. 30, 2022); *see also* Appellant Br. at 6-8 (stating Fitzgerald never discussed anything relating to religion, including religious curriculum). Like all faculty, Fitzgerald attended "Days of Reflection." *Fitzgerald*, 2022 WL 16707372 at \*3. However, due to her non-ministerial role, she was exempted from ministerial sessions, which "involved activities like commissioning participants to 'faithfully and joyfully serve as ministers of the faith.'" *Id.* (quoting App. at 36). Unlike Starkey, who continuously performed religious tasks throughout her tenure at Roncalli, Fitzgerald performed only three minor religious functions during her fifteen years of employment: (1) proposed that students be permitted to gather to talk or pray after the Parkland school tragedy rather than them staging a walkout,[7] (2) discussed and read—but did nothing to implement—one religious book, as a member of the Administrative Council,[8] and (3) attended one Senior Retreat, where she briefly discussed the "ups and downs of her own life." Appellant Br. at 14.

Relying on *Starkey*, the district court misapplied Supreme Court precedent in a way that undermines the ministerial exception's purpose. While Starkey may have been entrusted to perform religious functions and actually performed them, Fitzgerald did not. Given the facts of this case, a reasonable jury could find that Fitzgerald did not *personify* the church's beliefs or perform any *vital* religious duties. *Hosanna-Tabor*, 565 U.S. at 188.

---

[7] *See* Appellant Br. at 10.
[8] *See* Appellant Br. at 29.

B.    If *Starkey* is interpreted to create a one-factor test—what an employee is hypothetically entrusted to do—then *Starkey* sharply contradicts Supreme Court precedent and this Court's previous decision in *Grussgott.*

The Supreme Court explicitly instructed courts to "take all relevant circumstances into account" in determining whether an employee is a "minister" for purposes of applying the exception. *Morrissey-Berru*, 140 S. Ct. at 2067. The Court has emphasized that the factors set out in *Hosanna-Tabor* are not meant to constitute a "rigid formula," *and no one factor is meant to be dispositive. Id.* at 2063 (emphasis added); *Hosanna-Tabor*, 565 U.S. at 193 (stating "such a title, by itself, does not automatically ensure coverage"). In *Morrissey-Berru*, the Court stressed that not only were the teachers expected to help the schools carry out their missions, but that they actually "performed vital religious duties." *Morrissey-Berru,* 140 S. Ct. at 2066. As noted above, the Supreme Court emphasized that "[w]hat matters, at bottom, is what an employee does." *Id.* at 2064.

Because of this directive and the Court's edict to "take all relevant circumstances into account," *id.* at 2067, the actual function of the employee's role is as relevant as what an employment contract says the employee hypothetically does. The district court acknowledged that Fitzgerald raised "numerous genuine factual disputes over what exactly she did at the school." *Fitzgerald*, 2022 WL 16707372, at *5. "[A]s far as Fitzgerald attempts to create genuine disputes as to these issues, she is correct that a reasonable jury could make each of those findings on this record." *Id*. However, the district court stated that these factual disputes were immaterial under *Starkey*, thereby sidestepping the requirement to examine "all relevant circumstances." *Id.*

If *Starkey* is read to rely on only one factor in determining whether an employee is a minister, as the district court applied it below, the *Starkey* Court conflicted with Supreme Court precedent and also created an intra-Seventh Circuit split, deviating from the Court's decision in

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655 (7th Cir. 2018). In *Grussgott*, the

Seventh Circuit read *Hosanna-Tabor* to "impose, in essence, a totality-of-the circumstances

test." *Id.* at 661. *Grussgott* acknowledged that *Hosanna-Tabor*'s four-factor analysis provided a

"useful framework" despite not being dispositive in every case. *Id.* at 658-59. Thus, the

*Grussgott* Court considered the employee's job title, how she held herself out to the public, the

"substance reflected in [her] job title," and the important functions she performed. *Id.* at 659-60.

The Court concluded that "all facts must be taken into account and weighed on a case-by-case

basis." *Id.*

Here, the district court relied on *Starkey* language that "[w]hat an employee does involves

what an employee is entrusted to do, not simply what acts an employee chooses to perform."

*Fitzgerald,* 2022 WL 16707372, at *5 (quoting *Starkey,* 41 F.4th at 941). The *Starkey* Court

explained that "[u]nder Starkey's theory, an individual placed in a ministerial role could

immunize themselves from the ministerial exception by failing to perform certain job duties and

responsibilities. Religious institutions would then have less autonomy to remove an

underperforming minister than a high-performing one." *Starkey,* 41 F.4th at 941. However, this

explanation ignores the reality of the workplace—if these religious functions are central to the

job, an employee should be disciplined or fired for not performing them. A religious institution

would still retain the autonomy to remove underperforming employees. Significantly here,

Fitzgerald was viewed as an excellent employee, even commended for her performance for over

14 years. *See Fitzgerald*, 2022 WL 16707372, at *3. Not once was she reprimanded or otherwise

counseled for not performing religious activities that were hypothetically part of her job.[9] *See*
Appellant Br. at 15-16, 20-21.

Although the Seventh Circuit in *Grussgott* declined to take a "purely functional approach
in determining whether an employee's role is ministerial," the district court's failure to consider
the duties actually performed by Fitzgerald ignores Seventh Circuit precedent to take "all facts .
. . into account." *Grussgott*, 882 F.3d at 661 (citing *Cannata v. Cath. Diocese of Austin*, 700
F.3d 169, 176 (5th Cir. 2012) ("[B]ecause the Supreme Court eschewed a 'rigid formula' in
favor of an all-things-considered approach, courts may not emphasize any one factor at the
expense of other factors.") (alteration in original)).

This misguided focus, solely on the tasks with which employees are entrusted, may
incentivize religious employers to put any religious tasks in the job description but not ensure
that those religious tasks are actually completed. Thus, employers could shield themselves from
liability for unlawful discrimination under the guise of ministry work.

II.     *Fitzgerald's* unjustified expansion of the ministerial exception would potentially strip
millions of religious organization employees of their federally protected rights to be free from
invidious workplace discrimination.

If an employee is found to be a minister, that employee loses all their legal
antidiscrimination protections, regardless of whether it was sex-based discrimination, as
presented here, or discrimination based upon race, color, national origin, age, and or disability.
Inclusive and equitable workplace environments strengthen our democracy. Yet, our nation's
struggle toward achieving equal opportunity and eradicating discrimination is an ongoing battle.
The Civil Rights Act of 1964 was signed at a strenuous time in our nation's history. Given the

---

[9] *See also* Pl.'s Suppl. App. at 23 ¶ 167, ECF No. 125 ("At no point. . . did Principal Weisenbach tell the
other guidance counselors or [Fitzgerald] that [they] needed to pray with students, talk about God or
religion in [their] counseling appointments, or otherwise perform [their] counseling work from a religious
perspective.").

often violent and brutal events paving the way for equal rights in this country, the Act's purpose was "the vindication of human dignity." *Heart of Atlanta Motel, Inc. v. U. S.,* 379 U.S. 241, 291 (1964) (Goldberg, J. concurring). Its enactment inspired additional civil rights and antidiscrimination legislation meant to protect a substantial number of American workers, including millions of those in the religious sector.[10]

If the district court's misapplication of *Starkey*—focusing on what an employee is hypothetically "entrusted to do"—is accepted, it would dramatically increase the reach of the ministerial exception, inflame the discrimination battle, and impede our country's two-hundred-year struggle to "preserve and expand the promise of liberty and equality" for all citizens. *Starkey*, 41 F.4th at 941; *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 787 (2007) (Kennedy, J., concurring). Permitting a religious employer to apply the exception to a broad group of employees who do not in fact have religious duties would, in essence, allow them to further "limit [their] employees' civil rights," even if their tasks are "unrelated to religion."[11] If the district court's primary factor test of what an employee is "entrusted to do," rather than what an employee actually does, is adopted, it would strip "countless coaches, camp counselors, nurses, social-service workers, in-house lawyers, media-relations personnel, and many others who work for religious institutions" of their hard-fought legal protections. *Morrissey-Berru*, 140 S. Ct. at 2082 (Sotomayor, J., dissenting). Other courts and judges have echoed similar warnings regarding the expansion of the exception.[12]

---

[10] *See* The Equal Pay Act of 1963, 29 U.S.C. § 206(d); The Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e; The Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621; The Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101; The Civil Rights Act of 1991, 42 U.S.C. § 1981; The Rehabilitation Act of 1973, 29 U.S.C. § 791; The Genetic Information Nondiscrimination Act (GINA) of 2008, 42 U.S.C. § 200ff.

[11] Sabine Tsuruda, *Disentangling Religion and Public Reason: An Alternative to the Ministerial Exception*, 106 CORNELL L. REV. 1255, 1260 (2021).

[12] *See also Demkovich,* 3 F.4th at 995 (7th Cir. 2021) (Hamilton, J., dissenting) ("[M]any employers with religious affiliations, such as hospitals and schools, are trying to expand the reach of the ministerial exception to cover a much broader range of their

There is no reason to deprive citizens of their equal opportunity to pursue their workplace goals free from discrimination when the reach of the ministerial exception already adequately protects religious organizations. Moreover, *Starkey's* rationale risks depriving millions of religious workers of their statutorily granted antidiscrimination and workplace protections.

A.      Religious organizations employ millions of workers in various sectors of the economy.

Around 1.73 million workers are employed by religious organizations in the United States.[13] The majority of these religious organization employees have occupations wholly unrelated to ministerial functions. Religious educational institutions, home health care services, hospitals, food service providers, gymnasiums, childcare services, and social work facilities contribute to a "religious organization" sector that generates an estimated 400 billion dollars in annual revenues.[14] These statistics indicate that hundreds of thousands of religious organization employees are rightly entitled to Title VII and other federal civil rights protections.

---

employees, such as teachers, nurses, and other health-care workers."); *Sterlinski v. Cath. Bishop of Chicago*, 934 F.3d 568, 570–71 (7th Cir. 2019)*, as amended on denial of reh'g and reh'g en banc* (Oct. 31, 2019) ("It is easy to see a potential problem with a completely hands-off approach. Suppose a church insists that everyone on its payroll, down to custodians and school-bus drivers, is a minister. That is not fanciful—it is what one religious group did assert in *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985), in claiming an immunity from federal minimum-wage legislation."); *DeWeese-Boyd v. Gordon Coll.*, 487 Mass. 31, 163 N.E.3d 1000, 1017 (2021), *cert. denied*, 212 L. Ed. 2d 227, 142 S. Ct. 952 (2022) (reasoning that including "everyone in the [Gordan College] community" as under the ambit of the ministerial exception, "whether they be coaches, food service workers, or transportation providers," "would provide a significant expansion of the ministerial exception well beyond 'individuals who play certain key roles' in a religious institution. "As a result, the breath of this expansion . . . and its eclipsing and elimination of civil law protection against discrimination would be enormous.").

[13] *Religious Organizations*, Data USA, http://bit.ly/3jadT1a (last visited Jan. 19, 2023).

[14] See Brian J. Grim & Melissa E. Grim, *The Socioeconomic Contribution of Religion to American Society: An Empirical Analysis*, 12 Interdisc. J. of Research and Religion 3 (2016). The study uses data from religiously affiliated educational organizations, congregation finances and activities, faith-based charities, religious media industry, and traditional kosher and halal food revenues to derive its conservative estimate of 378 billion dollars in the total annual revenue of religious organizations in the United States.

One of religious organizations' largest sectors is the healthcare industry. There are nearly 4 million employees—many of whom do not share their employers' same beliefs—currently working for non-profit hospitals run by religious organizations.[15] Catholic hospitals alone make up 752,739 of those employees.[16] In fact, in 2016, around 20 percent of hospitals were religiously affiliated.[17] These numbers are only expected to increase given the rise in mergers between secular and religiously affiliated hospitals in the last decade.[18]

The religious education sector[19] also accounts for a large portion of religious organizations' revenue and funding. These educational institutions funnel roughly 74 billion dollars annually into the U.S. economy.[20] In 2021, education was one of the top employment sectors for the Bureau of Labor Statistics' Religious Organizations estimates, employing teachers, administrative staff, coaches, librarians, food service workers, janitors, and building and grounds maintenance workers.[21] During the 2011-2012 school year, religiously affiliated elementary and secondary schools employed 478,790 full-time staff.[22] That number has likely only increased since the last comprehensive religious education survey.

---

[15] Am. Hosp. Ass'n, *AHA Hospital Statistics* 10, 209-10 (2022 ed.).

[16] *See U.S. Catholic Health Care,* Cath. Health Ass'n U.S., https://bit.ly/3RcJ7RO (last visited Jan. 20, 2023).

[17] Maryam Guiahi, MD, et al., *Patient Views on Religious Institutional Health Care*, JAMA NETWORK (Dec. 27, 2019), https://bit.ly/40m5Uiu.

[18] *See* Tess Solomon, MPH, et al., *Bigger and Bigger: The Growth of Catholic Health Systems*, COMMUNITY CATALYST (2020), https://bit.ly/3RbBMSJ ("The 10 largest Catholic health systems have grown and strengthened through mergers and acquisitions, and now control significantly more short-term acute care hospitals than they did two decades ago. These 10 systems own or control 394 short-term acute care hospitals, a 50 percent increase since 2001.").

[19] The religious education sector includes primary, secondary, and higher education institutions.

[20] *Id*. at 13.

[21] *May 2021 National Industry-Specific Occupational Employment and Wage Estimates*, U.S. BUREAU OF LAB. STATS. (Mar. 31, 2022), http://bit.ly/3HjbKs0.

[22] This figure includes principals, assistant principals, teachers, teacher aides, guidance counselors, librarians, media specialists, library aides, nurses, student support staff, secretaries and clerical staff, food service personnel, custodians, and groundskeepers. *See Digest of Education Statistics: Table 205.60*, Nat'l Ctr. Educ. Stat. (June 2013), http://bit.ly/3DpGFC2.

Given these figures, religious organizations undoubtedly operate in comparable size, profit, and economic influence as nonreligious corporations. Differences between major for-profit employers and any number of religious organizations are not readily discernible by comparing profitability or widespread economic impact. Both employ workers who perform similar secular functions, yet, religious organizations enjoy exemptions from laws created to protect workers from discrimination.

B.     If courts focused solely on *Starkey's* "entrusted to do" language, religious organizations could discriminate against most, if not all, of their employees, including secretaries, maintenance workers, librarians, food service workers, and more.

The ministerial exception was intended as a shield for religious liberty.[23] Instead, it can become a sword to slice through anti-discrimination laws, further threatening our nation's struggle to achieve equitable work environments. If courts focused solely on the "entrusted to . . ." language,[24] every janitor, secretary, food service worker, and anyone else with a key card at a religious institution could be considered a minister—simply by putting a catch-all religious clause at the end of a contract. The consequences are legion: millions of American employees immediately lose anti-discrimination protections.

By way of example, imagine this "hypothetical": A janitor has worked at a religious institution keeping buildings clean and orderly for 14 years. She is a single, 43-year-old mother to three young children—all of whom are fully dependent on her income. She has no religious education or training, nor does she hold herself out as furthering the institution's core mission. Rather, she simply does her job, maintaining the school grounds and rarely, if ever, talking about

---

[23] *See Hosanna-Tabor*, *supra* note 3 ("By imposing an unwanted minister, the state infringes the Free Exercise Clause, which *protects* a religious group's right to shape its own faith and mission through its appointments.") (emphasis added).

[24] *Morrisey-Berru*, 140 S. Ct. at 2069 ("When a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow.")

faith. This janitor, sadly, was recently diagnosed with cancer. Concerned about her age and her continuing cancer treatments, the religious institution fires her. She had signed a contract stating, in only one sentence, that she had a duty to "assist students in strengthening and developing their social, emotional, intellectual and Christian development." Pet'r Mot. in Opp'n of Summ. J. at 11 (citing Br. 5, 21, 28).[25] Under the *Starkey* analysis (i.e., focusing on what she is "entrusted to do" as opposed to what she *actually does*), she would be considered a "minister," and would thus have no legal recourse. It strains credibility to say the First Amendment exemption for spiritual leaders—those who are *vital* to the organization's religious mission—strips this mother of anti-discrimination protection.

Unwarranted expansion of the ministerial exemption makes this hypothetical a reality. Under *Fitzgerald* and *Starkey*'s reasonings, this janitor becomes a religious leader simply by putting a catch-all religious clause about what she is "entrusted to do" in her contract. *See Starkey*, 41 F.4th at 941. Indeed, in *Demkovich*, the dissent discussed the ministerial exception's broad scope and how religious employers are being encouraged to use it and other church autonomy doctrines liberally, thus insulating themselves from liability. *Id*. (Hamilton, J., joined by Rovner & Wood, JJ., dissenting). Noting the "hydraulic pressure" applied to expand its scope, Judge Hamilton wrote that a religious organization can merely "*increase the perception that employees . . . are ministers*." *Id*. (emphasis in original). The dissent provides some graphic examples, as does the Appellant in their opening brief. See Appellant's Br. at 39-40. Risking redundancy, we will not repeat them here; but, without a doubt, if a *Starkey* type analysis is adopted, many religious institutions' employees will lose their promise of being free from unlawful workplace discrimination.

---

[25] *See also, e.g., Opening for a Custodian*, Bethlehem Baptist Church, https://bit.ly/3XKTvCZ (last visited Jan. 16, 2023) ("All employees shall maintain a Christian spirit of love and service toward the . . . staff, congregation, and those we serve, and in all aspects of employment are ministers of our faith." )

Religious institutions' powers extend far beyond the altar; it follows that every decision a religious organization makes cannot be doctrine or dogma simply *because* it is a religious organization. There are countless "prosaic activities" required to run religious institutions that are wholly secular. *Nation Ford Baptist Church Incorporated v. Davis*, 382 N.C. 115, 116 (N.C., 2022). To properly balance the "values protected by the First Amendment" and the state and public's interest in the "courthouse remaining open," courts therefore must be able to resolve disputes of "neutral principles of law." Courts must not allow religious institutions to skirt anti-discrimination laws by artificially inflating employee's ecclesiastical roles. *Id.; Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969).

The federal policy of giving employees notification of their rights guaranteed by the law is rooted in fairness and equity.[26] Indeed, in our nation's efforts to eradicate employment discrimination, Congress has emphasized the importance of federal laws protecting workers by requiring employers to post notice of federal antidiscrimination laws to ensure that employees have knowledge of their statutory rights to be free from workplace discrimination. *See* 42 U.S.C. § 2000(e)-10. But if the proposed test is adopted, millions of religious organization employees would be surprised to learn that they are "ministers," stripped of their rights to be free from invidious workplace discrimination.[27]

In employment law, religion and civil rights cannot always run parallel. Although religious institutions, in narrow circumstances, can be shielded from the courts' inquiries, it is

___

[26] There is no evidence that religious employers are telling their employees that they may lose the protections of the discrimination laws because they may be considered "ministers."

[27] Justice Breyer and Justice Ginsburg similarly expressed concerns that the employee did not have knowledge that she risked discharge for bring a civil action in lieu of resolving a dispute within the church. Justice Ginsburg expressly stated that "a rule that's going to bind the teachers, then you would expect to find it in the handbook. But the handbook doesn't tell her, if you complain to the E.E.O.C. about discrimination, then you will be fired." *See* Transcript of Oral Argument at 19-21, *Hosanna-Tabor*, 565 U.S. 171 (2012) (No. 10-553),.

not an impenetrable fortress. Indeed, there is certainly a stark contrast between choices in managing one's internal affairs and "general immunity from secular laws." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1027 (10th Cir. 2022) (quoting *Morrissey-Berru*, 140 S. Ct. at 2060). The ministerial exception is sound policy only when its scope is circumscribed. As the Supreme Court held, it should extend to the "selection of . . . individuals . . . who play key roles . . . and personify [the church's] beliefs," while "perform[ing] *vital* religious duties," and no more. *Morrissey-Berru*, 140 S. Ct. at 2067. The mere fact that an employee plays *a role*—or is hypothetically "entrusted" to play a role—does not automatically make that role ecclesiastically significant.

It is simply unnecessary to broaden the ministerial exception. The *Hosanna-Tabor* totality-of-the-circumstances test *already* carefully protects organization's religious freedoms, finding that a wide variety of employees qualify as ministers. The Supreme Court's test allows courts to make that distinction and this Court should, for the reasons above, use this standard to assess the ministerial exception.

CONCLUSION

This Court should reverse the district court's judgement and remand for proper analysis considering the entirety of the *Hosanna-Tabor* factors.

Respectfully submitted,

> Michael Foreman
> *Counsel of Record*
> Penn State Law Civil Rights Appellate Clinic
> 329 Innovation Boulevard, Suite 118
> University Park, PA 16802
> (814) 865-3832

> *Counsel for Amici Curiae*

CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1) and Circuit Rule 32, I certify that this brief:

(i) complies with the type-volume limitation of Circuit Rule 32 because it contains 5,897 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Circuit Rule 32(b) because it has been prepared using Microsoft Word 365, set in Times New Roman font in a size measuring 12 points or larger.

/s/ *Michael Foreman*

CERTIFICATE OF SERVICE

I certify that on February 1, 2023 this brief was filed using the Court's CM/ECF system.

All participants in the case are registered CM/ECF users and will be served electronically via

that system.

/s/ *Michael Foreman*