No. 22-2954

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

MICHELLE FITZGERALD,

*Plaintiff-Appellant,*

v.

RONCALLI HIGH SCHOOL, INC., and
ROMAN CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
No. 1:19-cv-04291-RLY-TAB
Hon. Richard L. Young

BRIEF OF *AMICI CURIAE*
THE AMERICAN CIVIL LIBERTIES UNION AND
THE AMERICAN CIVIL LIBERTIES UNION OF INDIANA
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

KENNETH J. FALK
American Civil Liberties Union of Indiana
1031 E Washington Street
Indianapolis, IN 46202
Tel: (317) 635-4059
kfalk@aclu-in.org

ADITI FRUITWALA
*Counsel of Record*
*Application for Admission Pending*
DANIEL MACH
JOSHUA BLOCK
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
afruitwala@aclu.org
dmach@aclu.org
jblock@aclu.org

*Counsel for Amici Curiae*

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __No. 22-2954__

Short Caption: __Michelle Fitzgerald v. Roncalli High School, Inc.__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

　American Civil Liberties Union; American Civil Liberties Union of Indiana

_____

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

　American Civil Liberties Union Foundation; American Civil Liberties Union of Indiana

_____

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

　　　　n/a

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　n/a

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

　n/a

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

　n/a

Attorney's Signature: __/s/ Aditi Fruitwala__　　　　Date: __January 25, 2023__

Attorney's Printed Name: __Aditi Fruitwala__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** ☑　**No** ☐

Address: __125 Broad Street, 18th Floor__

__New York, New York 10004__

Phone Number: __(212) 549-2500__　　　　Fax Number: _____

E-Mail Address: __afruitwala@aclu.org__

rev. 12/19 AK

Save As          Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: No. 22-2954

Short Caption: Michelle Fitzgerald v. Roncalli High School, Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    American Civil Liberties Union; American Civil Liberties Union of Indiana

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    American Civil Liberties Union Foundation; American Civil Liberties Union of Indiana

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: /s/ Kenneth J. Falk    Date: January 27, 2023

Attorney's Printed Name: Kenneth J. Falk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐  **No** ☑

Address: 1031 E. Washington St.

    Indianapolis, IN 46202

Phone Number: (317) 635-4059    Fax Number: (317) 635-4105

E-Mail Address: kfalk@aclu-in.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>No. 22-2954</u>

Short Caption: <u>Michelle Fitzgerald v. Roncalli High School, Inc.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    American Civil Liberties Union; American Civil Liberties Union of Indiana

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    American Civil Liberties Union Foundation; American Civil Liberties Union of Indiana

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: <u>/s/ Daniel Mach</u>    Date: <u>January 27, 2023</u>

Attorney's Printed Name: <u>Daniel Mach</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: <u>915 15th St. NW</u>

    <u>Washington, DC  20005</u>

Phone Number: <u>(202) 548-6604</u>    Fax Number: _____

E-Mail Address: <u>dmach@aclu.org</u>

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: No. 22-2954

Short Caption: Michelle Fitzgerald v. Roncalli High School, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

American Civil Liberties Union; American Civil Liberties Union of Indiana

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

American Civil Liberties Union Foundation; American Civil Liberties Union of Indiana

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

n/a

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Joshua Block     Date: January 27, 2023

Attorney's Printed Name: Joshua Block

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☐     **No** ☑

Address: 125 Broad Street, 18th Floor

New York, New York 10004

Phone Number: (212) 549-2593     Fax Number:

E-Mail Address: jblock@aclu.org

rev. 12/19 AK

## TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES ........................................................ vi

INTEREST OF *AMICI CURAE* ..................................... 1

SUMMARY OF ARGUMENT ........................................... 1

ARGUMENT ............................................................. 3

    I.    Title VII's Exemptions Do Not Provide a Defense for Policies That Facially Discriminate Based on Race, Color, Sex, or National Origin. ................................................................. 3

        A. Section 702 of Title VII exempts religious organizations from claims for religious discrimination only. ................................. 3

    II.   The "Church Autonomy" Doctrine Does Not Provide a Defense to Discrimination Against Non-Ministerial Employees. ............................... 10

        A. Hiring non-ministerial employees is not a matter of internal church government protected by church autonomy. ............................... 11

        B. Applying Title VII to this case does not require courts to answer ecclesiastical questions. ................................................. 14

    III.  Roncalli Does Not Have an Expressive Association Right to Discriminate Against Non-Ministerial Employees Based on Sex. ............ 16

        A. An employer-employee relationship is not an expressive association. ...... 16

        B. Any burden on Roncalli's expressive association satisfies strict scrutiny. ....................................................... 20

    IV.  Adopting Roncalli's Interpretations of Section 702, Church Autonomy Doctrine, and Expressive Association Would Gut Employment Protections. .......................................... 22

CERTIFICATE OF COMPLIANCE ................................. 25

CERTIFICATE OF SERVICE ...................................... 26

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
—— U.S. —— (2023) ............................................................................... 1

*Albemarle Paper Co. v. Moody*,
422 U.S. 405, 421 (1975) .................................................................. 10

*Baskin v. Bogan*,
12 F. Supp. 3d 1144 (S.D. Ind. 2014) ............................................ 21

Billard v. Charlotte Cath. High Sch.,
No. 3:17-cv-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021) ...................... 4, 6

*Bostock v. Clayton Cty., Ga.*,
140 S. Ct. 1731 (2020) ......................................................... 2, 6, 7, 21

*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000) .................................................................. 17, 18

*Boyd v. Harding Acad. of Memphis, Inc.*,
88 F.3d 410 (6th Cir. 1996) ............................................................. 4

*Bryce v. Episcopal Church in the Diocese of Colo.*,
289 F.3d 648 (10th Cir. 2002) ......................................................... 14

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .................................................................... 21

*Christian Legal Soc'y v. Walker*,
453 F.3d 853, 857, 860 (7th Cir. 2006) ............................................. 18

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v.*
*Amos*,
483 U.S. 327 (1987) ..................................................................... 4

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
450 F.3d 130 (3d Cir. 2006) ......................................................... 6, 14

*DeMarco v. Holy Cross High Sch.*,
4 F.3d 166 (2d Cir. 1993) ......................................................... 4, 14, 16

*Demkovich v. St. Andrew the Apostle Parish, Calumet City*,
3 F.4th 968 (7th Cir. 2021) ........................................................... 12

*Doe v. Cath. Relief Servs.*,
 Civ. Action No. CCB-20-1815, 2022 WL 3083439 (D. Md. Aug. 3, 2022) ......... 6, 15

*Dr. A. v. Hochul*,
 142 S. Ct. 552 (2021) ........................................................................... 15

*EEOC v. Arabian Am. Oil Co.*,
 499 U.S. 244 (1991) ............................................................................... 9

*EEOC v. Fremont Christian School*,
 781 F.2d 1362 (9th Cir. 1986) ................................................................. 6

*EEOC v. Miss. Coll.*,
 626 F.2d 477 (5th Cir. 1980) ............................................................. 6, 13

*EEOC v. Pac. Press Publ'g Ass'n*,
 482 F. Supp. 1291 (N.D. Cal. 1979) ......................................................... 5

*EEOC v. Pac. Press Publ'g Ass'n*,
  676 F.2d 1272 (9th Cir. 1982) .............................................. 4, 5, 13, 16

*EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
 884 F.3d 560 (6th Cir. 2018) ................................................................. 21

*EEOC v. Roman Cath. Diocese of Raleigh, N.C.*,
 213 F.3d 795 (4th Cir. 2000) ................................................................. 13

*Ference v. Roman Cath. Diocese of Greensburg*,
 No. 22-797, 2023 U.S. Dist. LEXIS 8416 (W.D. Pa. Jan. 18, 2023) ................. 6, 14

*Fulton v. City of Phila., Pa.*,
 141 S. Ct. 1868 (2021) ............................................................................ 1

*Geary v. Visitation of Blessed Virgin Mary Par. Sch.*,
 7 F.3d 324 (3d Cir. 1993) .................................................................. 14, 16

*Grussgott v. Milwaukee Jewish Day School, Inc.*,
 882 F.3d 655 (7th Cir. 2018) ................................................................. 12

*Herx v. Diocese of Fort Wayne-S. Bend Inc.*,
 48 F. Supp. 3d 1168 (N.D. Ind. 2014) ....................................................... 5

*Hishon v. King & Spaulding*,
 467 U.S. 69 (1984) ................................................................................ 17

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
 565 U.S. 171 (2012) ......................................................................... 12, 19

vii

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995) .......................................................................... 18

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.,*
   *UAW v. Johnson Controls, Inc.*,
   499 U.S. 187 (1991) .......................................................................... 15

*Kennedy v. St. Joseph's Ministries, Inc.*,
   657 F.3d 189 (4th Cir. 2011) ............................................................ 4

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
   138 S. Ct. 1719 (2018) ....................................................... 1, 15, 19, 21

*NLRB v. Catholic Bishop of Chicago*,
   440 U.S. 490 (1979) .......................................................................... 15

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) ........................................................... 11, 12, 22

*Our Lady's Inn v. City of St. Louis*,
   349 F. Supp. 3d 805 (E.D. Mo. 2018) ............................................. 19

*R.A.V. v. City of St. Paul, Minn.*,
   505 U.S. 377 (1992) .......................................................................... 18

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
   772 F.2d 1164 (4th Cir. 1985) ................................................ 5, 13, 20

*Richardson v. Nw. Christian Univ.*,
   242 F. Supp. 3d 1132 (D. Or. 2017) ................................................ 19

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) .................................................................. 17, 20, 21

*Scharon v. St. Luke's Episcopal Presbyterian Hosps.*,
   929 F.2d 360 (8th Cir. 1991) ............................................................ 14

*Slattery v. Cuomo*,
   531 F. Supp. 3d 547 (N.D.N.Y. 2021) ............................................ 19

*Snyder v. Phelps*,
   562 U.S. 443 (2011) .......................................................................... 20

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
   41 F.4th 931 (7th Cir. 2022) ......................................................... 7, 8, 9, 12

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
  496 F. Supp. 3d 1195 (S.D. Ind. 2020) .............................................. 7, 10

*United States v. O'Brien*,
  391 U.S. 367 (1968) ....................................................................... 18

*Wisconsin v. Mitchell*,
  508 U.S. 476 (1993) ....................................................................... 17

**Statutes**

29 U.S.C.A. § 206 ............................................................................. 23

29 U.S.C.A. § 621 ............................................................................. 23

42 U.S.C. § 2000e ........................................................................... 8, 9

42 U.S.C. § 2000e-1 ................................................................ 4, 7, 9, 10

42 U.S.C. § 2000e-2 ................................................................... passim

42 U.S.C.A. § 12101 ......................................................................... 23

**Other Authorities**

Council for American Private Education, *Private School Statistics at a Glance* ...... 22

EEOC, Legislative History of Title VII and XI of Civil Rights Act of 1964
  (1968) ..................................................................................... 5, 9

IBIS World, *Religious Organizations in the US - Employment Statistics 2004–
  2029* ........................................................................................ 22

MergerWatch, *Growth of Catholic Hospitals and Health Systems: 2016
  Update of the Miscarriage of Medicine Report* ...................................... 22

National Catholic Educational Association, *Enrollment and Staffing* ..................... 23

## INTEREST OF *AMICI CURAE*[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with approximately two million members dedicated to defending the principles of liberty and equality embodied in the Constitution. The ACLU of Indiana is one of the ACLU's statewide affiliates with more than 10,400 members. As organizations that advocate for religious liberty as well as equal rights for lesbian, gay, bisexual, transgender, and queer ("LGBTQ") people, the ACLU, the ACLU of Indiana, and their members have a strong interest in the application of proper standards when evaluating constitutional challenges to civil rights laws.

*Amici* have been involved in numerous cases involving the intersection of competing claims of religious liberty and LGBTQ equality. *See, e.g.*, *303 Creative LLC v. Elenis*, —— U.S. —— (2023) (*amicus*); *Fulton v. City of Phila., Pa.*, 141 S. Ct. 1868 (2021) (counsel); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719 (2018) (counsel). *Amicus* ACLU of Indiana has been involved in important cases in recent years in Indiana involving the civil rights and liberties of LGBTQ people.

## SUMMARY OF ARGUMENT

For 14 years, Michelle Fitzgerald (hereinafter "Ms. Fitzgerald" or "Plaintiff-Appellant") was a beloved employee and widely recognized as a caring and effective

---

[1] This brief has not been authored, in whole or in part, by counsel to any party in this appeal. No person, other than the *amici*, their members, or their counsel, contributed money that was intended to fund preparation or submission of this brief. All parties have consented to the filing of this brief.

guidance counselor, quickly promoted to supervise the counseling department at her alma mater Roncalli High School. Entry Granting Defs.' Mot. for Summ. J. ("Entry Granting MSJ") 1-2, ECF No. 140; Compl. 1, ECF No. 1. But after learning that Ms. Fitzgerald had lawfully married her long-term partner, Roncalli High School and the Roman Catholic Archdiocese of Indiana (hereinafter "Roncalli" or "Defendant-Appellees") told Ms. Fitzgerald that she could no longer work at the school because her marriage was contrary to the Catholic faith, which does not recognize same-sex marriages. Entry Granting MSJ 8-9, ECF No. 140.

In doing so, Roncalli violated Title VII, which prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); *see Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731 (2020). Although the Supreme Court only recently confirmed that Title VII protects LGBTQ people from sex discrimination, "worries about how Title VII may intersect with religious liberties are nothing new." *Id.* at 1754. For over 50 years, employees of parochial schools, church-affiliated hospitals, and other religious organizations have asserted Title VII claims against their employers. And during that time, every court of appeals to address such claims has reached the same conclusions: (1) Title VII provides religious organizations an exemption from claims for religious discrimination, but not from claims for discrimination based on race, color, sex, or national origin; (2) the First Amendment prevents courts from imposing liability on religious organizations for Title VII discrimination claims in contexts involving the termination of ministerial employees and from delving into ecclesiastical questions;

2

and (3) religious organizations do not have a statutory or constitutional right to discriminate against non-ministerial employees based on race, color, sex, or national origin, even when they invoke religious reasons for doing so.

Here, the District Court granted summary judgment for Roncalli, finding that the ministerial exception bars Ms. Fitzgerald's claims. Entry Granting MSJ 1-2, ECF No. 140. In its Motion for Summary Judgment/Motion for Judgment on the Pleadings (MSJ) and prior briefs, in addition to a ministerial exception defense, Roncalli mounted an array of constitutional and statutory arguments that urged expansive and faulty readings of Sections 702 and 703 of Title VII, the church autonomy doctrine, and freedom of association. *See* Defs.' Mot. Summ. J., ECF No. 42 ("Defs.' MSJ"). If accepted, any of these arguments would allow religious employers to discriminate against their employees for any reason, completely bypassing Title VII liability.

We agree with Plaintiff-Appellant Ms. Fitzgerald that the District Court misapplied the ministerial exception analysis required by the Supreme Court. Here, *amici* separately address Roncalli's other defenses, which, if accepted by this Court, invite a sweeping range of harm to the enforcement of our nation's longstanding civil rights laws.

## ARGUMENT

**I.  Title VII's Exemptions Do Not Provide a Defense for Policies That Facially Discriminate Based on Race, Color, Sex, or National Origin.**

**A. Section 702 of Title VII exempts religious organizations from claims for religious discrimination only.**

Section 702(a) of Title VII carves out a limited exception for religious organizations "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). Section 702 thus "exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 329 (1987).[2]

But Section 702 does not provide a similar exemption for religious organizations with respect to employment of individuals based on the individuals' race, color, sex, or national origin. Every circuit to consider the question agrees: the exemption "merely indicates that such institutions may choose to employ members of their own religion without fear of being charged with religious discrimination. Title VII still applies, however, to a religious institution charged with sex discrimination." *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996); *accord Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 173 (2d Cir. 1993); *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1276 (9th Cir. 1982) *abrogation recognized by Alcazar v. Corp. of Cath. Archbishop of Seattle*, 598 F.3d 668 (9th Cir. 2010).[3]

---

[2] Section 703(e) of Title VII provides a similar exemption for an educational institution that is "owned, supported, controlled, or managed" by a religious organization or "if the curriculum of such school. . . is directed toward the propagation of a particular religion." 42 U.S.C. § 2000e-2(e). Both sections effectually do the same thing. *Billard v. Charlotte Cath. High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, at \*8 (W.D.N.C. Sept. 3, 2021), *appeal filed*, No. 22-1440 (4th Cir. Apr. 25, 2022).

[3] These settled principles are consistent with Title VII's legislative history and purpose. *See Herx v. Diocese of Fort Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168, 1175

Moreover, Title VII prohibits religious organizations from engaging in sex discrimination even when that discrimination is motivated by religious beliefs. *Herx v. Diocese of Fort Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168, 1175-76 (N.D. Ind. 2014) (collecting cases), *appeal dismissed*, 772 F.3d 1085 (7th Cir. 2014). For example, in *Herx*, the district court found that Section 702 did not insulate a religious school's decision to not renew a teacher's contract after learning that she was undergoing in vitro fertilization in an effort to become pregnant, because – though the school's decision was based in its religious beliefs – the teacher's "Title VII claim alleges sex discrimination, not religious discrimination." *Herx*, 48 F. Supp. 3d at 1176. In *Pacific Press*, a publishing house affiliated with the Seventh-Day Adventist church could not fire an employee for filing a charge of sex discrimination with the EEOC even though the employee had violated church doctrine that prohibited lawsuits by members against the church. *See Pacific Press*, 676 F.2d at 1276-77, 1280. In *EEOC v. Fremont Christian School*, a religious school could not enforce the religious belief

---

(N.D. Ind. 2014) (citing *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1167 (4th Cir. 1985)). Congress repeatedly rejected proposals to expand the exemptions beyond claims for religious discrimination. The original 1964 bill passed by the House of Representatives would have provided a complete exemption for religious organizations, but the Senate replaced it with a narrower exemption limited to the employment of individuals of a particular religion. *See* EEOC, Legislative History of Title VII and XI of Civil Rights Act of 1964 at 1004, 3004, 3017 (1968) ("1964 Legis. Hist."). In 1972, Congress expanded Section 702 to cover all of a religious organization's activities (not merely its religious ones) but rejected an amendment that would have covered all types of discrimination (not merely discrimination based on religion). *See EEOC v. Pac. Press Publ'g Ass'n*, 482 F. Supp. 1291, 1304 (N.D. Cal. 1979), *aff'd*, 676 F.2d 1272 (9th Cir. 1982) (collecting legislative history).

5

that men should be the head of the household by paying health benefits to married men but not to married women. *See* 781 F.2d 1362, 1365-67 (9th Cir. 1986).[4]

The Supreme Court's decision in *Bostock* illustrates how discrimination motivated by religious beliefs regarding sexual orientation and marriage can also facially discriminate based on sex. *Bostock* teaches that "[w]hen an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex" regardless of their "additional intentions or motivations" for doing so. *Bostock*, 140 S. Ct. at 1744.

Thus, in post-*Bostock* cases in which a religious organization fires an employee for marrying a same-sex partner, courts have had little trouble concluding that Section 702 does not shield the employer from liability for sex discrimination. *See Ference v. Roman Cath. Diocese of Greensburg*, No. 22-797, 2023 U.S. Dist. LEXIS 8416, at *3-10 (W.D. Pa. Jan. 18, 2023) (report and recommendation); *Doe v. Cath. Relief Servs.*, Civ. Action No. CCB-20-1815, 2022 WL 3083439, at *4 (D. Md. Aug. 3, 2022); *Billard v. Charlotte Cath. High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, at *8 (W.D.N.C. Sept. 3, 2021), *appeal filed*, No. 22-1440 (4th Cir. Apr. 25, 2022); *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1203 (S.D. Ind. 2020), *appeal dismissed*, No. 20-3265, 2021 WL 9181051 (7th Cir.

---

[4] No circuit has ever held that Section 702 allows employers to facially discriminate based on sex. Although religious organizations have sometimes attempted to rely on *EEOC v. Miss. Coll.*, 626 F.2d 477 (5th Cir. 1980) and *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130 (3d Cir. 2006), those cases involved challenges to employment decisions that were facially sex-neutral where plaintiffs attempted to show that a claimed religious motivation was pretextual.

July 22, 2021). Employers cannot "convert any claim of discrimination on the basis of one of the protected classes under Title VII to a case of religious discrimination, [whenever] there was a religious reason behind the employment decision." *Starkey*, 496 F. Supp. 3d at 1203. In such cases, the religious organization's motivation may be to enforce its religious teachings, "[b]ut to achieve that purpose the employer must, along the way, intentionally treat an employee worse based in part on that individual's sex." *Bostock*, 140 S. Ct. at 1742. And Section 702's exemption for religious organizations covers only discrimination against individuals of a particular religion, not discrimination based on an individual's sex.

### B. The concurrence in *Starkey* misunderstands and misapplies Section 702.

In the face of decades of settled precedent, Judge Easterbrook's concurrence in *Starkey* concludes that Section 702 allows religious organizations to engage in race, color, sex, and national-origin discrimination as long as the discrimination is grounded in their religious beliefs. *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 945-47 (7th Cir. 2022) (Easterbrook, J., concurring). This Court should reject such a broad interpretation of Section 702.

The concurrence asserts that Section 702 applies to all discrimination claims because Section 702 says "this subchapter shall not apply." *Id*. at 945. But, the subsequent portion of the subsection is critical here, which states that the subchapter shall not apply only "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). The term "individuals of a particular religion" mirrors Title VII's underlying prohibition "fail[ing] or refus[ing] to hire or

to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Pursuant to Section 702, that underlying prohibition does not apply to discrimination based on an individual's religion, but continues to apply to discrimination based on that individual's race, color, sex, or national origin. The concurrence also asserts that Section 702 provides an exemption for religiously motivated sex discrimination because Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief." *Starkey*, 41 F.4th at 945 (Easterbrook, J., concurring). But the full definition states that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an *employee's* or *prospective employee's* religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j) (emphasis added). The section provides the *employee* with protections from religious discrimination, including the right to reasonable accommodations for the employee's religious practice. It does not provide religious organizations with new rights to use *their own* religious beliefs to discriminate based on an employee's race, color, sex, or national origin. After all, the relevant religion referred to in Section 702 is the religion of the "individual," not the religion of the employer.

Next, the concurrence analogizes to another part of the subchapter stating inapplicability "to an employer with respect to the employment of aliens outside any State" and argues that Section 702's religious exemption should be read similarly

broadly. *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring). But there are key textual differences between the "alien exemption" and the partial exemption for religious organizations. The original version of Section 702 passed by the House provided a categorical exemption for employment of aliens abroad *and* for religious organizations. *See* 1964 Legis. Hist. at 3050. The Senate then added new language limiting the exemption for religious organizations to an exemption "with respect to the employment of individuals of a particular religion." *Id.* As discussed above, the phrase "individuals of a particular religion" tracks the language of Title VII's underlying prohibition on discrimination because of an "individual's… religion" in 42 U.S.C. § 2000e-2(a)(1). The "alien exemption" does not contain similar phrasing about an "individual's" characteristics and cannot provide any guidance on how the phrase "individuals of a particular religion" should be interpreted. 42 U.S.C. § 2000e-1(a).[5]

Finally, the concurrence proceeds from the erroneous assumption that "[o]ne function of § 702(a) is to permit sex discrimination by religions that do not accept women as priests." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). In doing so, it ignores that such a function is already accomplished by the ministerial

---

[5] The concurrence also mischaracterizes what the "alien exemption" actually does. The Supreme Court held in *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991), that Title VII did not apply to the employment of anyone outside the United States, rendering the "alien exemption" functionally irrelevant. Congress responded by amending the definition of "employee" to provide that "[w]ith respect to employment in a foreign country, such term includes an individual who is a citizen of the United States." 42 U.S.C. § 2000e(f). As a result, non-citizens outside the US are excluded from the scope of Title VII because they are not encompassed in Title VII's definition of "employee"— not because of Section 702.

exception and by the exception for positions in which sex is a bona fide occupational qualification. *See* 42 U.S.C. § 2000e-2(e)(1). The only "function" of applying Section 702 to sex discrimination claims would be to authorize sex discrimination against non-ministerial employees.

Moreover, the concurrence's reading of the exemptions would necessarily apply beyond the context of a church's beliefs about same-sex marriage to give a defense to religious organizations seeking to enforce other religious beliefs requiring discrimination based on race, color, sex, or national origin. "Consider a religious employer that genuinely believes the Bible forbids interracial marriage. Under Defendants' interpretation of Section 702, that employer would be free to terminate an employee who married someone of a different race." *Starkey*, 496 F. Supp. 3d at 1203.

If Congress wished to allow religious employers to be fully exempted from Title VII, it could have done so. Instead, Congress wrote narrow exemptions for employing "individuals of a particular religion." 42 U.S.C. § 2000e-1(a). Expanding that plain text to encompass all religiously motivated discrimination against employees would conflict with the text of the statute, the legislative history, and Title VII's "central statutory purpose[] of eradicating discrimination throughout the economy." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975).

## II.    The "Church Autonomy" Doctrine Does Not Provide a Defense to Discrimination Against Non-Ministerial Employees.

Precedents from this Court and others are clear that the "church autonomy" doctrine applies to ministerial employees (in the form of the ministerial exemption)

10

and ecclesiastical questions only. When religious organizations employ non-ministerial employees, they must comply with Title VII and other generally applicable employment laws.

### A. Hiring non-ministerial employees is not a matter of internal church government protected by church autonomy.

The "church autonomy" doctrine cannot be extended beyond ministerial employees to provide an absolute right to fire *any* employee based on an organization's religious beliefs. This doctrine is limited to "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020). It does not extend to all employment decisions, but only "internal management decisions that are essential to the institution's central mission," such as the selection of its ministers. *Id.* at 2060.

To hold that the "church autonomy" doctrine applies here, to an employee without a ministerial role, would be to dramatically expand the doctrine beyond ministerial employees to insulate *all* personnel decisions from legal regulation when an employer asserts its decisions are based in any way on religious doctrine. Under this Court's precedent, however, the employment of non-ministerial employees is not part of "church autonomy" and is subject to neutral and generally applicable regulations. In *Grussgott v. Milwaukee Jewish Day School, Inc.*, this Court noted that "[u]nder both the Free Exercise Clause, 'which protects a religious group's right to shape its own faith and mission through its appointments,' and the Establishment Clause, 'which prohibits government involvement in such

11

ecclesiastical decisions,' religious organizations are free to hire and fire their *ministerial* leaders without governmental interference." 882 F.3d 655, 657 (7th Cir. 2018) (emphasis added) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188-89 (2012)).

In *Starkey v. Roman Catholic Archdiocese of Indiana, Inc.*, this Court explained that the doctrine of church autonomy reflects the balance struck by the First Amendment between "the 'interest of society in the enforcement of employment discrimination statutes' and 'the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission.'" 41 F.4th at 942 (quoting *Hosanna-Tabor*, 565 U.S. at 196). This balance means granting a degree of independence to religious entities "in matters of faith and doctrine and in closely linked matters of internal government." *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968, 975 (7th Cir. 2021) (quoting *Morrissey-Berru*, 140 S. Ct. at 2061). Thus, "[r]equiring a church to accept or retain an unwanted *minister*, or punishing a church for failing to do so, intrudes upon more than a mere employment decision" because such an "intrusion interferes with the internal governance of the church by depriving [it] of control over the selection of those who will personify its beliefs." *Id.* (emphasis added) (quoting *Hosanna-Tabor*, 565 U.S. at 188) (internal quotation marks omitted). Matters that do not involve ministers or require courts to adjudicate ecclesiastical questions, such as the case now before this Court, simply fall outside the ambit of the church autonomy doctrine.

12

The other circuits agree. "[C]hurches are not—and should not be—above the law. Like any other person or organization . . . [t]heir employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985); *see also EEOC v. Roman Cath. Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000). "The employment relationship between" a religious school and its non-ministerial "faculty and staff is one intended by Congress to be regulated by Title VII," and the fact that "faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern." *EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980).

A non-ministerial employee's "local church [can] invoke[] disciplinary actions such as censure or expulsion from the church which undoubtedly would qualify as ecclesiastical decisions immune from judicial review," but firing a non-ministerial employee "is an action that involves more than purely religious considerations; it also conflicts with rules of conduct established by Congress for legimate [sic] secular reasons." *Pacific Press*, 676 F.2d at 1281. And "notwithstanding [non-ministerial employees'] apparent general employment obligation to be a visible witness to the Catholic Church's philosophy and principles, a court [can] adjudicate [their] claims without the entanglement that would follow were employment of clergy or religious leaders involved." *Geary v. Visitation of Blessed Virgin Mary Par. Sch.*, 7 F.3d 324,

331 (3d Cir. 1993); *see also DeMarco,* 4 F.3d at 171-72 (distinguishing between ministerial and non-ministerial employees); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 363 n.3 (8th Cir. 1991) (same); *Ference*, 2023 U.S. Dist. LEXIS 8416, at *13 (report and recommendation) ("The Court therefore declines the Diocese's invitation to immunize it against all claims by secular employees based solely on the Diocese's blanket assertion that church doctrine requires what would otherwise be unlawful discrimination.").[6]

### B. Applying Title VII to this case does not require courts to answer ecclesiastical questions.

Finally, there are no ecclesiastical questions in this case that would implicate principles of "church autonomy." In cases such as *Curay-Cramer v. Ursuline Academy, Wilmington*, the plaintiffs' allegations required courts to evaluate whether a church's doctrinal beliefs about abortion were equivalent to its doctrinal beliefs about the Iraq war. 450 F.3d 130 (3d Cir. 2006). But these types of problems are wholly absent where an employment decision facially discriminates on the basis of race, color, sex, or national origin. "Whether an employment practice involves

---

[6] Roncalli relies on *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648 (10th Cir. 2002) for the proposition that when a church makes a personnel decision based on religious doctrine, the broader church autonomy doctrine applies. Defs.' MSJ 26, ECF No. 42 (citing *Bryce*, 289 F.3d at 660). But the holding in *Bryce* has no bearing on this case. *Bryce* was a case about a religious organization's *speech* about its employment decisions, not about the legality of employment decisions themselves. The employee in *Bryce* did not challenge the church's decision to terminate her employment, but instead attempted to challenge the church's speech about the termination decision as a form of sexual harassment. *Bryce*, 289 F.3d at 657.

disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). Because liability in this case depends on Roncalli firing Ms. Fitzgerald for being married to a spouse of the same sex—not on Roncalli's subjective motivations—"[t]his court need not question the sincerity or content of [Roncalli's] religious beliefs to assess the applicability" of the statute. *Cath. Relief Servs.*, 2022 WL 3083439, at *3.

By contrast, finding the "church autonomy" doctrine applicable here would create more constitutional difficulties by making liability turn on an organization's subjective religious motivations instead of an objective assessment of its conduct. And courts would have to make that assessment for all religious beliefs, including less common religious beliefs that might "seem strange [or] bewildering" to the unfamiliar. *Dr. A. v. Hochul*, 142 S. Ct. 552, 558 (2021) (Gorsuch, J., dissenting). In a country filled with religious diversity, "[t]he Constitution protects not just popular religious exercises." *Masterpiece*, 138 S. Ct. at 1734 (2018) (Gorsuch, J., concurring). "It protects them all." *Id*.

Nor does Title VII involve courts in the type of entanglement at issue in *NLRB v. Catholic Bishop of Chicago*, where the Supreme Court held that that applying the collective-bargaining requirements of the National Labor Relations Act ("NLRA") to church-operated schools would potentially intrude upon church autonomy. 440 U.S. 490, 502 (1979). All circuits to consider the question agree that there is "an

15

important distinction between the ongoing government supervision of all aspects of employment required under labor relations statutes like the NLRA and the limited inquiry required in anti-discrimination disputes." *DeMarco*, 4 F.3d at 169. An "award of monetary damages . . . does not amount to continuous supervision of the kind the Supreme Court sought to avoid in *Catholic Bishop*." *Pacific Press*, 676 F.2d at 1282; *accord Geary*, 7 F.3d at 328 (distinguishing between the NLRB's "pervasive jurisdiction in Catholic Bishop" and "the simple prohibitions of the ADEA").

Because Ms. Fitzgerald was a non-ministerial employee and her claims do not require the court to resolve any ecclesiastical question, "church autonomy" does not insulate Roncalli's discrimination from review.

### III.    Roncalli Does Not Have an Expressive Association Right to Discriminate Against Non-Ministerial Employees Based on Sex.

Beyond church autonomy, Roncalli's Motion for Summary Judgment raises an even more sweeping First Amendment argument based on the right to expressive association, asserting that Roncalli is an expressive association with a right to disaffiliate with those who "undermine their message." Defs.' MSJ 30, ECF No. 42. In doing so, Roncalli ignores established and unambiguous precedent finding that an employment relationship is not an expressive association. But, even if an employment relationship were entitled to a First Amendment right to association, any burden on Roncalli's expressive association satisfies strict scrutiny.

### A. An employer-employee relationship is not an expressive association.

The Supreme Court has never recognized a First Amendment right to engage in employment discrimination under the banner of "expressive association." To the

contrary, the Supreme Court has specifically found that Title VII does not infringe upon the First Amendment rights of employers. *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) ("In *Hishon*, we rejected the argument that Title VII infringed employers' First Amendment rights."); see also *Hishon v. King & Spaulding*, 467 U.S. 69, 78 (1984); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring in part). Furthermore, the Supreme Court has acknowledged that "[o]nce a contractual relationship of employment is established, the provisions of Title VII attach and govern certain aspects of that relationship." *Hishon*, 467 U.S. at 74.

To advance its novel theory regarding freedom of association, Roncalli relies almost entirely on *Boy Scouts of America v. Dale*, a Supreme Court case involving an anti-discrimination claim brought by a Boy Scouts assistant scoutmaster whose membership was revoked after the Boy Scouts learned he was gay. 530 U.S. 640, 644-45 (2000); Defs.' MSJ 30-33, ECF No. 42. Roncalli claims that because *Dale* ruled against compelling association with a gay scoutmaster, the same outcome is warranted here. *Id.* This argument fails because it disregards a critical aspect of the *Dale* decision that makes it inapplicable to this case: this case involves an employment relationship, whereas Dale was a volunteer bringing a claim under a public accommodation law. *See Dale*, 530 U.S. at 644-45. Dale was not subject to employment protections, such as Title VII protections. In fact, the Boy Scouts of America expressly acknowledged that their organization would have been subject to any employment laws that prevented discrimination based on sexual orientation. *Dale*, 530 U.S. at 672 (Stevens, J., dissenting) ("[W]e are unaware of any statute or

17

ordinance ... which prohibits discrimination against individual's employment upon the basis of homosexuality. In the event that such a law was applicable, it would be necessary for the Boy Scouts of America to obey it.") (quoting Boy Scouts President and Chief Scout Executive Letter on policies regarding gay men in the Boy Scouts).

The commercial nature of the employment relationship distinguishes Title VII from public accommodation laws regulating a voluntary association's membership. *See, e.g.*, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 857, 860 (7th Cir. 2006) (forced inclusion of members in student organization that had no employees); *cf. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995) ("peculiar" application of public accommodations statute to private entity's speech without any connection to "the provision of publicly available goods, privileges, and services"). Applying public accommodation laws to an expressive association's membership policies "directly and immediately affects associational rights." *Dale*, 530 U.S. at 659.

By contrast, when the government prohibits discrimination in employment or other economic transactions, those "acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 390 (1992). To the extent that regulations of those commercial transactions have an "incidental effect" on an organization's expressive message, *Dale*, 530 U.S. at 659, those regulations are evaluated by the more deferential standard of *United States v. O'Brien*, 391 U.S. 367 (1968). Thus, while "religious and philosophical objections are protected, it is a general rule that such objections

do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services." *Masterpiece*, 138 S. Ct. at 1727.

Roncalli cites only one federal decision actually permitting employment discrimination as a form of "expressive association," and the case acknowledged the distinction between *direct* burdens on an organization's membership policies and *incidental* burdens resulting from the regulation of commercial transactions. *See* Defs.' MSJ 30-31, ECF No. 42 (citing *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 822 (E.D. Mo. 2018)).[7]

Roncalli's assertion that it has a right to engage in employment discrimination as a form of expressive association would, if accepted, have boundless consequences. Because "[t]he right to freedom of association is a right enjoyed by religious and secular groups alike," *Hosanna-Tabor*, 565 U.S. at 189, the "associational rights [of religious institutions] are no stronger than those of other private entities." *Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132, 1153 (D. Or. 2017). Thus, if Roncalli has a "freedom of association" right to engage in employment discrimination, non-religious expressive organizations would also have the same right to do so. And such a right would not be limited to issues of sexual orientation.

---

[7] *Our Lady's Inn* held that a non-discrimination ordinance prohibiting employers from discriminating based on employees' reproductive health care decisions violated a religious employer's rights of expressive association. 349 F. Supp. 3d at 820-22. But another court has reached the opposite conclusion with respect to a similar law in New York. *See Slattery v. Cuomo*, 531 F. Supp. 3d 547, 568-69 (N.D.N.Y. 2021), *appeal filed*, No. 21-911 (2d Cir. Apr. 9, 2021).

It would provide a defense to any discrimination on the basis of identity – including actions that are explicitly racist, sexist, xenophobic, or anti-veteran – if the organization could articulate an religious justification for the action, because First Amendment rights do not depend on the courts' assessment of whether a particular viewpoint is worthy of protection. *Cf. Snyder v. Phelps*, 562 U.S. 443, 458 (2011). This result would nullify all employment discrimination protections.

### B. Any burden on Roncalli's expressive association satisfies strict scrutiny.

Any cognizable burden on Roncalli's freedom of association with respect to non-ministerial employees would survive strict scrutiny. "The right to associate for expressive purposes is not . . . absolute," and "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. Those requirements are easily satisfied here.

First, Title VII and other laws prohibiting sex discrimination in employment serve "an interest of the highest order" and may be "properly applied to the secular employment decisions of a religious institution, such as those relating to a secular teacher in a church-approved school." *Rayburn*, 772 F.2d at 1169. Prohibiting sex discrimination with respect to LGBTQ people is equally compelling. "[T]he laws and the Constitution can, and in some instances must, protect [same-sex couples] in the exercise of their civil rights. The exercise of their freedom on terms equal to others

20

must be given great weight and respect by the courts." *Masterpiece*, 138 S. Ct. at 1727.

Excluding same-sex couples from marrying prohibits them from participating fully as equal members of society. *See generally Baskin v. Bogan*, 12 F. Supp. 3d 1144, 1163 (S.D. Ind. 2014), *aff'd*, 766 F.3d 648 (7th Cir. 2014); *EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 591 n.12 (6th Cir. 2018) ("Courts have repeatedly acknowledged that Title VII serves a compelling interest in eradicating all forms of invidious employment discrimination proscribed by the statute."), *aff'd sub nom. Bostock*, 140 S. Ct. 1731.

Second, Title VII and other prohibitions on discrimination in commercial transactions are viewpoint neutral and unrelated to the suppression of ideas. Like the public accommodations law in *Roberts*, Title VII's prohibition on employment discrimination "does not aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." 468 U.S. at 623.

Third, like the public accommodations law in *Roberts*, applying Title VII to prohibit discrimination in employment with respect to non-ministerial employees "responds precisely to the substantive problem which legitimately concerns the State and abridges no more speech or associational freedom than is necessary to accomplish that purpose." *Id.* at 628-29 (internal quotation marks omitted); *cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) ("The Government

has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal.").

IV.    **Adopting Roncalli's Interpretations of Section 702, Church Autonomy Doctrine, and Expressive Association Would Gut Employment Protections.**

Adopting Roncalli's interpretations of Section 702, church autonomy doctrine, and freedom of association would gift religious organizations a license to discriminate against their employees. This could have enormous impact. Religious organizations employ nearly 1.7 million people in the United States[8] and include churches, schools, hospitals, financial services, broadcasting, and endowments, in addition to the "countless coaches, camp counselors, . . . social-service workers, in-house lawyers, media-relations personnel, and many others." *Morrissey-Berru*, 140 S. Ct. at 2082 (Sotomayor, J., dissenting). Seventy-eight percent of private schools in the United States were religiously affiliated in 2014[9], and 14.5 percent of hospitals were religiously affiliated in 2016.[10] Most staff at these institutions work in non-religious roles. For example, the National Catholic Educational Association

---

[8] IBIS World, *Religious Organizations in the US - Employment Statistics 2004–2029*, https://www.ibisworld.com/industry-statistics/employment/religious-organizations-united-states/ (last visited Jan. 13, 2023).
[9] Council for American Private Education, *Private School Statistics at a Glance*, https://capenetwork.org/private-school-statistics-at-a-glance/ (last visited January 24, 2023).
[10] MergerWatch, *Growth of Catholic Hospitals and Health Systems: 2016 Update of the Miscarriage of Medicine Report*,
http://static1.1.sqspcdn.com/static/f/816571/27061007/1465224862580/MW_Update-2016-MiscarrOfMedicine-report.pdf?token=BQ0NpBtNtozUjG34D7zm6R5p8lw%3D
(last visited January 24, 2023).

reports that 97.4 percent of professional staff at Catholic schools are laity and only 2.6 percent are religious staff or clergy.[11]

Roncalli's proposed interpretations would gut employment protections[12] for these 1.7 million employees. To take two examples, a religious organization would be free to fire *any* employee upon learning of the employee's pregnancy or disability, as long as the employer alleges a religious motivation, undermining the great, hard-fought gains won by the Pregnancy Discrimination Act and the Americans with Disabilities Act. These are precisely the types of employment decisions that our nation's anti-discrimination laws seek to prevent. Accepting Roncalli's radical analysis would improperly limit our civil rights protections far beyond anything the Constitution requires.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's judgment.

Dated: February 2, 2023          Respectfully submitted,

                                 */s/ Aditi Fruitwala*

                                 ADITI FRUITWALA
                                 DANIEL MACH

---

[11] National Catholic Educational Association, *Enrollment and Staffing*, https://www.ncea.org/NCEA/Who_We_Are/About_Catholic_Schools/Catholic_School_Data/Enrollment_and_Staffing.aspx?WebsiteKey=60819b28-9432-4c46-a76a-a2e20ac11cfd (last visited January 26, 2023).
[12] Title VII is just one of the fundamental anti-discrimination statutes aimed at protecting vulnerable populations. Some others include the Americans with Disabilities Act, 42 U.S.C.A. § 12101; Age Discrimination in Employment Act, 29 U.S.C.A. § 621; and the Equal Pay Act, 29 U.S.C.A. § 206, all of which would also be impacted by Roncalli's inaccurate and expansive proposed interpretations.

JOSHUA BLOCK
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
afruitwala@aclu.org
dmach@aclu.org
jblock@aclu.org

KENNETH J. FALK
American Civil Liberties Union of Indiana
1031 E Washington Street
Indianapolis, IN 46202
Tel: (317) 635-4059
kfalk@aclu-in.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,909 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with 12-point Century Schoolbook font.

Dated: February 2, 2023                    */s/ Aditi Fruitwala*
                                           Aditi Fruitwala

                                           *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:  February 2, 2023          */s/ Aditi Fruitwala*
Aditi Fruitwala

*Counsel for Amici Curiae*