No. 22-2954

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

MICHELLE FITZGERALD,

*Plaintiff-Appellant,*

v.

RONCALLI HIGH SCHOOL, INC., AND
ROMAN CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
Case No. 1:19-cv-04291 – Judge Richard L. Young

### APPELLEES' RESPONSE BRIEF

Luke W. Goodrich
*Counsel of Record*
Joseph C. Davis
Daniel H. Blomberg
The Becket Fund for
 Religious Liberty
1919 Pennsylvania Ave. N.W.,
 Ste. 400
Washington, DC 20006
(202) 955-0095
lgoodrich@becketlaw.org

*Counsel for Defendants-Appellees*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2954

Short Caption: Michelle Fitzgerald v. Roncalli High School, Inc., et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Roncalli High School, Inc.

    Roman Catholic Archdiocese of Indianapolis, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    The Becket Fund for Religious Liberty

    Wooton Hoy LLC (trial court counsel previously associated with Fitzwater Mercer / Mercer Belanger)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Luke W. Goodrich    Date: 04/10/2023

Attorney's Printed Name: Luke W. Goodrich

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ✔  No ☐

Address: The Becket Fund for Religious Liberty

    1919 Pennsylvania Avenue, NW, Suite 400, Washington, D.C. 20006

Phone Number: 202-995-0095    Fax Number: 202-995-0090

E-Mail Address: lgoodrich@becketlaw.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2954

Short Caption: Michelle Fitzgerald v. Roncalli High School, Inc., et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Roncalli High School, Inc.

Roman Catholic Archdiocese of Indianapolis, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Becket Fund for Religious Liberty

Wooton Hoy LLC (trial court counsel previously associated with Fitzwater Mercer / Mercer Belanger)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Joseph C. Davis      Date: 04/10/2023

Attorney's Printed Name: Joseph C. Davis

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address: The Becket Fund for Religious Liberty

1919 Pennsylvania Avenue, NW, Suite 400, Washington, D.C. 20006

Phone Number: 202-995-0095      Fax Number: 202-995-0090

E-Mail Address: jdavis@becketlaw.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2954

Short Caption: Michelle Fitzgerald v. Roncalli High School, Inc., et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Roncalli High School, Inc.

Roman Catholic Archdiocese of Indianapolis, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

The Becket Fund for Religious Liberty

Wooton Hoy LLC (trial court counsel previously associated with Fitzwater Mercer / Mercer Belanger)

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Daniel H. Blomberg    Date: 04/10/2023

Attorney's Printed Name: Daniel H. Blomberg

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]  No [✔]

Address: The Becket Fund for Religious Liberty

1919 Pennsylvania Avenue, NW, Suite 400, Washington, D.C. 20006

Phone Number: 202-995-0095    Fax Number: 202-995-0090

E-Mail Address: dblomberg@becketlaw.org

rev. 12/19 AK

## TABLE OF CONTENTS

DISCLOSURE STATEMENTS .................................................................... i

TABLE OF AUTHORITIES .................................................................... vi

STATEMENT CONCERNING ORAL ARGUMENT ................................. 1

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF ISSUES ....................................................................... 1

INTRODUCTION .................................................................................... 2

STATEMENT OF THE CASE .................................................................. 4

    I.  Factual Background .................................................................... 4

        A.  The Archdiocese and Roncalli ............................................. 4

        B.  Fitzgerald's Role in Guidance .............................................. 6

        C.  Fitzgerald's Role in Roncalli's Senior Leadership ................. 13

        D.  Fitzgerald's Nonrenewal .................................................... 16

    II.  Procedural Background ............................................................. 16

SUMMARY OF ARGUMENT ............................................................... 18

ARGUMENT ....................................................................................... 20

    I.  Fitzgerald's claims are barred by the ministerial exception under *Starkey*. . 20

        A.  The ministerial exception bars claims by ministers suing over their employment. ................................................... 20

        B.  Fitzgerald was a minister, as *Starkey* demonstrates. ................ 21

        C.  Fitzgerald's counterarguments are meritless. ........................... 26

    II.  Fitzgerald's claims are barred by Title VII's religious exemption. ................. 32

        A.  Title VII allows religious organizations to hire individuals of a particular religious belief, observance, or practice. ....................... 33

        B.  The district court's and Fitzgerald's contrary arguments are mistaken... 38

    III.  Fitzgerald's claims are barred by the First Amendment. ............................. 41

        A.  Fitzgerald's claims are barred by church autonomy. ................... 41

        B.  Fitzgerald's claims are barred by freedom of association. ........................ 43

C.  Constitutional avoidance requires affirmance. ..........................................46

IV. Fitzgerald's claims are barred by RFRA. .........................................46

CONCLUSION..................................................................................................47

CERTIFICATE OF COMPLIANCE..............................................................48

CERTIFICATE OF SERVICE.........................................................................48

STATUTORY ADDENDUM............................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alicea-Hernandez v. Catholic Bishop of Chi.*,
320 F.3d 698 (7th Cir. 2003) ................................................. 43

*Bear Creek Bible Church v. EEOC*,
571 F. Supp. 3d 571 (N.D. Tex. 2021) .................................... 37

*Behrend v. S.F. Zen Ctr.*,
No. 21-1905, 2023 WL 1997919 (N.D. Cal. Feb. 14, 2023).................................. 28

*Biel v. St. James Sch.*,
926 F.3d 1238 (9th Cir. 2019) ............................................... 20

*Bostock v. Clayton County*,
140 S.Ct. 1731 (2020) .......................................................*passim*

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ................................................... 44, 45

*Boyd v. Harding Academy of Memphis*,
88 F.3d 410 (6th Cir. 1996) ................................................. 40

*Bryce v. Episcopal Church in the Diocese of Colo.*,
289 F.3d 648 (10th Cir. 2002) ................................... 41, 42, 43

*Butler v. St. Stanislaus Kostka Catholic Acad.*,
609 F. Supp. 3d 184 (E.D.N.Y. 2022)....................... 28, 42, 43

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ......................................... 44, 45

*Cline v. Catholic Diocese of Toledo*,
206 F.3d 651 (6th Cir. 2000) ................................................. 40

*Corp. of Presiding Bishop v. Amos*,
483 U.S. 327 (1987) ........................................................... 4

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
450 F.3d 130 (3d Cir. 2006)...............................................*passim*

*DeMarco v. Holy Cross High School*,
4 F.3d 166 (2d Cir. 1993)..................................................... 40

*Demkovich v. St. Andrew the Apostle Par., Calumet City,*
  3 F.4th 968 (7th Cir. 2021) ................................................................ 20, 21, 32

*DeWeese-Boyd v. Gordon Coll.,*
  163 N.E.3d 1000 (Mass. 2021) ............................................................ 28

*Digit. Realty Tr., Inc. v. Somers,*
  138 S.Ct. 767 (2018) ............................................................................ 34

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
  575 U.S. 768 (2015) ............................................................................. 35

*EEOC v. Miss. Coll.,*
  626 F.2d 477 (5th Cir. 1980) .............................................................. 37

*EEOC v. Pac. Press Publishing Ass'n,*
  676 F.2d 1272 (9th Cir. 1982) ............................................................ 40

*Fidelity & Deposit Co. of Md. v. Edward E. Gillen Co.,*
  926 F.3d 318 (7th Cir. 2019) .............................................................. 33

*Fulton v. City of Philadelphia,*
  141 S.Ct. 1868 (2021) .......................................................................... 45

*Gordon Coll. v. DeWeese-Boyd,*
  142 S.Ct. 952 (2022) ........................................................................... 28

*Grussgott v. Milwaukee Jewish Day Sch., Inc.,*
  882 F.3d 655 (7th Cir. 2018) ............................................... 27, 28, 29, 32

*Hall v. Baptist Mem'l Health Care Corp.,*
  215 F.3d 618 (6th Cir. 2000) .............................................................. 43

*Hankins v. Lyght,*
  441 F.3d 96 (2d Cir. 2006) .................................................................. 47

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
  565 U.S. 171 (2012) ......................................................................*passim*

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
  515 U.S. 557 (1995) ............................................................................. 45

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.
  Am.,*
  344 U.S. 94 (1952) ............................................................................... 41

*Kennedy v. St. Joseph's Ministries, Inc.*,
   657 F.3d 189 (4th Cir. 2011) .................................................................. 40

*Korte v. Sebelius*,
   735 F.3d 654 (7th Cir. 2013) .................................................................. 47

*Larsen v. Kirkham*,
   499 F. Supp. 960 (D. Utah 1980) ......................................................... 39

*Listecki v. Off. Comm. of Unsecured Creditors*,
   780 F.3d 731 (7th Cir. 2015) .................................................................. 46

*Little v. Wuerl*,
   929 F.2d 944 (3d Cir. 1991).................................................. 34, 37, 39

*Maguire v. Marquette Univ.*,
   627 F. Supp. 1499 (E.D. Wis. 1986) ............................................. 37, 39

*McClure v. Salvation Army*,
   460 F.2d 553 (5th Cir. 1972) .................................................................. 40

*Nielen-Thomas v. Concorde Inv. Servs., LLC*,
   914 F.3d 524 (7th Cir. 2019) .................................................................. 34

*NLRB v. Catholic Bishop of Chicago*,
   440 U.S. 490 (1979) ............................................................................ 42, 46

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ....................................................................................... 4

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S.Ct. 2049 (2020) ..........................................................................*passim*

*Our Lady's Inn v. City of St. Louis*,
   349 F. Supp. 3d 805 (E.D. Mo. 2018) ................................................ 45

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l*
   *Presbyterian Church*,
   393 U.S. 440 (1969) ................................................................................. 43

*Rayburn v. General Conf. of Seventh-day Adventists*,
   772 F.2d 1164 (4th Cir. 1985) ............................................................... 32

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ................................................................................. 44

*Slattery v. Hochul,*
   61 F.4th 278 (2d Cir. 2023) .................................................................. 45, 46

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.,*
   41 F.4th 931 (7th Cir. 2022) ...................................................................*passim*

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.,*
   496 F. Supp. 3d 1195 (S.D. Ind. 2020) ....................................... 17, 34, 38

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.,*
   553 F. Supp. 3d 616 (S.D. Ind. 2021) ............................................. 18, 22

*Sterlinski v. Catholic Bishop of Chi.,*
   934 F.3d 568 (7th Cir. 2019) ...........................................................*passim*

*Tucker v. Faith Bible Chapel Int'l,*
   53 F.4th 620 (10th Cir. 2022) ................................................................ 32

*USA Gymnastics v. Liberty Ins. Underwriters, Inc.,*
   27 F.4th 499 (7th Cir. 2022) ................................................................. 36

*Widmar v. Sun Chem. Corp.,*
   772 F.3d 457 (7th Cir. 2014) ................................................................ 27

*Wilson v. Cook Cnty.,*
   937 F.3d 1028 (7th Cir. 2019) .............................................................. 25

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) .............................................................................. 42

*Woodring v. Jackson County,*
   986 F.3d 979 (7th Cir. 2021) ................................................................ 46

**Statutes**

42 U.S.C. § 2000bb-1 ................................................................................... 47

42 U.S.C. § 2000bb-3 ................................................................................... 47

42 U.S.C. § 2000e ....................................................................................*passim*

42 U.S.C. § 2000e-1 .................................................................................*passim*

42 U.S.C. § 2000e-2 ...................................................................................... 33

42 U.S.C. § 12112 .......................................................................................... 36

42 U.S.C. § 12113 ................................................................................ 36

Pub. L. 88-352, § 702 ......................................................................... 34

**Other Authorities**

1983 Code of Canon Law ...................................................................... 5

Catechism of the Catholic Church .......................................... 14, 15, 16

EEOC Compliance Manual § 12-I.C.1: Exceptions: Religious
    Organizations (Jan. 15, 2021) .................................................... 38

*Ellen Meets Indiana Guidance Counselor Shelly Fitzgerald*, YouTube,
    (Sept. 18, 2018) ................................................................................ 8

Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment
    Discrimination: Can Religious Organizations Continue to Staff on a
    Religious Basis?*, 4 Oxford J.L. & Relig. 368 (2015) ................... 35

Fed. R. App. P. 34 ................................................................................. 1

Pope Paul VI, *Gravissimum Educationis* § 8 (1965) ......................... 5

Stephanie N. Phillips, *A Text-Based Interpretation of Title VII's
    Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295 (2016) ..................... 38

## STATEMENT CONCERNING ORAL ARGUMENT

Oral argument is unnecessary because the dispositive issue in this appeal has been authoritatively decided in *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022); Fed. R. App. P. 34(a)(2)(B). There, this Court held that the Co-Director of Guidance at a Catholic school qualified as a "minister" under the First Amendment's ministerial exception, and therefore that all her employment claims were barred. Fitzgerald held the same position at the same school at the same time as the *Starkey* plaintiff, and she brings all the same claims. Thus, the dispositive issue in this appeal has been resolved in *Starkey*.

## JURISDICTIONAL STATEMENT

Appellant's jurisdictional summary is complete and correct.

## STATEMENT OF ISSUES

1.  Whether the district court correctly held that Plaintiff's claims are barred by the First Amendment's ministerial exception.

2.  Whether Plaintiff's claims are barred by Title VII's religious exemption.

3.  Whether Plaintiff's claims are barred by the First Amendment's doctrine of religious autonomy or right of expressive association.

4.  Whether Plaintiff's claims are barred by the Religious Freedom Restoration Act.

## INTRODUCTION

The question in this case is whether the Co-Director of Guidance at Roncalli High School is a "minister" under the First Amendment's ministerial exception. This Court has already answered that question in the affirmative. *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022). In *Starkey*, this Court concluded that the Co-Director of Guidance at Roncalli (there, Starkey) "was a minister under the exception," such that the First Amendment "bar[red] all her claims." This case involves the *other* Co-Director—who held the same job, at the same time, at the same school as Starkey, and who brings all the same claims. This case is therefore controlled by *Starkey*.

Fitzgerald's attempts to evade *Starkey* are meritless. Fitzgerald tries to manufacture a fact dispute by claiming that although her contract and job description required her to help pass on the Catholic faith, she didn't really do so, and in practice wasn't expected to. But Starkey tried the same thing, to no avail. As this Court recognized in *Starkey*, the employer's "expectations" are critical to determining ministerial status. And Supreme Court precedent tells courts where to look to determine those expectations—to documents like "employment agreements and faculty handbooks." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2056-57, 2066 (2020). Indeed, if such pre-litigation understandings could be so easily evaded once a dispute arose, then the core First Amendment freedom the ministerial exception protects—to hire and fire ministerial employees without fear of a civil court's second-guessing—would be illusory. A religious organization couldn't rely on the ministerial exception to protect its internal governance decisions even if (as here) it expressly designated an employee as a minister, expressly tasked the employee with religious functions, and had binding Circuit precedent holding that someone with the *exact same role in the same organization* was a minister.

But this case isn't just controlled by *Starkey*—it is even easier. For not only did Fitzgerald (like Starkey) repeatedly affirm her religious duties before this litigation arose; she expressly told the school she was in fact performing them. According to her own performance evaluation, Fitzgerald complied with her religious performance criteria by "consistently us[ing] spiritual life and resources in my counseling conversations as well as sharing my own spiritual experiences"—conduct she stated was "definitely ... a strength" at a "faith-based school" like Roncalli. Fitzgerald now claims she was stretching the truth to get a raise. But the very fact that *this* is how she would stretch the truth to get a raise at Roncalli only confirms this Court's point—that Roncalli guidance counselors were "entrusted with communicating the Catholic faith to the school's students." *Starkey*, 41 F.4th at 945. That is why Fitzgerald, like Starkey, is subject to the ministerial exception.

Even if this Court were inclined to entertain Fitzgerald's efforts to evade *Starkey*, her suit would be barred on multiple other grounds, all of which were addressed below and present alternative bases for affirmance. And this should be no surprise given the *reason* the Archdiocese declined to continue employing Fitzgerald (and Starkey): because she entered a same-sex union, in violation not just of her contract but of the Catholic Church's well-known teachings on marriage.

First, her suit is barred by Title VII's religious exemption, as Judge Easterbrook explained in his *Starkey* concurrence. This exemption permits religious organizations to employ only those who abide by the organization's religious practices. Applying the exemption's plain terms here would obviate the need to delve into constitutionally sensitive questions of ministerial status every time an employee sues over a religious employer's application of its religious requirements. Instead, it would simply give effect to Congress's determination that such suits are barred as a statutory matter, no matter the details of the plaintiff's role.

Fitzgerald's suit is also barred by the overlapping First Amendment protections of church autonomy and expressive association, both of which permit a religious school to decline to retain an employee—and especially a school leader—who rejects the teachings of its faith. And it is barred by the Religious Freedom Restoration Act (RFRA), which prohibits substantially burdening religious exercise unless the law satisfies strict scrutiny.

\* \* \*

At the First Amendment's core is the freedom of "religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 141 (3d Cir. 2006). This is a fundamental "means by which a religious community defines itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). And it includes the right to form communities adhering to the widespread, millennia-old, "decent and honorable religious" belief that "same-sex marriage should not be condoned." *Obergefell v. Hodges*, 576 U.S. 644, 672, 679-80 (2015). That is what the Archdiocese sought to do in *Starkey*, and what it seeks to do here. The district court should be affirmed.

## STATEMENT OF THE CASE

### I. Factual Background[1]

#### A. The Archdiocese and Roncalli

The Roman Catholic Archdiocese of Indianapolis is a religious community led by the Archbishop of Indianapolis, subject to the Pope, and governed under the Code of Canon Law. *See* SA.7-8; *Starkey*, 41 F.4th at 935 n.1. The Archdiocese's mission is to

---

[1]   "SA." denotes Appellees' supplemental appendix; "A." denotes Fitzgerald's appendix; "Op." denotes the district court's summary-judgment opinion; "Br." denotes Appellant's opening brief; "Dkt." denotes district-court docket entries.

"live the Gospel" by worshiping God in word and sacrament, sharing the Catholic faith, and serving the needy. SA.13.

Roncalli High School—named after Pope John XXIII, born Angelo Roncalli (SA.92 ¶23)—is a Catholic high school that exists to further the Archdiocese's "mission and purposes." SA.1. Roncalli seeks "to form Christian leaders in body, mind, and spirit" and help students "respond to the call of discipleship." SA.13; *accord* SA.89-90 ¶9. As explained in the student handbook, "the most important program at Roncalli" is "spiritual formation," because "true education is aimed at the formation of the human person in the pursuit of his ultimate end." A.228.

The relationship between the Archdiocese and Roncalli is governed by Catholic theology and canon law. Canon law requires the Archbishop to "take care" that Catholic schools be established and "regulate and watch over" their operations. 1983 Code c.802, §1; c.804, §1. Catholic schools serve as "the principal assistance to parents" in forming children in the Catholic faith. *Id.* c.795-96. Thus, Catholic educators must "bear witness to Christ" "by their life as much as by their instruction." Pope Paul VI, *Gravissimum Educationis* §8 (1965). And canon law requires them to be "outstanding in correct doctrine and integrity of life." 1983 Code c.803, §2.

To that end, Roncalli's faculty handbook charges the principal with hiring "faculty and staff whose values are compatible" with Roncalli's mission. SA.29. Principal Chuck Weisenbach testified that he prefers hiring faithful Catholics in teaching, administrative, and guidance-counseling roles, and expects all teachers and guidance counselors to be "actively seeking opportunities to be involved in the faith formation ... of our students." SA.94-95 ¶¶32-34.

**B. Fitzgerald's Role in Guidance**

Fitzgerald began working at Roncalli in 2004 as Guidance Counselor. SA.99-100. In 2007, Fitzgerald was promoted to Co-Director of Guidance alongside her colleague Lynn Starkey. A.156 ¶7.

**1.** Like other guidance counselors and teachers at Roncalli, Fitzgerald was employed under an annual contract that incorporated a specific job description. Fitzgerald's contract was entitled "School Guidance Counselor Ministry Contract." A.127-28; *see* SA.156:12-57:7. In May 2018, Fitzgerald signed this contract "acknowledg[ing] receipt of the ministry description that is attached to this contract" and agreeing to "fulfill the duties" listed there. A.127.

The ministry description states that a guidance counselor is "a minister of the faith." A.129. The guidance counselor's first listed duty is to "Facilitate[] Faith Formation," which includes the following responsibilities:

- "Communicates the Catholic faith to students and families through implementation of the school's guidance curriculum … [and] offer[s] direct support to individual students and families in efforts to foster the integration of faith, culture, and life."
- "Prays with and for students, families, and colleagues and their intentions. Participates in and celebrates liturgies and prayer services as appropriate."
- "Teaches and celebrates Catholic traditions and all observances in the Liturgical Year."
- "Models the example of Jesus, the Master Teacher, in what He taught, how He lived, and how He treated others."
- "Conveys the Church's message and carries out its mission by modeling a Christ-centered life."
- "Participates in religious instruction and Catholic formation, including Christian services, offered at the school[.]"

A.129.

The ministry description reaffirms that "Catholic schools are ministries of the Catholic Church" and that guidance counselors are "expressly charged with leading

students toward Christian maturity and with teaching the Word of God" and are "vital ministers sharing the mission of the Church." A.132.

Fitzgerald's contract also states that she "acknowledges having been provided with a copy of the Faculty Handbook" and "agrees that conscientious observance of the Faculty Handbook ... is an expressed duty of [her] performance of this contract." A.127. The Faculty Handbook lists the first duty of guidance counselors as "assist[ing] the students in strengthening and developing their social, emotional, intellectual and Christian development." SA.207, 209.

Angela Maly, a current guidance counselor at Roncalli, confirmed that the ministry description accurately describes "the day-to-day expectations" of the role. SA.217 ¶39; *accord* SA.93 ¶25. Roncalli guidance counselors are "required to, and do, assist students" not only with their "academic" needs, but also with their "social, mental," "emotional, and spiritual needs." SA.212 ¶4. In doing so, Maly "regularly pray[s] with students" in counseling sessions, leads students in collective prayer and worship at the school's chapel, and models "faith in action" for her students by participating in "mission trips and service projects" alongside them. SA.213-14, 216 ¶¶13, 20, 33-35.

Guidance counselors are in a unique position to influence students' mental, emotional, and spiritual needs. As Principal Weisenbach explained, Guidance "is the only school department whose staff members hold one-on-one meetings with every student throughout the year." SA.93 ¶28. Thus, "counselors are often the first to identify when students are grappling with difficult social, mental, academic, emotional, family, or spiritual issues." SA.93 ¶28. Guidance counselors are also a "crucial component of Roncalli's Student Assistance Program, where they work with other staff members to support students who could be facing any of a number of challenges (social, emotional, mental health, abuse, substance use, addictions, family, suicidal ideation, etc."). SA.93 ¶29; *see also infra* pp.12-13. Roncalli seeks to have those issues addressed in a

7

way that conveys the Church's teachings and forms students in the faith. SA.97-98
¶47.

For example, Maly testified that in her role as guidance counselor, she has coun-
seled students on issues of "anxiety, stress, depression, romantic relationship issues,
thoughts of suicide, sexual orientation, gender identity, and questions and doubts
about the Catholic faith and its moral teachings." SA.212 ¶6. In doing so, she "often
recommend[s] that we 'offer the struggle up to Christ through prayer.'" SA.212 ¶9.
Representative conversations have included talking a student through "how to rely
on God" during a breakup and assuring students "struggling to reconcile their sexual
orientation with their faith" that they are loved by God and "not define[d]" by their
orientation. SA.212-13 ¶¶7-12. In 2021, a student emailed Maly, thanking her for
"play[ing] a huge role in shaping the person [she is] today" and including a reflection
shared with the entire school, where she thanked Maly for encouraging her to "spend
time in the chapel alone with God each day." SA.214 ¶22.

Similarly, one of Fitzgerald's students told a national TV audience that Fitzger-
ald's room at school was her "safe spot," that Fitzgerald was "my person at Roncalli,"
and that Fitzgerald "was always there for" her as she worked through "quite a few
issues." *See Ellen Meets Indiana Guidance Counselor Shelly Fitzgerald*, YouTube, at
5:17-5:30, (Sept. 18, 2018), https://www.youtube.com/watch?v=UBPG0BexvtY; A.8
¶72. Another student testified that she went to Fitzgerald at least monthly for "dis-
cussions about my mental health" when she "was struggling with depression," and
Fitzgerald helped "ease my stress and depression." A.211 ¶¶9-10.

While guidance counselors also help students with academic and career-related
issues, Maly testified that "[f]aith and prayer are ... essential components" in ad-
dressing these issues, too. SA.212 ¶10. Maly, for example, has encouraged students
to pray through issues of scholarships, college, career, and class choices, helping them

"realize that God is in control" and "letting them know that I am there to ... help them be the best version of who God intended them to be." SA.212-13 ¶¶9-12.

**2.** For several years prior to acknowledging the ministry description in her 2018 contract, Fitzgerald herself affirmed the faith-formation aspects of her role.

In May 2016, for example, Fitzgerald was part of a discussion with Roncalli administrators on whether guidance counselors' pay should be salaried or hourly. During that discussion, Starkey transmitted a letter over her and Fitzgerald's names, which asserted that "school counselors qualify for a salaried contract to the same degree as ... teachers do," because they have the same "ministry" duties. SA.220.

In particular, this letter referenced "ArchIndy's Ministry Description for 'Teacher' (2.22.2016)," and explained that "[i]f school counselors had a Ministry Description, it would be identical to that of teachers, except for III.B.2 (daily lesson plans) and III.C.5 (efficient classroom routines)." SA.220; *see* SA.228:5-229:3, SA.230:7-15; SA.231-34. The duties this letter identified as "identical" match the duties in the ministry description for guidance counselors noted in bullet points above (*supra* p.6)—including "[p]rays with and for students," "[c]ommunicates the Catholic faith to students," "[p]articipates in spiritual retreats, days of reflection, and spiritual formation programs," "[d]isplay[s]" "Gospel values," "lead[s] their students toward Christian maturity," and "teach[es] the Word of God." SA.231-34; *compare* A.129-32.

After receiving the letter, Principal Weisenbach shared it with Archdiocesan staff, calling it a "letter written by Lynn and Shelly" and agreeing that of the "67 items listed on the archdiocesan ministry description for a teacher," "[a] guidance counselor fulfills 65 of the 67." SA.235. In response, Fitzgerald emailed him stating, "It's wonderful having you on our side." SA.237.

The next school year after this discussion, Fitzgerald's (and Starkey's) contracts began cross-referencing this "ministry description," SA.205, and her 2017-18 contract was entitled a "Ministry Contract," SA.203.

Also between 2014 and 2016, Starkey and Fitzgerald worked together to implement new evaluation criteria for the counselors they supervised. Previously, Roncalli had used the Catholic Educator Advancement Program (CEAP) to evaluate teachers' entitlement to "advance in their career levels and pay scale based on their performance." SA.95 ¶¶36-37. On Fitzgerald's and Starkey's "prompting," Roncalli extended that program to guidance counselors, with Fitzgerald and Starkey charged with "adapt[ing]" the criteria, SA.95 ¶37.

Those criteria required guidance counselors to perform many of the same religious tasks that would later be included in the ministry description. In particular, under the heading "Spirit of Roncalli Formation," Fitzgerald's and Starkey's criteria identified the following as characteristics of a "Distinguished School Counselor":

- "School counselor embraces, embodies and lives out the spirit of Saint John XXIII as evidenced by their living out of his traits in their ministry at Roncalli."
- "School counselor connects with students' spiritual life and resources in counseling (e.g. retreat, church, youth ministry, mission work)."
- "School counselor consistently attends Sunday mass or their denominational church service."

SA.109; *see* SA.240. Given these criteria, as Principal Weisenbach explained, "you are not eligible for advancement unless you're actively choosing to advance our Catholic mission." SA.96 ¶39.

Fitzgerald went through CEAP in 2016. SA.251-59; *see* SA.96 ¶42. In her CEAP self-assessment, Fitzgerald explained that she meets with students individually at least once a year "but often times, much more" and discusses "personal and social issues … and faith formation." SA.254-55. Such "personal and social counseling," she said, "is an important part of my daily work." SA.255.

As for "Spirit of Roncalli Formation," Fitzgerald stated she "love[s] … sharing [her] experiences and faith with others," and was "working the first retreat of the year, and plan[ning] to help more with St. Vincent de Paul," a food pantry. SA.258. She also emphasized:

> I consistently attend Sunday church service, all masses at Roncalli, and morning communion services when I am able. I consistently use spiritual life and resources in my counseling conversations as well as sharing my own spiritual experiences. … I am faithful, and have no problems sharing my beliefs and my love of God. In a faith-based school, I feel this definitely is a strength when working with young people who are seeking direction.

SA.258.

Fitzgerald's narrative ends with her four "Goals" for the coming year, which included working "a senior retreat." SA.259. In light of this evaluation, Fitzgerald was designated a Distinguished School Counselor. SA.167:11-13; SA.96 ¶42.[2]

Fitzgerald's self-evaluation is consistent with other contemporaneous statements about her role. For example, in 2018, a Roncalli board member and the father of two of her counselees praised Fitzgerald in a letter to Roncalli leadership for being "a faithful minister of the Church's teachings" and "always preach[ing] the message of the Gospel in the meetings with my family." SA.260.

Former guidance counselor Autumn Currens—another of Fitzgerald's declarants, A.178-84—also went through CEAP and identified her performance of religious duties in her counseling role. In her self-evaluation, Currens said she fulfilled the "Spirit of Roncalli Formation" criteria by "encouraging faith with my students" and "highly encourag[ing] students to attend retreat." SA.276. She stated she had become "more confident in" doing so by attending a retreat herself, going through the Rite of

---

[2]   Fitzgerald includes a document in her appendix that she calls "Fitzgerald CEAP Assessment." In fact, Fitzgerald has included only a handful of pages of that document, simply omitting the relevant portions discussed here. *Compare* A.140-43, *with* SA.251-59.

Christian Initiation of Adults (the process for entering the Catholic Church as an adult), and attending Mass. SA.276.

And even before CEAP, Fitzgerald's evaluations indicate the importance of faith to her work. For example, in a 2014 performance review, Principal Weisenbach commended her success in "find[ing] more ways to celebrate Christ, specifically through reading, journaling, praying, etc.," directing her to "[k]eep your focus strong here." A.147.

**3.** Consistent with the expectation that she participate in religious services, Fitzgerald regularly attended monthly Masses at Roncalli, receiving Holy Communion alongside her students and counselors who reported to her. SA.138:16-139:22; *see* SA.92 ¶24.

Consistent with her job description, Fitzgerald also participated in the Student Assistance Program (SAP). SA.121:15-18; *see* SA.209. As the student handbook states, SAP seeks to identify students "experiencing physical, social, emotional or spiritual difficulties" and offer "affirmation, support, direction, counseling and community referrals," giving them the "opportunities for growth and development that God intends." SA.280. Fitzgerald met regularly with SAP "to discuss at-risk students and connect them with resources," A.166 ¶89, and was the contact for anonymous referrals, SA.129:14-130:15.

As Fitzgerald notes, one issue SAP covered was drug and alcohol use. Br.12. At her deposition, Fitzgerald also acknowledged SAP sweeps more broadly and would encompass a student dealing with "mental health issues" or "depression." A.82:1-10. Agreeing, Maly testified that besides substance abuse, SAP addresses issues of "depression, anxiety, eating disorders," or "any form of bullying, self-harm, aggressive behaviors" or "harassment." SA.213 ¶¶14-16; *see also* App.23 ¶29 (Weisenbach, other

examples). And addressing these issues "includes discussing ... the resources to teach [students] how to pray and talk to God about" them. SA.214 ¶17.

Finally, in keeping with her CEAP goal, Fitzgerald attended and spoke at Roncalli's senior retreat. *See* A.174 ¶¶145, 147; *see supra* p.11. Roncalli has a "retreat program" for each class year, "culminat[ing]" in the senior retreat. App.6 ¶35. That retreat—the "Christian Awakening Retreat," SA.283—is a multi-night gathering Principal Weisenbach described as "the cornerstone of the senior experience." SA.96 ¶41. Its "ultimate goal" is to "help students understand how Christ is present in their daily life." SA.216 ¶35. Fitzgerald's complaint agrees the retreat is "a deeply personal and emotional experience" whose purpose is to give students "an opportunity to explore and reflect upon their personal and spiritual growth." A.12 ¶¶98-99.

In 2016, Fitzgerald gave the retreat's opening talk, entitled "Graph of Life," in which she discussed a Scripture passage, shared how her "relationship with God shifted throughout [her] life," and conveyed to students that "[a] person's relationship with God has highs and lows ... , and those shape the sort of personal relationship that person has with God in the present." SA.176:2-20; SA.179:21-185:11; SA.284-85. Afterward, students went "to a quiet place" and crafted "their own Graph of Life," based on Fitzgerald's message. SA.186:19-187:7.

### C. Fitzgerald's Role in Roncalli's Senior Leadership

Fitzgerald was not only tasked with "communicating the Catholic faith to students," she was also "one of the school leaders" responsible for "guiding the religious mission of the school." *Starkey*, 41 F.4th at 940.

As Co-Director of Guidance, Fitzgerald was the Co-Chair of the Guidance Department, SA.118:20-119:4, tasked with (*inter alia*) working with the Principal in hiring and supervising Guidance personnel. A.75:5-13; *see* SA.63.

Fitzgerald also served on Roncalli's Administrative Council, which Principal

Weisenbach described as the school's "main leadership body." SA.88 ¶4. The Council consists of the Principal, Campus Minister, Chaplain, two Assistant Principals, Dean of Students, Athletic Director, and Co-Directors of Guidance. SA.88 ¶4. Along with the Principal and Assistant Principal for Academic Affairs, the Director of Guidance (Fitzgerald's role) "is the only staff member who serves on both" the Administrative Council and the Department Chairpersons group. SA.89 ¶7.

During Fitzgerald's tenure, the Council met weekly, always opening in prayer. A.92:7-14; A.98:13-15. As Principal Weisenbach explained, frequent meetings were necessary because of the "urgent issues" addressed. SA.89 ¶8. Undisputed meeting agendas and notes confirm this, showing that Council discussions almost invariably began with "Student/family issues"—like health problems (*e.g.*, SA.286), bereavement (*e.g.*, SA.288), and faith developments (*e.g.*, "parents raised in evangelical churches; whole family is going thru RCIA [*i.e.*, becoming Catholic]," SA.292).

The Council also "makes decisions related to the school's religious mission." *Starkey*, 41 F.4th at 936. As Principal Weisenbach testified, "[m]ost faculty and staff recognize the Administrative Council as the lifeblood of decision-making at the school," and "the Administrative Council and the Department Chairs are responsible for 95% of Roncalli's daily ministry, education, and operations." SA.89 ¶¶5-7.

For example, the Council helped plan all-school liturgies, including by discussing who should serve "as Eucharistic ministers"[3] and whether to include "Eucharistic adoration."[4] SA.141:16-142:19; SA.147:12-149:3; SA.149:12-150:5; SA.294-95; SA.286-87. It discussed "[h]ow to get [students] more involved in the [M]ass," including "conversations about whether the music director should be heading the music instead of

---

[3]   *I.e.*, "'an acolyte or another member of the Christian faithful designated' to distribute Communion." *Starkey*, 41 F.4th at 936-37 & n.2 (quoting 1983 Code c.910, §2)).

[4]   *I.e.*, the "exposing" of "consecrated hosts"—bread that has become the Body of Christ—"to the solemn veneration of the faithful." Catechism of the Catholic Church ¶1378.

the nun." A.102:16-103:15; SA.145:22-146:20; *see* SA.297; SA.287 ("Concerns with the sung [M]ass (longer, less attentive, less engaged")). It discussed how to "[s]hape" a student "morality survey" on important Catholic beliefs regarding sexual activity, dishonesty, and drug use "to assist with our strategic planning goal of 'Forming intentional disciples.'" SA.154:8-155:12; SA.300. And it discussed whether "we [should] have information about the charisms[5] [of St. John XXIII] on our web site" (SA.299) and the "Senior Religion Capstone Project" for the Religion Department (SA.300-01).

Council agendas specifically show input from Fitzgerald on such issues. After the Parkland shooting, for example, Fitzgerald encouraged holding a "prayer service to honor kids who were killed." SA.296-97; *see also* SA.90 ¶13; A.99:8-100:12. In another meeting, Fitzgerald weighed in on a draft Archdiocesan policy dealing with transgender issues, expressing "concern" over a provision that would require school employees "to notify [a] youth's parents" if a student began identifying as transgender. SA.150:18-152:14; SA.292. In performance evaluations, Principal Weisenbach praised Fitzgerald's "input on the administrative council," A.148, and "the insights and ideas that [she] br[ought] to our weekly meetings." A.150; *cf*. SA.90 ¶12.

Further, Fitzgerald participated in a Council discussion group on a book called *Living as Missionary Disciples: A Resource for Evangelization*. SA.245-46. That book is published by the United States Conference of Catholic Bishops and designed to help "pastoral leaders" as they "develop, enhance, and review their own local strategies" to pursue evangelization. SA.225:21-226:10; *see* SA.90-91 ¶¶14-17. Fitzgerald confirmed why this discussion occurred: because the school "had taken a survey that showed that kids weren't attending church ... and they wanted to see ... how Roncalli could evangelize better." SA.144:7-14.

---

[5]    *I.e.*, "graces of the Holy Spirit" helping faithful Catholics "undertake various tasks and offices for the renewal and building up of the Church." Catechism of the Catholic Church ¶¶798-99.

### D. Fitzgerald's Nonrenewal

In May 2018, Roncalli renewed Fitzgerald's employment, with Fitzgerald signing the "School Guidance Counselor Ministry Contract" noted above. *Supra* p.6. Besides the provisions already discussed, the contract stated: "The School Guidance Counselor shall be deemed to be in default under this contract in the event of … any personal conduct or lifestyle at variance with the policies of the Archdiocese or the moral or religious teachings of the Roman Catholic Church." A.128. A default provision like this was included in Fitzgerald's annual employment contracts ever since she started at Roncalli in 2004. *See, e.g.*, SA.99-100; SA.156:20-164:19.

Fitzgerald's contract also provided she would "be in default under this contract" if she engaged in "any breach of duty," including "[r]elationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church." A.128.

In August 2018, Roncalli learned that Fitzgerald had entered a same-sex union. A.6 ¶52; Dkt.29 ¶52. Because this conduct violated Fitzgerald's contract and Church teaching, Fitzgerald was placed on "paid administrative leave" for the remainder of her contract, which was not renewed. A.7-8 ¶¶56, 66; Dkt.29 ¶¶56, 66; *see* Catechism of the Catholic Church ¶1660.

That same month, Starkey informed Roncalli that she too was in a same-sex union. *Starkey*, 41 F.4th at 938. Her contract was also not renewed. *Id.*

## II. Procedural Background

**1.** Starkey sued the Archdiocese and Roncalli in July 2019, asserting six claims: three under Title VII (unlawful termination, retaliation, and hostile work environment); a retaliation claim under Title IX; and two state-law claims for tortious interference. *Starkey*, 41 F.4th at 938. Fitzgerald sued the Archdiocese and Roncalli three months later, claiming (like Starkey) discrimination "because of sex", and asserting the same six claims. A.1-18.

16

The cases were initially assigned to the same district judge, but different magistrates. In November 2019, however, Fitzgerald filed a Notice of Related Action, asking that the cases be assigned to the same judge and magistrate. Dkt.21. Fitzgerald explained that the cases involved the same defendants, that Fitzgerald and Starkey "held the same positions," and that "resolution of this action and the Starkey Action will require the determination of the same or substantially identical questions of law and/or fact." *Id.* at 1-2. The request was granted.

**2.** The Archdiocese moved for judgment on the pleadings in both cases. The Archdiocese argued it was exempt from Starkey's and Fitzgerald's Title VII claims under Title VII's religious exemption; that the Title IX claims were preempted by Title VII, and that all their claims were barred by the First Amendment's protections for church autonomy and expressive association. *See* A.19-20.

In October 2020, the district court ruled on the *Starkey* motion, dismissing the Title IX claim as preempted but otherwise denying the motion. *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195 (S.D. Ind. 2020). Addressing Title VII's religious exemption, the court took a "narrow" view, holding it applies only where the plaintiff claims "religious" discrimination. *Id.* at 1201-05. The Archdiocese noticed an interlocutory appeal.

Fitzgerald attempted to intervene in the appeal. Mot. to Intervene, *Starkey*, No. 20-3265, Dkt.20 (7th Cir.). She explained that the cases "arise from a common nucleus of operative facts and present questions of law common to both cases," including "essentially identical legal arguments," such that "resolution of [the *Starkey* appeal] is likely to affect Fitzgerald's case." *Id.* at 2, 5. This Court denied intervention without opinion.

**3.** Back at the district court, the Archdiocese moved for summary judgment in *Starkey*, asserting ministerial-exception and RFRA defenses. Soon after, in

*Fitzgerald*, the district court denied the still-pending motion for judgment on the pleadings, explaining that *Fitzgerald* and *Starkey* were "virtually identical" and thus "adopt[ing] the reasoning and conclusions" from its prior *Starkey* order. A.21, 25.

The district court then granted summary judgment in *Starkey*, holding that "the Co-Director of Guidance at Roncalli falls within the ministerial exception," barring all her claims. *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 553 F. Supp. 3d 616, 627 (S.D. Ind. 2021). Three months later, the Archdiocese moved for summary judgment in *Fitzgerald*, seeking the same result. Dkt.119.

**4.** Starkey appealed the grant of summary judgment. In August 2022, this Court unanimously affirmed. The Court agreed that "Starkey as Co-Director of Guidance qualifies as a minister," and that "the ministerial exception bars all her claims, federal and state." 41 F.4th at 941, 945.

Judge Easterbrook concurred. He explained that he did "not object" to rejecting Starkey's claims under the ministerial exception but would have held the Title VII claims barred by Title VII's religious exemption. *Id.* at 945-46 (Easterbrook, J., concurring). On a "straightforward reading," that exemption "permits a religious employer to require the staff to abide by religious rules." *Id.* at 946.

After this Court's *Starkey* ruling, the parties filed supplemental district-court briefs in *Fitzgerald*. Dkt.138, 139. In September 2022, the district court entered summary judgment for the Archdiocese, holding that "Fitzgerald's position as Co-Director of Guidance qualifies for the ministerial exception under *Starkey*." Op.13. Given its ministerial-exception ruling, the district court declined to revisit the Archdiocese's other defenses under Title VII's religious exemption, the First Amendment, or RFRA. *Cf.* A.61-66. Fitzgerald appealed.

## SUMMARY OF ARGUMENT

**I.** The district court correctly held that this case is barred by the ministerial

exception under *Starkey*. Fitzgerald held the same role as the plaintiff in *Starkey*, at the same school, at the same time, and she brings the same claims. Like the *Starkey* plaintiff, Fitzgerald was designated as a minister in her contract; was tasked with forming students in the faith, praying with them, and worshiping with them; and was asked to teach and model the Catholic faith while counseling students through some of the most sensitive issues of their lives. She also served in the same leadership role as the *Starkey* plaintiff, where she supervised other guidance counselors, developed religious criteria to evaluate their work, and helped shape the religious mission of the entire school. The ministerial exception bars Fitzgerald's claims just as it barred the claims in *Starkey*.

**II.** Title VII also bars Fitzgerald's claims. Title VII states that it "shall not apply" to a religious organization "with respect to the employment of individuals of a particular religion." It defines "religion" to include "all aspects of religious observance and practice." Here, it is undisputed that the Archdiocese based its employment decision on Fitzgerald's rejection of the Archdiocese's "particular" "religious observance and practice" of marriage. That decision is protected by Title VII.

**III.** Multiple constitutional doctrines further bar Fitzgerald's claims, regardless of whether she is a minister. First, the church-autonomy doctrine protects the Archdiocese's freedom to select educators in Catholic schools who uphold its core religious teachings. Second, the freedom of expressive association protects the Archdiocese's right not to employ individuals who would undermine the Church's religious message. Finally, the doctrine of constitutional avoidance requires the Court to construe Title VII to avoid these constitutional problems.

**IV.** Fitzgerald's claims are also barred by RFRA because punishing the Archdiocese for asking school leaders to follow Church teaching would substantially burden the Archdiocese's religious exercise and cannot satisfy strict scrutiny.

# ARGUMENT

## I. Fitzgerald's claims are barred by the ministerial exception under *Starkey*.

This Court recently resolved the appeal of Fitzgerald's Co-Director of Guidance at Roncalli, holding that because "Starkey as Co-Director of Guidance qualifies as a minister," the "ministerial exception bars all her claims." *Starkey*, 41 F.4th at 941, 945. Fitzgerald held the same role, at the same school, at the same time, and brings the same claims. *Starkey* requires the same result.

### A. The ministerial exception bars claims by ministers suing over their employment.

Under the ministerial exception, "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady*, 140 S.Ct. at 2060. This rule "ensures that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone." *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 975 (7th Cir. 2021) (en banc) (cleaned up).

The ministerial exception serves a critical role in protecting religious groups' "independence on matters 'of faith and doctrine.'" *Our Lady*, 140 S.Ct. at 2060. Without it, "a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." *Id*. And the exception has deep First Amendment roots: "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 184 (2012).

The exception applies not just to "clergy" but to "any 'employee' who ... serves as a messenger or teacher of" the employer's faith. *Our Lady*, 140 S.Ct. at 2060, 2064. One of the most common applications is to educators at religious schools. *See Biel v. St. James Sch.*, 926 F.3d 1238, 1248 (9th Cir. 2019) (Nelson, J., dissenting from denial of

reh'g en banc) (collecting cases), *rev'd sub nom. Our Lady*, 140 S.Ct. 2049. As the Supreme Court has explained, "[i]n the Catholic tradition, religious education is 'intimately bound up with the whole of the Church's life.'" *Our Lady*, 140 S.Ct. at 2065 (quoting Catechism). And "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* at 2064.

In applying the exception, the central question is "whether the employee served a religious function." *Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568, 570 (7th Cir. 2019). But as this Court and the Supreme Court have repeatedly clarified, this inquiry doesn't authorize courts to "second-guess[]" what the employer believes "about its own organization and operations." *Id.*; *accord Our Lady*, 140 S.Ct. at 2066. Rather, in evaluating "[w]hat an employee does," the court asks "what an employee is entrusted to do, not simply what acts an employee chooses to perform." *Starkey*, 41 F.4th at 941. This reflects that the ministerial exception is but one component of "church autonomy"—which "teaches that avoidance, rather than intervention," is the default in "disputes involving religious governance." *Demkovich*, 3 F.4th at 975.

Courts applying the ministerial exception may also look to other "considerations," including the employee's "title," "the substance reflected in that title," and "her own use of that title." *Hosanna-Tabor*, 565 U.S. at 192. But these aren't "necessarily important" in every case. *Our Lady*, 140 S.Ct. at 2063.

**B. Fitzgerald was a minister, as *Starkey* demonstrates.**

This Court has applied the ministerial exception to a wide variety of roles. *Demkovich*, 3 F.4th at 983-84 (collecting cases). Most recently, in *Starkey*, this Court applied the exception to the *exact same role* at issue here.

**1.** Starkey, like Fitzgerald, was Co-Director of Guidance at Roncalli. Starkey, like Fitzgerald, was nonrenewed after Roncalli learned she had entered a same-sex union.

41 F.4th at 938. Starkey, like Fitzgerald, sued, alleging the same Title VII and state-law claims Fitzgerald presses here. Starkey, like Fitzgerald, lost on summary judgment, with the district court holding the ministerial exception covered "Starkey's role as Co-Director of Guidance." *Starkey*, 553 F. Supp. 3d at 623.

This Court unanimously affirmed. Starkey was a minister, this Court explained, "because she was entrusted with communicating the Catholic faith to the school's students and guiding the school's religious mission." 41 F.4th at 945.

To determine this, the Court looked to "her employment agreements and faculty handbooks," which "stat[ed] that she was expected to carry out Roncalli's religious mission." *Id.* at 940. Under these documents, a guidance counselor's "job included facilitating faith formation by communicating the Catholic religion to students, 'modeling a Christ-centered life,' and 'pray[ing] with and for students.'" *Id.* And "guidance counselors were 'to foster the spiritual, academic, social and emotional growth of the children entrusted in his/her care.'" *Id.* (quoting ministry description).

The Court further noted that Starkey wasn't just a guidance counselor but was the "Co-Director of Guidance and a member of the Administrative Council"—making her "one of the school leaders responsible for the vast majority of 'Roncalli's daily ministry, education, and operations.'" *Id.* As Co-Director of Guidance, she had "supervisory authority" over other counselors, who were likewise tasked with the above religious duties. *Id.* And as an Administrative Council member, she "was entrusted with ... advising the principal on matters related to the school's religious mission." *Id.* Moreover, as Co-Director of Guidance, she "helped develop the criteria used to evaluate guidance counselors, which included religious components like assisting students in faith formation and attending church services." *Id.*

The Court also looked to other *Hosanna-Tabor* considerations, holding they further supported ministerial status. First, under the "title" consideration,

"Roncalli ... held Starkey out as a minister." *Id.*; *see Hosanna-Tabor*, 565 U.S. at 191. "She was identified as a 'minister of the faith' in her job description and employed under a 'Ministry Contract.'" 41 F.4th at 940.

Second, Starkey held herself out as a minister by "not[ing]" her ministry duties "in salary-related communications with school administrators." *Id.* This Court highlighted Starkey's letter to Principal Weisenbach stating "that if 'school counselors had a Ministry Description, it would be identical to that of teachers,' with only two exceptions unrelated to religion." *Id.* at 936; *see* SA.220.

And the Court rejected Starkey's counterarguments (which Fitzgerald repeats here). First, Starkey argued that notwithstanding her employment documents, "she never engaged in religious matters"; "she did not speak on religious topics during Administrative Council meetings, and she would not pray or discuss religion with students during one-on-one counseling sessions." 41 F.4th at 941. But the Court said this "misunderstands the ministerial exception." *Id.* "[A]n employee is still a minister if she fails to adequately perform the religious duties she was hired and entrusted to do." *Id.* Otherwise, "an individual placed in a ministerial role could immunize themself ... by failing to perform certain job duties and responsibilities"—giving religious institutions "less autonomy to remove an underperforming minister than a high-performing one." *Id.*

Alternatively, Starkey argued that the "Ministry Description and Ministry Contracts" describing her religious duties "were pretextual," given their timing. *Id.*; *compare* Br.37. But the Court explained that "for more than 30 years, Roncalli's employment contracts included a morals clause, and all evidence shows that the school considered Starkey to be a minister and entrusted her with religious duties." 41 F.4th at 941. Given this, "the addition of a Ministry Description only made formal Starkey's" preexisting "role." *Id.*

**2.** *Starkey* controls here. Given that Starkey and Fitzgerald held the same role at the same school at the same time, the material facts are identical.

First, as in *Starkey*, Fitzgerald's "employment agreements and faculty handbooks recognized" her religious "job duties and responsibilities." *Id.* at 940. Indeed, Fitzgerald had the same contract and ministry description as Starkey. *Compare id.* at 937-38 *with* A.127-32; *see also* SA.207, 209. And here, too, the record shows that "counselors contributed to Roncalli's religious mission of putting faith into action by volunteering at service projects, going on mission trips, and attending a retreat program." 41 F.4th at 940; *see* SA.216 ¶¶33-35. Fitzgerald did so herself, giving the opening talk to students at the senior "Christian Awakening Retreat" about her "relationship with God." *Supra* p.13.

Second, like Starkey, Fitzgerald wasn't just a guidance counselor; she was also Co-Director of Guidance and an Administrative Council member. SA.88 ¶4. Fitzgerald "had supervisory authority over other guidance counselors." 41 F.4th at 940; *see* SA.63. Fitzgerald "helped develop the criteria used to evaluate guidance counselors, which included religious components like assisting students in faith formation and attending church services." 41 F.4th at 940; SA.95-96 ¶¶36-41. And Fitzgerald "was entrusted with ... advising the principal on matters related to the school's religious mission," 41 F.4th at 940—a duty she in fact repeatedly carried out. *See* SA.296-97 (Fitzgerald suggesting "prayer service" for students in response to Parkland shooting); SA.150:18-152:14, SA.292 (Fitzgerald expressing "concern" over Archdiocesan transgender policy).

Third, as with Starkey, Roncalli held Fitzgerald out as a minister—she was likewise "identified as a 'minister of the faith' in her job description and employed under a 'Ministry Contract.'" 41 F.4th at 940. Also like Starkey, Fitzgerald held herself out as a minister—the May 2016 "salary-related" letter this Court relied on was sent in

Starkey's *and Fitzgerald*'s names, *id.*; *see* SA.220, with Fitzgerald writing in a follow-up email that it was "wonderful" Principal Weisenbach agreed with them, SA.237. And more than Starkey, Fitzgerald was recognized by the school community as a minister, with a board member and parent of Fitzgerald's counselees publicly lauding her as a "faithful minister of the Church's teachings" who "has always preached the message of the Gospel in the meetings with my family." SA.260.

Indeed, this case is even easier than *Starkey*. There, this Court applied the ministerial exception even though it took as true that Starkey "never discussed religion during a student consultation." 41 F.4th at 936.

Here, however, Fitzgerald in her own job evaluation said the opposite. *See* SA.255-58. Fitzgerald said she "me[]t with students regularly" to address "faith formation"; "ha[d] no problems sharing my beliefs and my love of God" with students; and "consistently use[d] spiritual life and resources in my counseling conversations as well as sharing my own spiritual experiences." SA.255, 258. And she (correctly) described this as "a strength" in a "faith-based school" when "working with young people who are seeking direction." SA.258.

In short, the material facts in this case and *Starkey* are identical, if not stronger. Fitzgerald has admitted as much—acknowledging from the outset that "resolution of this action and the Starkey Action will require the determination of the same or substantially identical questions of law and/or fact," Dkt.21 at 1-2; *see also* Mot. to Intervene, *supra* p.17 (cases "arise from a common nucleus of operative facts" and present "essentially identical legal arguments"). Not surprisingly, the district court deemed them "virtually identical." A.21. Thus, if this Court's "[p]rinciples of stare decisis" mean anything, *Starkey* must control here. *Wilson v. Cook Cnty.*, 937 F.3d 1028, 1035 (7th Cir. 2019).

**C. Fitzgerald's counterarguments are meritless.**

**1.** Fitzgerald's efforts to evade this result fail. Fitzgerald primarily argues that even if her contract and ministry description included religious duties, she didn't "actually perform[]" them. Br.24. But besides contradicting her own self-evaluation and contemporaneous statements of students and parents who supported her, *supra* pp.8, 11, this is identical to the lead argument rejected in *Starkey*: "What an employee does involves what an employee is entrusted to do, not simply what acts an employee chooses to perform." 41 F.4th at 941.

And indeed, the acts Fitzgerald now says she didn't perform are identical to those claimed by Starkey. For example:

- Fitzgerald says that notwithstanding her contract and ministry description, she "did not pray or discuss religions with students." Br.7. Starkey said the same thing. Appellant's Br., *Starkey*, No. 21-2524, Dkt.14 ("Starkey Br."), at 14.

- Fitzgerald argues that when students raised personal or spiritual issues, she would "send[] the student to the school's social worker" or chaplain. Br.7, 27-28. Starkey did too. 41 F.4th at 936 ("[W]hen confronted with non-academic concerns, she would refer a student to a social worker or chaplain.").

- Fitzgerald says even if the Administrative Council "sometimes address[ed] ministry issues, those 'were "handled" by "the campus pastor, religion department, and priest."'" Br.29. Starkey said likewise. Starkey Br.40 ("On the occasion that the Administrative Council discussed topics connected to religious matters, Starkey deferred to the other members ... who were qualified to address those topics.").

- Fitzgerald characterizes the duties she did perform as "primarily" secular, and largely "indistinguishable from those of a guidance counselor at a public school." Br.6, 28. Ditto for Starkey. Starkey Br.13, 23 ("duties ... were secular," "varied minimally from what she now does ... at a public high school").

All these claims (however dubious) were taken as true in *Starkey*—yet they didn't change the result.

**2.** Sensing the problem, Fitzgerald tries to claim that she, unlike Starkey, disputes whether Roncalli actually "*expected* her to perform" religious duties, or whether they

were merely "dropped into [her] ... formal employment documents." Br.31, 38. But Starkey said *exactly the same thing*—that the contract and ministry description didn't "accurately ... describe ... Roncalli's expectations," making her a "minister ... on paper only." Starkey Br.31. Indeed, Fitzgerald's counsel filed an amicus brief in *Starkey* saying the same thing *about Starkey herself*: that "Starkey showed" her "formal documents" "d[id] not accurately reflect [her] employer's *actual expectations* or [her] true, on-the-ground job functions." AU Amicus Br., *Starkey*, 2021 WL 5344713, at *12-13 (emphasis added). Yet this Court rejected that theory, looking to Starkey's "employment documents" to determine what she was "entrusted to do." 41 F.4th at 940-41.

And rightly so. For one thing, under basic summary-judgment law, an employee can't "thwart summary judgment" merely by "speculating as to an employer's state of mind." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014). So neither Starkey nor Fitzgerald could defeat the ministerial exception by offering declarations espousing their *own* beliefs about *Roncalli*'s expectations.

More importantly, under binding ministerial-exception precedent, pre-litigation employment documents are treated as important (and often dispositive) evidence of the employer's expectations. In *Our Lady*, for example, the Court relied on the plaintiffs' "employment agreements and faculty handbooks" as demonstrating what they were "expected" to do—emphasizing that "the schools' definition and explanation of their roles is important." 140 S.Ct. at 2066. Likewise, *Sterlinski* relied on a church document describing the religious importance of organ playing—disclaiming the authority to "reject a church's characterization of its own theology and internal organization." 934 F.3d at 570. And in *Grussgott v. Milwaukee Jewish Day School, Inc.*, this Court relied on the school's written description of its curriculum as religious, explaining it was "the *school's* expectation—that Grussgott would convey religious teachings

to her students—that matters." 882 F.3d 655, 661 (7th Cir. 2018) (emphasis added).[6]

Of course, the documented expectations can't be "subterfuge." *Id.* at 660. But under *Grussgott*, *Sterlinski*, and *Starkey*, this inquiry is restrained, looking only to whether the expectations were "hoked up for the occasion" or instead reflect a pre-litigation understanding of the role. *Sterlinski*, 934 F.3d at 571. And here, as in *Starkey*, undisputed evidence shows *Fitzgerald herself* affirming her religious duties well before this litigation—by claiming them in the May 2016 salary communications, SA.220, SA.237; by incorporating them into evaluation criteria, SA.109; and by attesting in her own evaluation that she was indeed performing them, SA.255-58. That's far *more* evidence of "honest[y]" than supported the unanimous affirmances of summary judgment in *Grussgott*, 882 F.3d at 660, *Sterlinski*, 34 F.3d at 571, or even *Starkey* itself. *See also Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 198 (E.D.N.Y. 2022) ("While Butler contends now that his job was not ministerial in nature," he previously "acknowledged otherwise," "in a precise and explicit way.").

Fitzgerald's efforts to explain away her prior statements only further prove that Roncalli entrusted her with religious duties. For example, she now says she "disagreed" with the 2016 communications where Starkey and Principal Weisenbach touted guidance counselors' religious duties, using Fitzgerald's name and cc'ing Fitzgerald. Br.13. But even assuming this is true (despite her contemporaneous email calling the Principal's agreement "wonderful," SA.237), it still demonstrates that the

---

[6]   *See also, e.g.*, *Behrend v. S.F. Zen Ctr.*, No. 21-1905, 2023 WL 1997919, at *3-4, *7 (N.D. Cal. Feb. 14, 2023) ("after-the-fact opinion" of declarant was "not relevant to" *employer's* "view of [plaintiff's] position" on "guest services," "kitchen," and "maintenance" crews). *Cf. DeWeese-Boyd v. Gordon Coll.*, 163 N.E.3d 1000, 1013-14 (Mass. 2021) ("focus[ing] on the handbook's detailed expectations ... to understand" plaintiff's duties, but concluding they didn't trigger exception); *but see Gordon Coll. v. DeWeese-Boyd*, 142 S.Ct. 952 (2022) (statement of Alito, J., joined by Thomas, Kavanaugh, and Barrett, JJ.) ("That conclusion reflects a troubling and narrow view of religious education.").

other Co-Director of Guidance, the Principal, and Roncalli all *expected* guidance counselors to carry out those duties—which is what "matters." *Grussgott*, 882 F.3d at 661.

Similarly, addressing the CEAP evaluation, Fitzgerald says she was "exaggerat[ing]" about satisfying the religious criteria because she "wanted to get a raise." SA.174:18-175:8; *see* Op.7. But even assuming this is true, the very fact that she would exaggerate about performing religious tasks to get a raise only underscores that it was Roncalli's *expectation* that she perform them. That expectation is the critical piece—even "if she fails" (or later says she failed) "to adequately perform the religious duties she was hired and entrusted to do." *Starkey*, 41 F.4th at 941.

**3.** Aside from the dispositive expectations issue, Fitzgerald's other counterarguments likewise fail.

For example, Fitzgerald says "title" cuts against ministerial status, since public schools have guidance counselors too. Br.24. But *Starkey* held that her title *supported* ministerial status, since Starkey (like Fitzgerald) "was identified as a 'minister of the faith' in her job description and employed under a 'Ministry Contract.'" 41 F.4th at 940. Fitzgerald disagrees, Br.25 n.5, but her argument simply rejects *Starkey*.

Next, Fitzgerald attempts to impugn the testimony of counselor Angela Maly, citing a former student's declaration that Maly "never prayed" or "discussed religion with him." Br.27. But testimony by *one* student that Maly didn't pray or discuss religion *with him* doesn't conflict with Maly's testimony (backed by concrete examples and statements by other students) that she "regularly" and "often" does these things when appropriate to a student's situation. SA.212-13 ¶¶9, 13; SA.214-15 ¶22.

Alternatively, Fitzgerald cites declarations from other counselors who claim they didn't perform the religious functions detailed by Maly. Br.27. But Starkey, too, submitted declarations from the same counselors saying the same thing. *See, e.g.*, Starkey Br.37-38 (affidavit of Autumn Currens). This Court noted as much but relied

on Maly anyway. *See* 41 F.4th at 935-36 ("[a]nother former counselor disagreed" with Maly that "praying and attending liturgies ... was a regular part of her job"). And for good reason: regardless whether Fitzgerald can find others who also didn't do their jobs—and who are also (unsurprisingly) *former* Roncalli employees—Maly's *actual performance* of these religious duties confirms they are part of what guidance counselors were "entrusted to do." *Id.* at 941.[7]

Turning to the Administrative Council, Fitzgerald cites the district court for the proposition that the record viewed in her favor indicates it "only ran day-to-day operations, while other departments engaged in spiritual teaching." Br.29. But the Archdiocese's contention isn't that the Council "engaged in spiritual teaching"; it's that the Council "makes decisions related to the school's religious mission," *Starkey*, 41 F.4th at 936, rendering Fitzgerald one of a handful of "key, visible leader[s]" of a thoroughgoingly Catholic school, SA.93 ¶30; *see Our Lady*, 140 S.Ct. at 2064. Here, as in *Starkey*, that contention is confirmed by undisputed evidence.

Undisputed agendas and meeting minutes show the Council (for example) planning all-school liturgies, discussing how to bolster student involvement at Mass, and addressing a student "morality" survey implicating important Catholic beliefs. *Supra* pp.14-15. And while Fitzgerald (like Starkey) claims *she* didn't "contribute" to such conversations about "religious ministry," Br.10; *compare* 41 F.4th at 937, this appears to be mere semantics about what constitutes a "ministry" issue. Undisputed agendas and meeting minutes show *Fitzgerald*, for example, suggesting a prayer service and weighing in on the Archdiocese's transgender policy. *Supra* p.15. On the school's

---

[7]    Fitzgerald also echoes Starkey in suggesting the Court discount Maly's testimony because Maly began at Roncalli in 2018, the year Fitzgerald was put on leave. Br.27; *compare* Starkey Br.37 ("Maly's employment began in August 2018, the final year of Starkey's employment."). But *Starkey* declined that suggestion, and unsurprisingly so, since (1) Maly works under the same ministry description operative here, SA.217 ¶¶38-40; and (2) the ministry description only "formaliz[ed]" the preexisting ministry duties Starkey and Fitzgerald had repeatedly affirmed beforehand. 41 F.4th at 941.

"definition and explanation," these are ministry issues—and the school's "explanation ... is important." *Our Lady*, 140 S.Ct. at 2066.

Pivoting, Fitzgerald offers several hairsplitting distinctions, noting Starkey (1) twice led morning prayers over Roncalli's P.A. system, (2) once sent an email to teachers about preparing non-Catholic students for liturgy, and (3) previously held other jobs Fitzgerald concedes were "religious." Br.31-32. But in *Starkey* itself, Fitzgerald's counsel told this Court the two P.A. prayers were too "insignificant and incidental" to count. AU Amicus Br., 2021 WL 5344713, at *8. Nor were they important to the decision. This Court mentioned the P.A. prayers only in passing to illustrate the leadership role Starkey shared with Fitzgerald. 41 F.4th at 940; *see also* SA.91 ¶18 (Council members invited on rotation to lead them). And it did not mention the email to teachers or previous jobs in its legal analysis at all.

**4.** Finally, Fitzgerald claims the Archdiocese seeks "absolute deference" to its assertion of ministerial status, which she says would "not serve the ministerial exception's purpose." Br.34, 38-41. But *Starkey* didn't absolutely defer, and the Court needn't do so here. Rather, *Starkey* simply followed *Our Lady*—finding the Archdiocese's "definition and explanation" of Starkey's role "important," and concluding it was confirmed by other undisputed facts also present here, *Our Lady*, 140 S.Ct. at 2066; *see Starkey*, 41 F.4th at 940.

Meanwhile, it's Fitzgerald, not the Archdiocese, who would flout the ministerial exception's purposes. If ministers could reach a jury merely by offering post-litigation affidavits purporting to dispute what they said, did, and agreed to in accepting and performing a ministerial role, then almost any ministerial-exception case could go to a jury. Courts (and juries) would routinely have to engage in "incredibly difficult" "religious line-drawing"—on "what constitutes religious activity" and whether an employee "approached her [job] from a ['secular'] rather than a religious perspective"—

"entangl[ing] the government with religion." *Grussgott*, 882 F.3d at 660. And a core purpose of the exception—barring use of the "full panoply of legal process ... to probe the mind of the church" in ministerial selection, *Rayburn v. General Conference of Seventh-day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985)—would be lost, *see also Tucker v. Faith Bible Chapel Int'l*, 53 F.4th 620, 629 (10th Cir. 2022) (Bacharach, J., dissenting from denial of reh'g en banc) ("mak[ing] summary adjudication less likely" in ministerial-exception cases "extend[s] judicial entanglement in ecclesiastical matters"), *cert. pet. filed*, No. 22-741; *Demkovich*, 3 F.4th at 982-83 (citing *Rayburn*).

Moreover, religious organizations couldn't reasonably know which employees were ministers—even when (as here) the employees were senior leaders, were expressly designated as ministers, were tasked with religious functions, and reported that they were "consistently" carrying out those functions. Indeed, the organization couldn't even know who was a minister when binding Circuit precedent *already held* that the *exact same role in the same organization at the same time* qualified for the exemption. It's the rare religious organization that would feel "free to choose those who will guide it on its way," *Hosanna-Tabor*, 565 U.S. at 196, given the gossamer version of the ministerial exception Fitzgerald seeks to spin up here.

Fortunately, binding precedent forecloses Fitzgerald's novel request—including *Our Lady*, *Grussgott*, *Sterlinski*, and (of course) *Starkey*. Whether a plaintiff falls within the ministerial exception is a "legal" question for resolution by "[c]ourts," not juries. *Grussgott*, 882 F.3d at 661-62. And that legal question is answered here by the undisputed evidence amply confirming that Fitzgerald (like Starkey) was a minister. The Court should affirm.

## II. Fitzgerald's claims are barred by Title VII's religious exemption.

Even if this case were distinguishable on the ministerial exception (it isn't), Title VII's religious exemption provides a straightforward statutory basis for rejecting

Fitzgerald's claims. As Judge Easterbrook explained in *Starkey*, the "proper sequence" is ordinarily to start with a statutory defense (like the Title VII exemption) before addressing a constitutional defense (like the ministerial exception). 41 F.4th at 945 (Easterbrook, J., concurring). The Title VII exemption was fully briefed and decided by the district court—and this Court can "affirm ... on any ground supported by the record." *Fidelity & Deposit Co. of Md. v. Edward E. Gillen Co.*, 926 F.3d 318, 324 (7th Cir. 2019). Here, the Title VII exemption plainly bars Fitzgerald's claims.[8]

### A. Title VII allows religious organizations to hire individuals of a particular religious belief, observance, or practice.

Title VII contains two exemptions relevant here. The first, applicable to all religious corporations, provides:

> This subchapter shall not apply to ... a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion.

42 U.S.C. §2000e-1(a). The second, specific to religious "educational institutions," similarly provides that, "[n]otwithstanding any other provision of this subchapter, ... it shall not be an unlawful employment practice" for such institutions "to hire and employ employees of a particular religion." *Id.* §2000e-2(e).

Defendants are both "religious corporation[s]" and an "educational institution," so both exemptions apply. But since both employ the functionally identical language of

---

[8]    Fitzgerald says the Archdiocese's non-ministerial-exception defenses are "premature" because they haven't gone to discovery. Br.41 n.11. But nothing further is necessary to support these defenses—which is why the Archdiocese moved for judgment on the pleadings on them. For example, the relevant facts for the Title VII exemption—that Roncalli and the Archdiocese are religious organizations, that the Catholic Church opposes same-sex marriage, and that Fitzgerald (rejecting this belief) entered one—have never remotely been disputed; they are indeed the gravamen of the complaint. *See, e.g.*, *Curay-Cramer*, 450 F.3d 130 (applying Title VII religious exemption on the pleadings); *Starkey*, 41 F.4th at 946-47 (Easterbrook, J., concurring) (applying Title VII exemption in identical procedural posture). The same is true for the other defenses—everything relevant to them is either undisputed or resolved against Fitzgerald as a matter of law.

"individuals of a particular religion," this brief for simplicity focuses on the first.

As Judge Easterbrook explained in *Starkey*, that exemption forecloses claims like Fitzgerald's, 41 F.4th at 945-47. This is confirmed by Title VII's text, structure, and precedent.

**Text.** When interpreting a statute, this Court "always begin[s] with the text." *Nielen-Thomas v. Concorde Inv. Servs., LLC*, 914 F.3d 524, 528 (7th Cir. 2019). When the text is clear, that's "the end of the analysis." *Bostock v. Clayton County*, 140 S.Ct. 1731, 1743 (2020).

Here, the text is straightforward. The "subchapter" the religious exemption covers is all of Title VII. *See* Pub. L. 88-352, §702. And Title VII expressly defines "religion": it includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. §2000e(j). "When a statute includes an explicit definition, [courts] must follow" it. *Digit. Realty Tr., Inc. v. Somers*, 138 S.Ct. 767, 776-77 (2018). Doing so here yields the following: "This subchapter [*i.e.*, Title VII] shall not apply to" a religious employer "with respect to the employment of individuals of a particular [religious 'belief,' 'observance,' or 'practice.']." 42 U.S.C. §§2000e-1(a), 2000e(j).

That plain-text reading forecloses Fitzgerald's claims. The Archdiocese declined to renew Starkey's contract because she rejects the Church's "belief" and "practice" of marriage. A.6-8 ¶¶51-58, 66-67. Under the exemption, Title VII does not apply to that decision. Rather, the Archdiocese is free to "employ only persons whose beliefs and conduct are consistent with [its] religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991).

The district court rejected this straightforward analysis, holding the exemption applies only when the plaintiff asserts a claim of "religious discrimination." A.25. Thus, because Fitzgerald asserts a claim of *sex* discrimination, the exemption doesn't apply. *Starkey*, 496 F. Supp. 3d at 1204.

But that interpretation is irreconcilable with the text. Again, the "subchapter" referenced in the exemption "comprises all of Title VII"—not just the prohibition on religious discrimination. *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). Thus, "there is no limitation that turns on the mere chance that the employee-plaintiff complains of religious discrimination as opposed to claiming under some other protected class such as sex." Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment Discrimination: Can Religious Organizations Continue to Staff on a Religious Basis?*, 4 Oxford J.L. & Relig. 368, 376 (2015), https://perma.cc/D94R-R5MF.

**Structure.** The plain-text reading of the exemption is also confirmed by the exemption's structure. The structure is simple: "[law X] shall not apply to [religious employers] with respect to [conduct Y]." 42 U.S.C. §2000e-1(a). The *law* that shall not apply is "[t]his subchapter"—*i.e.*, all of Title VII, not just the ban on religious discrimination. *Id.* And the *conduct* exempted is the "employment of individuals of a particular" "belief," "observance," or "practice." *Id.*; 42 U.S.C. §2000e(j). So when a religious employer engages in the relevant conduct—making employment decisions based on an individual's religious "belief," "observance," or "practice"—Title VII doesn't apply.

If Congress had wanted to limit the religious exemption to only *religious discrimination claims*—as the district court held—it easily could have done so. It could have said, "This subchapter's *prohibition on religious discrimination* shall not apply ... ." Or it could have said, "This subchapter shall not apply to *claims of religious discrimination* against ... ." But it didn't—and that decision is controlling here. *See, e.g., EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) (explaining that courts can't "add words to [Title VII] to produce what is thought to be a desirable result").

This structural point is further underscored by the *other half* of §2000e-1(a), the "alien" exemption. Section 2000e-1(a) in fact includes *two* exemptions introduced with

the same language: "This subchapter shall not apply *to an employer with respect to the employment of aliens outside any State*, or to a religious [employer] with respect to the employment of individuals of a particular religion … ." (emphasis added). If the religious exemption were somehow limited only to certain types of Title VII claims (*i.e.*, religious discrimination), one would expect the alien exemption to have a parallel limitation (*i.e.*, claims of race or national-origin discrimination). But courts have imposed no such limitation on the alien exemption. Rather, "[t]hat language has been understood to mean what it says: none of Title VII's substantive rules applies to aliens covered by § 702(a)." *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring).

Finally, this understanding of the religious exemption is confirmed by the use of identical language in the parallel exemption in the Americans with Disabilities Act (ADA). The ADA's religious exemption provides: "*This subchapter* shall not prohibit a religious corporation, association, educational institution, or society from giving preference in employment to *individuals of a particular religion*." 42 U.S.C. §12113(d)(1) (emphasis added). If the district court were right—that an exemption for employing "individuals of a particular religion" protects only against claims of *religious* discrimination—then the ADA's religious exemption would be entirely superfluous, because the ADA doesn't prohibit religious discrimination; it prohibits only *disability* discrimination. *Id.* §12112(a).

Thus, the only way to give the ADA's religious exemption any meaning is to construe it to allow religious employers to make employment decisions based on an employee's religion—even when the employee brings a claim of disability discrimination. If this is what an exemption for employing "individuals of a particular religion" means under the ADA, the same follows under the identical language of Title VII. *See, e.g.*, *USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 515 (7th Cir. 2022) (explaining "*in pari materia*" canon).

*Precedent.* Precedent likewise supports applying the exemption to bar Fitzgerald's claims. Multiple courts have already held that the exemption applies to sex-discrimination claims like Fitzgerald's. *See, e.g.*, *Curay-Cramer*, 450 F.3d at 140-41; *EEOC v. Miss. Coll.*, 626 F.2d 477, 485-86 (5th Cir. 1980); *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 591 (N.D. Tex. 2021) ("The plain text of this exemption, therefore, is not limited to religious discrimination claims[.]"); *Maguire v. Marquette Univ.*, 627 F. Supp. 1499, 1502-04 (E.D. Wis. 1986), *aff'd in part, vacated in part on other grounds*, 814 F.2d 1213 (7th Cir. 1987).

*Curay-Cramer* is illustrative. There, a Catholic school dismissed a teacher for engaging in pro-choice advocacy in violation of Catholic teaching. 450 F.3d at 132. The teacher sued for sex discrimination, but the Third Circuit rejected her claim under Title VII's religious exemption, explaining, "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Id.* at 141 (quoting *Little*, 929 F.2d at 951). Because the school had "offer[ed] a religious justification" for its decision, the teacher's claim was barred. *Id.* at 142.

Judge Easterbrook's *Starkey* opinion likewise demonstrates the point. As that opinion explains, the religious exemption "permits a religious employer to require the staff to abide by religious rules." 41 F.4th at 946. Thus, in *Starkey*, the Archdiocese was entitled to nonrenew Starkey for failing to engage in the "religious observance" of "avoiding [same-sex] marriages," even if absent the exemption such a decision would constitute unlawful "sex discrimination." *Id.* at 946. "A straightforward reading of § 2000e-1(a), coupled with § 2000e(j)," requires this result. *Id.* So too here.

And the EEOC agrees with this reading. Its Compliance Manual explains that "the exemption allows religious organizations to prefer to employ individuals who share their religion, defined not by the self-identified religious affiliation of the

employee, but broadly by the employer's religious observances, practices, and beliefs." EEOC Compliance Manual §12-I.C.1: Exceptions: Religious Organizations (Jan. 15, 2021), https://perma.cc/YQ9L-6UY6. And it cites *Curay-Cramer* to illustrate, stating that Title VII's religious exemption "bars adjudication of the sex discrimination claim" in such a case because it "preserves the religious school's ability to maintain a community composed of individuals faithful to its doctrinal practices." *Id.*

### B. The district court's and Fitzgerald's contrary arguments are mistaken.

Neither the district court nor Fitzgerald offers any good reason to reject this plain-language reading. The district court worried accepting it would "swallow Title VII's rules," amounting to a "complete exemption" from claims based on "race, color, sex or national origin" discrimination. *Starkey*, 496 F. Supp. 3d at 1202-03; *see* A.25. But besides being a "naked policy appeal[]," *Bostock*, 140 S.Ct. at 1753, this is incorrect. The plain-language reading of the exemption doesn't give religious employers a "complete exemption" from all Title VII claims; it exempts them only *when* their employment decision is based on an individual's particular religious belief, observance, or practice. They remain subject to all Title VII claims when it is not—like when the employer's reasons are (purportedly) based on performance, personality, or budget.

For her part, Fitzgerald says the exemption simply "permits religious organizations to hire only coreligionists." Br.42-43. Thus, a "Catholic nonprofit may choose to hire only Catholic outreach workers; a Sikh food bank may choose to hire only Sikh cooks." *Id.* at 43.

But many courts have rejected this "co-religionist preference" theory of the exemption. Stephanie N. Phillips, *A Text-Based Interpretation of Title VII's Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295, 303-07 (2016). And for good reason: because it is "squelched by the definitional clause in § 2000e(j)." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). Again, under that definition, an employee's

"religion" isn't limited to his denominational affiliation; it includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. §2000e(j).

Thus, Fitzgerald is correct that Catholic employers may choose to hire only employees who identify as Catholic. Br.43. But a Catholic employer may also choose to hire only employees who not only identify as Catholic but actually accept the Church's beliefs. *Maguire*, 627 F. Supp. at 1502-03. Or a Catholic employer may choose to hire both Catholics and non-Catholics but require its employees to abide by particular religious practices and observances (on marriage or otherwise). *Little*, 929 F.2d at 949-51. That is exactly what the Archdiocese did here.

In other words, "being 'of a particular religion' involves more than denominational affiliation"; it "includes conduct considered by the employer or the employee to have religious significance." *Id.* at 950. The contrary reading is "inconceivable": Congress would not "purport to free religious schools to employ those who best promote their religious mission, yet shackle them to a legislative determination that all nominal members are equally suited to the task." *Larsen v. Kirkham*, 499 F. Supp. 960, 966 (D. Utah 1980), *aff'd*, 1982 WL 20024 (10th Cir.).

Changing tacks, Fitzgerald claims the Archdiocese's reading is "foreclosed by *Bostock*," citing *Bostock*'s statement that Title VII is "trigger[ed]" "[s]o long as the plaintiff's sex was one but-for cause of" an employment decision. Br.43. But this statement is irrelevant to the religious exemption (which no *Bostock* defendant had raised, *see* 140 S.Ct. at 1754). The question isn't whether Title VII is "triggered" when an employee is nonrenewed for entering a same-sex marriage, but whether that nonrenewal is nevertheless *exempted from liability* when done by a religious organization seeking to employ individuals of a particular religion.

On that question, *Bostock* only helps the Archdiocese. The Court went out of its way to note that, even in the context of sex discrimination, it is "deeply concerned

with preserving the promise of the free exercise of religion." *Bostock*, 140 S.Ct. at 1754. To that end, it highlighted several "doctrines protecting religious liberty" potentially available in "future cases" asserting sex discrimination—including Title VII's "express statutory exception for religious organizations." *Id.* (citing 42 U.S.C. §2000e-1(a)). It would make no sense to highlight Title VII's religious exemption in a sex-discrimination case unless the exemption could bar sex-discrimination claims.

Finally, Fitzgerald asserts that "every circuit to consider the question has rejected" the Archdiocese's reading of Title VII. Br.43-44. Far from it. Fitzgerald simply ignores the Archdiocese's cases, cited above. Meanwhile, none of her cases support her cramped interpretation, and several support the Archdiocese.

The Fourth Circuit's decision in *Kennedy v. St. Joseph's Ministries, Inc.*, for example, affirmed that the exemption grants religious employers "permission to employ only persons whose *beliefs and conduct* are consistent with the employer's religious precepts," 657 F.3d 189, 194 (4th Cir. 2011) (emphasis added)—exactly what the Archdiocese argues here. Likewise, *Boyd v. Harding Academy of Memphis* held a religious school could (like the Archdiocese) make an employment decision based on the plaintiff's "sex outside of marriage in violation of [the school's] code of conduct." 88 F.3d 410, 413 (6th Cir. 1996); *see also Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000) (citing *Boyd*). In *EEOC v. Pacific Press Publishing Association*, the court rejected the notion (which the Archdiocese also rejects) that religious organizations have "a complete exemption from regulation under [Title VII]." 676 F.2d 1272, 1276 (9th Cir. 1982); *see also McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972) (similar). And *DeMarco v. Holy Cross High School* was an Age Discrimination in Employment Act case involving no assertion of the Title VII religious exemption at all. 4 F.3d 166 (2d Cir. 1993).

*   *   *

40

Religious organizations nationwide have long relied on Title VII's promise that they are free to choose employees who share their religious beliefs and practices. *See* Religious Orgs. Amicus Br., *Starkey*, No. 21-2524, Dkt.29 (7th Cir.). The district court's decision upends this settled expectation. And it would force courts to engage in constitutionally sensitive inquiries into employees' status as "ministers," even when the claim should be foreclosed from the outset by plain statutory text. The Court should hold that Fitzgerald's claims are barred by Title VII.

## III. Fitzgerald's claims are barred by the First Amendment.

Beyond the ministerial exception, other First Amendment doctrines also bar Fitzgerald's claims—including the doctrine of church autonomy and the freedom of expressive association. At minimum, this Court should avoid these constitutional issues by interpreting Title VII's religious exemption according to its plain text.

### A. Fitzgerald's claims are barred by church autonomy.

The church-autonomy doctrine protects the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). As explained above, one "component of this autonomy" is the ministerial exception, *Our Lady*, 140 S.Ct. at 2060, which shields a church's employment decisions regarding ministers even when not made "for a religious reason," *Hosanna-Tabor*, 565 U.S. at 194. But church autonomy covers "matters of internal government" beyond just ministerial employment decisions. *Our Lady*, 140 S.Ct. at 2061. Importantly here, it also protects "personnel decision[s]" for non-ministers that are "based on religious doctrine." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002).

*Bryce* is instructive. There, a church's youth minister sued under Title VII, alleging that church officials' statements about homosexuality and the youth pastor's

41

same-sex union constituted sex discrimination. *Id.* at 651-53. The Tenth Circuit declined to decide whether the plaintiff was a "minister" for ministerial-exception purposes. *Id.* at 658 n.2. Instead, it held the "broader church autonomy doctrine" "extends beyond the specific ministerial exception" to include "personnel decision[s]" "rooted in religious belief." *Id.* at 656-58 & n.2 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). Because the plaintiff challenged a "personnel decision based on religious doctrine," her suit was barred. *Id.* at 660.

Church autonomy likewise bars Fitzgerald's claims here. Even if Fitzgerald weren't a minister (she was), the "personnel decision" at issue here was "rooted in religious belief"—namely, Fitzgerald's rejection of the Church's teaching on marriage. *See* A.7 ¶54. Therefore, church autonomy "forecloses judicial inquiry into" Fitzgerald's claims. *Butler*, 609 F. Supp. 3d at 198-204 (applying doctrine to Catholic school teacher fired for "reject[ing]" the Church's "position on same-sex marriage").

*NLRB v. Catholic Bishop of Chicago* confirms this result. There, the Supreme Court held that Catholic schools couldn't be ordered by the NLRB to bargain collectively with "lay teachers," given the "serious constitutional questions" that would follow. 440 U.S. 490, 494-95, 501 (1979). In doing so, the Court explained that especially when schools' employment practices are "mandated by their religious creeds," civil adjudication would "necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission"—so "the very process of inquiry ... may impinge on rights guaranteed by the Religion Clauses." *Id.* at 502.

So too here. Indeed, this suit threatens *more* impingement on church autonomy than *Catholic Bishop* did. There, the church merely had to bargain collectively with qualified educators it willingly employed. Here, the church must employ an educator *against its will* after deeming that educator *religiously disqualified*. And the

entanglement problem is just as severe. Fitzgerald says she plans to prove sex discrimination by showing she was treated worse than other Roncalli employees whose opposite-sex sexual conduct violated *other* Church tenets. A.10 ¶¶81-82, 87. Yet a court could "make this determination only after assessing the relative significance to the religion of the[se] tenets." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969). That is an inquiry the "First Amendment does not permit." *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 626-27 (6th Cir. 2000) (courts cannot compare "the severity of violating two tenets of [the] faith"); *see also Curay-Cramer*, 450 F.3d at 137-39 ("measur[ing] the degree of severity of various violations of Church doctrine" "would violate the First Amendment").

Echoing the district court, Fitzgerald says applying church autonomy here would render the ministerial exception "a dead letter." Br.46. Not so. Although the doctrines sometimes overlap (as here), they serve unique purposes. The ministerial exception applies only to a *narrow* set of employees (ministers), but covers employment decisions made for *any reason*—"secular or religious." *Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 703 (7th Cir. 2003). The church-autonomy doctrine protects personnel decisions for a broader range of employees (including non-ministers) but *only* when the decision is "rooted in religious belief." *Bryce*, 289 F.3d at 657; *see also Butler*, 609 F. Supp. 3d at 204 ("no binding authority has ever said that the ministerial exception eclipses this doctrine in employment-discrimination cases").

Fitzgerald's claims founder on both. Even if Fitzgerald weren't a minister, the church-autonomy doctrine would bar her claims.

**B. Fitzgerald's claims are barred by freedom of association.**

Fitzgerald's claims are further barred by the freedom of association, which protects both the right "to associate with others" for expressive purposes and the right

43

"not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622-23 (1984). If an organization "engage[s] in some form of expression," and if forcing it to associate with someone would "significantly affect [its] ability to advocate" its viewpoints, then "the First Amendment prohibits" the forced association unless strict scrutiny is satisfied. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, 650, 659 (2000); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861-64 (7th Cir. 2006).

Both the Supreme Court's decision in *Dale* and this Court's decision in *Walker* are controlling here. In *Dale*, a former scoutmaster sued the Boy Scouts, claiming his dismissal for being "an avowed homosexual and gay rights activist" violated state antidiscrimination law. 530 U.S. at 643-45. But the Supreme Court held that the First Amendment foreclosed his claim, explaining that the freedom to associate "presupposes a freedom not to associate," and forced association with the plaintiff would undermine the Scouts' ability to express its view opposing homosexual conduct. *Id.* at 647-48.

Similarly, in *Walker*, a university denied recognition to a Christian student group because the group excluded members "who engage in or affirm homosexual conduct." 453 F.3d at 857. Applying *Dale*, this Court held that forcing the group to include those members "significantly affect[ed]" its "ability to express its disapproval of homosexual activity." *Id.* at 862. And the university's interest in prohibiting sexual-orientation discrimination did not outweigh the First Amendment. *Id.* at 863-64.

So too here. Fitzgerald doesn't dispute that the Archdiocese is an expressive association. Indeed, "[r]eligious groups" like the Archdiocese "are the archetype of" expressive associations. *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring).

Nor does Fitzgerald dispute that it would significantly undermine the Archdiocese's ability to express its religious viewpoint if it were forced to employ in senior leadership positions those whose views and conduct are diametrically opposed to that

44

viewpoint. As this Court explained in *Walker*: "It would be difficult for [a religious group] to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same time, it must accept members who engage in that conduct." 453 F.3d at 863. And, just as in *Dale* and *Walker* (and *Hurley* and *Fulton*), the government's "interest in eliminating discrimination" based on "sexual orientation" "d[oes] not justify such a severe intrusion on [the Archdiocese's] rights to freedom of expressive association." *Dale*, 530 U.S. at 657, 659; *Walker*, 453 F.3d at 863-64; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 578-79 (1995); *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1882 (2021).

Unable to contest this straightforward application of *Dale* and *Walker*, Fitzgerald instead asserts that "associational rights are inapplicable in the employment context." Br.48; *see also* ACLU Br.16-17. But the Second Circuit just rejected the same argument, reaffirming that "[t]he right to expressive association allows [an organization] to determine that its message will be effectively conveyed only by *employees* who sincerely share its views." *Slattery v. Hochul*, 61 F.4th 278, 288 (2d Cir. 2023) (emphasis added).

*Slattery* involved a state law prohibiting employment discrimination based on "reproductive health decision[s]"—and thus requiring a pro-life pregnancy center to "retain employees who violate its policies against procuring abortions." *Id.* at 283-84. Applying *Dale* and *Walker*, the Second Circuit held that the law would impose "severe burdens" on the center's freedom of expressive association by forcing it "to employ individuals who act or have acted against the very mission of its organization." *Id.* at 288. And it held that the state's interest in "preventing discrimination" "cannot overcome the expressive association right." *Id.* at 289; *accord, e.g.*, *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 821-22 (E.D. Mo. 2018).

*Slattery*'s analysis applies here—particularly because Fitzgerald not only rejects

45

the Church's teaching and refuses to live by it, but also actively advocates against the Church's message. She serves on the board of "Shelly's Voice," an eponymous organization that publicly opposes the Church's teaching on sexuality. A.8; *Shelly's Voice*, https://perma.cc/3BLC-BY6S. Her "activism … continues to this day," A.9, including working at a "philanthropic foundation" funding LGBTQ causes. SA.116:4-117:18; SA.189:8-190:1. As in *Dale*, *Walker*, and *Slattery*, forcing Roncalli to retain Fitzgerald in senior leadership while she rejects and advocates against its message would impose unjustifiably "severe burdens" on the school's ability to communicate its message to students. *Slattery*, 61 F.4th at 288. Fitzgerald's claims are therefore barred.

### C. Constitutional avoidance requires affirmance.

At minimum, constitutional avoidance requires this Court to interpret Title VII to avoid the "serious First Amendment questions" raised by Fitzgerald's claims. *Catholic Bishop*, 440 U.S. at 504. Interpreting Title VII to require the Archdiocese to retain Fitzgerald would raise significant constitutional concerns. *See supra* Part III.A-B. The statute must be interpreted to avoid that result absent a "clear expression of an affirmative intention of Congress" to require it. *Catholic Bishop*, 440 U.S. at 504. But not only does Title VII lack such a "clear expression"; it affirmatively *exempts* religious groups employing individuals of a particular religious belief, observance, or practice. *Supra* Part II. Both plain statutory text and constitutional avoidance require affirmance. *Curay-Cramer*, 450 F.3d at 137-42 (applying avoidance)

### IV. Fitzgerald's claims are barred by RFRA.

Finally, RFRA bars Fitzgerald's claims. A panel of this court previously held that RFRA doesn't apply in cases where the government isn't a party. *See Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015). Nevertheless, this Court is not bound by its "prior opinions" if they have been "overruled or *undermined* by the decisions of a higher court." *Woodring v. Jackson Cnty.* 986 F.3d 979, 993 (7th

Cir. 2021). Just so here. As the Supreme Court explained in *Bostock*, RFRA "operates as a kind of super statute" and "might supersede Title VII's commands in appropriate cases." 140 S.Ct. at 1754; *cf. Hankins v. Lyght*, 441 F.3d 96, 103-04 (2d Cir. 2006); CLS Amicus Br., *Starkey*, 2022 WL 522749, at *4 (notwithstanding *Listecki*, "RFRA, properly interpreted, provides a defense in private-party suits.").

This is one of those "appropriate cases." RFRA prohibits any "application" of any "Federal law" that would "substantially burden" the "free exercise of religion" unless it satisfies strict scrutiny. 42 U.S.C. §§2000bb-1(a)-(b), 2000bb-3(a). Here, punishing the Archdiocese for asking its leaders to adhere to the Church's teaching on marriage would put "substantial pressure on" it "to modify" its religiously motivated conduct. *Korte v. Sebelius*, 735 F.3d 654, 682 (7th Cir. 2013). Fitzgerald has not even offered a "compelling interest" that would justify this burden, much less argued that penalizing the Archdiocese for its religious decisions would be the "least restrictive means" of advancing it. Nor could she. Her claims are therefore barred by RFRA.

## CONCLUSION

This Court should affirm judgment for the Archdiocese.

Respectfully submitted,

/s/ Luke W. Goodrich
Luke W. Goodrich
*Counsel of Record*
Joseph C. Davis
Daniel H. Blomberg
The Becket Fund for
  Religious Liberty
1919 Pennsylvania Ave. N.W.,
  Ste. 400
Washington, DC 20006
(202) 955-0095
lgoodrich@becketlaw.org

*Counsel for Defendants-Appellees*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND
TYPE-STYLE REQUIREMENTS**

1. This brief complies with the length limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the requirements of Fed. R. App. P. 32(a) and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Century Schoolbook font.

/s/ Luke W. Goodrich
Luke W. Goodrich

Dated: April 10, 2023

**CERTIFICATE OF SERVICE**

I certify that on April 10, 2023, the foregoing brief was served on counsel for all parties by means of the Court's ECF system.

/s/ Luke W. Goodrich
Luke W. Goodrich

# STATUTORY ADDENDUM

**Title VII of the Civil Rights Act of 1964 (42 U.S.C.):**

\*\*\*

SEC. 2000e. DEFINITIONS

\*\*\*

**(j)** The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

\*\*\*

SEC. 2000e-1. EXEMPTION

**(a) Inapplicability of subchapter to certain aliens and employees of religious entities.**— This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

\*\*\*

**Religious Freedom Restoration Act of 1993 (42 U.S.C.):**

\*\*\*

SEC. 2000bb-1. FREE EXERCISE OF RELIGION PROTECTED

**(a) In general.**— Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

**(b) Exception.**— Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

**(1)** is in furtherance of a compelling governmental interest; and

**(2)** is the least restrictive means of furthering that compelling governmental interest.

\*\*\*

SEC. 2000bb-3. APPLICABILITY

**(a) In general.**— This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.