No. 22-2954

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

MICHELLE FITZGERALD,

*Plaintiff-Appellant,*

v.

RONCALLI HIGH SCHOOL, INC., AND ROMAN
CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, INC.,

*Defendants-Appellees.*

On Appeal from a Final Judgment of the
United States District Court for the Southern District of Indiana
Case No. 1:19-cv-04291-RLY-TAB Hon. Richard L. Young

### REPLY BRIEF OF APPELLANT MICHELLE FITZGERALD

MARK W. SNIDERMAN
Sniderman Law
151 N. Delaware Street,
Suite 1520
Indianapolis, IN 46204
(317) 361-4700

BRADLEY GIRARD
GABRIELA HYBEL
Americans United for Separation of
   Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-3234

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ................................................................................. ii

Introduction ....................................................................................... 1

Argument ........................................................................................... 3

I.   The ministerial exception does not apply. ................................................. 3

     A.   Genuine disputes of material fact preclude holding that Fitzgerald
          was a minister as a matter of law. ................................................... 3

     B.   *Starkey* does not control and does not overcome Fitzgerald's
          showing of pretext. .................................................................... 10

II.  Roncalli's remaining constitutional and statutory arguments fail. .................... 14

     A.   There is no expressive-association right to fire employees based on
          their sex. .............................................................................. 14

     B.   Church autonomy does not apply. ...................................................... 17

     C.   Section 702 of Title VII does not exempt Roncalli from Fitzgerald's
          sex-discrimination claims. ........................................................... 19

     D.   RFRA does not apply. .................................................................. 25

Conclusion ......................................................................................... 26

Certificate of Compliance ......................................................................

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alexander v. Gardner-Denver Co.,*
 415 U.S. 36 (1974) ........................................................................ 21

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ........................................................................ 9

*Bates v. City of Chi.,*
 726 F.3d 951 (7th Cir. 2013) ........................................................ 12

*Bio v. Fed. Express Corp.,*
 424 F.3d 593 (7th Cir. 2005) ................................................... 18, 23

*Bostock v. Clayton Cnty.,*
 140 S.Ct. 1731 (2020) ............................................................... 24, 25

*Boy Scouts of Am. v. Dale,*
 530 U.S. 640 (2000) .......................................................... 14, 15, 16

*Boyd v. Harding Acad. of Memphis, Inc.,*
 88 F.3d 410 (6th Cir. 1996) ......................................................... 24

*Bryce v. Episcopal Church,*
 289 F.3d 648 (10th Cir. 2002) ...................................................... 18

*Burwell v. Hobby Lobby Stores, Inc.,*
 573 U.S. 682 (2014) ...................................................................... 17

*Christian Legal Soc'y v. Martinez,*
 561 U.S. 661 (2010) ................................................................ 15, 16

*Curay-Cramer v. Ursuline Acad. of Wilmington,*
 450 F.3d 130 (3d Cir. 2006) ......................................................... 23

*EEOC v. Fremont Christian Sch.,*
 781 F.2d 1362 (9th Cir. 1986) ...................................................... 24

*EEOC v. Pac. Press Pub. Ass'n,*
 676 F.2d 1272 (9th Cir. 1982) ................................................. 18, 24

*EEOC v. Pac. Press Pub. Ass'n,*
 482 F.Supp. 1291 (N.D. Ca. 1979) .............................................. 21

*Espinoza v. Farah Mfg. Co.,*
 414 U.S. 86 (1973) ..................................................................... 22, 23

*Grussgott v. Milwaukee Jewish Day Sch., Inc.,*
 882 F.3d 655 (7th Cir. 2018) ..................................................... 8, 12

*Hishon v. King & Spalding,*
 467 U.S. 69 (1984) ........................................................................ 14

## TABLE OF AUTHORITIES—continued

Page(s)

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) ................................................................ 10

*Kennedy v. St. Joseph's Ministries, Inc.*,
657 F.3d 189 (4th Cir. 2011) ................................................ 24

*Listecki v. Off. Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) ................................................ 25

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ................................................................ 21

*NLRB v. Cath. Bishop of Chi.*,
440 U.S. 490 (1979) ................................................................ 18

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S.Ct. 2049 (2020) .............................................................. 3

*Payne v. Pauley*,
337 F.3d 767 (7th Cir. 2003) .................................................. 4

*Rabe v. United Air Lines, Inc.*,
636 F.3d 866 (7th Cir. 2011) ................................................ 23

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .......................................................... 15, 17

*Runyon v. McCrary*,
427 U.S. 160 (1976) ................................................................ 14

*Slattery v. Hochul*,
61 F.4th 278 (2d Cir. 2023) ...................................... 15, 16, 24

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
No. 20-3265 (7th Cir. 2021) .................................................. 10

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
41 F.4th 931 (7th Cir. 2022) ...................... 2, 3, 8, 10, 11, 13

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
553 F.Supp.3d 616 (S.D. Ind. 2021) .................................. 11

*Sterlinski v. Cath. Bishop of Chi.*,
934 F.3d 568 (7th Cir. 2019) ...................................... 12, 13, 14

*Trans World Airlines v. Hardison*,
432 U.S. 63 (1977) ................................................................ 22

*Vesey v. Envoy Air, Inc.*,
999 F.3d 456 (7th Cir. 2021) .................................................. 4

## TABLE OF AUTHORITIES—continued

**Page(s)**

*West v. Radtke,*
    48 F.4th 836 (7th Cir. 2022) .................................................. 17

*Widmar v. Sun Chem. Corp.,*
    772 F.3d 457 (7th Cir. 2014) ................................................. 12

*Woodring v. Jackson Cnty.,*
    986 F.3d 979 (7th Cir. 2021) ................................................. 25

**Statutes and Rules**

42 U.S.C. § 2000e ............................................................... 20, 21

42 U.S.C. § 2000e-1 ........................................................... 19, 22

42 U.S.C. § 2000e-2 ........................................................... 19, 21

42 U.S.C. § 12113 ................................................................. 25

Fed. R. Civ. P. 56 .................................................................. 9

**Other Authorities**

118 Cong. Rec. 705 (1972) ...................................................... 22

EEOC Compliance Manual (Jan. 15, 2021) ............................... 23

H.R. Rep. No. 88-914 (1963) ................................................... 21

H.R. Rep. No. 101-485 (1990) ................................................. 25

## INTRODUCTION

Fitzgerald's evidence shows that as a guidance counselor she did not play any role in faith formation, never mind an important one. Instead, she focused on college admissions, standardized testing, and study skills. She supervised other guidance counselors who provided the same secular support to students. And to the rare extent that she weighed in on any religious topic in Administrative Council meetings, it was to raise secular concerns. Fourteen years of consistent communication from Roncalli made clear to Fitzgerald (and others) that her role was not a religious one.

Roncalli, unsurprisingly, disagrees. According to Roncalli, Fitzgerald was expected to pray with students and, more broadly, guide them on a spiritual journey. And to the extent that she and her colleagues did not, they were not living up to their responsibilities—despite what Fitzgerald's glowing evaluations might suggest. Additionally, Roncalli argues that as a member of the administration, Fitzgerald oversaw the other counselors in their religious duties and was a member of the decision-making body for core religious questions.

This appeal is simple: Both Fitzgerald and Roncalli have submitted evidence that supports their telling. Both have submitted evidence that counters the other side's. And neither party disagrees about the materiality of the disputed facts. Because a reasonable factfinder could believe either side, summary judgment was improper.

Instead of applying the summary-judgment standard, Roncalli argues that its evidence is more convincing than Fitzgerald's and that it is not her place to determine what matters to Roncalli. But the weight of the evidence is not a question for the Court to resolve on summary judgment. And Fitzgerald does not question what

1

counts as "religious" to Roncalli. She does not dispute that "communicating the Catholic faith to students" and "guiding the religious mission of the school," Resp. Br. 13, are religious responsibilities. She has shown, however, that she did not perform these duties and Roncalli never expected her to.

Roncalli ignores much of this record and selectively cites the record in a different case—*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022). Roncalli insists that *Starkey* forecloses Fitzgerald's claims. But any guidance that *Starkey* might offer must be considered in light of the record in *this* case. And on the record here, *Starkey* does not control.

The rest of Roncalli's arguments—which were raised in a motion to dismiss—are as novel as they are wrong. Roncalli argues that Fitzgerald's complaint must be dismissed under two constitutional doctrines and two statutory schemes. Not only are these arguments premature, but the text, history, and caselaw go the other way.

Fitzgerald does not ask this Court to conclude that she was not a minister (although she has more than enough evidence to show that she was not). She merely asks the Court to look past Roncalli's selective framing of the case, apply the summary-judgment standard to the facts in the record, and reject Roncalli's request to break new constitutional and statutory ground at the motion-to-dismiss stage.

This Court should remand the case, correct the district court's interpretation of *Starkey*, and give Fitzgerald the chance to show a finder of fact that she never performed—and was never expected to perform—any religious responsibilities.

## ARGUMENT

### I. The ministerial exception does not apply.

The district court correctly outlined "Fitzgerald's considerable evidence," Op. 4, and concluded that factual disputes "abound" as to what was expected of her as a guidance counselor, Op. 7. Instead of holding (as it should have) that these factual disputes precluded summary judgment, the court cited *Starkey* and held that the disputes were immaterial as a matter of law because formal employment documents labeled Fitzgerald a minister. As Fitzgerald's opening brief explained (at 22-23), the district court's decision should be reversed because it ignored the functional test the Supreme Court has twice outlined.

Roncalli does not even attempt to defend the district court's holding—it devotes one fly-by sentence to the opinion. *See* Resp. Br. 18. Instead, Roncalli misconstrues the summary-judgment standard, misapplies that standard to the record evidence, and misreads *Starkey*.

### A. Genuine disputes of material fact preclude holding that Fitzgerald was a minister as a matter of law.

Under the ministerial exception, what is material is "what an employee does," *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2064 (2020), or is expected to do, *Starkey*, 41 F.4th at 941. Roncalli does not disagree that Fitzgerald's evidence goes to material facts; its brief makes no mention at all of materiality. Instead, Roncalli tries to outweigh Fitzgerald's evidence by offering its own competing narrative and asking the Court to draw inferences in Roncalli's favor.

But at summary judgment, the Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs

for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Instead, all facts and inferences must be construed "in the light most favorable to the non-moving party." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021). And when the evidence tells two plausible, but "vastly different stories—as [it does] here—it is almost certain that there are genuine issues of material fact in dispute," so summary judgment must be denied. *Payne*, 337 F.3d at 770.

Roncalli's brief raises three relevant questions under the ministerial exception: (1) whether Fitzgerald played an important religious role as a guidance counselor, (2) whether her position as Co-Director of Guidance was a religious-leadership role, and (3) whether Roncalli, or anyone, held her out as a minister. The material facts are disputed as to each.

**1.** Fitzgerald's evidence shows that she never played any role in "faith formation" with her students. She did not pray with them. She did not discuss religion. She did not give them spiritual counseling of any kind. Br. 7-8. Instead, she did what guidance counselors at public schools do—she discussed class schedules, extracurriculars, standardized tests, and the college-application process. Br. 6. Others confirm this: Fellow guidance counselors, school staff, and students who went to Fitzgerald for counseling all testified that Fitzgerald did not provide spiritual guidance to students. Br. 7-8.

In response, Roncalli argues that Fitzgerald is lying, and that in reality she *did* assist students in faith formation. Resp. Br. 7-8, 29-30. Roncalli relies principally on statements from Angela Maly about her own role as a guidance counselor at Roncalli after Fitzgerald was fired. According to Maly, she "'regularly pray[s] with students'

in counseling sessions, leads students in collective prayer and worship at the school's chapel, and models 'faith in action' for her students." Resp. Br. 7. From that, Roncalli asks this Court to draw the inference that what Maly did after Fitzgerald was fired must be what Fitzgerald did. Resp. Br. 29-30. Although a factfinder could believe Maly's questionable testimony, it could instead believe Fitzgerald, Fitzgerald's colleagues, Fitzgerald's students, and a student of Maly's to boot. But that doesn't matter now: Who is more believable is not a decision for summary judgment.

Roncalli also points to a letter from Daniel Parker, a father of two Roncalli students, saying that Fitzgerald had been "a faithful minister of the Church's teachings" and had preached "the message of the Gospel" in meetings with his children. Resp. Br. 11. But Roncalli neglects to mention that one of Parker's children submitted a declaration explaining that Fitzgerald played no role whatever in the student's spiritual life. *See* 216A.

Or consider Roncalli's insistence that, regardless of what Fitzgerald actually did as a guidance counselor, she was *expected* to provide religious direction to students. Roncalli supports its argument by citing language in the Roncalli handbook and terms in a ministerial contract, which was distributed mere months before Fitzgerald's termination. Resp. Br. 22. Meanwhile, Fitzgerald cites, among other evidence, her own performance reviews—which evaluated her on entirely secular criteria and never instructed her to perform religious duties—and statements from other Roncalli staff, who explained that they didn't send students to the Guidance Department for religious instruction or support. *See* Br. 25, 27, 32. A reasonable factfinder could conclude what any employee would: The boss's consistent praise says

much more about what's expected than boilerplate language in formal H.R. documents.

Roncalli also insists that Fitzgerald herself described her role in religious terms when completing the Catholic Educator Advancement Program (CEAP), and even if those descriptions were not an accurate reflection of what she did, they show what she thought was expected of her. Resp. Br. 29. But here too Roncalli ignores Fitzgerald's evidence putting her statements in context. The CEAP's rubric for guidance counselors included religious components. Resp. Br. 10. But that was not because it reflected the job of guidance counselors. It was because Principal Chuck Weisenbach thought it would "not be fair to the teachers" to have guidance counselors omit the religious components. 169A ¶ 113. So even though Fitzgerald would have been *willing* to do those tasks, she never did because they "never were a part of [her] job." 116A. And in Fitzgerald's year-and-a-half CEAP process, none of the observations, evaluations, or feedback—done by Weisenbach—had anything to do with religion. 169A-70A.

The district court acknowledged that "the exact meaning and truthfulness of this self-evaluation is genuinely at issue." Op. 7. And more broadly, the district court correctly found that "on this record" a factfinder could find that Fitzgerald did not play any religious role. Op. 11. Resolving these fact disputes is basic trial practice. For example, Fitzgerald can show that her CEAP evaluation required her to respond to criteria for teachers that did not reflect her role. Roncalli can argue what it perceives as inconsistencies in her explanation. But at summary judgment, pointing out a seeming inconsistency doesn't mean that one party's telling carries the day—

6

especially the *moving* party's. It means that the factfinder must weigh the evidence and decide who to believe.

**2.** Roncalli argues that, as Co-Director of Guidance and a member of the Administrative Council, Fitzgerald played an important role in Roncalli's religious mission and direction. For example, it cites her contribution to a discussion about the Archdiocesan draft policy requiring employees to notify transgender students' parents if their child discussed their gender with faculty or staff. Resp. Br. 24, 30. A handful of similar instances, Roncalli argues, prove that Fitzgerald debated religious issues, so the Court must draw the inference (in Roncalli's favor) that Fitzgerald played a religious role on the Administrative Council.

But as Fitzgerald's opening brief explained (at 28-30), a factfinder could come to the opposite conclusion. Fitzgerald's evidence shows that her role on the Administrative Council was to address "logistical issues," not spiritual ones. Br. 9. Roncalli can point to just one time during Fitzgerald's eleven-year tenure on the Administrative Council that she discussed transgender students. Resp. Br. 15. And that meager evidence does not support the inference Roncalli asks the Court to draw: Fitzgerald's evidence shows that her comment was about government-mandated confidentiality for guidance counselors. As she put it, "in my job as a counselor, we have ethical responsibilities of confidentiality and I felt like this was breaking that confidentiality." 106A. So too with Roncalli's other out-of-context examples.[1]

---

[1] Here, and elsewhere, Roncalli describes its own evidence as "undisputed." *See, e.g.*, Resp. Br. 30. But at summary judgment, what matters is whether *facts* are disputed. Not evidence. So while Fitzgerald does not dispute that Roncalli's handful of weekly agendas exist, she does dispute (through admissible evidence) the material

**3.** Roncalli argues that Fitzgerald and Roncalli both held Fitzgerald out as a minister. Here too, Fitzgerald's evidence supports the opposite conclusion.

Fitzgerald had the titles "Guidance Counselor" and "Co-Director of Guidance"—the same titles assigned to staff at public schools. Roncalli's website communicated to parents and the Roncalli community that the Guidance Department was meant to serve students' *academic* needs. 229A-30A. The website's sole mention of anything religious was that the department had a social worker (not a guidance counselor) from Catholic Charities. 229A. Unsurprisingly, then, students understood the Guidance Department's role as getting "the college acceptance rate as high as possible." 203A ¶ 10. Fitzgerald reinforced that perception; she never held herself out as a faith leader because she "did not think it would be appropriate" to do so. 172A ¶ 134.

In the face of that evidence, Roncalli points to private documents, like Fitzgerald's job description and ministry contract. Resp. Br. 24. But this Court has held that the relevant question is how the employee is "perceived by others." *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 660 (7th Cir. 2018). And although *Starkey* said that Roncalli "held Starkey out as a minister" through her job description and ministerial contract, the Court did not explain how private documents between an employee and employer affect how an employee is perceived by others. *See Starkey*, 41 F.4th at 940. No matter. Even if Fitzgerald's employment documents are relevant to how she was held out, at most they conflict with Fitzgerald's evidence. *See* Br. 25.

---

fact that Roncalli asks this Court to infer from those agendas—her role on the Council.

Left with nothing else, Roncalli continues to rely on a letter that Starkey (not Fitzgerald) sent to Weisenbach about counselor's salaries. Resp. Br. 23. In it, Starkey drew comparisons to the ministerial duties of teachers. But Fitzgerald did not draft, sign, or even know about the letter. Br. 13. Instead of confronting—or acknowledging—those facts, Roncalli points to an email that Fitzgerald sent to Weisenbach thanking him for his support in the dispute about pay structures. Resp. Br. 24-25. But in that email, Fitzgerald thanked Weisenbach for his help protecting counselors' summer pay and wider employment benefits—she did not agree to Starkey's descriptions of counselors' responsibilities. 170A-71A ¶ 125.

*          *          *

Rather than acknowledge these material fact disputes, Roncalli ignores much of Fitzgerald's evidence and insists that the Court disregard the rest as "post-litigation affidavits." Resp. Br. 31. But that's just an invitation "to weigh the evidence and determine the truth of the matter," which the Court cannot do at summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Affidavits and declarations are valid forms of evidence, worthy of the same consideration on summary judgment as all other admissible evidence. Fed. R. Civ. P. 56(c)(1)(A).[2]

At this stage, all reasonable inferences from the evidence—that Fitzgerald did not, and was not expected to, guide her students in the faith; played no part in religious leadership at Roncalli; and was not held out as a minister—preclude a ruling

---

[2] Ironically, Roncalli relies on a video in which a student described Fitzgerald's office as her "safe spot." Resp. Br. 8. The video wasn't introduced in the district court. It isn't in the record. So it can't be considered now. In all events, as any public-school teacher knows, making a child feel safe does not make one a spiritual leader.

for Roncalli, the moving party. After summary judgment, the factfinder may weigh the evidence presented by both parties and draw inferences however it sees fit. But at this point, disputes of fact mean that summary judgment was improper.

## B. *Starkey* does not control and does not overcome Fitzgerald's showing of pretext.

**1.** Unable to justify summary judgment on this record, Roncalli argues that the Court's decision in *Starkey* forecloses Fitzgerald's claims. That's wrong for two reasons.

First, as Roncalli previously stated to this Court, "Fitzgerald's case" and the one "involving Lynn Starkey . . . originate from two separate incidents." Resp. to Mot. to Intervene at 2, *Starkey*, No. 20-3265, ECF 23 (7th Cir.). Roncalli ignores its own argument, and points to Fitzgerald's statements that the cases are similar. Resp. Br. 25. To the extent they may have been similar at the motion-to-dismiss stage, further factual development clarified the differences. Regardless, this Court *agreed* with Roncalli that the cases were sufficiently different, even at the motion-to-dismiss stage, and denied Fitzgerald's motion to intervene in *Starkey*. Abandoning its previous successful stance, Roncalli now insists that *Starkey* controls.

But these are two separate incidents, involving two separate employees, shown through two separate evidentiary records. And the ministerial exception requires a fact-intensive inquiry for each employee. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012). To the extent *Starkey* is relevant, it must be considered in the context of the record here.

The differences are substantial. Lynn Starkey was a certified catechist and had previously served as Roncalli's New Testament teacher. *Starkey*, 41 F.4th at 935-36.

Fitzgerald had none of that training or experience. 155A ¶ 4. As Roncalli argued, Starkey was promoted because of her professional religious background. Br. in Supp. of Def.'s Mot. for Summ. J. at 6, *Starkey*, 553 F.Supp.3d 616 (S.D. Ind. 2021) (No. 19-cv-3153). Fitzgerald, on the other hand, had no professional religious experience. 125A-26A. And perhaps because of her religious background, Starkey had religious responsibilities. For example, she "gave other staff guidance on how to incorporate students of different faiths into Catholic liturgy, such as by preparing students for 'congregational responses' and helping them adapt to the Catholic version of the 'Lord's Prayer.'" Br. in Supp. of Def.'s Mot. for Summ. J. at 9, *Starkey*, 553 F.Supp.3d 616 (No. 19-cv-3153). She also delivered all-school prayers where she encouraged students to "include God in [their] own daily life," and asked God "to open our hearts and minds so we can know, love, and understand you more and more." *Id.* at 16. Fitzgerald did none of that.

Second, Fitzgerald presents evidence that was notably lacking in *Starkey*. Starkey argued that she didn't perform the duties Roncalli expected of her. But as this Court explained, "what an employee does involves what an employee is entrusted to do, not simply what acts an employee chooses to perform." *Starkey*, 41 F.4th at 941. Fitzgerald has shown that Roncalli never actually entrusted her with religious duties, despite what it alleges now. She put forth considerable evidence that Roncalli never told her that she should "pray with students, talk about God or religion in [her] counseling appointments, or otherwise perform [her] counseling work from a religious perspective." 161A ¶ 49. To the contrary, she received overwhelmingly positive feedback for performing entirely secular job functions. *See* Br. 15-16.

Roncalli says that by introducing this evidence, Fitzgerald is merely "speculating as to an employer's state of mind." Resp. Br. 27 (quoting *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014)). But *Widmar* supports Fitzgerald, not Roncalli. There, the Court distinguished between evidence showing "weaknesses, implausibilities, inconsistencies, or contradictions" in an employer's statements, 772 F.3d at 465 (quoting *Bates v. City of Chi.*, 726 F.3d 951, 956 (7th Cir. 2013)), and statements from an employee's deposition speculating about what an employer might have thought at any given time, *id.* at 460-61. Fitzgerald's evidence is the former. She does not speculate about what anyone was thinking. Instead, she shows the contradictions between what Roncalli says to the Court now, and what Roncalli made clear to her while she was still employed. *See, e.g.*, Br. 31-33. This evidence could convince a reasonable factfinder that Roncalli's statements are "unworthy of credence." *Widmar*, 772 F.3d at 465.[3]

**2.** What's more, a reasonable factfinder could infer that the formal employment documents on which Roncalli relies—which were the sole basis for the district court's decision—were pretextual.

Roncalli concedes that employers can't use "documented expectations" to pretextually label employees "ministers" regardless of their actual duties. Resp. Br. 28 (quoting *Grussgott*, 882 F.3d at 660). But Roncalli then insists that the analysis of what counts as pretext "is restrained, looking only to whether the expectations were 'hoked up for the occasion' or instead reflect a pre-litigation understanding of the

---

[3] Likewise, the question here is not, as Roncalli contends (at 31), whether Fitzgerald approached her work from a secular perspective. The question is whether Roncalli tasked her with any of the religious duties it now says it assigned to her.

role." Resp. Br. 28 (quoting *Sterlinski v. Cath. Bishop of Chi.*, 934 F.3d 568, 571 (7th Cir. 2019)).

Roncalli creates the "pre-litigation" requirement from whole cloth. No court has imposed it. Nor would it make any sense. If an employer's evidence could be deemed pretext only if it came into being *after* a plaintiff brought suit, then there would be nothing stopping religious employers from preemptively labeling every employee a minister, lest future employment actions get challenged in court. Indeed, many employers are already trying to do so. *See* Br. 40. Pretext does not turn on timing alone. It turns on whether an employer labeled an employee a minister to protect the employer from liability.

Hence, the *Starkey* panel rejected Starkey's argument that, because of when the documents labeling Starkey a minister were introduced, they must have been pretext. The court held that "[o]n this record, the changes to Roncalli's employment contracts are an honest formalization of Starkey's ongoing responsibilities." *Starkey*, 41 F.4th at 941. But Fitzgerald's evidence shows more than just suspicious timing. Roncalli required Fitzgerald to sign the ministerial contract fourteen years after she began working at Roncalli without any discussion or explanation. Br. 16. And only *after* Fitzgerald signed the contract did Roncalli give her the document describing ministerial duties. 171A-72A ¶¶ 128-31. The language did not reflect the duties or responsibilities that had previously been assigned to her. 171A-72A ¶¶ 130-32. And after having her sign the contract, Roncalli did not give her any new training or instructions on incorporating religion into her work. 172A ¶¶ 132-33. Roncalli even informed one teacher that she had "nothing to worry about" when she explained that

her religious beliefs conflicted with the ministerial contract addendum. 195A ¶ 15. That is more than enough evidence for a factfinder to conclude that the ministerial contract and formal documents were pretextual.[4]

If an employer were looking for a way to label "*everyone* on its payroll, down to custodians and school-bus drivers, [as] a minister," *Sterlinski*, 934 F.3d at 570-71, so that it might receive the ministerial exception's legal protections, it would do exactly what Roncalli did here. This Court should not encourage such an end-run around fundamental protections for employees—especially because it would do nothing to protect the interests underlying the ministerial exception.

## II. Roncalli's remaining constitutional and statutory arguments fail.

### A. There is no expressive-association right to fire employees based on their sex.

**1.** Neither this Court nor the Supreme Court has ever held that employers have a freedom-of-expressive-association right to discriminate against employees in violation of antidiscrimination laws.

As Fitzgerald's opening brief explained (at 48-49), just as "[t]here is no constitutional right . . . to discriminate in the selection of who may attend a private school or join a labor union," there is no constitutional right to discriminate against lay employees. *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (citing *Runyon v. McCrary*, 427 U.S. 160 (1976)). The Boy Scouts conceded this point in *Boy Scouts of*

---

[4] In *Sterlinski*, the plaintiff never contended that "the Bishop's justification for calling him a 'minister' [was] pretextual." 934 F.3d at 571. He did, however, challenge the religious importance of playing the organ. *Id.* at 570. Fitzgerald does not challenge Roncalli's description of religious importance. *See* Br. 37-38. Instead, she explains that she was never expected to perform any religious duty and that Roncalli's evidence to the contrary is pretextual.

*America v. Dale*, acknowledging that "it would be necessary for the Boy Scouts of America to obey" any law that "prohibits discrimination against [an] individual's employment." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 672 (2000) (Stevens, J., dissenting); *see also* ACLU Br. 16-18.

Ignoring *Hishon* altogether, Roncalli points to a single out-of-circuit decision. Resp. Br. 45-46 (citing *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023)). *Slattery* was wrongly decided, and in all events, would not change the outcome here.

In *Slattery*, a Second Circuit panel held that the freedom of expressive association extended to employment decisions. But *Slattery* ignored the critical distinction between direct and incidental burdens on speech: While requiring a membership organization to admit members publicly opposed to the organization's message might directly burdens the group's ability to send that message, regulating employment relationships only incidentally burdens an employer's speech. *See Dale*, 530 U.S. at 659; *see also* ACLU Br. 18-19. And like Roncalli does here, *Slattery* ignored *Hishon* and relied exclusively on cases about membership in expressive organizations. 61 F.4th at 286-91. It said nothing of the fact that "an organization engaged in commercial activity enjoys only minimal constitutional protection" under the freedom of expressive association when it comes to "recruitment of . . . employees." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 635 (1984) (O'Connor, J., concurring in part).

Yet even under the standard for membership in expressive organizations, *Slattery* was wrong. "[T]he right of expressive association permits a group to exclude an applicant for membership only if the admission of that person would 'affect in a significant way the group's ability to advocate public or private viewpoints.'"

15

*Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 726-27 (2010) (Alito, J., dissenting) (quoting *Dale,* 530 U.S., at 648). And *Dale* made clear that an expressive, membership association cannot "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." 530 U.S. at 653. Yet under the Second Circuit's logic, it seems that any employer that "engage[s] in some form of expression, whether it be public or private," *id.* at 648, could opt out of antidiscrimination law so easily.

**2.** Even if this Court were to adopt *Slattery*'s mistaken interpretation of the expressive-association doctrine, that would not help Roncalli here.

First, Title VII's prohibition against firing guidance counselors because they are gay does not "significantly affect[] [Roncalli's] ability to advocate its viewpoints." *Slattery*, 61 F.4th at 287. The Second Circuit held that—at the motion-to-dismiss stage, when all facts must be viewed in light most favorable to the plaintiff—the plaintiff, a crisis pregnancy center, had plausibly alleged that being forced to hire employees who had terminated pregnancies would severely burden its ability to express its message. *Id.* at 288. There, "the very mission of" the plaintiff organization was to dissuade pregnant women from having abortions. *Id.*

Roncalli's purpose includes teaching students to "'live the Gospel' by worshiping God in word and sacrament, sharing the Catholic faith, and serving the needy." Resp. Br. 5. At the motion-to-dismiss stage, Roncalli must point to facts alleged in Fitzgerald's complaint to show that merely employing Fitzgerald significantly affected its ability to convey its viewpoint. Roncalli doesn't try to satisfy that standard. Instead, Roncalli points (at 46) to Fitzgerald's public activity after Roncalli

announced publicly that it had put her on leave, *see* 176A ¶ 170. Even under *Slattery*, Fitzgerald's post-firing activities are irrelevant to Roncalli's ability to communicate its message while she was employed.

Second, even if this Court were to conclude that the allegations in Fitzgerald's complaint did implicate Roncalli's expressive-association rights, Fitzgerald still satisfies any level of scrutiny.

Title VII's prohibition on sex discrimination furthers "a compelling governmental interest." *West v. Radtke*, 48 F.4th 836, 848 (7th Cir. 2022). It is also viewpoint neutral, unrelated to the suppression of ideas, and "precisely [tailored] to the substantive problem which legitimately concerns the State." *See U.S. Jaycees*, 468 U.S. at 629. It "abridges no more speech or associational freedom than is necessary to accomplish [its] purpose," *id.*, of ending employment discrimination based on race, color, religion, sex, and national origin. *Cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) ("The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal.").

## B. Church autonomy does not apply.

Roncalli insists that the church-autonomy doctrine allows it to discriminate against its employees, as long as it alleges a religious reason for doing so. But that's not how the church-autonomy doctrine operates. As explained in Fitzgerald's opening brief (at 45-47), the church-autonomy doctrine prohibits courts from answering

*religious* questions. The cases Roncalli cites do not depart from that long-settled conclusion.

In *Bryce v. Episcopal Church*, for example, the court could not rule on the plaintiffs' harassment claim without wading into internal debates over church doctrine because the plaintiffs' claim rested on whether a church's internal discussion of its religious doctrine was itself unlawful harassment. 289 F.3d 648, 651-53, 658 (10th Cir. 2002). Fitzgerald does not ask the Court to examine internal religious discussions or resolve any religious disputes. The Court can decide this case by answering nonreligious questions, including whether Fitzgerald is a member of a protected class and whether she performed her job as a lay guidance counselor satisfactorily. *See Bio v. Fed. Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005).

In *NLRB v. Catholic Bishop of Chicago*, the Supreme Court explained that Congress could not have given the NLRB jurisdiction over religious schools without a clear expression of intent to do so. 440 U.S. 490, 507 (1979). That is because the invasive process of collective bargaining could touch on "nearly everything that goes on in the schools," *id.* at 503, which might give rise to "difficult and sensitive questions" of governmental entanglement with a religious institution, *id.* at 507. This case requires no such all-encompassing oversight of Roncalli's relationships with its employees. Answering whether Roncalli fired Fitzgerald for a discriminatory reason "does not amount to continuous supervision of the kind the Supreme Court sought to avoid in *Catholic Bishop.*" *EEOC v. Pac. Press Pub. Ass'n*, 676 F.2d 1272, 1282 (9th Cir. 1982).

**C. Section 702 of Title VII does not exempt Roncalli from Fitzgerald's sex-discrimination claims.**

**1.** Roncalli's interpretation of Title VII's religious exemption is wrong on the law's text, purpose, and history.

Section 703 of Title VII makes it "an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his . . . employment because of such individual's [1] race, [2] color, [3] religion, [4] sex, or [5] national origin." 42 U.S.C. § 2000e-2(a)(1). Section 702(a) provides a limited exemption: Title VII shall not apply to certain religious employers—meaning it is *not* an unlawful employment practice for those religious employers to discriminate— "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). The most logical reading is that for certain religious employers, Section 702(a) removes (3) "religion" from the list, leaving the others. For the other four, religious employers are treated just like every other employer: discrimination based on (1) race, (2) color, (4) sex, or (5) national origin is still prohibited "even though other factors," like an employee's religion, "also motivated the practice." 42 U.S.C. § 2000e-2(m).

Roncalli argues that "[i]f Congress had wanted to limit the religious exemption to only *religious discrimination claims*" it would have drafted the language differently. Resp. Br. 35. But as just explained, Section 702 and 703 are structurally alike—both limiting when an employer can discriminate based on specific protected characteristics. So Congress *did* limit the exemption to religious-discrimination claims—it just did so following the structure otherwise used in the statute.

19

Rejecting that straightforward reading, Roncalli's argument turns on Section 701's definition of religion. Roncalli argues that because subsection (j) defines religion as including "all aspects of religious observance and practice, as well as belief," 42 U.S.C. § 2000e(j), and because religious employers can discriminate against "individuals of a particular religion," none of Title VII applies if an employer can point to any "aspect[] of religious observance and practice, as well as belief" with which the employer disagrees. Resp. Br. 35.

But that argument makes sense only if the Court ignores, as Roncalli does, the second clause in subsection (j): "The term 'religion' includes all aspects of religious observance and practice, as well as belief, *unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.*" 42 U.S.C. § 2000e(j).

The second clause, beginning with "unless," clarifies and limits the first. Setting aside statutory interpretation, as a grammatical matter, the two clauses cannot be read separately. Take for example the statement "Everyone is allowed admission, unless the bouncer decides they are being unruly." It would be unreasonable to read that as saying that everyone is allowed admission. And it would be nonsensical to conclude that it had anything to do with whether the *bouncer* is allowed admission.

But that is precisely how Roncalli reads 701(j). It ignores the second clause, which changes the meaning, and then applies the first clause in a way that makes the second irrational. When the complete definition is considered, Roncalli's plug-and-play (at 35) falls apart: Title VII does not apply to a religious employer making any

20

decision based on an employee's belief, observance, or practice—but if the religious employer demonstrates that he is unable to reasonably accommodate the employee's religious practice, then Title VII *does* apply. Nonsense.

Reading the entire definition in subsection (j) makes clear that the definition explains what Section 703 means in prohibiting discrimination against an *employee* based on that "individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). An employer can discriminate against an employee based on her religion—which includes observance, practice, and belief—only if the employer can show that accommodating the employee's religion will cause "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

**2.** "The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). It "represent[s] a congressional command that each employee be free from discriminatory practices." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974).

Early versions of the legislation provided broader exemptions for religious employers. *EEOC v. Pac. Press Pub. Ass'n*, 482 F.Supp. 1291, 1303 (N.D. Cal. 1979). An initial draft of the bill stated "[t]he title will not apply . . . to religious corporations, associations, or societies." H.R. Rep. No. 88-914, at 2402 (1963). But Congress rejected that broad exemption and added the narrowing language that allows religious employers to discriminate based on an employee's religion—not her race, color, national origin, or sex.

The history of subsection (j)'s definition of religion, which Roncalli ignores, likewise confirms Fitzgerald's reading. The definition was added after federal courts and the EEOC collectively struggled to define the scope of an employer's duty to accommodate the needs of religious employees. *Trans World Airlines v. Hardison*, 432 U.S. 63, 71-73 (1977). "The intent and effect of this definition was to make it an unlawful employment practice under § 703(a)(1) for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Id.* at 74. The definition was added to ensure "that freedom from religious discrimination" protects *employees. Id.* at 75 (quoting 118 Cong. Rec. 705 (1972)). It was never about giving preference to employers.

Roncalli also insists (at 35-36) that the categorical nature of Section 702's "alien exemption" supports its argument. Not so. The alien exemption says that Title VII does not apply "to an employer with respect to the employment of aliens outside any State." 42 U.S.C. § 2000e-1(a). That means that Title VII does not apply to noncitizens working outside the U.S., even though it applies to noncitizens working within the U.S.

Roncalli argues that because the alien exemption covers all claims, so too for the religious exemption. Or put another way, if the religious exemption were limited to religious-discrimination claims, then the alien exemption would have included parallel limitations excluding race or national-origin claims. Resp. Br. 36. That argument is based on a misunderstanding that the statute's use of "alien" is a proxy for race or national origin. It's not: "Congress did not intend the term 'national origin'

22

to embrace citizenship requirements." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 89 (1973). So the alien exemption has nothing to do with any of Section 703's protected characteristics. It limits Title VII's applicability to noncitizens to discrimination that occurs within the U.S. *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 869 (7th Cir. 2011). Because the two exemptions are not parallel in what they address, the seemingly categorical nature of the alien exemption has no bearing whatever on the explicitly limited nature of the religious-employer exemption.

**3.** Roncalli's reading of the caselaw is as mistaken as its reading of the text.

Roncalli cites *Curay-Cramer v. Ursuline Academy of Wilmington* as applying the same interpretation of Section 702 that Roncalli asks this Court to adopt. But there, a fired teacher argued that the school punished her more harshly for publicly supporting abortion than it punished men who are Jewish or opposed the Iraq war. 450 F.3d 130, 139 (3d Cir. 2006). The court held that it would not apply Title VII when a plaintiff's claim required "inquiry into a religious employer's religious mission or the plausibility of its religious justification for an employment decision." *Id.* at 141.[5] Fitzgerald's claims will not require that kind of analysis—Roncalli does not deny that it fired her for marrying her wife.[6]

---

[5] The EEOC's guidance likewise is concerned with Title VII claims that would require entering the thicket of religious questions. *See* EEOC Compliance Manual § 12-I.C.1: Exceptions: Religious organizations (Jan. 15, 2021) (citing *Curay-Cramer*, 450 F.3d at 141).

[6] Among other allegations of discrimination, Fitzgerald's complaint referenced Roncalli's treatment of other staff who violated different church teachings. She has not pursued that argument. And she doesn't need to: All Fitzgerald needs to show is that she was fired for marrying her wife. *See Bio*, 424 F.3d at 596.

Roncalli also relies on *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189 (4th Cir. 2011). But the plaintiff in *Kennedy* brought a *religious*-discrimination claim against a religious hospital—the question was whether Section 702 also foreclosed harassment claims based on religion. 657 F.3d at 191. And in *Boyd v. Harding Academy of Memphis, Inc.*, the court held that a school did not discriminate when it fired the plaintiff for being "pregnant and unwed" because the school "had terminated at least four individuals, both male and female, who had engaged in extramarital sexual relationships that did not result in pregnancy." 88 F.3d 410, 414 (6th Cir. 1996). *Boyd* made clear that Title VII still applies "to a religious institution charged with sex discrimination." *Id.* at 413; *see also Slattery*, 61 F.4th at 283 (Section 702 exempts "religious employers from Title VII's prohibition against *religious* discrimination in hiring.") (emphasis added). That remains true even when religious organizations argue that their sex discrimination is motivated by religious doctrine. *See EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1365-67 (9th Cir. 1986); *Pac. Press*, 676 F.2d at 1276-77, 1280; *see also* ACLU Br. 5-6.

Finally, Roncalli misreads *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020), and argues that the majority's mention of Title VII's religious exemption means that because *Bostock* was a sex-discrimination case, the Court concluded that the religious exemption must apply in sex-discrimination cases. But the Court was listing a host of protections for religious liberty that might apply generally in employment disputes involving religious institutions. *Id.* at 1754. The Court saved those questions "for future cases." *Id.*; *see also* ACLU Br. 6-7 (collecting post-*Bostock* cases rejecting Roncalli's approach).

**4.** With no support in the text, purpose, history, or caselaw, Roncalli turns to a different statute—the Americans with Disabilities Act. Roncalli argues that because both use the same language in allowing religious employers to give "preference in employment to individuals of a particular religion," 42 U.S.C. § 12113(d)(1), both should be given the same meaning. According to Roncalli, because the ADA doesn't prohibit religious discrimination, the only way to give the term meaning is if it allows religious employers to engage in disability discrimination based on the employer's religious beliefs. Resp. Br. 36. But Section 12113(d)(1) ensures that a religious body can give preference to a coreligionist at the expense of a disabled person. H.R. Rep. No. 101-485, at 76 (1990). All things being equal, an Evangelical organization can choose to hire a nondisabled Evangelical applicant rather than a disabled Catholic applicant. That has no bearing on Title VII.

### D. RFRA does not apply.

Roncalli argues that this Court should reverse its prior holding that RFRA applies only when the government is party to a suit, *see Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015), because the "Court is not bound by its 'prior opinions' if they have been 'overruled or *undermined* by the decisions of a higher court.'" Resp. Br. 46 (quoting *Woodring v. Jackson Cnty.*, 986 F.3d 979, 993 (7th Cir. 2021)). The only case Roncalli tries to frame as undermining *Listecki* is *Bostock*, where the Supreme Court reasoned that RFRA might apply to Title VII claims in "appropriate cases." Resp. Br. 47 (quoting *Bostock*, 140 S.Ct. at 1754). Yet the Court did not hold, or even hint, that an appropriate case is anything other than when the government is a party. *See Bostock*, 140 S.Ct. at 1754.

Even if *Bostock* somehow allowed the Court to revisit *Listecki*, Fitzgerald's opening brief explained (at 44-45) that RFRA's text demands that it applies only when the government is a party. Roncalli gives no reason to reject that plain reading.

## CONCLUSION

The Court should vacate the grant of summary judgment and remand for further proceedings.

Respectfully submitted,

 /s/ *Bradley Girard*

| | |
|---|---|
| MARK W. SNIDERMAN | BRADLEY GIRARD |
| Sniderman Law | *Counsel of Record* |
| 151 N. Delaware Street, | GABRIELA HYBEL |
| Suite 1520 | Americans United for Separation of |
| Indianapolis, IN 46204 | Church and State |
| (317) 361-4700 | 1310 L Street NW, Suite 200 |
| | Washington, D.C. 20005 |
| | (202) 466-3234 |
| | *girard@au.org* |

*Counsel for Appellant*

May 11, 2023

**CERTIFICATE OF COMPLIANCE**

In accordance with Federal Rule of Appellate Procedure 32(g)(1) and Circuit Rule 32, I certify that this brief:

(i) complies with the type-volume limitation of Circuit Rule 32 because it contains 6,948 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Circuit Rule 32(b) because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 12 points or larger.

*/s/ Bradley Girard*