# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 22-2954

MICHELLE FITZGERALD,

*Plaintiff-Appellant*,

*v.*

RONCALLI HIGH SCHOOL, INC. and ROMAN
CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, INC.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 19-cv-4291 — **Richard L. Young**, *Judge*.

_____

ARGUED JUNE 2, 2023 — DECIDED JULY 13, 2023

_____

Before FLAUM, BRENNAN, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. Michelle Fitzgerald worked for Roncalli High School—a Catholic high school run by the Archdiocese of Indianapolis—for fourteen years. After providing Fitzgerald years of exceptional performance reviews, the school declined to renew her one-year employment contract because it contended her same-sex marriage was contrary to the school's religious mission. Fitzgerald sued the school and

Archdiocese for sex discrimination, and the defendants raised the ministerial exception as a defense. The district court granted summary judgment for the defendants on this ground, and Fitzgerald appealed. We affirm.

## I. Background

For fourteen years, Michelle Fitzgerald worked for the defendants as a guidance counselor and Co-Director of Guidance. She was, by all accounts, a good and effective employee and earned years of stellar performance reviews during her tenure at Roncalli. But in 2018, the defendants declined to renew her one-year employment agreement, explaining that her same-sex marriage was contrary to the Catholic faith. Shortly after Fitzgerald was placed on administrative leave, her Co-Director of Guidance, Lynn Starkey, informed Roncalli that she too was in a same-sex marriage. Like with Fitzgerald, the school decided not to renew Starkey's employment agreement.

Fitzgerald and Starkey brought separate lawsuits against the school for, among other things, sex discrimination under Title VII. The cases were assigned to the same district court judge. Starkey's case proceeded to summary judgment first, which the district court granted in favor of the defendants. We affirmed the decision in *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022).

About two months after our decision in *Starkey*, the district court granted summary judgment to the defendants in Fitzgerald's case, as well. Although the court acknowledged numerous genuine factual disputes in the record, it found that *Starkey* foreclosed Fitzgerald's case. This timely appeal followed.

## II. Analysis

There is no dispute that the defendants fired Fitzgerald because of her same-sex marriage and that Title VII prohibits this kind of sex discrimination. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1744 (2020). But the defendants contend that certain exceptions, exemptions, and protections guard their actions from statutory liability. The district court granted summary judgment on the ministerial exception. Our analysis begins and ends there.

The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. In *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 565 U.S. 171, 176–77 (2012), the Supreme Court held that this language bars employment discrimination suits "when the employer is a religious group and the employee is one of the group's ministers." This is what has long been called "the ministerial exception." *Id.* at 180. As the Court explained, "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision." *Id.* at 188. "Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Id.*

Because the ministerial exception is a defense, the burden to prove that an employee is a minister is on the defendants. *See Sterlinski v. Cath. Bishop of Chi.*, 934 F.3d 568, 571 (7th Cir. 2019). This is a multi-factored, fact-specific inquiry. *See Hosanna-Tabor*, 565 U.S. at 190 (refusing to "adopt a rigid formula for deciding when an employee qualifies as a minister"). We consider, among other things, "the formal title given [the

plaintiff] by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church." *Id.* at 192; *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020) (emphasizing that "[w]hat matters … is what an employee does"). In determining whether an employee served a religious role, we show deference to the church. *See Sterlinski*, 934 F.3d at 570–71. That said, a church cannot show entitlement to the ministerial exception simply by asserting that everyone on its payroll is a minister or by requiring that all employees sign a ministerial contract. *Id.* In such circumstances, like in other Title VII cases, the plaintiff can defeat summary judgment by producing evidence that the church's justification is pretextual. *Id.* at 571; *see also Grussgott v. Milwaukee Jewish Day Sch.*, 882 F.3d 655, 660 (7th Cir. 2018) ("This does not mean that we can never question a religious organization's designation of what constitutes religious activity, but we defer to the organization in situations like this one, where there is no sign of subterfuge.").

Just last year, we affirmed the application of the ministerial exception to Fitzgerald's Co-Director of Guidance. *Starkey*, 41 F.4th at 945. That decision goes a long way in resolving this case. As with Starkey, there is no genuine dispute that Fitzgerald played a crucial role on the Administrative Council, which was responsible for at least some of Roncalli's daily ministry, education, and operations. *Id.* at 940. And like Starkey, Fitzgerald "helped develop the criteria used to evaluate guidance counselors, which included religious components like assisting students in faith formation and attending church services." *Id.* Additionally, Fitzgerald held herself out as a minister, further supporting the district court's finding.

Considered together, these undisputed facts preclude a reasonable jury from finding that Fitzgerald was not a minister.

*Administrative Council*. Fitzgerald concedes that she sat on the Administrative Council in her capacity as the Co-Director of Guidance. Although Fitzgerald disputes the extent of the Council's involvement in the school's religious operations, she cannot deny that the Administrative Council participated in at least *some* religious planning and discussion. Council meeting notes suggested that it planned religious details of religious services. On September 27, 2016, for example, the Council discussed a morality survey, deciding to "[s]hape it to assist with [the school's] strategic planning goal of '[f]orming intentional disciples' and developing soft skills." On November 8, 2016, the Council discussed "[c]oncerns with the sung mass," noting that people were less attentive and engaged, and a "[c]oncern … over the distribution of wine" at services. And on March 6, 2018, the Council discussed holding a prayer service for victims of the Parkland shooting and "[m]usic at all school liturgies."

Just like Starkey's role on the Council, Fitzgerald's membership in this group made her one of a handful of "key, visible leader[s]" of the school. And despite Fitzgerald's attempts to undermine her contributions, there is no genuine dispute that Fitzgerald participated in some of the religious aspects of the Administrative Counsel. Fitzgerald, for example, participated in the Counsel's discussion of the Archdiocese's policy on transgender students, expressing concern "over the part of having to tell the transgendered youth's parents." And, following the Parkland shooting, Fitzgerald was the one who suggested the school provide students space and time to gather and pray for victims. Fitzgerald attempts to

characterize her contributions as logistical rather than religious, but under Supreme Court precedent, a school's explanation of ministry issues is entitled to deference. *See Our Lady*, 140 S. Ct. at 2066 (noting that "[a] religious institution's explanation of the role of such employees in the life of the religion in question is important").* For these reasons, it is undisputed that Fitzgerald was a member of and participated in a religious leadership committee at Roncalli as the Co-Director of Guidance.

*Guidance Counselor Evaluation Criteria*. Also supporting the application of the ministerial exception, Fitzgerald concedes that she helped implement the Catholic Educator Advancement Program ("CEAP") for the evaluation of guidance counselors at Roncalli. Under this program, the school evaluates guidance counselors on their embodiment of the "Spirit of Roncalli," which "seeks to identify in specific ways how the teacher/guidance counselor is living out the mission of [the] school, supporting the fulfillment of the mission of [the] school, and living out the charisms of Saint John XXIII." We found the development of these same criteria relevant in *Starkey*. 41 F.4th at 940.

Attempting to distinguish her role, Fitzgerald contends that the "religious components" of the CEAP criteria do not

---

* This deference applies to the church's characterization of certain activities as religious or secular. It does not relieve a religious institution of its obligation at summary judgment to show there is no genuine dispute regarding the relevant underlying facts—for example, that the employee was expected to or did perform those religious functions in the course of her employment. In this case, Fitzgerald fails to dispute that she, like Starkey, participated in the Council and helped perform its religious duties.

reflect guidance counselor duties and that these components were only included because Principal Weisenbach believed it would "not be fair to the teachers" for the guidance counselors not to have the same standards. But Weisenbach's statement can only reasonably be interpreted in one way: he believed it would not be fair for guidance counselors to have different standards because he believed teachers and guidance counselors shared religious job responsibilities. If he did not believe that religious criteria were relevant for guidance counselors, it is hard to imagine why Weisenbach would have thought that omission of these standards would have been unfair to teachers. *See REXA, Inc. v. Chester*, 42 F.4th 652, 665 (7th Cir. 2022) (declining to draw unreasonable inferences at summary judgment).

*2016 CEAP Self-Evaluation*. Lastly, the record supports that Fitzgerald held herself out as a minister in her 2016 CEAP self-evaluation. In it, she emphasized her participation in the school's religious services, noting: "I am working the first retreat of the year, and plan to help more with St. Vincent de Paul. I consistently attend Sunday church service, all masses at Roncalli, and morning communion services when I am able." She also emphasized the ways that she used her religious beliefs in her counseling duties, stating: "I consistently use spiritual life and resources in my counseling conversations as well as sharing my own spiritual experiences. … I am faithful, and have no problems sharing my beliefs and my love of God." She concluded: "In a faith-based school, I feel this definitely is a strength when working with young people who are seeking direction." These statements confirm that Fitzgerald was conveying religious teachings in her work.

On the other hand, Fitzgerald now contends that she exaggerated her involvement in the religious components of the school because "it was part of the rubric" and she "wanted to get a raise in pay." But this does not help her case. Even if we accept that she exaggerated on her evaluation and did not actually perform these religious duties, the fact that she mentioned these activities in her self-evaluation to get a raise supports that she understood these criteria to be important to the school. As the defendants persuasively explain, "the very fact that she would exaggerate about performing religious tasks to get a raise only underscores that it was Roncalli's expectation that she perform them."

Considering all the evidence in the record, we conclude that there is no daylight between this case and *Starkey*. Our precedent makes clear that Fitzgerald was a minister at Roncalli and that the ministerial exception bars this suit. But cases like today's—involving two plaintiffs with the same title, at the same school, performing the same duties, and bringing the same claims in our court—are rare. A fact-specific inquiry remains necessary in cases where the ministerial exception is asserted as a defense to balance the enforcement of our laws against the protections of our Constitution. *See Hosanna-Tabor*, 565 U.S. at 190.

### III. Conclusion

For the foregoing reasons, the district court properly granted the defendants summary judgment on the ministerial exception. We therefore do not address the defendants' alternate arguments for affirmance.

Affirmed

No. 22-2954 9

BRENNAN, *Circuit Judge*, concurring. I join the majority opinion in full, as I agree this case can be resolved on constitutional grounds. I write separately to highlight that, as noted by our colleague in *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 945 (7th Cir. 2022) (Easterbrook, J., concurring), the Title VII claims may also be resolved by 42 U.S.C. § 2000e–1(a), the religious employer exemption, which takes priority to avoid constitutional questions. *N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 582–83 (1979); *Ind. Right to Life Victory Fund v. Morales*, 66 F.4th 625, 632 (7th Cir. 2023). Some district courts in our circuit have applied an atextual reading of that statutory exemption, so I offer some thoughts to correct course.

**A. Textual Reading**

Section 702(a) of Title VII provides the religious employer exemption, which reads:

> This subchapter shall not apply … to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e–1(a). "'This subchapter' refers to Title 42, Chapter 21, Subchapter VI, which comprises all of Title VII." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). So when the exemption applies, "all of Title VII drops out," including the provisions prohibiting discrimination on non-religious bases and providing for mixed-motive liability. *Id.*; *see generally* 42 U.S.C. § 2000e–2(a), (m).

_not used_

Roncalli and the Archdiocese are religious employers eligible for the exemption; the parties do not contest this point. The debate as to whether the exemption applies is with the qualifying clause: "with respect to the employment of individuals of a particular religion." § 2000e–1(a). Under Title VII, "religion" is a defined term that "includes all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). But who decides the requisite religious belief, observance, or practice? And what must courts do when a covered employer supplies a religious reason for an adverse employment decision that implicates a protected class other than religion? These questions reveal the fault lines when considering the statutory text, caselaw, and the parties' arguments.

Fitzgerald posits that the "religion" referenced in the exemption is the individual's religion. But were that the focus, the exemption would read differently, as the "individual's religion." Instead, the exemption states, "individuals *of* a particular religion." § 2000e–1(a) (emphasis added). "Of" in ordinary usage has both a possessive and a descriptive meaning, and to choose between the two, context is instructive. *Of*, GARNER'S MODERN ENGLISH (4th ed. 2016).

The term "particular" in the phrase "individuals of a particular religion" already hints at a religious employer's selectivity in employment. Considered as a whole, the exemption's text applies only to a religious employer and only "with respect to the employment of individuals … to perform work connected with the carrying on by such [religious employer] of its activities." § 2000e–1(a). This context shows that the § 702(a) exemption is concerned with "alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions."

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987). The focus is on a religious employer's ability to perform its religious activities. This conclusion is reinforced by prior, narrower enactments of the exemption, which read "to perform work connected with the carrying on by such [religious employer] of its *religious* activities." 42 U.S.C. § 2000e-1(a) (1970) (amended 1972) (emphasis added); 42 U.S.C. § 2000e-1(a) (1964). All arrows point one way: "Of" is descriptive, and "individuals of a particular religion" means individuals whose beliefs, observances, or practices align with the employer's religious expectations. *See Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring) ("A religious school is entitled to limit its staff to people who will be role models by living the life prescribed by the faith, which is part of 'religion' as § 2000e(j) defines that word.").

### B. Other Circuits

When an employer provides a religious reason for an adverse employment decision that implicates a protected class other than religion, the circuits apply this exemption in various ways. At one end of the spectrum, the Ninth Circuit has held that the exemption applies only to religious discrimination and has suggested it does not apply where the adverse employment decision implicates another protected class, even when the employer provides a religious reason. *See EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1364–66 (9th Cir. 1986); *EEOC v. Pac. Press Pub. Ass'n*, 676 F.2d 1272, 1274–77 (9th Cir. 1982).[1] Consonant with this view, some district courts in our

---

[1] The Second Circuit has not grappled with this issue, but it has held that the exemption applies only to religious discrimination claims. *Fratello*

circuit sidestep employers' religious justifications and find that so long as the plaintiff alleges discrimination based on a non-religious protected class, the exemption does not apply. *See, e.g., Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1201–05 (S.D. Ind. 2020); *Garrick v. Moody Bible Inst.*, 494 F. Supp. 3d 570, 576 (N.D. Ill. 2020); *Herx v. Diocese of Ft. Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168, 1175–76 (N.D. Ind. 2014).

Three circuits have tempered this approach by accounting for a covered employer's religious rationale for an adverse employment decision, subject to a pretext inquiry. For example, the Sixth Circuit has allowed religious employers to avoid Title VII liability for allegedly discriminating against other protected classes where the employment decision was grounded in a non-pretextual religious policy. *See Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 658–59, 666–68 (6th Cir. 2000); *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413–15 (6th Cir. 1996). On a similar tack, the Fourth and Fifth Circuits have held that once a religious employer "presents convincing evidence that the challenged employment practice resulted from discrimination on the basis of religion," § 702(a) forecloses further inquiry into "whether the religious discrimination was a pretext for some other form of discrimination." *EEOC v. Miss. Coll.*, 626 F.2d 477, 485–86 (5th Cir. 1980); *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985); *see also Fremont Christian*, 781 at 1366. These circuits have recognized that non-pretextual religious grounds for an employment decision can exempt the employer from Title VII, even when a religious employer also

---

*v. Archdiocese of N.Y.*, 863 F.3d 190, 200 n.21 (2d Cir. 2017); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 173 (2d Cir. 1993).

allegedly discriminates on a basis other than religion. Paradoxically, these same circuits have also held—contrary to the text—that the exemption applies to religious discrimination only. *Cline*, 206 F.3d at 658; *Boyd*, 88 F.3d at 413; *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011); *Rayburn*, 772 F.2d at 1166; *Mississippi College*, 626 F.2d at 484 (citing *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972)).

Similarly, the Third Circuit has held that an employer's religious reason triggers the exemption, while reserving the possibility that a religious justification could be pretext where "a plaintiff avers that truly comparable employees were treated differently following substantially similar conduct." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 141 (3d Cir. 2006); *see Little v. Wuerl*, 929 F.2d 944, 949–51 (3d Cir. 1991). But unlike other circuits, the Third Circuit has explicitly acknowledged that the exemption can bar Title VII claims alleging discrimination on bases other than religion, such as sex. *Curay-Cramer*, 450 F.3d at 141–42.

### C. The Exemption in Practice

The textual reading of § 702(a) is not far from that of the Third, Fourth, Fifth, and Sixth Circuits. Like Judge Easterbrook, I see no principled way to limit the all-encompassing scope of "This subchapter" when the religious employer exemption applies. *See Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). So, when a covered employer demonstrates that an adverse employment decision was made because the relevant individual's beliefs, observances, or practices did not conform with the employer's religious expectations, the exemption would apply and bar a Title VII claim on that employment decision. But as in our sister circuits, a pretext

inquiry—akin to step three of the *McDonnell Douglas Corp. v. Green* framework—should apply to the employer's proffered religious rationale. 411 U.S. 792, 804 (1973); *cf. Cline*, 206 F.3d at 658–59, 666–68; *Boyd*, 88 F.3d at 413–15; *Rayburn*, 772 F.2d at 1166; *Mississippi College*, 626 F.2d at 485–86. As under the indirect method of proof, the plaintiff would bear the burden of showing that the religious reason is pretext for discrimination on a basis other than religion. *See generally Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021).

Such a pretext inquiry would mitigate concerns raised by Fitzgerald and amici that religious employers would have license to violate Title VII should they manufacture a religious reason for an adverse employment decision. As always, the pretext question would not be "whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). But an employee could rebut honest belief by "weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's proffered reason such that a reasonable person could find it unworthy of credence. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) (citation omitted). If there is a genuine issue of material fact as to pretext, it would go to trial. If not, the exemption would bar a plaintiff's Title VII claims.

Fitzgerald contends that Roncalli's assignment of ministerial labels and duties to her were pretextual. But the parties do not dispute that Roncalli and the Archdiocese had a non-pretextual religious policy against employees entering into same-sex marriages and that Fitzgerald was terminated

because she did so. As such, Fitzgerald's Title VII claims would be barred by the religious employer exemption.

Here, the § 702(a) exemption overlaps with the protections of the ministerial exception. But, no doubt, our circuit and its district courts will have occasion to address the statutory exemption in another case where a non-minister plaintiff asserts Title VII claims against a religious employer.